| | |
|---|---|
| **DCB NASHVILLE, LLC,**<br>a Delaware limited liability company,<br><br>  Plaintiff,<br><br>v.<br><br>**THE METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY**,<br><br>  Defendant. | Case No. _____<br>Judge _____<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES UNDER 42 U.S.C. § 1983**<br><br>**JURY DEMAND** |

## COMPLAINT

Plaintiff DCB Nashville, LLC ("DC BLOX" or "Plaintiff"), by and through undersigned counsel, brings this action against Defendant The Metropolitan Government of Nashville and Davidson County ("Metro" or "Defendant") and alleges as follows:

## STATEMENT OF THE CASE

As part of Metro's relentless efforts to prohibit DC BLOX's lawful and vested use of its property as a data center, the Metropolitan Council of Nashville and Davidson County (the "Council") adopted Ordinance No. BL2026-1448 (the "Data Center Moratorium"), which imposes a blanket prohibition on the acceptance, processing, approval, and issuance of zoning, building, or grading permits and related administrative appeals for data center developments within the jurisdictional boundaries of Metro Nashville. The Data Center Moratorium was signed into law by the Mayor on July 24, 2026. Exhibit A.

Metro has now refused to process a data-center project that Metro's own Zoning Administrator determined was lawful under the zoning in effect when DC BLOX applied and was vested before Metro enacted later restrictions. Tennessee law protects DC BLOX through

two independent routes: first, the statutory protection afforded an existing or recently ceased lawful industrial, commercial, or business use under Tenn. Code Ann. § 13-7-208; and second, the vested property right established by submission of substantially compliant building-permit applications under Tenn. Code Ann. § 13-4-310, reinforced by Tenn. Code Ann. § 29-43-101's rejection of the pending-ordinance doctrine.

For years before the challenged zoning changes, Asurion—the previous tenant on the property—lawfully used the Property as an office and data-center facility. That use was known to Metro and reflected in Metro-issued permits expressly referring to data-center operations. Asurion had maintained that use and still has equipment on the Property, which would clearly qualify as a legal use under Tenn. Code Ann. § 13-7-208(g) that could continue even in the event of zoning changes. DC BLOX acquired the Property for the continued data-center use and, before Metro enacted the challenged legislation, submitted building permit applications for that use.

Metro's Zoning Administrator first classified the proposed project as a permitted General Office use and later, after reviewing the floor plans, as Warehouse with incidental General Offices, also permitted as of right in the IWD district. The Zoning Administrator further determined in writing that DC BLOX's May 29, 2026, building-permit applications had vested under Tenn. Code Ann. § 13-4-310.

Metro nevertheless enacted Ordinance No. BL2026-1448 and has applied it to stop processing DC BLOX's permits. Metro Legal advised the Planning Commission that the Data Center Moratorium would apply even to vested data-center projects, while also acknowledging that a vested project retains the right to build under the law in effect when it vested. Metro then adopted new data-center zoning standards in Ordinance No. BL2026-1391, effective July 31,

2026, which cannot lawfully displace DC BLOX's protected preexisting use or its independently vested permit rights.

The Data Center Moratorium was also materially expanded on third reading to reach "administrative appeals" and to extend the outside termination date to December 1, 2026, without re-referral of the materially amended ordinance to the Metropolitan Planning Commission. Metro has applied that language to delay Board of Zoning Appeals proceedings concerning this Property.

The Data Center Moratorium, moreover, is a targeted attack against DC BLOX, in violation of federal constitutional protections. Despite the prohibitive language against all data centers, Council specifically and intentionally targeted Plaintiff's vested project and used "every tool" and "every avenue" it could to deny or delay the project. Such conduct clearly violates Plaintiff's rights secured by the Fifth and Fourteenth Amendments to the United States Constitution, including Plaintiff's procedural and substantive due process rights, its right to just compensation for a regulatory taking of its property, and its right to equal protection of the laws.

The Data Center Moratorium is prohibiting DC BLOX from obtaining approval of its permits. Plaintiff is now faced with unreasonable and illegal delay endangering its commitments to its customers. Therefore, Plaintiff seeks declaratory and injunctive relief, compensatory damages, attorney fees under 42 U.S.C. § 1988, and such other relief as this Court deems just and proper.

**JURISDICTION AND VENUE**

1. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983 and the Fifth and Fourteenth Amendments to the United States Constitution.

2. This Court also has jurisdiction under 28 U.S.C. § 1343(a)(3) and (4) because DC BLOX seeks to redress deprivations, under color of state law, of rights secured by the Constitution of the United States.

3. This Court has authority to grant declaratory relief under 28 U.S.C. §§ 2201 and 2202.

4. This Court has supplemental jurisdiction over DC BLOX's Tennessee-law claims under 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy and arise from the same nucleus of operative fact as the federal claims.

5. This Court also has authority to grant equitable relief under its traditional equitable powers and applicable federal law.

6. Venue is proper in this District under 28 U.S.C. § 1391(b) because the acts and omissions giving rise to the claims occurred in the Middle District of Tennessee, the Property is in this District, and Metro resides in this District for venue purposes.

**PARTIES**

7. Plaintiff DCB Nashville, LLC is a Delaware limited liability company and the current owner of the real property located at 648 and 650 Grassmere Park Drive, Nashville, Tennessee 37211 (the "Property"). DC BLOX is engaged in the business of developing and operating data-center and digital-infrastructure facilities.

8. DCB Nashville, LLC is a subsidiary of DC BLOX PARENT LLC.

9. DCB Nashville, LLC purchased the property at 648 Grassmere Park on July 16, 2026.

10. The property was transferred by deed from MARKETSTREET GRASSMERE, LLC, to DCB Nashville, LLC, of record in Instrument number 20260720-0065582, in the Register's Office of Davidson County, Tennessee.

11. On July 17, 2026, Burr Computer Environments, Inc., on behalf of DCB Nashville, LLC, submitted a complete building permit application to the Metropolitan Government of Nashville and Davidson County, Tennessee.

12. Defendant The Metropolitan Government of Nashville and Davidson County, Tennessee is a consolidated metropolitan government and municipal corporation organized under Tennessee law. The Metropolitan Council is Metro's legislative body. Metro, its departments, and its officials acted under color of state law at all times relevant to this action.

## FACTUAL ALLEGATIONS

### A. **The Property and the Preexisting Data-Center Use**

13. The Property consists of approximately 23.49 acres at 648 and 650 Grassmere Park Drive in Nashville (Parcel Number 13300013500).

14. The subject property is and was zoned IWD (Industrial Warehousing/Distribution) at all times material before the 2026 data-center zoning changes.

15. The current land use policy for the property is DEC - District Employment Center. Metro's District Employment Center supports IWD zoning and industrial warehouse uses as well as light and medium manufacturing, industrial warehouse, and distributive businesses and wholesale use.

16. The Property is adjacent to the Nashville Zoo and is a part of the Radnor-Seaboard-Sidco-Harding Place industrial corridor that includes over 1,400 acres of properties zoned IWD or IR (Industrial Restricted). The uses included in this area are industrial, office, warehouse, transportation, and institutional uses, including a railroad switchyard, locomotive and railcar maintenance involving screeching, impacts, diesel locomotives and 24-hour-type freight operations in essentially the same acoustic environment. Other uses in the area include a polymer

materials manufacturer, a steel fabrication business that includes industrial cutting and bending of reenforced steel, industrial food-processing and manufacturing operation, a large rail-served transloading and heavy freight logistics operator.

17. For years before the events giving rise to this action, Asurion operated office and data-center functions on the Property. Metro approved that use through Metro-issued permits that expressly referenced data-center operations.

18. The preexisting Asurion facility used the Property for the same essential category of data-center activity that DC BLOX intends to continue and expand: housing and operating computer/data-processing systems and associated equipment, together with supporting electrical, cooling, network, backup-power, and office functions.

19. Asurion had maintained its use and still has equipment on the Property.

20. That continued use qualifies for protection under Tennessee's non-conforming use statute. Additionally, the protected data-center use was never intentionally or voluntarily abandoned. The Property was contracted for, acquired, designed, and permitted for continued data-center use before Metro changed the zoning regulations.

21. While Asurion operated the office/data center, MARKETSTREET GRASSMERE, LLC owned the property and leased it to Asurion.

22. The approximately 23.49-acre Property contains a reasonable amount of space for continuation, reconstruction, and expansion of the protected data-center activity without creating a nuisance to adjoining landowners.

### B. DC BLOX's Acquisition and Reliance

23. DC BLOX began searching for a suitable Nashville data-center location in approximately January 2022. The Property was first presented as a potential site in April 2024,

and DC BLOX focused on the Grassmere location by May 2025 after evaluating other potential sites.

24. The Property was particularly suitable because it was zoned IWD, had existing data-center operations, had significant fiber-optic network connectivity, and had access to the electrical capacity required for DC BLOX's proposed development.

25. During acquisition discussions, the seller informed DC BLOX that the Nashville Zoo had expressed interest in purchasing the Property or a portion of it. Between approximately June and September 2025, DC BLOX proposed to MARKETSTREET GRASSMERE, LLC potential subdivisions under which DC BLOX would acquire the portion required for its data center while the Zoo could acquire the balance.

26. Those proposals did not result in a final transaction between the seller and the Zoo.

27. On or about November 7, 2025, DC BLOX PARENT, LLC entered into a Purchase and Sale Agreement with MarketStreet Grassmere LLC to acquire the Property for approximately $23,000,000. The agreement was conditioned upon or otherwise premised on DC BLOX's intended use of the Property for data-center development.

28. Before closing, DC BLOX invested substantial sums in due diligence, engineering, architectural design, utility coordination, environmental and geotechnical work, legal work, and other predevelopment expenditures in reliance on the Property's lawful data-center use and IWD zoning.

29. On or about February 2, 2026, DC BLOX initiated communications with the Mayor's Office and other Metro officials regarding the planned data-center development, including the Property address and the contemplated first and second phases of the project.

30. On or about March 31, 2026, DC BLOX met with Metro's Department of Economic and Community Development regarding the project.

31. DCB Nashville, LLC closed on the purchase of the Property on July 16, 2026, for approximately $23,000,000.

## C. Metro Determines the Use Is Permitted and DC BLOX Submits Its Permit Applications

32. Before BL2026-1391 became effective, the Metropolitan Zoning Code did not define "data center" as a distinct land-use classification. Metro administratively classified data centers under existing use categories, including General Office and Warehouse.

33. On or about May 11, 2026, as permitted by the Purchase and Sale Agreement between DC BLOX and MARKET STREET GRASSMERE, LLC, DC BLOX submitted grading-permit applications for the proposed development.

34. On or about March 18, 2026, Metro Zoning Administrator Joey Hargis issued a use determination classifying DC BLOX's proposed data center as a "General Office" use, which was permitted as of right in the IWD zoning district

35. On May 29, 2026, DC BLOX submitted building-permit applications for the proposed data-center facility.

36. The May 29 building-permit applications substantially complied with the requirements of Metro's development ordinances and regulations within the meaning of Tenn. Code Ann. § 13-4-310(b)(2).

37. No preliminary development plan was required as a prerequisite to the building permits for the proposed development.

38. Following DC BLOX's acquisition of the Property, an additional building permit application was submitted in the new owner's name.

39. On July 21, 2026, after reviewing DC BLOX's building permit application and floor plans, Zoning Administrator Hargis amended the use classification to "Warehouse with incidental General Offices," another use permitted as of right in the IWD zoning district under the law governing the May 29 applications.

40. On July 28, 2026, Zoning Administrator Hargis issued a written determination to the Board of Zoning Appeals confirming that DC BLOX's building-permit applications had vested under Tenn. Code Ann. § 13-4-310(b)(1)(C) and were to be reviewed under the rules, regulations, and zoning applicable to the applications.

41. At all times when DC BLOX submitted the relevant applications, the use determined by Metro to describe the proposed development as General Office or Warehouse with incidental General Offices, was permitted as of right on the IWD-zoned Property.

42. Upon information and belief, all previous Zoning Administrators who have addressed this use have likewise interpreted the undefined use of Data-Center as General Office and/or Warehouse.

### D. Metro Introduces New Data-Center Zoning After DC BLOX Applies

43. On May 26, 2026, after DC BLOX submitted grading applications and shortly before the May 29 building applications, BL2026-1391 and BL2026-1392 were filed. BL2026-1391 proposed for the first time to create separate data-center use classifications and new zoning restrictions and conditions for data-center facilities.

44. BL2026-1391 ultimately created five separate data-center categories based on size and electrical capacity, assigned those uses to specified zoning districts, and imposed new conditions and application requirements. The ordinance was passed on July 21, 2026, approved by the Mayor on July 24, 2026, and became effective July 31, 2026.

45. Among other things, BL2026-1391 changed the treatment of data-centers in IWD and imposed requirements that did not exist when Asurion operated a data-center on the property, when DC BLOX submitted its May 29 building permit application, or when DC BLOX filed its July 21 building permit application.

46. Those later-enacted requirements cannot lawfully extinguish the preexisting data-center use protected by Tenn. Code Ann. § 13-7-208 or the vested rights created by Tenn. Code Ann. § 13-4-310 and Tenn. Code Ann. § 29-43-101.

**E. The Data Center Moratorium and Metro's Express Decision to Apply It to Vested Projects**

47. On June 8, 2026, after DC BLOX had submitted its May 29, 2026, building permit applications, Ordinance No. BL2026-1448 was filed to impose a temporary moratorium on the acceptance, processing, approval, and issuance of specified permits for data-center developments.

48. The Data Center Moratorium recited concerns about electrical demand, backup generators, fuel storage, cooling systems, noise, vibration, twenty-four-hour operations, and proximity to residential neighborhoods, parks, schools, greenways, zoological institutions, and other uses.

49. The reference to zoological institutions evidences Metro's intent that the Data Center Moratorium apply to DC BLOX's Property, which is adjacent to the Nashville Zoo. The Data Center Moratorium was introduced amid intense public opposition to DC BLOX's proposed project due to misleading statements made by Nashville Zoo representatives and officials.

50. The Planning Commission considered a substitute version of BL2026-1448 on June 25, 2026. That substitute imposed a moratorium on specified permits until November 1, 2026, or the effective date of BL2026-1391 and BL2026-1392, whichever occurred first.

51. The Planning Commission staff report separately recorded "Comments from Metro Legal" addressing vested projects. Metro Legal advised that permits for data-center uses should not be accepted, processed, reviewed, approved, or issued while the Data Center Moratorium was in effect.

51. Most significantly, Metro Legal advised that the Data Center Moratorium would apply to all data-center projects "even if the project is vested," while simultaneously acknowledging that a project with established vested rights would retain the right to build under the law in effect when it vested and would not be subject to subsequent changes in law.

52. The Data Center Moratorium therefore does not operate merely as a neutral pause while Metro determines what future standards will govern DC BLOX. By Metro's own admission, later standards cannot govern DC BLOX's vested project. As applied to DC BLOX, the Data Center Moratorium instead solely delays the processing and exercise of rights that Metro itself acknowledges survive the later zoning changes. In other words, the only effect of this Data Center Moratorium on DC BLOX is to delay its vested project.

53. During the Planning Commission hearing on the Data Center Moratorium bill, the commissioners discussed whether the length of the moratorium was appropriate.

54. On July 21, 2026, during third reading and after the Council received the recommendation from the Planning Commission, the Council adopted Amendment No. 1 to BL2026-1448. The amendment materially changed Section 1 by adding "administrative appeals" to the matters subject to the Data Center Moratorium and changing the termination provision from November 1, 2026, or the effective date of BL2026-1391 and BL2026-1392, whichever came first, to an outside date of December 1, 2026.

55. The materially amended ordinance was not re-referred to the Metropolitan Planning Commission for review and recommendation after the addition of administrative appeals and the change to the duration/termination structure.

56. BL2026-1448 passed on third reading as amended on July 21, 2026, and was approved by the Mayor on July 24, 2026. By its terms, it became effective upon publication.

57. Metro has applied the Data Center Moratorium to DC BLOX by placing the relevant permits on "HOLD" and refusing to process, review, approve, or issue the development approvals necessary for the project.

58. The delay is ongoing and materially affects DC BLOX's contractual obligations to its customer, development schedule, financing and carrying costs, construction sequencing, utility coordination, and competitive position.

**F. Metro's Application of the Data Center Moratorium to Administrative Appeals**

59. Tennessee law establishes and defines the authority of municipal boards of zoning appeals, including appellate jurisdiction over administrative zoning decisions. Tenn. Code Ann. §§ 13-7-206 and 13-7-207.

60. Before final passage of BL2026-1448, appeals concerning the Zoning Administrator's determinations for the Property were filed with the Metropolitan Board of Zoning Appeals ("BZA"), including an appeal by Councilmember Courtney Johnston and an appeal by the Nashville Zoo at Grassmere.

61. The final Data Center Moratorium does not expressly amend the administrative appeal rights granted to property owners in Tenn. Code Ann. § 13-7-206 and 13-7-208. Instead, Amendment No. 1 purports to impose a moratorium upon the "acceptance, processing, approval,

and issuance of zoning, building, or grading permits or administrative appeals by" the Department of Codes Administration and Metropolitan Water Services.

62. This effort to subrogate the authority of the State of Tennessee by preventing DC BLOX from appealing the decision of the Metro Zoning Administrator to process or issue the pending permits referenced above violates Tennessee law and is an effort by Metro to undermine the protections granted to property owners through the Tennessee Vested Property Rights Act.

63. Metro has also interpreted or implemented that language to delay or stay the BZA proceedings concerning DC BLOX until after the Data Center Moratorium. Zoning Administrator Joey Hargis has deferred the pending appeals by Councilmember Johnston and the Zoo until after the expiration of the Data Center Moratorium, leaving a cloud on the property and obstructing financial and contractual obligations of DC BLOX.

64. To the extent Metro interprets BL2026-1448 to suspend, eliminate, or materially restrict the BZA's jurisdiction conferred by Tenn. Code Ann. §§ 13-7-206 and 13-7-207, the ordinance exceeds Metro's authority and violates state law.

### G. Targeted Government Action Directed at DC BLOX

65. The Data Center Moratorium was enacted against the backdrop of public and governmental efforts directed specifically at stopping DC BLOX's Grassmere project.

66. Councilmember Courtney Johnston, the principal sponsor of BL2026-1448 and an appellant challenging the Zoning Administrator's decision, publicly stated that she was "doing everything I can, legislatively and otherwise, to prevent this project from coming to fruition" next to the Nashville Zoo.

67. Mayor Freddie O'Connell publicly opposed the Grassmere project and issued Executive Order No. 59 relating to data-center development and an expedited temporary moratorium.

68. On June 12, 2026 during a phone call to attorney Dan Weede representing DC BLOX, then-Director of Law Wally Dietz stated that Metro would do whatever it could to ensure that the DC BLOX Project was not developed.

69. On August 4, 2026, the Metropolitan Council passed BL2026-1489, as amended, authorizing Metro to acquire by negotiation or condemnation the fee interest in the approximately 23.49-acre parcel at 648 Grassmere Park for "office, warehouse, training and other uses" by Metro departments.

70. DC BLOX does not rely in this action on the mere existence of a legitimate land-use debate as proof of a constitutional violation. Rather, these actions are relevant to the purpose, character, and application of the official policies challenged here, including Metro's decision to halt a project that already obtained statutory protection and a written vesting determination.

### H. Disparate Treatment

71. Other data-center facilities have operated within Metro Nashville under warehouse, office, or similar classifications and have not been subjected to the same combination of permit holds, project-specific condemnation authorization, and other extraordinary measures imposed on DC BLOX.

72. Upon information and belief, RadiusDC operates or is developing a data-center facility at 2902 Brick Church Pike in Nashville and received permit processing activity and/or trade permit approvals after the Mayor approved BL2026-1448, while DC BLOX's permits were placed on hold.

73. Like DC BLOX's property on Grassmere Park, RadiusDC's property at 2902 Brick Church Pike is zoned IWD. It too has a pending building application that was submitted prior to the change to the Metro Zoning Code on July 24, 2026, that prevents data-center on its property.

74. Metro also has not imposed comparable moratoria on other industrial or commercial facilities based solely on characteristics such as electrical demand, backup generation, fuel storage, mechanical equipment, noise, vibration, or twenty-four-hour operation.

75. DC BLOX's relevant permits remain on hold while Metro has continues permitting activity for at least some other data-center or comparable projects.

## CAUSES OF ACTION

## COUNT I

### Substantive Due Process

(42 U.S.C. § 1983; Fourteenth Amendment)

76. DC BLOX incorporates paragraphs 1 through 75 as if fully set forth herein.

77. DC BLOX possesses protected property interests in its ownership and lawful use of the Property, its preexisting use rights under Tenn. Code Ann. § 13-7-208, and its vested permit rights under Tenn. Code Ann. § 13-4-310 and applicable Tennessee law.

78. Metro's application of BL2026-1448 to DC BLOX is arbitrary and irrational as applied to those protected interests. Metro has determined that DC BLOX's use was permitted under the governing IWD zoning, determined that the July 17, 2026 application vested, and acknowledged that subsequent data-center zoning changes cannot govern a project that vested before the Data Center Moratorium.

79. The stated planning purpose for a temporary moratorium, allowing time to develop future standards, does not rationally justify withholding the processing of an already vested project where Metro acknowledges those future standards cannot apply to that project.

80. The as-applied deprivation is reinforced by the sequence and character of Metro's actions directed at this particular project, including the post-application Data Center Moratorium, the express policy of applying it even to vested projects, the project specific public statements, the administrative hold, the denial of an appeal to the BZA, and the condemnation authorization.

81. Metro acted through official municipal policy. The Metropolitan Council enacted BL2026-1448, and Metro departments have implemented the ordinance by placing DC BLOX's permits on hold and refusing to process them.

82. Metro's challenged conduct is arbitrary, capricious, and without a rational relationship to a legitimate governmental objective as applied to DC BLOX's already protected and vested project, and under the alleged circumstances constitutes an egregious abuse of governmental power.

83. As a direct and proximate result, DC BLOX has suffered and continues to suffer carrying costs, delay, threatened customer and contractual losses, competitive injury, impairment of development rights, and other damages in an amount to be proven.

## COUNT II

### Equal Protection - Class of One

#### (42 U.S.C. § 1983; Fourteenth Amendment)

84. DC BLOX incorporates paragraphs 1 through 83 as if fully set forth herein.

85. The Equal Protection Clause prohibits intentional differential treatment of similarly situated persons or entities without a rational basis.

86. Metro intentionally subjected DC BLOX to materially different permitting treatment than one or more similarly situated industrial developers, data-center developers and operators, including RadiusDC, while lacking a rational basis for the difference.

87. The relevant comparator analysis includes the projects' zoning, use, scale, permitting posture, vesting status, permit type, and the timing and nature of Metro's post-Data Center Moratorium permit processing. DC BLOX will establish that the identified comparator or comparators are similarly situated in all relevant respects to the specific governmental treatment challenged.

88. Metro continued to process and/or approve material permit activity for RadiusDC after BL2026-1448 while holding DC BLOX's permit applications and refusing comparable processing.

89. No rational distinction justifies permitting one similarly situated data-center project to continue through the permitting system while refusing to process DC BLOX's project, particularly where DC BLOX had an express vesting determination and independently asserts a protected prior use.

90. Metro's differential treatment was intentional and was carried out pursuant to official policy and official decisions attributable to Metro.

91. As a direct and proximate result, DC BLOX has suffered and continues to suffer delay, carrying costs, competitive disadvantage, threatened loss of customer commitments, inability to meet contractual obligations, and other damages.

## COUNT III

### Procedural Due Process - As-Applied Administrative Deprivation

(42 U.S.C. § 1983; Fourteenth Amendment)

92. DC BLOX incorporates paragraphs 1 through 91 as if fully set forth herein.

93. This Count does not depend on an asserted federal constitutional right to notice or a hearing before the Metropolitan Council enacted generally applicable legislation. It challenges the improper amendment on final reading, targeting the DC BLOX project, and Metro's administrative implementation of official policy against an already submitted project that Metro's Zoning Administrator determined to be vested, together with DC BLOX's asserted preexisting protected use.

94. DC BLOX possessed protected property interests before Metro placed the applications on hold, including its statutory preexisting-use rights and vested permit rights described above.

95. After the Zoning Administrator determined that DC BLOX's applications were vested, Metro implemented BL2026-1448 by refusing to process, review, approve, or issue the permits and by delaying the administrative-appeal mechanism through which the underlying zoning determinations were to be adjudicated.

96. Because the deprivation results from the terms and implementation of official Metro policy itself, DC BLOX had no meaningful pre-deprivation administrative mechanism through which it could obtain processing of its vested applications while the Data Center Moratorium was being enforced against them.

97. Metro continues to refuse to process and issue permits related to DC BLOX's project. Recent requests to have grading and demolition permits issued were refused despite the approval of all reviewing agencies within Metro.

98. Metro thereby continues to deprive DC BLOX of protected property interests without constitutionally adequate process, causing the damages and irreparable injury alleged above.

## COUNT IV

### Regulatory Taking Without Just Compensation

(42 U.S.C. § 1983; Fifth and Fourteenth Amendments)

99. DC BLOX incorporates paragraphs 1 through 98 as if fully set forth herein.

100. The Takings Clause of the Fifth Amendment, applicable to Metro through the Fourteenth Amendment, prohibits the taking of private property for public use without just compensation.

101. Metro's temporary restriction as applied to DC BLOX must be evaluated under the factors identified in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978), including economic impact, interference with reasonable investment-backed expectations, and the character of the governmental action.

    A. **Economic impact**: DC BLOX purchased the Property for approximately $23,000,000 specifically for data-center development and is incurring measurable carrying costs and delay-related losses while Metro refuses to process its permits.

    B. **Investment-backed expectations**: DC BLOX contracted for and acquired the Property for data-center use after Metro had long permitted data-center operations on the property, after Metro's Zoning Administrator determined the proposed use

was permitted as of right, and after DC BLOX submitted applications that Metro's Zoning Administrator determined had vested.

C. **Character of the governmental action**: although BL2026-1448 is temporary and presently extends to December 1, 2026, Metro has applied it to suspend the exercise and processing of rights that Metro's Zoning Administrator determined had vested before enactment and has done so amid a coordinated course of project-specific governmental action.

102. Metro has not paid or offered just compensation for any taking resulting from the as-applied Data Center Moratorium.

103. If the Court enjoins the Data Center Moratorium and permits DC BLOX to proceed, DC BLOX is entitled to just compensation for the period that its project was obstructed. Alternatively, if the Court determines that Metro may lawfully enforce the Data Center Moratorium against DC BLOX notwithstanding the state-law and due-process claims above, DC BLOX is entitled to just compensation for any compensable regulatory taking proven under *Penn Central*.

**COUNT V**

**Declaratory Judgment - Protected Preexisting Data-Center Use**

(Tenn. Code Ann. § 13-7-208(b)-(g), (l)(3); 28 U.S.C. §§ 2201-2202)

104. DC BLOX incorporates paragraphs 1 through 103 as if fully set forth herein.

105. Tenn. Code Ann. § 13-7-208 protects industrial, commercial, and business establishments lawfully operating before a zoning change and, subject to the statutory conditions, permits continuation, expansion, and reconstruction of those activities after the zoning change.

106. Tenn. Code. Ann. § 13-7-208(g), as made applicable to industrial, commercial, and business establishments in metropolitan municipalities by § 13-7-208(l)(3), provides that the protections of subsections (b)-(d) do not cease merely upon a temporary interruption of operations; the statute uses a thirty-continuous-month cessation period and further provides that the restrictions in subsection (g) apply only where the property owner intentionally and voluntarily abandons the nonconforming use, with the government bearing the burden of proving an overt act of abandonment.

107. The Property was lawfully used for office and data-center operations before BL2026-1391 became effective. Metro had permitted and recognized that data-center use. Asurion had maintained that use and still has equipment on the Property. DC BLOX further alleges that there was no intentional and voluntary abandonment.

108. DC BLOX acquired and developed the Property to continue and expand the same essential data-center activities previously conducted there.

109. BL2026-1391 and BL2026-1448 cannot lawfully extinguish the Property's protected preexisting use or prevent continuation, expansion, and reconstruction to the extent authorized by Tenn. Code Ann. § 13-7-208.

110. An actual controversy exists because Metro has placed DC BLOX's permits on hold and is refusing to process the project notwithstanding DC BLOX's claim of protected preexisting-use rights.

111. DC BLOX is entitled to a declaration that its protected data-center use was not terminated by the cessation before the zoning change and that, upon satisfaction of the remaining statutory conditions, Metro may not apply later zoning restrictions to prohibit the lawful continuation, reconstruction, and expansion of that protected use.

**Declaratory Judgment - Permit-Based Vested Rights and Rejection of the Pending-Ordinance Doctrine**

(Tenn. Code Ann. § 13-4-310; Tenn. Code Ann. § 29-43-101; 28 U.S.C. §§ 2201-2202)

112. DC BLOX incorporates paragraphs 1 through 111 as if fully set forth herein.

113. Tenn. Code Ann. § 13-4-310(b)(1)(C) establishes a vested property right upon submission of a building permit allowing construction of a building where no prior preliminary development plan is required, provided the application substantially complies with applicable local development ordinances and regulations as required by § 13-4-310(b)(2).

114. DC BLOX submitted its substantially compliant building permit applications on July 17, 2026, before BL2026-1448 and BL2026-1391 were enacted. No preliminary development plan was required.

115. Metro's Zoning Administrator independently determined in writing that the July 26, 2026, applications had vested under Tenn. Code Ann. § 13-4-310(b)(1)(C).

116. Tenn. Code Ann. § 29-43-101 declares Tennessee public policy that the merits of a permit application are to be judged under the law in effect at the time of application and expressly rejects the pending-ordinance doctrine described in *Harding Academy v. Metropolitan Government of Nashville and Davidson County*, 222 S.W.3d 359 (Tenn. 2007).

117. Accordingly, Metro may not use BL2026-1448, BL2026-1391, or other later enacted development standards to change the substantive zoning and development standards governing DC BLOX's July 17, 2026, application.

118. Metro Legal itself acknowledged in the June 25 Planning Commission staff report that a project determined to be vested before the Data Center Moratorium would retain the right

to build under the law in effect when it vested and would not be subject to subsequent law changes.

119. An actual controversy exists because Metro nevertheless refuses to process and act on DC BLOX's vested applications while BL2026-1448 is in effect.

120. DC BLOX is entitled to a declaration that in addition to the existing use of the property as a data-center, its July 17, 2026 applications established vested rights under Tenn. Code Ann. § 13-4-310; that the merits of that application and previously filed applications must be judged under the law governing them at application; and that later enacted data-center restrictions may not be applied to defeat those rights.

## COUNT VII

### Declaratory Judgment - Ultra Vires Interference with Board of Zoning Appeals Jurisdiction

(Tenn. Code Ann. §§ 13-7-206 and 13-7-207; 28 U.S.C. §§ 2201-2202)

121. DC BLOX incorporates paragraphs 1 through 120 as if fully set forth herein.

122. The jurisdiction and authority of a municipal board of zoning appeals arise from and are constrained by Tennessee law, including Tenn. Code Ann. §§ 13-7-206 and 13-7-207.

123. Amendment No. 1 to BL2026-1448 added "administrative appeals" to the matters purportedly subject to the Data Center Moratorium by Metro departments.

124. Metro has applied or interpreted the amended Data Center Moratorium to defer or prevent timely adjudication of the pending BZA appeals concerning DC BLOX and the Property.

125. A municipal ordinance may not suspend, eliminate, or materially curtail jurisdiction that state law confers upon a board of zoning appeals. To the extent BL2026-1448 is interpreted or enforced to do so, it conflicts with and is preempted by Tennessee law and is ultra vires.

126. DC BLOX is entitled to a declaration that BL2026-1448 does not lawfully suspend the BZA's statutory jurisdiction over the pending appeals and to equitable relief preventing Metro from using the Data Center Moratorium to delay or foreclose those proceedings.

**COUNT VIII**

**Declaratory Judgment - Invalid Enactment of Materially Amended Data Center Moratorium**

(Tenn. Code Ann. §§ 13-7-203(b) and 13-7-204; 28 U.S.C. §§ 2201-2202)

127. DC BLOX incorporates paragraphs 1 through 126 as if fully set forth herein.

128. Tennessee's municipal zoning statutes require Planning Commission review and recommendation as part of the prescribed process for zoning ordinances and amendments. See Tenn. Code Ann. §§ 13-7-203(b), 13-7-204; *Cherokee Country Club, Inc. v. City of Knoxville*, 152 S.W.3d 466 (Tenn. 2004); *Westland West Community Ass'n v. Knox County*, 948 S.W.2d 281 (Tenn. 1997); *Edwards v. Allen,* 216 S.W.3d 278 (Tenn. 2007).

129. The version reviewed and approved by the Planning Commission imposed the Data Center Moratorium on specified permits until November 1, 2026, or the effective date of BL2026-1391 and BL2026-1392, whichever occurred first, and did not include administrative appeals in Section 1.

130. On third reading, Council materially altered the ordinance by adding administrative appeals and replacing the Planning Commission version's termination structure with a December 1, 2026, outside date.

131. Those changes altered both the matters subject to the Data Center Moratorium and the period during which the Data Center Moratorium could continue after the companion zoning legislation became effective.

132. The materially amended ordinance was not returned to the Planning Commission for review and recommendation before final passage.

133. Because the final ordinance materially departed from the version reviewed by the Planning Commission without the review required by Tenn. Code Ann. § 13-7-204, BL2026-1448 is invalid and unenforceable, in whole or at least as to the materially added provisions, as determined by the Court.

## COUNT IX

### Declaratory Judgment – Preemption under Tennessee Vested Property Rights Act

(Tenn. Code Ann. §§ 13-7-206 and 13-7-207; 28 U.S.C. §§ 2201-2202)

134. DC BLOX incorporates paragraphs 1 through 133 as if fully set forth herein.

135. The Data Center Moratorium purports to suspend the acceptance of applications. However, this is directly contrary to the Tennessee Vested Property Rights Act, which vests property owners in development standards that apply at the time of the application. Tenn. Code Ann. § 13-4-310(b) & (c); Tenn. Code Ann. § 13-4-301(5)(B) ("'Submission' means: With respect to a building permit, the date on which an applicant submits to a local government a complete application for approval of the building permit.").

136. Similarly, Tenn. Code Ann. § 29-43-101 provides that "property owners should expect that the merits of a permit application will be judged on the law in effect at the time of the application."

137. Suspending the ability to even submit an application is a clear violation of these statutes and a transparent attempt to avoid application of a property's owners statutory and constitutional right to vest in development standards in place at the time of the application.

138. DC BLOX is entitled to a declaration that BL2026-1448 is void as preempted by the Tennessee Vested Property Rights Act and, therefore, cannot be applied to DC BLOX to further hinder and obstruct its vested project.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff DCB Nashville, LLC respectfully requests that the Court enter judgment in its favor and against Defendant The Metropolitan Government of Nashville and Davidson County and grant the following relief:

A. A declaratory judgment that Ordinance No. BL2026-1448, as amended, violates Plaintiff's substantive and procedural due process rights under the Fourteenth Amendment to the United States Constitution;

B. A declaratory judgment that Ordinance No. BL2026-1448, as amended, violates Plaintiff's right to equal protection of the laws under the Fourteenth Amendment;

C. A declaratory judgment that Ordinance No. BL2026-1448, as amended, constitutes a regulatory taking of Plaintiff's property without just compensation in violation of the Fifth and Fourteenth Amendments;

D. A declaratory judgment that the Property's had a lawful preexisting office/data-center use which remains protected under Tenn. Code Ann. § 13-7-208, subject to the statutory conditions for continuation, expansion, and reconstruction;

E. A declaratory judgment that DC BLOX's July 17, 2026, building permit application further established vested property rights under Tenn. Code Ann. § 13-4-310 and that

the merits of those applications must be judged under the governing law applicable at application/vesting, including Tenn. Code Ann. § 29-43-101;

F. A declaratory judgment that BL2026-1448 and BL2026-1391 are void or unenforceable as applied to the extent they purport to extinguish, alter, delay, or defeat DC BLOX's rights protected by Tenn. Code Ann. §§ 13-7-208, 13-4-310, and 29-43-101;

G. A declaratory judgment that BL2026-1448 does not lawfully suspend or restrict the Metropolitan Board of Zoning Appeals' jurisdiction under Tenn. Code Ann. §§ 13-7-206 and 13-7-207 and is void or unenforceable to the extent Metro interprets it otherwise;

H. A declaratory judgment that BL2026-1448, or the materially added portions of it, are invalid and unenforceable because the materially amended ordinance was not returned to the Metropolitan Planning Commission for the review required by Tennessee law;

I. A preliminary and permanent injunction enjoining Metro from enforcing BL2026-1448 and later-enacted data-center zoning standards against DC BLOX and the Property in a manner inconsistent with DC BLOX's rights under Tenn. Code Ann. §§ 13-7-208, 13-4-310, and 29-43-101;

J. A preliminary and permanent injunction requiring Metro to accept, process, review, and act upon DC BLOX's building, grading, zoning, and related development applications under the law governing those applications, without applying later-enacted standards that cannot lawfully govern the vested/protected project;

**K.** A preliminary and permanent injunction prohibiting Metro from using BL2026-1448 to delay, stay, or foreclose BZA proceedings concerning the Property beyond the authority permitted by Tennessee law;

**L.** Compensatory damages in an amount to be proven at trial for injuries caused by Metro's violations of DC BLOX's federal constitutional rights, excluding any duplicative recovery;

**M.** Just compensation for any regulatory taking proven under the Fifth and Fourteenth Amendments;

**N.** Reasonable attorneys' fees and costs under 42 U.S.C. § 1988 and other applicable law;

**O.** Prejudgment and post-judgment interest as allowed by law; and

**P.** Such other and further relief as the Court deems just and proper.

<h1 style="text-align:center">JURY DEMAND</h1>

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,


_/s/ Joshua C. Lee_____
Joshua C. Lee, #30227
R. Alex Dickerson, #27184
J. Douglas Sloan III, #21016
Thompson Burton PLLC
1801 West End, Suite 1550
Nashville, TN 37203
Telephone: (615) 988-1629
alex@thompsonburton.com
joshua.lee@thompsonburton.com
dsloan@thompsonburton.com

Attorneys for Plaintiff DCB Nashville, LLC