nashvillenext

## A General Plan for Nashville & Davidson County

Adopted June 22, 2017

Amended August 24, 2017

Amended March 26, 2026

# Volume III: Community Plans





# Community Character Manual

PAGE LEFT INTENTIONALLY BLANK


Case 3:26-cv-01143 Document 12-5 Filed 08/15/26 Page 2 of 9 PageID #: 65

# METROPOLITAN PLANNING COMMISSION
# OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE

**Resolution No. RS2015-256**

**"BE IT RESOLVED by The Metropolitan Planning Commission that NashvilleNext is approved in accordance with the staff report and recommendations in the staff report with the following amendments: 2; 3; 4; 5; 14; 15; 16; 18; 20; 22a, 22c; 23; 24; 25; 31; 32; and the deferral of 11 areas ~~identified in the Whites Creek area until the August 13, 2015 Planning Commission meeting with the~~ Public Hearing closed. (9-0)"**

Resolution No. RS2015-256

WHEREAS, Section 13-4-203 of the Tennessee Code, Annotated, authorizes a General Plan "with the general purpose of guiding and accomplishing a coordinated, adjusted and harmonious development of the municipality which will, in accordance with existing and future needs, best promote public health, safety, morals, order, convenience, prosperity and the general welfare, as well as efficiency and economy in the process of development, and identify areas where there are inadequate or nonexistent publicly or privately owned and maintained services and facilities when the planning commission has determined the services are necessary in order for development to occur;" and

WHEREAS, Chapter 5, section 11.504 (c) of the Metro Nashville Charter gives the Metro Planning Commission the power to "Make, amend and add to the master or general plan for the physical development of the entire metropolitan government area;" and

WHEREAS, Section 18.02 of the Charter of the Metropolitan Government of Nashville and Davidson County requires that zoning regulations be enacted by the Council "only on the basis of a comprehensive plan prepared by the Metropolitan Planning Commission;" and

WHEREAS, the last General Plan, *Concept 2010, A General Plan for Nashville/Davidson County* was adopted in 1992; and

WHEREAS, Mayor Karl Dean, seeing fit to update the General Plan, announced on May 22, 2012 that the General Plan would be updated, assigning the task to the Metro Planning Department; and

WHEREAS, under the leadership of the *NashvilleNext* Steering Committee and the Community Engagement Committee, the staff of the Metropolitan Planning Commission worked with stakeholders in Nashville/Davidson County, holding over 420 public meetings and events and soliciting input through online forums, engaging over 18,500 participants in providing public input to update the General Plan;

WHEREAS, the Metropolitan Planning Commission, empowered under state statute and the Charter of the Metropolitan Government of Nashville and Davidson County to adopt master or general plans for smaller areas of the county, finds that the process followed to develop the *NashvilleNext* General Plan included diverse, widespread, and meaningful community participation and substantial research and analysis and therefore finds that replacing the *Concept 2010* General Plan with *the NashvilleNext* General Plan is warranted; and

NOW, THEREFORE, BE IT RESOLVED that the Metropolitan Planning Commission hereby ADOPTS *NashvilleNext, A General Plan for Nashville/Davidson County* in accordance with sections 11.504 (e), (j), and 18.02 of the charter of the Metropolitan Government of Nashville, and Davidson County as the basis for the Commission's development decisions in the county.

James McLean, Chairman
Adoption Date: June 22, 2015

Attest:

J. Douglas Sloan, III, Secretary and Executive Director


Case 3:26-cv-01143 Document 12-5 Filed 08/15/26 Page 3 of 9 PageID #: 66

# PARTS OF THE PLAN

Each part of the plan has a role to play. Some parts are broad and visionary, while others are specific and detailed. This section helps users of the plan understand how the parts fit together and support one another. No part of the plan is intended to stand alone; each can only be understood as working together with the rest of the plan.

## I Vision, Trends, & Strategy

Volume I presents the role and powers of the plan, key trends and issues that the plan addresses, a summary of the plan's strategy and approach to the future, and implementation goals and policies.

## II Elements

- Land Use, Transportation & Infrastructure
- Arts, Culture & Creativity
- Economic & Workforce Development
- Education & Youth
- Health, Livability & the Built Environment
- Housing
- Natural Resources & Hazard Adaptation

## III Communities

Nashville's Community Plans provide history and context for Nashville's 14 Community Planning Areas, along with community-specific issues, strategies, and sketches of how different places in the community could change over time. Detailed Community Character Maps link the broad, county-wide Growth Concept Map to character policies that guide zoning and development decisions.

### Community Character Manual

The Community Character Manual provides detailed explanations of the character policies used in the Community Character Maps.

## IV Actions

Specific tasks for Metro departments and partners to undertake, within a recommended timeframe.

## V Access Nashville 2040

Volume V is the overarching vision of how transportation works under NashvilleNext.


Case 3:26-cv-01143 Document 12-5 Filed 08/15/26 Page 4 of 9 PageID #: 67

# CONTENTS

## Volume III

*Community Character Manual*


**Introduction** .......... **7**
*Structure of Character Policies* .......... *17*
*General Principles* .......... *41*
*Strategies* .......... *45*
*Implementing the Principles & Strategies* .......... *53*
*Interpreting Community Character Policies* .......... *61*

**CI Civic** .......... **63**

**CO Conservation** .......... **69**

**OS Open Space** .......... **79**

**TR Transition** .......... **87**

**T1 Natural** .......... **95**
*T1 Natural Open Space* .......... *99*

**T2 Rural** .......... **103**
*T2-RA Rural Agriculture* .......... *111*
*T2-RCS Rural Countryside* .......... *115*
*T2-RM Rural Maintenance* .......... *119*
*T2-NC Rural Neighborhood Center* .......... *123*

**T3 Suburban** .......... **129**
*T3-NM Suburban Neighborhood Maintenance* .......... *137*
*T3-NE Suburban Neighborhood Evolving* .......... *143*
*T3-NC Suburban Neighborhood Center* .......... *149*
*T3-CC Suburban Community Center* .......... *155*
*T3-RC Suburban Residential Corridor* .......... *161*
*T3-CM Suburban Mixed Use Corridor* .......... *167*

**T4 Urban** .......... **173**
*T4-NM Urban Neighborhood Maintenance* .......... *181*
*T4-NE Urban Neighborhood Evolving* .......... *187*
*T4-MU Urban Mixed Use Neighborhood* .......... *193*
*T4-NC Urban Neighborhood Center* .......... *199*
*T4-CC Urban Community Center* .......... *205*
*T4-RC Urban Residential Corridor* .......... *211*
*T4-CM Urban Mixed Use Corridor* .......... *217*

**T5 Center** .......... **223**
*T5-MU Center Mixed Use Neighborhood* .......... *229*
*T5-RG Center Regional Center* .......... *235*

**T6 Downtown** .......... **241**
*T6-DN Downtown Neighborhood* .......... *249*
*T6-CP Downtown Capitol* .......... *255*
*T6-DC Downtown Core* .......... *259*
*T6-SB Downtown Second and Broadway* .......... *263*

**D District** .......... **267**
*D-DR District Destination Retail* .......... *271*
*D-EC District Employment Center* .......... *275*
*D-I District Impact* .......... *279*
*D-IN District Industrial* .......... *285*
*D-MI District Major Institutional* .......... *289*
*D-OC District Office Concentration* .......... *295*

**APPENDICES**
*Putting the Community Characer Manual into Practice* .......... *299*
*Community Character Policy Summary* .......... *304*
*Glossary* .......... *308*




Case 3:26-cv-01143 Document 12-5 Filed 08/15/26 Page 5 of 9 PageID #: 68

# D-EC District Employment Center

## Policy Intent

Maintain, create, and enhance Districts where a mixture of office, commercial, and sometimes select light industrial uses are predominant.

## General Characteristics

District Employment Center (D-EC) areas are concentrations of employment that are often in a campus-like setting. A mixture of office and commercial uses are present, but are not necessarily vertically mixed. Light industrial uses may also be present in appropriate locations with careful attention paid to building form, site design, and operational performance standards to ensure compatibility with other uses in and adjacent to the D-EC area.

Complementary uses are also present and are encouraged as secondary and supportive to the primary function of D-EC areas as places of intense economic activity featuring large numbers of jobs. Daily convenience retail, restaurants, and services for the employees and medium- to high-density residential are appropriate secondary and supportive uses within the district. These uses may also be found in mixed-use areas near the district. In general, secondary and supportive uses , such as retail and restaurants, typically make up about a quarter of the land in a developed D-EC area in order to protect its primary function of providing intense concentrations of jobs. Secondary and supportive uses are encouraged to be in locations that allow them to be accessed externally by the general population and accessed internally by the employees working within the district so that they may remain sustainable businesses.

These areas are buffered from surrounding residential properties with native vegetation or landscaping and through the use of transitions in building and site design including, but not limited to, the use of smaller buildings on the perimeter of the area.

### EXAMPLES OF APPROPRIATE LAND USES*

Primary Uses:

- Office; Educational; Medical
- Mixed Use
- Industrial: Light or Medium Manufacturing;
- Commercial: Hotel/Motel; Communication
- Industrial: Distributive business/ Wholesale

Secondary and Supportive Uses:

- Commercial: All Other Uses
- Industrial Warehouse
- Residential
- Institutional

### ZONING*

- OR20-A, OR20
- OR40-A, OR40
- ORI-A, ORI
- ORI-A, ORI
- OG
- MUG-A, MUG
- MUI-A, MUI
- IWD, IR
- Design-based zoning

**Disclaimer: This information is provided as an aid for general reference and should not be construed as all data that may apply to each property. Users should independently verify the accuracy of the information.*


Case 3:26-cv-01143 Document 12-5 Filed 08/15/26 Page 6 of 9 PageID #: 69

# D-EC District Employment Center

## Application

D-EC policy is generally applicable to three types of areas. First, it is applied to areas that are zoned for a combination of commercial, office, and light industrial uses. Second, areas where the primary land use mixture is commercial, office, and light industrial. Third, areas that are envisioned to become a thoughtfully designed mixture of commercial, office, and in some cases compatibly designed and located light industrial. D-EC policy is appropriate where there is a concentration of non-retail employment uses and there is an expressed interest in the integration of those uses into the surrounding built environment while maintaining the predominance of the employment uses.

Commonly used boundaries to define D-EC policy areas include, but are not limited to: boundaries defined by evolving or intended development patterns (considering lot size, mass, spacing, orientation of buildings, etc.), environmental features, human-made features (rail lines, major utility easements, prominent roads and streets), and transitional uses (open space, higher-density residential, institutional). The application and boundary delineation of this policy are established during the Community Planning Process.

## Design Principles

### *Building Form and Site Design*

A mix of building types is expected. The mass, orientation, and placement of buildings are based on the building type and location. Special consideration is given to the district's surrounding policy areas, mass, orientation, and placement of surrounding buildings, as well as the role of the building in transitioning from the D-EC land use into the adjacent policy areas. The building form is appropriate to the street type.

**Massing –** The massing of mixed-use, office, commercial, residential, and institutional buildings results in a footprint with moderate to high lot coverage. The scale and massing of industrial buildings are designed through a site-specific plan, which establishes a well-defined transition into surrounding non-industrial uses.

**Orientation –** Buildings, including the main pedestrian entrance, are oriented to the street or open space.

**Setbacks –** While setbacks of the buildings in relation to each other may vary, buildings are placed at the back edge of the sidewalk, in shallow to moderate setbacks, creating a defined and enhanced space for pedestrians. There is minimal spacing between buildings.

Uses that include outside storage or parking provide knee walls or other design features to separate the public and private realms.

**Building Height –** Buildings of all types are generally one to greater than 20 stories tall, depending on the building type and location within the district and the character of surrounding transect and policy areas.

When considering heights for proposed developments, consideration is given to the following factors:

- Proximity to other Community Character Policies and the role of the building in transitioning between policies (see below for further details on transitions);
- Planned height of surrounding buildings and the impact on adjacent historic structures;
- Contribution that the building makes to the overall fabric of the D-EC area in terms of creating pedestrian-friendly streetscapes, plazas and open space, innovative stormwater techniques, etc.;
- Relationship of the height of the building to the width of the street, with wider streets generally corresponding to taller building heights;
- Prominence of the street;
- Capacity of the block structure and rights of way to accommodate development intensity;
- Proximity to existing or planned transit;
- Use of increased building setbacks and/or building stepbacks to mitigate increased building heights;


Case 3:26-cv-01143 Document 12-5 Filed 08/15/26 Page 7 of 9 PageID #: 70

- Topography;
- Ability to provide light and air between buildings and in the public realm of streets, sidewalks, internal walkways, multiuse paths, and open spaces; and,
- Extent to which affordable or workforce housing as defined in the Glossary of this document is provided by the development.

**Landscaping –** Landscaping with trees, shrubs, and other plantings is widespread and is used to establish a unique sense of place, assist with stormwater management, and provide effective buffering for adjacent residential areas. Street trees and other plantings are appropriate. Landscaping is provided in surface parking lots. Native plants and natural rainwater collection are used to minimize maintenance costs and the burden on infrastructure.

**Parking –** Parking is ideally located behind or beside buildings, particularly when D-EC areas adjoin Urban, Center, or Downtown Transect areas. Up to two rows of parking in front of buildings may be appropriate. Other parking arrangements are designed to minimize visibility and/or the appearance of vast contiguous areas of parking. The perimeters of such parking lots are heavily landscaped to screen parking from view of the street.

**Signage –** Signage alerts motorists, pedestrians, and cyclists to their location and assists them in finding their destination in a manner that is not distracting or overwhelming. The design and location of signage complement and contribute to the envisioned character of the D-EC area. Consideration is given to surrounding Community Character policy areas in establishing the design and location of signage. A consistent, appropriately themed wayfinding and signage program is encouraged. Signage is generally scaled for pedestrians, and building mounted signs, projecting signs, and awning signs are appropriate. Monument signs may be appropriate.



**Landscaping on an employment center campus**

### *Transitioning*

Buildings at the edges of the D-EC area form transitions in scale and massing where it adjoins lower-intensity Community Character policy areas, with thoughtful attention given to the placement and orientation of buildings within these edges as they relate to their surroundings. Implementation through rezoning occurs as proposals are judged on their merits and ability to meet the goals of the Community Plan. Buildings at the edges of D-EC policy areas:

- Step down in height as they move closer to adjacent lower-intensity areas. This may require different heights within an individual structure and/or more varied building types;
- Avoid placing parking garage entrances and unlined parking structures opposite lower-intensity areas;
- Respond to differences in topography to avoid buildings that loom over lower-intensity buildings at lower elevations;
- Are oriented so that there is a back-to-back relationship between the higher-intensity buildings and lower-intensity buildings;
  - Are separated from lower-intensity areas by rear alleys or service lanes; and,
  - Pay particular attention to articulating facades that face lower-intensity Community Character policy areas.


Case 3:26-cv-01143 Document 12-5 Filed 08/15/26 Page 8 of 9 PageID #: 71

# D-EC District Employment Center

### *Connectivity*

**Access –** Vehicular access from surrounding areas is obtained from arterial-boulevards, preferably with four or more travel lanes, and freeways. Such larger thoroughfares provide access to the perimeter of the district, while collector-avenues, local streets, and private streets provide access to buildings internal to the district. Some uses may require limited and controlled access points for safety. Access points are consolidated and coordinated with strategic access points across all fronting streets.

**Block Length –** Varies based on the surrounding policy areas and is consistent with the existing or planned street network.

**Pedestrian/Bicycle –** There is a high level of connectivity between streets and sidewalks within and external to the district. Walkways for pedestrians are provided from streets and large parking areas to buildings. Crosswalks are provided at intersections and corners and are raised or clearly marked. Greenways and bikeways are encouraged.

**Vehicular –** D-EC areas are generally located along or near arterial-boulevard streets, preferably with four or more travel lanes. Connectivity to surrounding neighborhoods and corridors is low to moderate and avoids truck traffic on local streets and all residential streets outside the D-EC area. Connectivity within the D-EC area is provided through coordinated access and circulation, which may include the construction of new streets.

### Zoning

The following is the list of preferred zoning districts to implement the D-EC policy subject to the applicant's ability to prove that the requested zoning district is consistent with the other provisions of D-EC policy that are detailed above. A site's location within the D-EC area, such as its location in relation to environmentally sensitive features, centers, corridors, and neighborhoods, will be weighed when considering which zoning districts would be appropriate in a given situation. Other factors, such as the size of the site, will also be considered.

- OR20-A, OR20
- OR40-A, OR40
- ORI-A, ORI
- OG
- MUG-A, MUG
- MUI-A, MUI
- IWD, IR
- Design-based zoning

If there are any unique conditions requiring a site-specific approach an individual rezoning application may need to be in the form of design-based zoning to accomplish the policy objectives listed in D-EC. A conceptual development plan may be developed by the Metro Planning Department for the entire D-EC to guide rezoning of sites within the area. The conceptual development plan will establish standards for the preferred method of implementing the D-EC policy for that area.

Other existing and future zoning districts may be appropriate based on the locational characteristics of the subject property and the ability of the applicant to document that the proposed zoning district is consistent with the policy.


Case 3:26-cv-01143 Document 12-5 Filed 08/15/26 Page 9 of 9 PageID #: 72