# Metropolitan Planning Commission




## Staff Reports

# June 25, 2026

*Mission Statement: The Planning Commission is to guide the future growth and development for Nashville and Davidson County to evolve into a more socially, economically and environmentally sustainable community with a commitment to preservation of important assets, efficient use of public infrastructure, distinctive and diverse neighborhood character, free and open civic life, and choices in housing and transportation.*



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 2 of 153 PageID #: 144

# SEE NEXT PAGE

# NO SKETCH



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 4 of 153 PageID #: 146

| | |
|---|---|
| **Item #1** | **Text Amendment 2026Z-012TX-001** |
| **Project Name** | **Data Center Regulations** |
| **Council Bill No.** | BL2026-1391 |
| **Council District** | Countywide |
| **School District** | Countywide |
| **Requested by** | Councilmembers Rollin Horton, Delishia Porterfield, Brenda Gadd, Jordan Huffman, Ginny Welsch, Kyonzte Toombs, Jeff Preptit, Emily Benedict, Jason Spain, Sean Parker, Sheri Weiner, Terry Vo, Russ Bradford, Jacob Kupin, Sandy Ewing, Courtney Johnston, Sandra Sepulveda, Erin Evans, Mike Cortese, Olivia Hill, Burkley Allen, Brandon Taylor, Clay Capp |
| **Deferrals** | This item was deferred at the June 11, 2026, Planning Commission meeting. A public hearing was held and closed on June 11, 2026. |
| **Staff Reviewer** | Shane |
| **Staff Recommendation** | *Approve with a substitute ordinance.* |

---

**APPLICANT REQUEST**
**Amend the Zoning Code relating to data centers.**

**PROPOSED AMENDMENT TO TITLE 17**
The ordinance as filed would amend multiple chapters of Title 17 to create a comprehensive regulatory framework for data centers: establish five data center use types, add associated definitions, assign each use to appropriate zoning districts and specify levels of review, and establish new performance, location, and permitting standards.

**CASE HISTORY**
Following the June 11, 2026, Planning Commission public hearing, staff used the discussion, questions, and feedback from the Planning Commission, along with meetings with the Nashville Electric Service (NES), Metro Water Services (MWS), Metro Legal, and the New Buildings Institute, to inform research into a possible substitute ordinance. The issues raised by the Commission and how the proposed substitute prepared by Planning staff responds to them will be discussed below.

**BACKGROUND**
Stand-alone data centers are becoming increasingly common as a land use. Their continued expansion requires a clear and predictable local framework. While these facilities support essential digital services, they can also have impacts on land availability, energy systems, and surrounding sensitive uses. These impacts vary significantly based on size, design, and technology. Staff has modifed the filed ordinance to ensure that proposed facilities are compatible with surrounding uses and consistent with long-term planning objectives. Tools such as distance requirements, performance standards, and utility verification letters can give the Planning Commission more



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 5 of 153 PageID #: 147

confidence that data centers will be regulated appropriately based on their impacts. The proposed approach supports economic development while helping the community maintain infrastructure reliability, environmental quality, and predictable development patterns.

**ANALYSIS AND SUBSTITUTE**

Staff conducted additional research on separation distances, environmental and infrastructure impacts, performance standards, and regulatory practices in peer cities. The staff proposed substitute reflects this research and makes several adjustments intended to safeguard community assets, align with emerging best practices, and ensure the ordinance is enforceable.

A review of peer cities across the Southeast and Southwest found that typical minimum separation distances from sensitive uses (residences, schools, parks, etc.) range from between 100 to 600 feet, even within dense mixed-use areas, with one city currently considering 1,000 feet in a draft ordinance. Tennessee jurisdictions reflect a similar pattern, with only Jonesborough adopting a buffer as large as 1,500 feet. In this context, the originally proposed 100- and 500-foot separations proposed for small- and medium-sized data centers appear comparable to those proposed by other cities. The Mayor's Executive Order 59 asks departments to continue research and analysis pertaining to how best to regulate this emerging technology. Planning staff recommends keeping the currently proposed separation requirement for large data centers but will continue to research and evaluate the standards.

Importantly, though, staff's research indicates that cities do routinely apply separation distances as large as a half-mile from high-capacity transit infrastructure. These corridors represent focal points of public investment that warrant careful land use control. Based on this finding, staff recommends requiring a separation of one half-mile from the centerlines of Choose How You Move (CHYM)-designated All-Access Corridors for all medium and large data centers. Staff finds that the scale of public investment associated with these corridors justifies stronger locational protections.

The Commission asked for information on data centers currently operating in Davidson County. The best publicly available information that staff has found on stand-alone data centers is the Data Center Maps website. This website is primarily focused on connecting buyers and sellers of data center services although it also identifies large single-user data centers such as the Meta campus in Gallatin. It does not capture other centers that are built specifically for a particular user and utilized by that user for their own needs exclusively, whether separate or integrated into the primary structure. This website identifies 12 data centers in Davidson County: nine operating, one under construction, and two planned. Based on an initial review, some of these may become non-conforming if the proposed regulations are passed. There is no publicly available data that staff has identified on data centers that are integrated into a principal use and solely used by that principal use, such as a university data center used solely by the university (example – Vanderbilt Hill Data Center). If integrated into a principal use, these types of data centers are likely to be classified as accessory by the proposed regulations. However; the regulations may overly limit accessory data centers both in where they are permitted by zoning district and in size. Staff proposes to continue with the legislation as drafted but will continue research into how to best regulate these types of data centers moving forward.

Research into potential impacts from noise, electromagnetic fields, and stormwater runoff to sensitive populations and wildlife found that noise is the most consistently documented environmental impact from data centers. The noise performance standards included in the substitute ordinance are aligned with peer city practices and are expected to mitigate harmful effects to nearby residents and wildlife. Review of guidance from the World Health Organization and National Cancer Institute showed no established evidence supporting residential separation distances for data centers based on electromagnetic field exposure. Stormwater runoff characteristics for data centers are similar to other industrial and warehousing uses. Any changes to stormwater management standards should be applied comprehensively across industrial uses and considered through updates to the Metro Stormwater Management Manual. Staff recommends annual onsite measuring equipment and annual reporting requirements be developed for ground level criteria pollutant impacts resulting from onsite generation usage, with standards for penalties and fees for noncompliance.

During its discussion, the Commission raised questions about potential trade-offs between stricter performance standards and reduced separation distances. At this time, staff finds that additional study is needed to answer this question. Because the large-scale deployment of stand-alone data centers is a relatively new phenomenon for most communities, performance standards tailored to data centers that would function as predictably as separation buffers are still being explored by researchers and practitioners across the country. Additionally, utility providers are unable to assess power or water availability at the parcel level without extensive analysis funded by the applicant, limiting the ability to preemptively apply location-based adjustments to standards countywide.

Staff also examined whether performance flexibility could account for trade-offs between water and energy usage. While power usage effectiveness (PUE) is well-established and addressed in ANSI/ASHRAE Standard 90.4 (an energy-efficiency standard that sets performance requirements for the mechanical and electrical systems of data centers), water usage effectiveness (WUE) remains an emerging metric not tied to accepted guidelines. Peer cities are currently requiring closed-loop cooling systems to limit consumption, but staff's research did not find any jurisdiction tying water usage to zoning performance standards. Therefore, the ordinance retains the requirement for closed-loop cooling and incorporates ASHRAE 90.4 as the national model code developed to ensure best practices and good resource stewardship in energy efficiency reporting.

Research confirmed that large and campus data centers can sometimes impose power demands comparable, not to other industrial users, but at a scale comparable to entire neighborhoods in some instances. Campus-size data centers remain prohibited within the county, and this is consistent with similar prohibitions on "hyperscaler" data centers that peer cities are implementing. For the data centers that are permitted, staff retained the requirement for pre-approval letters from NES and MWS and the requirement for annual compliance reporting, going so far as to strengthen the language in line with NES's current processes and to bolster the reporting requirements with higher renewable energy standards. Both NES and MWS indicated that their existing capacity review processes already govern infrastructure planning, and so staff recommends that the required annual reports be included in the substitute to support these efforts and provide further oversight from the Codes Department when it comes to noise, energy efficiency, and lighting.



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 7 of 153 PageID #: 149

Regarding backup power, staff recommends clarifying that combustion-based generators can operate without strict limits only during emergencies and any NES-directed load mitigation periods. The substitute retains the prohibition on non-testing usage otherwise. While renewable or zero-emission backup systems are encouraged, staff finds that current technology and space requirements make full on-site zero-emission backup generation infeasible for most large facilities. Partial use of solar is realistic and may be incentivized pending further research into specific thresholds. A 15 percent renewable energy utilization target appears achievable and is included in the substitute if off-site generation is permitted and properly documented through annual reporting. Staff recommends that as performance standards for onsite and offsite renewables are developed, a study into VPPs (Virtual Power Plants) may be considered.

Staff reviewed the potential for clustering data centers in designated areas. While clustering may reduce infrastructure costs, it can also limit the ability of utilities to distribute load. Given this uncertainty, staff does not recommend adjusting separation distances between data centers at this time. To prevent piecemeal development from circumventing thresholds applicable to larger data center categories, the substitute ordinance includes new definitions and aggregation rules. These ensure that all phases and related components of a data center development are reviewed and regulated as a single data center regardless of parcel divisions, ownership, or permit sequencing.

HubNashville will serve as the single reporting point for zoning and code enforcement issues related to data centers. Violations will be addressed through environmental court, where Metro Legal may seek injunctive relief and fines. As the regulations are developed, staff would recommend ensuring that regulations are in place to properly enforce violations to the regulations. Existing data centers that become nonconforming if the legislation passes may continue to operate and expand in accordance with the applicable standards at the time they were established but remain subject to current health and safety requirements.

Metro Legal reviewed the ordinance against recent state law, including Public Chapter 961 regarding utility infrastructure upgrades, and found that the two were compatible. The proposed substitute also updates emissions requirements for backup generators to reference EPA New Source Performance Standards as they may be amended in the future. Metro Legal has indicated that Metro cannot apply standards here that override or supersede current federal law.

Finally, the proposed substitute ordinance clarifies how distances are measured, revises definitions, adds correctional facilities to the list of sensitive land uses, and brings provisions related to light trespass and façade materials waivers in line with other sections of the Code. Parking provisions have also been calibrated better to prevent the creation of unnecessary impervious area.

Overall, the proposed substitute ordinance reflects additional research and inter-departmental coordination and provides clearer, more enforceable standards for regulating data centers. Staff finds that the revisions adequately address community protections based on the current state of technological knowledge, with the caveat that staff is continuing to research best practices and sound operational benchmarks as per the Mayor's Executive Order 59. Further amendments may also be proposed at Metro Council, and Planning will need to review and make determinations at

that time as to whether the changes are consistent with the Planning Commission's recommendation.

**FISCAL IMPACT RECOMMENDATION**
There is no fiscal impact identified with this amendment.

**COUNCIL**
The proposed text amendment passed on first reading at the June 2, 2026, Metro Council meeting. The public hearing at Council is scheduled for July 7, 2026.

**MPC RULES AND PROCEDURES/TEXT AMENDMENT REVIEW PROCESS**
The Planning Commission adopted amended Rules and Procedures (Section VIII. D) on October 24, 2024, requiring zoning text amendments to go through a two-step process at the Planning Commission to allow a public hearing at the first meeting where it is considered, then a deferral of two regularly scheduled meetings (four weeks), with final consideration at a second meeting. The Planning Commission public hearing was held on June 11, 2026. This item was then deferred to the June 25, 2026, Planning Commission meeting following a suspension of the rule requiring a two meeting-deferral to allow for the Planning Commission's recommendation to be transmitted to Metro Council before the council public hearing on July 7, 2026.

**STAFF RECOMMENDATION**
Staff recommends approval with a substitute.

**PROPOSED SUBSTITUTE ORDINANCE NO. BL2026-1391**

**An ordinance amending Title 17 of the Metropolitan Code of Laws, to add various new data center uses and related definitions and conditions to the Zoning Code (Proposal No. 2026Z-012TX-001).**

BE IT ENACTED BY THE COUNCIL OF THE METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY:

Section 1. That Section 17.04.060 of the Metropolitan Code is hereby amended by adding the following new definitions in alphabetical order:

"Closed loop system" means a system that constantly reuses and recycles an initial load of water within its operation, reducing the draw on external water sources and minimizing wastewater discharge. A closed loop system shall not use evaporative cooling, and may consist of methods including, but not limited to, air-cooled (dry) cooling, rear-door heat exchanger cooling, hybrid dry economizer cooling, direct-to-chip cooling, or immersion cooling.

"Data center" means a ~~physical room,~~ building~~,~~ or facility primarily used for housing and operating computer systems and associated equipment, including servers, data storage and processing systems, and accessory infrastructure such as cooling systems, power generators, electrical substations, and network hardware. Data center includes "data center – accessory", "data center – small", "data center – medium", "data center – large", and "data center – campus". The square footage of a data center shall include the total square footage of each floor in the data center development, the square footage of any supporting uses, and the square

footage of any additional exterior equipment, such as substations, electrical yards, mechanical yards, and all other exposed equipment, located within the property boundaries. A “server room” shall not be considered a data center. A collection of computer work stations configured solely for use by a principal use shall not be considered a data center.

“Data center – accessory” means a data center of 5,000 square feet in size or less that has a maximum utilization capacity of 1MW of electricity and is accessory to ~~another~~ a principal use. The principal use shall utilize more square footage than the data center.

“Data center – campus” means a geographically contiguous development of one or multiple buildings utilized as a data center and all associated supporting structures and uses, including a dedicated power substation, built across one or multiple phases totaling ~~at least~~ more than 500,000 square feet and/or ~~has~~ with a maximum utilization capacity greater than 100MW. This use shall not be permitted in Davidson County.

“Data center – large” means a data center ~~between~~ larger than 100,000 ~~and~~ but not exceeding ~~499,000~~500,000 square feet in size and/or ~~has~~ with a maximum utilization capacity ~~between~~ greater than 20MW ~~and~~ but not exceeding100MW of electricity and which utilizes a dedicated power substation.

“Data center – medium” means a data center ~~between~~ larger than 20,000 ~~and~~ but ~~99,000~~ not exceeding 100,000 square feet in size and/or ~~has~~ with a maximum utilization capacity ~~between~~ greater than 5MW ~~and~~ but not exceeding 20MW of electricity and which may utilize a dedicated power substation.

“Data center – small” means a data center of 20,000 square feet in size or less and/or ~~has~~ with a maximum utilization capacity of 5MW of electricity and which does not utilize a dedicated power substation. Data center – small uses may be located in ~~mixed use~~ structures containing more than one nonresidential use that do not contain residential units provided that the data center makes up less than thirty percent (30%) of the total square footage of the building.

“Load” means the total power consumed by servers, storage, cooling, ventilation, generators, and other networking devices that operate within a data center.

“Maximum utilization capacity” means the greatest amount of electric demand associated with a data center development, as determined by the greater of:

1. the maximum electrical demand requested from or approved by the electric service provider;
2. the total designed IT load;
3. the maximum load shown on electrical, mechanical, utility, substation, generator, or building plans;
4. the maximum load reasonably capable of being served by installed or proposed transformers, switchgear, generators, substations, battery systems, or other electrical infrastructure; or
5. the maximum load represented in any application, utility request, marketing material, lease, development plan, financing document, public filing, or permit submittal.

“Megawatt (MW)” means the unit of measurement for electricity that is equivalent to one million watts.

“Server room” means a dedicated closet or room containing servers and/or other computer equipment that is less than 500 square feet in size and that is located within and supports functions of a principal use and relies on the principal use’s existing HVAC and electrical supply.

Section 2. That Section 17.08.030 of the Metropolitan Code is hereby amended by adding the following to the Zoning District Land Use Table: "Data center – accessory" as an industrial use permitted as accessory

(A) in the MUG, MUI, OG, ORI, CS, CF, DTC North, DTC South, DTC West, DTC Central, DTC East, SCR, IWD, IR, and IG zoning districts; "Data center – small" as an industrial use permitted with conditions (PC) in the CS, CF, DTC South, DTC West, DTC Central, IWD, IR, and IG zoning districts; "Data center – medium" as an industrial use permitted with conditions (PC) in the IWD, IR, and IG zoning districts; "Data center – large" as an industrial use permitted by special exception (SE) in the IR and IG zoning districts; and "Data center – campus" as an industrial use not permitted in any zoning district.

Section 3. That Section 17.16.090 of the Metropolitan Code is hereby amended by adding the following as ~~a~~ new Subsections C~~,~~ and D~~, and E~~ and redesignating the existing Subsection C and subsequent subsections:

C. Data Center - Small.

1. Location. ~~No data center shall be permitted on a parcel within one hundred linear feet of a parcel containing a residential use, daycare home, daycare center, religious institution, community education use, park, zoo, or other data center~~No data center shall be permitted in a location that is less than 100 feet from a residential use, day care home, daycare center, religious institution, community education use, park, zoo, correctional facility, or other data center. Distance shall be measured in a straight line from the closest point of a parcel line of the parcel for which the data center is sought to the closest point of the parcel line of the parcel on which the identified uses are located.
2. Buffer yards. Buffer yard standards shall comply with the provisions of Chapter 17.24 of the Metropolitan Code.
3. Design standards for data centers not incorporated within a ~~mixed-use~~ building that includes more than one nonresidential use.
   a. When within 300 feet of a publicly accessible road or right-of-way, a minimum of thirty percent (30%) of the width of the front façade at the ground level of any building shall consist of ~~fenestration~~ glazing.
   b. A minimum of thirty percent (30%) of the width of the side and rear facades shall incorporate decorative faux windows, architecturally glazed windows, or other decorative treatment.
   c. Building façades oriented towards a public right-of-way or a parcel zoned a non-industrial zoning district shall be constructed of brick, brick veneer, stone, cast stone, cementitious siding, glass, or materials substantially similar in form and function. The Zoning Administrator, based on a recommendation from the planning department, may waive this requirement if the building façade is not visible from the adjacent parcel or the public right-of-way.
   d. Rooftop mechanical equipment, including but not limited to heating, air conditioning, ventilation, generators, and similar equipment, shall not exceed a height of thirty feet as measured from the base of the equipment. Such equipment shall be screened ~~to fully conceal the mechanical equipment from the adjacent roadways and properties and from the site itself~~ from public streets and from surrounding properties. No screening shall be required for renewable energy infrastructure or for green infrastructure, such as green roofs, rooftop cisterns, and other bioretention equipment.
   e. Building height for any data center shall not exceed 75' in height or the maximum allowed height permitted in the applicable zoning district the data center is located within, whichever is more restrictive. Any applicable height control planes shall also apply.

4. Operational standards.
   a. ~~There shall be no light trespass from the site onto surrounding properties, including any right-of-way~~ Standards for light trespass shall meet all requirements of Section 17.28.100.E.4.
   b. All cooling and ventilation equipment shall operate on a closed-loop system.
   c. Cooling, ventilation, and other external equipment shall not be located between the primary data center building and a public right-of-way, unless located on the rooftop of a data center building.
   d. Excluding generator testing or commissioning activities, emissions producing electrical generation shall be for backup and emergency use only. Outside of emergencies or without the permission of



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 11 of 153 PageID #: 153

Nashville Electric Service (NES), ~~O~~ operation of such generators shall be limited to ~~no more than seventy-two hours consecutively~~testing only. This subsection shall not apply to the use of renewable energy sources including, but not limited to solar panels, small wind energy facilities, and waste heat recovery.

e. Any emissions producing electrical generators on the property shall comply with U.S. Environmental Protection Agency (EPA) New Source Performance Standards (NSPS) for at least Tier 4 emission standards, as such standards may be amended.
   i. Testing for these generators shall not exceed 10 hours per month.
   ii. Testing for these generators shall only occur between the hours of 9:00 a.m. and 5:00 p.m.
   iii. Generators shall be fully enclosed within a sound attenuation wall for noise reduction and to reduce pollution.
   iv. A generator testing log demonstrating compliance with these standards shall be maintained and furnished to the Zoning Administrator or their designee upon request.

f. Maximum permissible sound levels shall not exceed sixty-five (65) decibels (dB) during the daytime (7:01 a.m. to (9:59 p.m.) and fifty-five (55) decibels (dB) during the nighttime (10:00 p.m. to 7:00 a.m.) as measured from any property line.

5. Future improvements. Any changes to a data center - small that increase the square footage or add maximum utilization capacity requires review of a new permit consistent with Section 17.40.575. If applicable, the classification may be adjusted to account for added square footage and/or capacity and permit and zoning requirements of the new classification will govern.

D. Data Center - Medium.

1. Location. ~~No data center shall be permitted on a parcel within five hundred linear feet of a parcel containing a residential use, daycare home, daycare center, religious institution, community education use, park, zoo, or other data center~~No data center shall be permitted in a location that is less than 500 feet from a residential use, day care home, daycare center, religious institution, community education use, park, zoo, correctional facility, or other data center or less than 2,640 feet from the centerline of a Choose How You Move (CHYM) All-Access Corridor. Distance shall be measured in a straight line from the closest point of a parcel line of the parcel for which the data center is sought to the closest point of the parcel line of the parcel on which the identified uses are located or from the closest point of a parcel line of the parcel for which the data center is sought to the centerline of identified corridors.
2. Buffer yards. Where a data center is located on a parcel adjacent to a non-industrial zone district, there shall be screening in the form of landscape buffer yard Standard D applied along common property lines.
3. Design standards.
   a. When within 300 feet of a publicly accessible road or right-of-way, a minimum of thirty percent (30%) of the width of the front façade at the ground level of any building shall consist of ~~fenestration~~ glazing.
   b. A minimum of ten percent (10%) of the width of the side and rear facades shall incorporate decorative faux windows, architecturally glazed windows, or other decorative treatment.
   c. Building façades oriented towards a public right-of-way or a parcel zoned a non-industrial zoning district shall be constructed of brick, brick veneer, stone, cast stone, cementitious siding, glass, or materials substantially similar in form and function. The Zoning Administrator, based on a recommendation from the planning department, may waive this requirement if the building façade is not visible from the adjacent parcel or the public right-of-way.
   d. Rooftop mechanical equipment, including but not limited to heating, air conditioning, ventilation, generators, and similar equipment, shall not exceed a height of thirty feet as measured from the base of the equipment. Such equipment shall be screened ~~to fully conceal the mechanical equipment from the adjacent roadways and properties and from the site itself~~ from public streets and from

surrounding properties. No screening shall be required for renewable energy infrastructure or for green infrastructure, such as green roofs, rooftop cisterns, and other bioretention equipment.

   e. Building height for any data center shall not exceed 75' in height or the maximum allowed height permitted in the applicable zoning district the data center is located within, whichever is more restrictive. Any applicable height control planes shall also apply.

4. Operational standards.
   a. Substations, electrical yards, mechanical yards, and any other exposed equipment shall not be located between the primary structure and a public road or right-of way and shall be fully screened from all adjacent parcels and rights-of-way by the primary structure unless owned or jointly owned by Nashville Electric Service (NES), in which case the location, if between the primary structure and a public right-of-way, shall be screened from public view and adjacent properties by a Type D landscape buffer yard.
   b. ~~There shall be no light trespass from the site onto surrounding properties, including any right-of-way~~ Standards for light trespass shall meet all requirements of Section 17.28.100.E.4.
   c. All cooling and ventilation equipment shall operate on a closed-loop system.
   d. Cooling, ventilation, and other external equipment shall not be located between the primary data center building and a public right-of-way, unless located on the rooftop of a data center building.
   e. Substations associated with the operation of a data center shall only be permitted in the IWD, IR, and IG zoning districts, and shall be located at least fifty feet from any public right-of-way or adjacent parcel. Vehicle storage and service equipment shall not be collocated with the substation.
   f. Excluding generator testing or commissioning activities, emissions producing electrical generation shall be for backup and emergency use only. Outside of emergencies or without the permission of Nashville Electric Service (NES), ~~O~~ operation of such generators shall be limited to no more than seventy-two hours consecutively. This subsection shall not apply to the use of renewable energy sources including, but not limited to solar panels, small wind energy facilities, and waste heat recovery.
   g. Any emissions producing electrical generators on the property shall comply with U.S. Environmental Protection Agency (EPA) New Source Performance Standards (NSPS) for at least Tier 4 emission standards, as such standards may be amended.
      i. Testing for these generators shall not exceed 10 hours per month.
      ii. Testing for these generators shall only occur between the hours of 9:00 a.m. and 5:00 p.m.
      iii. Generators shall be fully enclosed within a sound attenuation wall for noise reduction and to reduce pollution.
      iv. A generator testing log demonstrating compliance with these standards shall be maintained and furnished to the Zoning Administrator or their designee upon request.
   h. Maximum permissible sound levels shall not exceed sixty-five (65) decibels (dB) during the daytime (7:01 a.m. to (9:59 p.m.) and fifty-five (55) decibels (dB) during the nighttime (10:00 p.m. to 7:00 a.m.) as measured from any property line.

5. Future improvements. Any changes to a data center - medium that increase the square footage or add maximum utilization capacity requires review of a new permit consistent with Section 17.40.575. If applicable, the classification may be adjusted to account for added square footage and/or capacity and permit and zoning requirements of the new classification will govern.

Section 4. That Section 17.16.185 of the Metropolitan Code is hereby amended by adding the following as a new Subsection A and redesignating the existing Subsection A and subsequent subsections:

A. Data Center - Large.

1. Location. ~~No data center shall be permitted on a parcel within two thousand six hundred and forty linear feet of a parcel containing a residential use, daycare home, daycare center, religious institution,~~

~~community education use, park, zoo, or other data center~~No data center shall be permitted in a location that is less than 2,640 feet from a residential use, day care home, daycare center, religious institution, community education use, park, zoo, correctional facility, or other data center or less than 2,640 feet from the centerline of a Choose How You Move (CHYM) All-Access Corridor. Distance shall be measured in a straight line from the closest point of a parcel line of the parcel for which the data center is sought to the closest point of the parcel line of the parcel on which the identified uses are located or from the closest point of a parcel line of the parcel for which the data center is sought to the centerline of identified corridors.

2. Buffer yards. There shall be screening in the form of landscape buffer yard Standard D-1 plus an eight foot tall masonry wall applied outside of the front setback along all side and rear property lines of the parcel(s) containing the data center use.
3. Design standards.
   a. When within 300 feet of a publicly accessible road or right-of-way, a minimum of thirty percent (30%) of the width of the front façade at the ground level of any building shall consist of ~~fenestration~~ glazing.
   b. A minimum of ten percent (10%) of the width of the side and rear facades shall incorporate decorative faux windows, architecturally glazed windows, or other decorative treatment.
   c. Building façades oriented towards a public right-of-way or a parcel zoned a non-industrial zoning district shall be constructed of brick, brick veneer, stone, cast stone, cementitious siding, glass, or materials substantially similar in form and function. The Zoning Administrator, based on a recommendation from the planning department, may waive this requirement if the building façade is not visible from the adjacent parcel or the public right-of-way.
   d. Rooftop mechanical equipment, including but not limited to heating, air conditioning, ventilation, generators, and similar equipment, shall not exceed a height of thirty feet as measured from the base of the equipment. Such equipment shall be screened ~~to fully conceal the mechanical equipment from the adjacent roadways and properties and from the site itself~~ from public streets and from surrounding properties. No screening shall be required for renewable energy infrastructure or for green infrastructure, such as green roofs, rooftop cisterns, and other bioretention equipment.
   e. Building height for any data center shall not exceed 75' in height or the maximum allowed height permitted in the applicable zoning district the data center is located within, whichever is more restrictive. Any applicable height control planes shall also apply.
   f. If a data center includes the use of renewable energy sources to offset at least fifty percent (50%) of a data center's total energy usage, the building height for the data center shall be permitted to increase to a maximum of one hundred fifty (150) feet if such additional height conforms to the permitted height and height control plane of the applicable zoning district the data center is located within. Renewable energy sources may consist of solar panels, on-site solar farm, small wind energy facilities, waste heat recovery, and other renewable energy sources.
4. Operational standards.
   a. Substations, electrical yards, mechanical yards, and any other exposed equipment shall not be located between the primary structure and a public right-of way and shall be fully screened from all adjacent parcels and rights-of-way by the primary structure unless owned or jointly owned by Nashville Electric Service (NES), in which case the location, if between the primary structure and a public right-of-way, shall be screened from public view and adjacent properties by a landscape buffer yard Standard D.
   b. ~~There shall be no light trespass from the site onto surrounding properties, including any right-of-way~~ Standards for light trespass shall meet all requirements of Section 17.28.100.E.4.
   c. All cooling and ventilation equipment shall operate on a closed-loop system.

d. Cooling, ventilation, and other external equipment shall not be located between the primary data center building and a public road or right-of-way, unless located on the rooftop of a data center building.
e. Substations associated with the operation of a data center shall only be permitted in the IR and IG zoning districts, and shall be located at least fifty feet from any public right-of-way or adjacent parcel. Vehicle storage and service equipment shall not be collocated with the substation.
f. Excluding generator testing or commissioning activities, emissions producing electrical generation shall be for backup and emergency use only. Outside of emergencies or without the permission of Nashville Electric Service (NES), ~~O~~operation of such generators shall be limited to no more than seventy-two hours consecutively. This subsection shall not apply to the use of renewable energy sources including, but not limited to solar panels, small wind energy facilities, and waste heat recovery.
g. Any emissions producing electrical generators on the property shall comply with U.S. Environmental Protection Agency (EPA) New Source Performance Standards (NSPS) for at least Tier 4 emission standards, as such standards may be amended.
  i. Testing for these generators shall not exceed 10 hours per month.
  ii. Testing for these generators shall only occur between the hours of 9:00 a.m. and 5:00 p.m.
  iii. Generators shall be fully enclosed within a sound attenuation wall for noise reduction and to reduce pollution.
  iv. A generator testing log demonstrating compliance with these standards shall be maintained and furnished to the Zoning Administrator or their designee upon request.
h. Maximum permissible sound levels shall not exceed sixty-five (65) decibels (dB) during the daytime (7:01 a.m. to (9:59 p.m.) and fifty-five (55) decibels (dB) during the nighttime (10:00 p.m. to 7:00 a.m.) as measured from any property line.

5. Future improvements. Any changes to a data center - large that increase the square footage or add maximum utilization capacity requires review of a new permit consistent with Section 17.40.575. If applicable, the classification may be adjusted to account for added square footage and/or capacity and permit and zoning requirements of the new classification will govern.

Section 5. That Section 17.16.300 of the Metropolitan Code is hereby amended by adding the following as a new Subsection A and redesignating the existing Subsection A and subsequent subsections:

A. Data Center - Accessory.
1. Location. Data center - accessory uses shall be fully located within the same structure containing the principal use.
2. Operational standards.
  a. All cooling and ventilation equipment shall operate on a closed-loop system.
  b. Cooling, ventilation, and other external equipment shall not be located between the building containing the data center and a public right-of-way.
  c. Excluding generator testing or commissioning activities, emissions producing electrical generation shall be for backup and emergency use only. Outside of emergencies or without the permission of Nashville Electric Service (NES), ~~O~~ operation of such generators shall be limited to no more than seventy-two hours consecutively. This subsection shall not apply to the use of renewable energy sources including, but not limited to solar panels, small wind energy facilities, and waste heat recovery.
  d. Any emissions producing electrical generators on the property shall comply with U.S. Environmental Protection Agency (EPA) New Source Performance Standards (NSPS) for at least Tier 4 emission standards, as such standards may be amended.
    i. Testing for these generators shall not exceed 10 hours per month.



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 15 of 153 PageID #: 157

ii. Testing for these generators shall only occur between the hours of 9:00 a.m. and 5:00 p.m.
iii. Generators shall be fully enclosed within a sound attenuation wall for noise reduction and to reduce pollution.
iv. A generator testing log demonstrating compliance with these standards shall be maintained and furnished to the Zoning Administrator or their designee upon request.

e. Maximum permissible sound levels shall not exceed sixty-five (65) decibels (dB) during the daytime (7:01 a.m. to (9:59 p.m.) and fifty-five (55) decibels (dB) during the nighttime (10:00 p.m. to 7:00 a.m.) as measured from any property line.

Section 6. That Table 17.20.030 of the Metropolitan Code is hereby amended by adding the following as industrial uses in alphabetical order: "Data center - small" requiring a minimum of 1 space per employee on the largest shift, plus 1 space per 25,000 square feet (no UZO parking minimum exemption outside of DTC); "Data center - medium" requiring a minimum of 1 space per employee on the largest shift, plus 1 space per 25,000 square feet (no UZO parking minimum exemption outside of DTC); "Data center - large" requiring 1 space per employee on the largest shift, plus 1 space per ~~10~~25,000 square feet (no UZO parking minimum exemption outside of DTC); "Data center - campus" requiring 1 space per employee plus 1 space per ~~1~~25,000 square feet (no UZO parking minimum exemption outside of DTC). The Traffic Engineer may require additional parking based on documented operational need, including security, maintenance, deliveries, or service vehicles.

Section 7. That Chapter 17.40 of the Metropolitan Code is hereby amended by amending Section 17.40.340.A. as follows:

Section 17.16.090.C. (Data Center - Small)
Section 17.16.090.D. (Data Center - Medium)
Section 17.16.185.A. (Data Center – Large)
Section 17.16.300.A. (Data Center – Accessory)

Section ~~7~~8. That Chapter 17.40 of the Metropolitan Code is hereby amended by adding a new Section 17.40.575 as follows:

17.40.575 - Permits for data centers.
The application requirements for zoning permits for any data center use shall include the following in addition to all requirements of Section 17.40.530 of this code. Initial permit application shall include all related buildings, structures, future phases, equipment yards, generator yards, parking areas, and supporting improvements. No applicant or developer may divide data centers into separate buildings, phases, or parcels to avoid classification. If a permit is issued for a data center at one classification and additional permits are sought in the future that would shift the data center into a higher classification, permits may not be issued unless the standards of the higher classification can be met.

A. ~~The developer shall provide written confirmation at the time of application for a zoning permit that Nashville Electric Service (NES) has reviewed the proposed data center and agreed to provide electric service to the data center. No zoning permit shall be approved if NES has not agreed to provide electric service.~~ The developer shall provide written confirmation from Nashville Electric Service at the time of application for a zoning permit that NES has reviewed the proposed data center, has or will have capacity to serve, and has agreed to provide electric service to the data center once payment in full of any applicable charges and fees have been made.
B. The developer shall provide written confirmation at the time of application for a zoning permit that the utility providing water and sewer service to the site has reviewed the proposed data center and has



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 16 of 153 PageID #: 158

determined that there is adequate capacity to service the data center. No zoning permit shall be approved if the applicable utility has determined that there is insufficient water and/or sewer capacity to service the data center.

C. A noise impact assessment shall be required as part of the zoning permit application and shall be assessed at a distance of 500 feet from the property lines of the parcel(s) containing the data center. The noise impact assessment shall:
   1. Define the scope of the assessment, including the geographic area, the noise sources to be studied, and the specific objectives of the assessment.
   2. Measure pre-operation ambient noise, existing background noise, and provide acoustic mitigation strategies to ensure the post construction noise levels do not exceed sixty-five (65) decibels (dB) during the daytime (7:01 a.m. to 9:59 p.m.) and fifty-five (55) decibels (dB) during the nighttime (10:00 p.m. to 7:00 a.m.) as measured from all property lines.

D. A water consumption and sustainability plan certified by a licensed engineer addressing conservation and scarcity, outlining the total water requirement of the data center, including cooling needs, and any strategies to reduce or mitigate excessive water usage shall be submitted prior to approval of the zoning permit. The plan shall demonstrate that water usage will not significantly strain the local and regional water supply. The water consumption and sustainability plan shall specifically demonstrate or identify:
   1. The vulnerability of the project and project site to water scarcity and drought.
   2. Anticipated disturbances of public services, including but not limited to transport, communication, sanitation, fresh water, and electricity supply.
   3. Any drought monitoring and forecasting systems that exist in the project area.
   4. Proposed water scarcity/drought management measures to alleviate risk, including water storage, alternative sources, and reduced use of resources.
   5. The adoption of advanced low-water or water-free cooling systems that align with the adopted Drought Management Plan of the Metropolitan Water Services Department.

E. An energy consumption and sustainability plan including the energy load before construction of the data center and the projected daily operational load once constructed shall be submitted. This assessment shall demonstrate:
   1. Compliance with the latest edition of American National Standards Institute/American Society of Heating, Refrigerating and Air-Conditioning Engineers (ANSI/ASHRAE) Standard 90.4. Performance metrics for mechanical load component (MLC) and electrical loss component (ELC) must be calculated and shown to be within allowable limits. Applicants must provide, with third-party verification:
      a. Pre-construction compliance report including energy model and equipment specs;
      b. Post-construction verification confirming built conditions meet design intent.
   2. Estimates of peak electricity demand and strategies for mitigating strain on local power infrastructure.
   3. Estimates of proposed improvements and alternatives to minimize the need for additional transmission lines from the designated power provider.
   4. The use of sustainable alternatives for power generation, such as solar panels, small-scale wind turbines, or other renewable energy sources that will provide at least ~~10~~15% of total power usage. This can be achieved by a combination of on-site generation and off-site generation that must be additive to the Tennessee Valley Authority (TVA) system.
   5. A decommissioning plan for unsold or surplus data infrastructure, for recycling all on-site electronic infrastructure through certified recyclers that follow Responsible Recycling (R2) Standard for Electronics Recyclers and/or e-Stewards® Standard for Responsible Recycling and Reuse of Electronic Equipment.
   5. Planned use of sustainable practices to limit or offset the data center's use of power and water.

F. A lighting plan demonstrating compliance with ~~that there will be no light trespass from the site onto surrounding properties, including any right-of-way~~ <u>the requirements of Section 17.28.100.E.4</u>.

G. Transmission line impact assessment: a transmission line impact assessment shall identify the need for new or upgraded transmission lines to meet the data center's electricity requirements. This assessment shall include the potential environmental impact on public land, including tree removal from ~~county~~ <u>Metro</u>-owned land and rights-of-way. This assessment shall also include information on any planned substation's location and shall show the required screening mechanism(s).

H. Any additional information requested by any reviewing department or agency shall be submitted prior to approval of the zoning permit.

I. The operator of a data center shall submit an annual compliance report that details any changes to, and continuation of all, assessments submitted as part of the zoning permit approval process and demonstrate compliance and monitoring of all application requirements and conditions of zoning to the zoning administrator or their designee no later than the first of January of each year.

Section 8. The Metropolitan Clerk is directed to publish a notice announcing such change in a newspaper of general circulation within five days following final passage.

Section 9. This Ordinance shall take effect upon publication of the above said notice, the welfare of The Metropolitan Government of Nashville and Davidson County requiring it.



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 18 of 153 PageID #: 160

# SEE NEXT PAGE



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 19 of 153 PageID #: 161

# NO SKETCH



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 20 of 153 PageID #: 162

| | |
|---|---|
| **Item #2** | **Data Center Moratorium BL2026-1448** |
| **Council District** | Countywide |
| **School District** | Countywide |
| **Requested by** | Councilmembers Courtney Johnston, Russ Bradford, Jacob Kupin, Sheri Weiner, Erin Evans, Jordan Huffman |
| **Staff Reviewer** | Shane |
| **Staff Recommendation** | *Approve a substitute.* |

**APPLICANT REQUEST**
An ordinance declaring a temporary moratorium upon the acceptance, processing, approval, and issuance of zoning, building, or grading permits for data center developments on property within Nashville & Davidson County.

**BACKGROUND**
At the June 2, 2026, Metropolitan Council meeting two bills, BL2026-1391 and BL2026-1392, were introduced. BL2026-1391 creates a definition for data centers in the Metropolitan Zoning Code, classifies data centers by type, and establishes other regulatory considerations for data centers as a land use. BL2026-1392 authorizes the restriction of building materials for the proposed land use.

The process for text updates to the Zoning Code includes two hearings at the Metropolitan Planning Commission and three readings at the Metropolitan Council prior to their enactment. (Note: This process only applies to BL2026-1391 as BL2026-1392 is only required to be approved by the Metropolitan Council). The recitals in the filed legislation for BL2026-1448, the subject of this staff report, indicate that given the length of the approval process, "in the interim, it is in the best interests of the health, welfare, and safety of Nashville and Davidson County and its residents that the Metropolitan Council declare a temporary moratorium upon the acceptance, processing, approval, and issuance of zoning, building, or grading permits for data center developments on property within Nashville and Davidson County."

At the June 11, 2026, Planning Commission meeting, the Planning Commission considered BL2026-1391 and the public hearing was held. The Commission subsequently deferred the item to June 25, 2026. BL2026-1391 and BL2026-1392 are currently scheduled for a public hearing at the July 7, 2026, Metropolitan Council meeting.

The moratorium places a hold on the acceptance, processing, approval, and issuance of zoning, building, or grading permits by the Metropolitan Department of Codes Administration and the Metropolitan Water Services Department for any data center development for property within Nashville & Davidson County until November 1, 2026 or the effective date of BL2026-1391 and BL2026-1392, whichever occurs first.

**ANALYSIS**



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 21 of 153 PageID #: 163

*Proposed Moratorium*
Tennessee State Law allows moratoria to be implemented via an ordinance that is reviewed by the Planning Commission and approved by the local legislative body. Data centers as a land use have known impacts related to energy demands, water usage, generator operations, environmental concerns, and noise. Potential impacts to adjacent land uses vary depending on scale and operation of data centers. The existing Zoning Code does not define data centers or allow for effective differentiation between small accessory server rooms, moderately sized commercial data centers, and large-scale operations.

The moratorium defines a data center as "a building or facility primarily used for housing and operating computer systems and associated equipment, including servers, data storage and processing systems, and accessory infrastructure such as cooling systems, power generators, electrical substations, and network hardware." This definition matches the definition in the filed legislation for BL2026-1391; however, the moratorium does not differentiate based on size of data center. Given the use of technology by many existing land uses, the broad definition may impact other proposed land uses seeking permits such as small or medium data centers that are built specifically for a particular user and utilized by that user for their own needs exclusively. Planning staff is also evaluating this potential impact through the review of BL2026-1391.

A moratorium is an appropriate tool to allow for permanent legislation to be drafted and put into place. Staff recommends approval of a substitute to BL2026-1448 which would align the definition of a data center with the definition proposed in the substitute to BL2026-1391. As to the length of the moratorium, Planning staff believes that determination is better made by Metro Council.

With the rise of data centers as a land use, many municipalities are currently adopting temporary moratoriums including Birmingham (AL), DeKalb County (GA), Aurora (CO), Howell Township (MI), Norton (OH), and Saline (MI). While many municipalities are looking towards increased regulations around data centers, some municipalities have prohibited data centers entirely.

*Comments from Metro Legal*
Metro Legal has indicated that permits for data center uses should not be accepted, processed, reviewed, approved, or issued.

Guidance from Metro Legal states that departments that process permits subject to the moratorium should use the definition as outlined in the legislation in enforcing the moratorium. As the permits listed include zoning, building, or grading, the affected departments include Codes and Water Services.

The moratorium would apply to all data center development projects, even if the project is vested, meaning that none of the listed permits should be accepted, processed, approved, or issued while the moratorium is in effect. Any development that has established vested rights will still have the right to build according to the law that was in effect when they vested. For example, a project that has applied for a building permit and has been determined to be vested prior to the moratorium would not be subject to any subsequent changes to the law that occur while the moratorium is in effect.

**STAFF RECOMMENDATION**

Staff recommends approval of a substitute ordinance.

**PROPOSED SUBSTITUTE ORDINANCE NO. BL2026-1448**

**An ordinance declaring a temporary moratorium upon the acceptance, processing, approval, and issuance of zoning, building, or grading permits for data center developments on property within Nashville & Davidson County.**

WHEREAS, the Metropolitan Government of Nashville and Davidson County has authority to regulate land use and development through Title 17 of the Metropolitan Code of Laws, known as the Metropolitan Zoning Code, to protect the public health, safety, and welfare; and

WHEREAS, the Metropolitan Zoning Code does not currently define "data center" as a distinct land use classification; and

WHEREAS, in the absence of a specific data center classification, data centers may be administratively classified under existing use categories that were not written to address the scale, intensity, operational characteristics, or impacts of modern data-center development; and

WHEREAS, data centers may have land-use impacts materially different from ordinary office, warehouse, telecommunications, utility, or industrial uses, including high electrical demand, backup generators, fuel storage, battery systems, substations, transformers, cooling systems, mechanical equipment, noise, vibration, lighting, stormwater impacts, security fencing, emergency-response concerns, and continuous twenty-four-hour operations; and

WHEREAS, data centers may be appropriate in certain locations if properly defined, reviewed, conditioned, buffered, and regulated, but may be incompatible with nearby residential neighborhoods, public parks, schools, greenways, zoological institutions, public spaces, and other sensitive uses without appropriate standards; and

WHEREAS, the Metropolitan Government has a substantial public interest in ensuring that data centers are not permitted or vested under land-use classifications that do not accurately describe the principal use or address the use's operational impacts; and

WHEREAS, on June 2, 2026, BL2026-1391 and BL2026-1392 were introduced at the Metropolitan Council; and

WHEREAS, these two pieces of legislation propose to define what a data center is in the context of the Metropolitan Zoning Code, delineate the different types of data centers based on size and power use, and set up reasonable conditions and restrictions for the various types of data centers to enable them to operate in a compatible and harmonious manner within Nashville and Davidson County; and

WHEREAS, BL2026-1391 and BL2026-1392 must go through the required review and approval process, including two readings at the Metropolitan Planning Commission and three readings at the Metropolitan Council prior to their enactment; and

WHEREAS, this review and approval process will take several months to complete; and



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 23 of 153 PageID #: 165

WHEREAS, in the interim, it is in the best interests of the health, welfare, and safety of Nashville and Davidson County and its residents that the Metropolitan Council declare a temporary moratorium upon the acceptance, processing, approval, and issuance of zoning, building, or grading permits for data center developments on property within Nashville and Davidson County

NOW, THEREFORE, BE IT ENACTED BY THE COUNCIL OF THE METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY:

Section 1. That a moratorium is hereby declared upon the acceptance, processing, approval, and issuance of zoning, building, or grading permits by the Metropolitan Department of Codes Administration and the Metropolitan Water Services Department for any data center development for property within Nashville & Davidson County until November 1, 2026 or the effective date of BL2026-1391 and BL2026-1392, whichever occurs first.

Section 2. That for the purposes of this ordinance, a "data center development" shall include any development including a ~~physical room,~~ building~~,~~ or facility primarily used for housing and operating computer systems and associated equipment, including servers, data storage and processing systems, and accessory infrastructure such as cooling systems, power generators, electrical substations, and network hardware. Data center includes "data center – accessory", "data center – small", "data center – medium", "data center – large", and "data center – campus". The square footage of a data center shall include the total square footage of each floor in the data center development, the square footage of any supporting uses, and the square footage of any additional exterior equipment, such as substations, electrical yards, mechanical yards, and all other exposed equipment, located within the property boundaries. A "server room" shall not be considered a data center. A collection of computer work stations configured solely for use by a principal use shall not be considered a data center.

Section 3. The Metropolitan Clerk is directed to publish a notice announcing such change in a newspaper of general circulation within five days following final passage.

Section 4. This Ordinance shall take effect upon publication of the above said notice, the welfare of The Metropolitan Government of Nashville and Davidson County requiring it.



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 24 of 153 PageID #: 166

# NO SKETCH



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 25 of 153 PageID #: 167

| | |
|---|---|
| **Item #3** | **Text Amendment 2026Z-010TX-001** |
| **Project Name** | **Underground Utilities** |
| **Council Bill No.** | BL2026-1360 |
| **Council District** | Countywide |
| **School District** | Countywide |
| **Requested by** | Councilmembers Joy Styles and Quin Evans-Segall |
| **Deferrals** | This item was deferred at the May 28, 2026, Planning Commission meeting. A public hearing was held and closed on May 28, 2026. |
| **MPC Rules and Procedures** | This item was deferred to the June 25, 2026, Metropolitan Planning Commission meeting after the public hearing was closed per section VIII.D of the Rules and Procedures of the Metropolitan Planning Commission. |
| **Staff Reviewer** | Shane |
| **Staff Recommendation** | *Approve with a substitute ordinance.* |

**APPLICANT REQUEST**
**Amend the Zoning Code relating to undergound utilities.**

**PROPOSED AMENDMENT TO TITLE 17**
The bill as filed would amend Chapter 17.28 of the Metropolitan Code of Laws to require underground utilities for all developments, regardless of type, that proposes new streets. Staff has outlined details concerning implementation of the change. A proposed substitute is included in the staff report for review.

**BACKGROUND**
The zoning code currently requires that all new residential developments proposing new public or private streets place any utilities along said streets underground (17.28.103.A). Most developments proposing to build new streets are residential in nature, such as subdivisions or multi-family residential Specific Plans (SPs). For larger non-residential projects, new streets (public or private) may be proposed. Currently the code does not require these developments, if they lack a residential component, to install utilities underground.

The proposed changes to the original bill as filed are shown below:

Section 1. That Subsection 17.28.103.A of the Metropolitan Code of Laws is hereby amended by deleting it in its entirety and replacing it with the following:

A. Applicability. These standards shall apply to any application for development submitted to the metropolitan government for approval, wherein a new public or private street is to be constructed now or in the future, or where an existing public or private stub street, is to be extended, as follows:



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 26 of 153 PageID #: 168

1. Any application for a new or amended preliminary planned unit development;
2. Any new or amended preliminary SP plan;
3. Any new or amended preliminary urban design overlay district; or
4. Any new or revised preliminary subdivision plat; and in the case of a proposed revised preliminary plat, these provisions shall only apply to those plats deemed to be a major modification by the executive director of the metro planning department, as provided in the Subdivision Regulations.

At the May 28, 2026, Planning Commission public hearing, staff presented the item and opened the public hearing. During the discussion the Commissioners asked about how alleys were distinguished from streets in determining whether underground utilities would be required on a particular roadway. Alleys are identified on Metro's official street and alley maps, and currently the code does not require utilities placed within new alleys to be located underground. This would not change with the proposed legislation. Also, in the same way that existing streets with above ground utilities would not be required to bury utilities, existing alleys with above ground utilities would also be exempt from the undergrounding requirement.

The Commission also asked about how the cost of installing new above-ground utilities compared with the cost of installing new underground utilities. While the cost will likely vary project by project, according to TW Powerline Constructions, based in California, underground distribution systems are typically two to five times more expensive to build than overhead lines. However, maintenance requirements are generally less frequent and more predictable, which can result in cost savings over time.

**FILED BILL SUMMARY**
The ordinance as originally filed proposes to strike "residential" from the description of which types of development require the undergrounding of utilities, thereby applying the section to any type of development that proposes new streets.

**ANALYSIS AND SUBSTITUTE**
Historically, much of Nashville's electrical and stormwater infrastructure was built above ground. Above ground utilities present not only an aesthetic challenge for Nashville's landscape but a safety liability as well, as experienced with the rising number of tornados or winter storm Fern this year. Closing the current loophole in the code, which permits non-residential development to install utilities above ground, is a matter of public safety. NashvilleNext supports both a walkable, obstruction-free pedestrian environment and safe, resilient neighborhoods for all.

Staff is proposing edits to the legislation that are not intended to alter the purpose or effect of the bill; rather, they add clarification around how the change will be implemented. In consultation with Nashville Electric Service (NES), Nashville Department of Transportation (NDOT), Metro Water Services (MWS), and Metro Legal, staff determined that the following changes would be appropriate:

- To prevent parking lot drive aisles from being conflated with commercial private streets, which, under the proposed changes, will be required to underground utilities, staff is

proposing to distinguish between "parking areas, driving aisles within parking areas, and private highway-rail grade crossings" and "private streets." The former will not be required to bury utilities while the latter will. The exempt areas are private areas internal to developments rather than areas the general public is expected to traverse regularly.

- Staff is proposing language clarifying that Metro agencies are not liable for any costs developers may incur when installing underground utilities.
- Staff is proposing an effective date.

These proposed changes support the intent of the originally filed bill and clarify important considerations regarding its implementation. Staff has included a proposed substitute in the body of this text for review after consultation with NDOT, MWS, NES, and Metro Legal, who have reviewed and approved of the proposed changes.

**FISCAL IMPACT RECOMMENDATION**

There is no fiscal impact identified with this amendment.

**COUNCIL**

The proposed text amendment passed on first reading at the April 21, 2026, Metro Council meeting. The public hearing at Council is scheduled for July 7, 2026.

**MPC RULES AND PROCEDURES/TEXT AMENDMENT REVIEW PROCESS**

The Planning Commission adopted amended Rules and Procedures (Section VIII. D) on October 24, 2024, requiring zoning text amendments to go through a two-step process at the Planning Commission to allow a public hearing at the first meeting where it is considered, then a deferral of two regularly scheduled meetings (four weeks), with final consideration at a second meeting.

The Planning Commission public hearing was held on May 28, 2026. This item was then deferred to the June 25, 2026, Planning Commission meeting and is ready for a recommendation to Council.

**STAFF RECOMMENDATION**

Staff recommends approval with a substitute.

**PROPOSED SUBSTITUTE ORDINANCE NO. BL2026-1360**

**An ordinance amending Chapter 17.28 of the Metropolitan Code of Laws to amend regulations on underground utilities (Proposal No. 2026Z-010TX-001).**

BE IT ENACTED BY THE COUNCIL OF THE METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY:

Section 1. That Subsection 17.28.103.A of the Metropolitan Code of Laws is hereby amended by deleting it in its entirety and replacing it with the following:



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 28 of 153 PageID #: 170

A. Applicability. These standards shall apply to any application for development submitted to the metropolitan government for approval, wherein a new public or private street is to be constructed now or in the future, or where an existing public or private stub street, is to be extended, as follows:

1. Any application for a new or amended preliminary planned unit development;

2. Any new or amended preliminary SP plan;

3. Any new or amended preliminary urban design overlay district; or

4. Any new or revised preliminary subdivision plat; and in the case of a proposed revised preliminary plat, these provisions shall only apply to those plats deemed to be a major modification by the executive director of the metro planning department, as provided in the Subdivision Regulations.

5. Parking areas, driving aisles within parking areas, and private highway-rail grade crossings are not included in the definition of 'private street.'

Section 2. That Subsection 17.28.103.B of the Metropolitan Code of Laws is hereby amended by inserting the following and renumbering subsequent sections:

B. Any costs associated with development pursuant to Section 1.A. shall not be borne by any metropolitan agency or department.

Section 3. That Subsection 17.28.103.C of the Metropolitan Code of Laws is hereby amended by inserting the following and renumbering subsequent sections:

C. The standards affecting nonresidential development shall apply to any application for development submitted to the metropolitan government for approval after January 1, 2027.

Section ~~2~~4. The Metropolitan Clerk is directed to publish a notice announcing such change in a newspaper of general circulation within five days following final passage.

Section ~~3~~5. This Ordinance shall take effect upon publication of the above said notice, the welfare of The Metropolitan Government of Nashville and Davidson County requiring it.

INTRODUCED BY:

__________________________

Joy Styles
Member of Council



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 29 of 153 PageID #: 171

# NO SKETCH



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 30 of 153 PageID #: 172

| | |
|---|---|
| **Item #4** | **Text Amendment 2026Z-011TX-001** |
| **Project Name** | **East Bank Design Review Committee** |
| **Council Bill No.** | BL2026-1361 |
| **Council District** | 19 – Kupin |
| **School District** | 01 – Taylor<br>05 – Fayne |
| **Requested by** | Councilmembers Emily Benedict, Clay Capp, Jacob Kupin, and Quin Evans-Segall |
| **Deferrals** | This item was deferred at the May 28, 2026, Planning Commission meeting. A public hearing was held and closed on May 28, 2026. |
| **MPC Rules and Procedures** | This item was deferred to the June 25, 2026, Metropolitan Planning Commission meeting after the public hearing was closed per section VIII.D of the Rules and Procedures of the Metropolitan Planning Commission. |
| **Staff Reviewer** | Hammer |
| **Staff Recommendation** | *Approve with a substitute ordinance.* |

**APPLICANT REQUEST**

**Amend Chapter 17.37 of the Metropolitan Code of Laws to establish an East Bank Design Review Committee within the Downtown Code ("DTC")**

**PROPOSED AMENDMENT TO TITLE 17**

A request to amend Chapter 17.37 of the Metropolitan Code of Laws to establish an East Bank Design Review Committee (EB DRC) to act as the Downtown Code Design Review Committee (DTC DRC) for the East Bank and Wasioto Bend subdistricts and to codify the committee's membership.

**BACKGROUND**

The Downtown Code (DTC), adopted in 2010, regulates the bulk standards and design requirements of properties within downtown Nashville and portions of the East Bank, including standards such as building height, the proximity of buildings to streets, and permitted building façade materials.

The Downtown Code creates an eight-member Design Review Committee (DTC DRC), subject to the rules and procedures adopted by the Planning Commission. Four of these members are nominated by the Chamber of Commerce, the Civic Design Center, the Downtown Partnership, and the Urban Residents Association, with each organization nominating one member subject to confirmation by the Planning Commission. The remaining four members are directly appointed, with one member each chosen by the Mayor, the Vice-Mayor (on behalf of the Metro Council), the Historic Commission, and the Planning Commission. All members of the DRC are required to be design professionals, except for the Chamber of Commerce member and the Downtown Partnership



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 31 of 153 PageID #: 173

member. Design professional means a degree or significant experience in a design related field such as architecture, landscape architecture, urban design, or urban planning.

When the DTC was adopted, the DTC DRC only reviewed "modifications" which is the term of art for deviations from standards of the DTC. The authority of the DTC DRC was expanded in 2021 with the adoption of BL2021-868, which requires that a DTC Concept Plan be filed and reviewed by the DTC DRC for all new development projects, with recommendations provided to the DRC by the Metropolitan Planning Department and Nashville Department of Transportation and Multimodal Infrastructure (NDOT).

Separately, all Metropolitan Development and Housing Agency (MDHA) Redevelopment Districts, except for the Capitol Hill Redevelopment District, include a Design Review Committee (MDHA DRC). Within these districts, final approval of the MDHA DRC acts as approval of the DTC Concept Plan – the DTC DRC is not involved in review of plans within redevelopment districts.

The primary focus of the review by both DTC DRC and MDHA DRC is on the design of buildings, as opposed to entitlements review such as number of stories or allowed uses. The DTC establishes allowed bulk, massing and uses. The DRC review is focused on the technical architectural design of buildings, overall site design, and integration into the surrounding context.

The Planning Department has developed processes and standards for high quality design through principles adopted by the DRC. These principles are designed to work in a variety of contexts as Downtown itself includes a broad range of subdistricts, from the lower scale and historically rich to the more dense urban neighborhoods. The Downtown Code DRC has informed design quality in established neighborhoods and emerging ones.

The Downtown Code was recently expanded by the Metropolitan Council to create the East Bank and Wasioto Bend subdistricts on the east side of the Cumberland River, both within the Downtown Community Plan. Presently, projects in these subdistricts would be reviewed by the DTC DRC when a DTC Concept Plan is submitted.

At the May 28, 2026, Planning Commission public hearing, staff presented the proposed legislation and opened the public hearing. During the discussion, the Commissioners expressed that while determining appropriate representation is important, another design review committee could be duplicative and add more bureaucracy and complexity to the development process. The Commissioners also questioned whether a new committee would result in better urban design outcomes.

**FILED BILL SUMMARY**

A substitute was made to the original bill at first reading. The proposed substitute ordinance would create an eight-member East Bank Design Review Committee (EB DRC). For properties located within the East Bank and Wasioto Bend subdistricts, the EB DRC will assume the responsibilities of the DTC DRC. This authority includes reviewing and approving DTC Concept Plans and approving major modifications to DTC standards. The EB DRC would consist of eight voting



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 32 of 153 PageID #: 174

members, all of whom must reside in Davidson County. Membership appointments are divided as follows:

- **Appointed (3):** One member appointed by the Mayor, one by the Metro Council, and one by the Planning Commission.
- **Nominated (5):** One member nominated by each of the following organizations, subject to confirmation by the Planning Commission: East Bank neighborhood association, Cayce Place Resident Association, Urban Land Institute, Nashville Area Chamber of Commerce, and the Civic Design Center.

Five of the eight members (appointees of the Mayor, Council, Planning Commission, Civic Design Center, and the Urban Land Institute) must be design professionals with a degree or experience in architecture, landscape architecture, planning, or urban design. Members will serve four-year terms, with the Mayor, Council, and Planning Commission initial appointees serving an initial two-year term, then a four-year term thereafter. Any decision made by the EB DRC may be appealed to the Planning Commission.

Table 1. Design Review Committee Comparison

| **Existing DTC DRC** | **Proposed EB DRC as filed** |
|---|---|
| Mayor appointment* | Mayor appointment* |
| Metro Planning Commission appointment* | Metro Planning Commission appointment* |
| Nashville Area Chamber of Commerce | Nashville Area Chamber of Commerce |
| Nashville Civic Design Center* | Nashville Civic Design Center* |
| Vice Mayor (on behalf of Metro Council) appointment* | Metro Council appointment* |
| Metro Historic (member of MHZC)* | Urban Land Institute* |
| Nashville Downtown Partnership | Cayce Place Resident Association |
| Urban Residents Association* | East Bank neighborhood association |

*denotes design professional requirement

**ANALYSIS AND SUBSTITUTE**

This text amendment would take three core actions: (1) remove the authority of the DTC DRC over the East Bank and Wasioto Bend subdistricts, (2) create an EB DRC with authority over these subdistricts to be administered by the Metro Planning Department, and (3) establish the membership of the EB DRC.

Staff proposes a substitute legislation that reduces the duplication of bureaucratic functions between the existing DTC DRC and the proposed EB DRC and streamlines the two committees. These proposed changes would result in more design professionals on the EB DRC, while addressing the overlapping functions between the two bodies. The changes also contain measures to help achieve quorum during the early development period of the East Bank area, such as adding a ninth member to make achieving quorum easier and placing a trigger on when some members are active and count towards achieving quorum. Following the May 28, 2026 public hearing, staff recommends a substitute that reflects the following changes:



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 33 of 153 PageID #: 175

- The EB DRC shall be governed by the same Rules and Procedures as those adopted by the Planning Commission for the DTC DRC.
- If a nominating/appointing entity has a responsibility to name a representative to both DRCs, a single representative will serve on both and their terms on both committees shall be the same.
- The EB DRC shall have the same officers (Chair, Vice Chair, Secretary) as DTC DRC.
- Clarify that the Vice Mayor is responsible for appointing a member, but that the Council process for nominations to Boards and Commissions shall be how that member is selected.
- Replace the Cayce Place Resident Association member of the original bill with a member residing within the Urban Zoning Overlay (UZO), appointed by the Council. This member shall be a design professional.
- Add a member residing within the Imagine East Bank (IEB) plan area, appointed by the District Council Member. This member shall be a design professional.
- Specify that the East Bank Residents Association and IEB Plan Area Resident members shall only be active and count towards meeting quorum twelve (12) months after at least 1,000 residential units receive a certificate of occupancy.
- Specify that appeals of EB DRC decisions are heard by the Planning Commission, as they are with DTC DRC.
- Clarify that the committee reviews DTC Concept Plans rather than stating that final EB DRC approval acts as a DTC Concept Plan.

Table 2. Filed Bill and Proposed Substitute Bill Membership Comparison

| **Filed Bill EB DRC** | **Proposed Substitute EB DRC** |
|---|---|
| Mayor appointment* | Mayor appointment* |
| Metro Planning Commission appointment* | Metro Planning Commission appointment* |
| Nashville Area Chamber of Commerce | Nashville Area Chamber of Commerce |
| Nashville Civic Design Center* | Nashville Civic Design Center* |
| Metro Council appointment* | Vice Mayor appointment*^ |
| Urban Land Institute* | Urban Land Institute* |
| East Bank neighborhood association | East Bank Residents Association* |
| Cayce Place Resident Association | IEB Plan Area Resident*~ |
| | UZO Resident appointed by Council*^ |

* denotes design professional requirement
^ denotes that appointment occurs by Council process for Boards and Commissions
~ denotes nomination by District Council Member

The caption of the filed bill specifies the bill's purpose is the creation of an EB DRC, so a proposed substitute of the bill may only change details of the EB DRC, not alter the DTC DRC. However, several sections of the proposed substitute, like specifying residency requirements, creating an attendance policy, and adding a representative from ULI as a ninth member, could benefit the DTC DRC and result in better design outcomes.



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 34 of 153 PageID #: 176

**FISCAL IMPACT RECOMMENDATION**
There is an indirect fiscal impact anticipated with this amendment. While no direct capital expenditures are required, staffing and managing a new DRC will require additional administrative time and resources from the Planning Department and associated legal staff.

**COUNCIL**
The proposed text amendment passed on first reading at the April 21, 2026, Metro Council meeting. The public hearing at council is scheduled for the July 7, 2026, Metro Council meeting.

**MPC RULES AND PROCEDURES/TEXT AMENDMENT REVIEW PROCESS**
The Planning Commission adopted amended Rules and Procedures (Section VIII. D) on October 24, 2024, requiring zoning text amendments to go through a two-step process at the Planning Commission to allow a public hearing at the first meeting where it is considered, then a deferral of two regularly scheduled meetings (four weeks), and then final consideration at a second meeting.

The Planning Commission public hearing was held on May 28, 2026. This item was then deferred to the June 25, 2026, Planning Commission meeting and is ready for a recommendation to Council.

**STAFF RECOMMENDATION**
Staff recommends approval with a substitute.

**SUBSTITUTE ORDINANCE NO. BL2026-1361**

**An ordinance to amend Chapter 17.37 of the Metropolitan Code of Laws to establish an East Bank Design Review Committee within the Downtown Code ("DTC"), all of which is described herein (Proposal No. 2026Z-011TX-001).**

BE IT ENACTED BY THE COUNCIL OF THE METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY:

Section 1. That the Modifications to the Standards subsection of the Application of the DTC: Modifications section of Section I of the Downtown Code is amended by deleting it in its entirety and replacing it with the following:

Modifications to the Standards

Based on site-specific issues, an applicant may seek modifications to the standards of this document.

Any standard within the DTC may be modified, insofar as the intent of the standard is being met, the modification results in better urban design for the neighborhood as a whole, and the modification does not impede or burden existing or future development of adjacent properties.

The DTC, the Downtown Plan and any other policies and regulations from governing agencies shall be consulted when considering modifications. Any standards that shall not be



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 35 of 153 PageID #: 177

modified are explicitly noted in this document.

Modifications may be approved by Planning staff, the Downtown Code Design Review Committee (DTC DRC) or the Planning Commission.

- Minor modifications – deviations of 20 percent or less – or modifications explicitly noted herein as minor may be approved by Planning Staff.
- Any determination made by the Planning Staff may be appealed to the DTC DRC.
- Major modifications – deviations of more than 20 percent – and modifications of standards without numbers may be approved by the DTC DRC. Within the East Use Area ~~Bank and East Bend subdistricts~~, the East Bank Design Review Committee ("EB DRC") shall act as the DTC DRC. Within MDHA redevelopment districts, the MDHA DRC shall act as the DTC DRC.
- Any determination made by the DTC DRC, the EB DRC, or the MDHA DRC regarding standards of the DTC may be appealed to the Planning Commission by the applicant or the Planning Department.
- All building permits for modifications authorized by the Planning Staff, DTC DRC, EB DRC, or Planning Commission must be obtained within three years from the date of approval."

Section 2. That the ~~Modifications~~ Application Process subsection of the Application of the DTC: Modifications section of Section I of the Downtown Code is amended by deleting it in its entirety and replacing it with the following:

Application Process

The DTC DRC shall review and approve a DTC Concept Plan for a site prior to approval of a DTC Final Site Plan. A recommendation from the Nashville Department of Transportation and Multimodal Infrastructure shall be required for a DTC Concept Plan.

- The DTC, the Downtown Plan, other policies, official guidelines (such as the Downtown Code Design Guidelines), regulations from governing agencies, and other best practices shall be consulted when considering a DTC Concept Plan. No standard within the DTC shall relieve a project of the review process associated with a Concept Plan application.
- Modifications shall be requested concurrently with the DTC Concept Plan.
- Within the East Bank and East Bend subdistricts, the EB DRC shall act as the DTC DRC ~~and final EB DRC approval shall act as the DTC Concept Plan~~.
- Within MDHA redevelopment districts, the MDHA DRC shall act as the DTC DRC and final MDHA approval shall act as the DTC Concept Plan.
- Any determination made by the Planning Staff may be appealed to the DTC DRC or EB DRC. Any determination made by the DTC DRC, EB DRC, or the MDHA DRC regarding standards of the DTC may be appealed to the Planning Commission by the applicant or the Planning Department.

Section 3. That the ~~Design Review & Compliance subsection of the~~ Application of the DTC:



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 36 of 153 PageID #: 178

Design Review and Compliance section of Section I of the Downtown Code is amended by adding the following subsection after the Design Review Committee subsection:

**East Bank Design Review Committee**

The EB DRC is subject to the rules and procedures adopted by the Planning Commission for the DTC DRC. The EB DRC will consist of ~~eight (8)~~ nine (9) voting members. All members shall be residents of Davidson County. One member shall be nominated by each of the following with confirmation by the Planning Commission:

- East Bank ~~neighborhood association~~ Resident Association
- ~~Cayce Place Resident Association~~ Imagine East Bank (IEB) Plan Area Resident (nominated by district Councilmember)
- Urban Land Institute
- Nashville Area Chamber of Commerce
- Civic Design Center

One member shall be appointed by the following:

- Mayor
- Metropolitan Council (Resident of the Urban Zoning Overlay)
- Planning Commission
- Vice Mayor

The EB DRC member nominated by the District Council Member shall reside within the area on the east side of the Cumberland River, south of I-65 and west of I-24. If this member no longer resides within this area during their term, a vacancy shall be declared. If multiple District Council Members represent this area, this member shall be nominated by the consensus of all District Council Members.

The EB DRC member appointed by the Metropolitan Council shall reside within the Urban Zoning Overlay (UZO). If this member no longer resides within the UZO during their term, a vacancy shall be declared.

The EB DRC members nominated by the East Bank Resident Association and District Council Member (IEB Area Resident) shall be considered inactive for the purposes of voting and quorum until twelve (12) months after at least 1,000 residential units receive a certificate of occupancy within the area on the east side of the Cumberland River, south of I-65 and west of I-24.

The EB DRC member appointed by the Vice Mayor shall be selected by the same process within the Rules of Procedure of the Council of the Metropolitan Government of Nashville and Davidson County as used for election to boards and commissions.

Members appointed by the Mayor, Metropolitan Council, Planning Commission, Vice Mayor, District Council Member (IEB Area Resident), East Bank Resident Association and



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 37 of 153 PageID #: 179

the Civic Design Center shall be design professionals, with a degree or several years of experience in architecture, landscape architecture, planning or urban design. The member appointed by the Urban Land Institute shall be a licensed architect or landscape architect.

Each term shall be four years.~~, with the appointees of the Mayor, Metropolitan Council and Planning Commission serving an initial two-year term upon adoption of the DTC~~. Any vacancy occurring during the unexpired term of any members shall be filled in the manner prescribed herein for the original selection of the members of the EB DRC. A new mayor and/or Metropolitan Council may appoint a new representative after the term of the existing representative has expired.

If an EB DRC member fails to attend least 2/3 of the prior twelve (12) meetings, or misses three (3) consecutive meetings, a vacancy shall be declared and new member requested from the appointing or nominating entity.

If a nominating or appointing entity has a responsibility to name a representative to the DTC DRC as well as the EB DRC, a single representative will serve on both committees and their terms on both committees shall be the same. The EB DRC shall have the same officers as those elected by the process outlined in the DTC DRC.

Section 4. That the Sign Permit Modifications subsection of the Modifications of the DTC section of Section V of the Downtown Code is amended by deleting it in its entirety and replacing it with the following:

Sign Permit Modifications

Requests for modifications to sign standards are reviewed through the process outlined on pages 14 and 15. Modifications are reviewed by Planning staff and the East Bank Design Review Committee, the MDHA Design Review Committee or the DTC Design Review Committee. The applicant may appeal a decision through the process described on pages 14 and 15. All sign Modifications are Major Modifications. Two additional types of Modifications for signage related permits may be requested and are outlined below.

Section 5. The Metropolitan Clerk is directed to publish a notice announcing such change in a newspaper of general circulation within five days following final passage.

Section 6. This Ordinance shall take effect upon publication of above said notice announcing such change in a newspaper of general circulation, the welfare of The Metropolitan Government of Nashville and Davidson County requiring it.

SEE NEXT PAGE



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 39 of 153 PageID #: 181




## 2025SP-044-001

U.S. DEPARTMENT OF VETERANS AFFAIRS – NASHVILLE
Map 071-05, Part of Parcel(s) 027
03, Bordeaux-Whites Creek-Haynes Trinity
02 (Kyonzté Toombs)



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 40 of 153 PageID #: 182

| | |
|---|---|
| **Item #5** | **Specific Plan 2025SP-044-001** |
| **Project Name** | **U.S. Department of Veterans Affairs – Nashville** |
| **Council District** | 02 – Toombs |
| **School District** | 01 – Taylor |
| **Requested by** | E2L FDS Nashville, LLC, applicant; The American Baptist Theological Seminary, owner. |
| **Deferrals** | This item was deferred at the June 11, 2026, Planning Commission meeting. No public hearing was held. |
| **Staff Reviewer** | Shane |
| **Staff Recommendation** | *Approve with conditions and disapprove without all conditions.* |

---

**APPLICANT REQUEST**
**Preliminary SP to permit a nonresidential development with medical uses.**

Zone Change
A request to rezone from One and Two-Family Residential (R6) to Specific Plan (SP) zoning for a portion of property located at Baptist World Center Drive (unnumbered), approximately 200 feet south of West Trinity Lane (20.20 acres), to permit a nonresidential development with medical uses.

**Existing Zoning**
One and Two-Family Residential (R6) requires a minimum 6,000 square foot lot and is intended for single-family dwellings and duplexes at an overall density of 7.26 dwelling units per acre. *Based on acreage alone, R6 would permit a maximum of 146 duplex lots. This does not account for compliance with the Metro Subdivision Regulations and compliance with these regulations may result in fewer lots.*

**Proposed Zoning**
Specific Plan-Institutional is a zoning district category that provides for additional flexibility of design, including the relationship of streets to buildings, to provide the ability to implement the specific details of the General Plan. *This Specific Plan includes institutional uses.*

**BORDEAUX-WHITES CREEK-HAYNES TRINITY COMMUNITY PLAN**
T4 Urban Mixed Use Corridor (T4 CM) is intended to enhance urban mixed use corridors by encouraging a greater mix of higher density residential and mixed use development along the corridor, placing commercial uses at intersections with residential uses between intersections; creating buildings that are compatible with the general character of urban neighborhoods; and a street design that moves vehicular traffic efficiently while accommodating sidewalks, bikeways, and mass transit.

T4 Urban Mixed Use Neighborhood (T4 MU) is intended to maintain, enhance, and create urban, mixed use neighborhoods with a development pattern that contains a variety of housing along with



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 41 of 153 PageID #: 183

mixed use, commercial, institutional, and even light industrial development. T4 MU areas are served by high levels of connectivity with complete street networks, sidewalks, bikeways, and existing or planned mass transit.

Haynes Trinity Supplemental Policy
The site is within the Haynes Trinity Supplemental Policy which was approved and adopted by the Planning Commission on January 11, 2018. The mobility plan component of the Haynes Trinity Planning Study calls for a more connected street system to provide a strong and cohesive block structure. The Mobility Plan within the Study identifies the benefits of increased street connectivity which include lower traffic volumes on major streets, alternative route choices, and redundant emergency vehicle access.

Conservation (CO) is intended to preserve environmentally sensitive land features through protection and remediation. CO policy applies in all Transect Categories except T1 Natural, T5 Center, and T6 Downtown. CO policy identifies land with sensitive environmental features including, but not limited to, steep slopes, floodway/floodplains, rare or special plant or animal habitats, wetlands, and unstable or problem soils. The guidance for preserving or enhancing these features varies with what Transect they are in and whether or not they have already been disturbed.

The approximately 20.20-acre site is zoned One and Two-Family Residential (R6) and is located at the intersection of Baptist World Center Drive and Youngs Lane, immediately north of the American Baptist College campus and northeast of the Cumberland River. The site is currently vacant and generally wooded. Surrounding land uses include institutional and religious uses associated with American Baptist College to the south (zoned R6), scattered residential parcels along Youngs Lane to the north (zoned R6), additional institutional uses to the west (zoned Office General), and a higher-density residential neighborhood across Baptist World Center Drive to the east zoned Single-Family Residential (RS5).

The Preliminary SP proposes the construction of a new three-story, 204,285-square-foot Veterans Affairs Community-Based Outpatient Clinic (CBOC). Uses identified in the plan include medical office, medical appliance sales, medical or scientific lab, outpatient clinic, and rehabilitation services. The facility is organized around a primary public entrance oriented to Baptist World Center Drive, where a heavily landscaped streetscape intersects with a meandering “memorial plaza” walkway that extends from the right-of-way (ROW) to the front lawn of the building to create a formal front entry sequence. The plaza includes hardscape, planting beds, and elements honoring the six military service branches. The building is positioned centrally on the site, with surface parking lots located primarily to the west and east to serve patients, visitors, and staff.



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 42 of 153 PageID #: 184




**Site Plan**




**Rendering**

Access to the site is provided from both Baptist World Center Drive and Youngs Lane. Public, staff, and ambulance access is concentrated at Baptist World Center Drive, while a service access for trash collection and loading is along Youngs Lane. These operational areas are fully screened with landscape buffers, including an enhanced evergreen buffer along Youngs Lane.

Parking is provided in excess of Metro requirements in order to meet federal VA standards, with a total of 1,100 parking spaces compared to the required 1,021. Bicycle parking is included per code. Pedestrian circulation is accommodated through accessible walking paths connecting parking areas, building entrances, and the memorial plaza. Parking is oriented perpendicular to the structure so that pedestrians do not have to cross rows of parked cars to reach the entrance. A sidewalk winds around the perimeter of the parking lot, offering views in the southwest corner of the Cumberland River. Fire lanes are provided throughout the site with continuous access around the building.

Landscaping meets or exceeds Metro landscape requirements, including perimeter landscape buffers (Type D, except where required improvements to the intersection of Youngs Lane and Baptist World Center only leave room for a Type A) and interior parking lot tree requirements. The plan proposes bioretention areas, detention facilities, and pervious pavers to manage stormwater.

The SP also includes design standards such as glazing minimums, façade articulation, and limitations on blank wall width. MCSP requirements are reflected on the plan for both the Baptist World Center and Youngs Lane frontages.

**ANALYSIS**

The site is within the T4 Urban Mixed Use Corridor (T4 CM) and T4 Mixed Use (T4 MU) policy areas. Both T4 CM and T4 MU encourage mid- to low-rise, mixed-use buildings with shallow setbacks, minimal spacing, formal landscaping, rear or side parking, alleys, short block patterns, and strong pedestrian, bicycle, and transit connections. Given the Veteran Administration's security and access requirements, achieving these goals is difficult. Staff's design guidance for the applicant, however, resulted in several interventions that brought the plan closer to the policy intent. Wider and denser landscape buffers are now shown along both frontages, and the parking lot landscaping islands have been enlarged; a formal pedestrian pathway from Baptist World Center Drive connects to the entrance of the building; and parking has been reoriented to facilitate direct pedestrian paths through the parking lot from the proposed bus stop on Baptist World Center Drive.

Regarding policy, given the proposal for a healthcare facility and the site's adjacency to institutional uses in the area, including the American Baptist College campus to the south, Planning is evaluating various policy alternatives for this site and will provide a recommendation to the MPC at a future meeting. The current Haynes Trinity Supplemental policy includes a mobility component that calls for a planned collector street through the site. This collector street was envisioned to support an urban mixed use development pattern anticipated at the time the policy was adopted. Given the pattern in this area is trending more towards institutional, and the higher intensity mixed use development pattern has not been realized, any subsequent policy amendments would remove this planned collector street. A greenway connection was also envisioned from the Cumberland River along the planned collector street to Baptist World Drive. As the planned collector will be removed with the policy amendment, the greenway connection would as well. However, the greenway is still



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 44 of 153 PageID #: 186

required along the river, which is outside of the boundary of this application. This SP also does not preclude a future greenway alignment from being evaluated with future developments. Staff will continue to discuss greenway connections with the subsequent policy amendment, with a recommendation to the MPC at a future meeting.

A portion of the site contains Conservation (CO) policy related to steep slope conditions near the western edge of the property. Construction plans, including stormwater grading, will be reviewed in detail with the final SP. Future development will need to comply with the adopted Stormwater Management Manual.

**FIRE MARSHAL RECOMMENDATION**
**Approve**

**WEGO PUBLIC TRANSIT RECOMMENDATION**
**Approved with conditions**

- Developer shall upgrade and provide new bus facilities with appurtenances as per latest WeGo Transit Design Guidelines, and encourage transit use as below:
- Developer shall provide an upgraded Baptist World Center Dr & Gooch St Southbound in-lane local service shelter type bus stop with appurtenances, conveniently located for ped access to the development and to a crosswalk over Baptist World Center Dr.
- IF the conversion of the intersection of Baptist World Center Dr & Vashti St to All-Way stop control places the existing Baptist World Center Dr & Vashti St westbound bus stop beyond a Stop Bar, THEN the Developer shall provide a pair of in-lane local service ADA boarding pad bus stops on Baptist World Center Dr at that intersection which are immediately clear of Stop Sign Stop Bars. The exact location and layout of these bus stops and pedestrian connections shall be agreed with WeGo prior to next SP case.
- Developer shall coordinate with WeGo and Nashville Connector to create an ongoing Travel Demand Management Program to encourage transit use. This program shall include transit mode split and/or mode shift targets, with timeframes. The program shall include, as an example, provision of convenient free shuttle rides, which do not require pre-booking, between the nearest four (World Baptist World Center Dr and Trinity Lane) bus stops and the principal entrances of the development. Such service shall be advertised, as a minimum, at the bus stops. The program shall include items to encourage transit use as agreed with WeGo's Community Impact Partnership program, Caitlin.Okrzesik@nashville.gov. .
- Please add text under "Site Related Details" on p7 of the June 3rd revision to the effect of "Transit use shall be encouraged via infrastructure improvements and Travel Demand Management. Continuous, safe and convenient pedestrian access routes shall be provided between principal doorways of the project and high quality bus stops. A Travel Demand Management Plan shall be created and enacted, which shall include programs with transit mode split and/or mode shift targets, and timeframes."
- All WeGo conditions shall be complete prior any occupancy or use of the site.
- Developer shall liaise with WeGo Robert.Johnson@Nashville.gov and reach agreement on all WeGo conditions prior to next SP case.

**STORMWATER RECOMMENDATION**
**Approve**

**WATER SERVICES RECOMMENDATION**
**Approve with conditions**

- Approved as a Preliminary SP only. Public and/or private Water and Sanitary Sewer construction plans must be submitted and approved prior to Final Site Plan/SP approval. The approved construction plans must match the Final Site Plan/SP plans. Submittal of an availability study is required before the Final SP can be reviewed. Once this study has been submitted, the applicant will need to address any outstanding issues brought forth by the results of this study. A minimum of 30% Water and Sanitary Sewer Capacity Fees must be paid before issuance of building permits. Unless and until 100% of Capacity Charge has been paid, No Water/Sanitary Sewer Capacity is guaranteed.

**NASHVILLE DOT ROADS RECOMMENDATION**
**Approve with conditions**

- Final constructions plans shall comply with the design regulations established by NDOT. Final design and improvements may vary based on actual field conditions.
- On final plans, provide call outs and dimensions for any frontage improvements required through coordination w/ planning, per the MCSP(Major Collector Street Plan).
- On final plans, reference the following NDOT standard details: ST-200,-210,-215,-249,-252,-253, -320,-324.
- Reference JBS drain inlet details type 3300v TYP (Contact NDOT roads for details if needed).
- All public street intersections should be provided with stop control(signs/bars) and ADA compliant pedestrian access ramps.
- Any public access point (ramps, drives) and/or intersection should meet AASHTO stopping sight distance requirements, otherwise additional MUTCD warning signs may be required by traffic.
- Provide plan view exhibits w/ final plans. Any proposed roadway sections, ramps, driveways, sidewalks, curb & gutter, etc. shall be designed and called outed per NDOT ST-standard details.
- Submit landscape plan with the final SP.
- A mandatory referral approval will be required for proposed abandonments of existing ROW and/or encroachments into existing ROW.
- There shall be no earthen retaining walls installed in the public ROW. There shall be no vertical utility obstructions in new public sidewalks (or roadways) and the removal, or relocation, of utilities will be required to accommodate new public sidewalks.
- Note: A private hauler will be required for waste/recycle disposal. Contact Metro Water services for waste disposal requirement solidwastereview@nashville.gov. Submit waste/recycle disposal plan with final SP.
- Note: Additional 1-1/2' mill and overlay may be required to cover full extents of utility, and/or road widening, work in the public ROW. On final site plans, call out “mill & overlay extents to be coordinated in field with NDOT inspector”.

- Additional comments: Provide half-sections along Young's Lane and Baptist World Center ROW, per detail ST-260 schedule. Minimum pavement width to be provided along Young's Lane and Baptist World Center ROW frontage shall be 22 ft.
- Comply w/ NDOT traffic comments/conditions of approval.

**NASHVILLE DOT TRAFFIC AND PARKING RECOMMENDATION**
**Approve with conditions**

- Baptists World Center Drive and Youngs Lane; The intersection shall be modified in order to accommodate the anticipated truck turning movements/loading, however there shall be no direct vehicular access for employees or visitors along Youngs Ln. The access point(s) on Youngs Ln shall only be for Services (loading/deliveries) and for emergencies only. Off-peak loading and deliveries for this development shall also be prioritized to minimize impacts to traffic operations.
- Intersection of W Trinity Lane and Baptist World Center Drive/Whites Creek Pike; Modify the traffic signal to remove split signal phasing for the northbound and southbound approaches and replace with lead/lag left turn signal phasing.
- [3]Intersection of Baptist World Center Drive and Site Access 1;
- [3.A.] A northbound left turn lane should be provided by the widening of Baptist World Center Drive to a three-lane cross-section along the site frontage.
- [3.B.] Stop control with a “STOP” (R1-1) sign and stop line pavement marking should be installed for the eastbound Site Access 1 approach to Baptist World Center Drive.
- [3.C.] Site Access 1 should be designed and constructed to allow for sufficient intersection sight distance, clear of any obstructions such as vegetation, landscaping, hardscaping, signs, driveway approach grades, and fencing within the departure sight triangles.
- [3.D.] Provide a pedestrian crossing at site access 1 across Baptists world center with appropriate enhancements, per FHWA guidance. Further coordination with NDOT will be required at Final SP.
- [4] Intersection of Baptist World Center Drive and Site Access 2;
- [4.A.] A northbound left turn lane with a minimum storage length of 50 feet should be provided by the widening of Baptist World Center Drive to a three-lane cross-section along the site frontage.
- [4.B.] Stop control with a “STOP” (R1-1) sign and stop line pavement marking should be installed for the eastbound Site Access 2 approach to Baptist World Center Drive.
- [4.C.] Site Access 2 should be designed and constructed to allow for sufficient intersection sight distance, clear of any obstructions such as vegetation, landscaping, hardscaping, signs, driveway approach grades, and fencing within the departure sight triangles.
- The applicant shall comply with the MCSP streetscape requirements along the frontage of Baptists World Center Drive and Youngs Ln. A minimum of 22' of pavement will be required along the frontage of Youngs Ln.
- Intersection of Baptist World Center Drive and Vashti Street; Install all-way stop-control, including stop line pavement markings, “Stop” signs (R1-1) with “All Way” supplemental plaques (R1-3P) on each approach. Install “Stop Ahead” warning signs (W3-1) on the northbound and southbound approaches approximately 200 feet in advance of the intersection.

- Coordinate with WeGo on transit stop improvements within the study area of the development. Off-site transit improvements may be limited by available ROW and/or other constraints.
- The applicant's final construction drawings shall comply with the design regulations established by the Nashville Department of Transportation, in effect at the time of the approval of the preliminary development plan or final development plan or building permit, as applicable. Final design may vary based on field conditions.

**ANTICIPATED TRIP CALCULATIONS**

The proposed rezoning from R6 to SP is estimated to have an increase of 5,239 daily weekday trips, including 231 additional AM peak hour trips and 438 additional PM peak hour trips. For a full traffic table, please contact the Planning Department.

**METRO SCHOOL BOARD REPORT**

As the proposed SP would not permit residential uses, it is not expected to generate any additional students.

**STAFF RECOMMENDATION**

Staff recommends approval with conditions and disapproval without all conditions.

**CONDITIONS**

1. Permitted uses shall be limited to 205,000 square feet of medical uses as defined in the plan.
2. On the corrected copy, update the fallback zoning per the fallback zoning condition.
3. Access from Youngs Lane shall be limited to services (loading/deliveries) and emergency access only.
4. Greenway connections shall be discussed with evaluation of the subsequent policy amendment.
5. No signage is approved with this preliminary SP.
6. With the submittal of the final site plan, provide architectural elevations complying with all architectural standards and conceptual elevations outlined on the preliminary SP for review and approval.
7. Comply with all conditions and requirements of Metro reviewing agencies.
8. A corrected copy of the Preliminary SP plan, incorporating the conditions of approval by Metro Council, shall be provided to the Planning Department prior to or with final site plan application.
9. If a development standard, not including permitted uses, is absent from the SP plan and/or Council approval, the property shall be subject to the standards, regulations and requirements of the MUG zoning district as of the date of the applicable request or application. Uses are limited as described in the Council ordinance.
10. The final site plan/building permit site plan shall depict any required public sidewalks, any required grass strip or frontage zone and the location of all existing and proposed vertical obstructions within any required sidewalk and grass strip or frontage zone. Prior to the issuance of use and occupancy permits, existing vertical obstructions shall be relocated outside of any required sidewalk. Vertical obstructions are only permitted within any required grass strip or frontage zone.

11. The Preliminary SP plan is the site plan and associated documents. If applicable, remove all notes and references that indicate that the site plan is illustrative, conceptual, etc.
12. Minor modifications to the Preliminary SP plan may be approved by the Planning Commission or its designee based upon final architectural, engineering or site design and actual site conditions. All modifications shall be consistent with the principles and further the objectives of the approved plan. Modifications shall not be permitted, except through an ordinance approved by Metro Council, that increase the permitted density or floor area, add uses not otherwise permitted, eliminate specific conditions or requirements contained in the plan as adopted through this enacting ordinance, or add vehicular access points not currently present or approved.
13. The requirements of the Metro Fire Marshal's Office for emergency vehicle access and adequate water supply for fire protection must be met prior to the issuance of any building permits.



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 49 of 153 PageID #: 191




**2026SP-011-001**
PLEASANT GREEN
Map 081-15, Parcel(s) 600-602
Map 081-16, Parcel(s) 339-344, 741-743
08, North Nashville
21 (Brandon Taylor)



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 50 of 153 PageID #: 192

| | |
|---|---|
| **Item #6** | **Specific Plan 2026SP-011-001** |
| **Project Name** | **Pleasant Green** |
| **Council District** | 21 – Taylor |
| **School District** | 05 – Fayne |
| **Requested by** | Thomas and Hutton, applicant; Scott C. Chambers and Pleasant Green Baptist Church TRS, owners. |
| **Deferrals** | This item was deferred at the April 23, 2026, May 14, 2026, May 28, 2026, and June 11, 2026 Planning Commission meetings. No public hearing was held. |
| **Staff Reviewer** | Garland |
| **Staff Recommendation** | *Defer to the July 23, 2026, Planning Commission meeting.* |

**APPLICANT REQUEST**
**Preliminary SP to permit a mixed-use development.**

Preliminary SP
A request to rezone from One and Two-Family Residential (R6) and Commercial Service (CS) to Specific Plan (SP) zoning for properties located at 1501 and 1503, Scovel Street, 1100, 1102, 1104 16th Avenue North, 1412, 1414, 1417, 1502, 1600, 1602, 1604 Jefferson Street, approximately 384 feet west of 14th Avenue North (1.76 acres) and within the Jefferson Street Redevelopment District, to permit a mixed-use development.

**STAFF RECOMMENDATION**
Staff recommends deferral to the July 23, 2026, Planning Commission meeting.



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 51 of 153 PageID #: 193




**2026SP-022-001**
HOBSON HEIGHTS SP
Map 150, Part of Parcel 171
Map 150, Parcel(s) 206, 212
Map 151, Parcel(s) 087
13, Antioch – Priest Lake
08 (Deonté Harrell)

| | |
|---|---|
| **Item #7** | **Specific Plan 2026SP-022-001** |
| **Project Name** | **Hobson Heights SP** |
| **Council District** | 32 – Styles |
| **School District** | 06 – Mayes |
| **Requested by** | Dale and Associates, Inc., applicant; Ammon Shreibman owners. |
| **Deferrals** | This item was deferred from the May 14, 2026, May 28, 2026, and June 11, 2026, Planning Commission meetings. No public hearing was held. |
| **Staff Reviewer** | Marton |
| **Staff Recommendation** | *Approve with conditions and disapprove without all conditions.* |

---

**APPLICANT REQUEST**
**Preliminary SP to permit 150 single-family residential lots.**

Preliminary SP
A request to rezone from Agricultural/Residential (AR2a) to Specific Plan (SP) zoning for properties located at 6334 Mt. View Road, Hobson Pike (unnumbered) and a portion of property located at 6324 Mt. View Road, approximately 761 feet west of Smith Springs Boulevard, to permit 150 single-family residential lots (29.65 acres).

**Existing Zoning**
Agricultural/Residential (AR2a) requires a minimum lot size of two acres and is intended for uses that generally occur in rural areas, including single-family, two-family, and mobile homes at a density of one dwelling unit per two acres. The AR2a District is intended to implement the natural conservation or rural land use policies of the general plan. *AR2a would permit a maximum of 14 duplex lots. This does not account for compliance with the Metro Subdivision Regulations and compliance with these regulations may result in fewer lots.*

**Proposed Zoning**
Specific Plan-Residential (SP-R) is a zoning district category that provides for additional flexibility of design, including the relationship of streets to buildings, to provide the ability to implement the specific details of the General Plan. This Specific Plan includes only one residential building type.

**ANTIOCH – PRIEST LAKE COMMUNITY PLAN**
T3 Suburban Neighborhood Evolving (T3 NE) is intended to create and enhance suburban residential neighborhoods with more housing choices, improved pedestrian, bicycle, and vehicular connectivity, and moderate density development patterns with moderate setbacks and spacing between buildings. T3 NE policy may be applied either to undeveloped or substantially under-developed "greenfield" areas or to developed areas where redevelopment and infill produce a different character that includes increased housing diversity and connectivity. Successful infill and redevelopment in existing neighborhoods needs to take into account considerations such as timing

and some elements of the existing developed character, such as the street network, block structure, and proximity to centers and corridors. T3 NE areas are developed with creative thinking in environmentally sensitive building and site development techniques to balance the increased growth and density with its impact on area streams and rivers.

Conservation (CO) is intended to preserve environmentally sensitive land features through protection and remediation. CO policy applies in all Transect Categories except T1 Natural, T5 Center, and T6 Downtown. CO policy identifies land with sensitive environmental features including, but not limited to, steep slopes, floodway/floodplains, rare or special plant or animal habitats, wetlands, and unstable or problem soils. The guidance for preserving or enhancing these features varies with what Transect they are in and whether or not they have already been disturbed. *Conservation policy on the site is associated with a small area of stream buffer along the eastern boundary.*




**Proposed Plan**

**SITE CONTEXT**
The subject site consists of three parcels and portion of a fourth parcel, totaling 29.65 acres, located south of Mt. View Road and north of Hobson Pike. The properties have been zoned Agricultural/Residential (AR2a) since 1974 and currently contain one home on the property at 6334 Mt. View Road. Surrounding properties are zoned Single-Family Residential (RS15), One and Two-Family Residential (R10), and Specific Plan (SP). The SP to the south of the site was approved in 2025, and permits 105 multi-family residential units. The site has frontage on both Mt. View Road and Hobson Pike. Mt. View Road is classified as a collector avenue and Hobson Pike is classified as an arterial boulevard per the Major and Collector Street Plan. An SP application was previously filed for the subject properties in 2021, with the request to permit 232 residential units (case 2021SP-005-001). The Planning Commission recommended approval of the plan at its February 11, 2021, meeting, however the case did not move forward at Metro Council.

**PLAN DETAILS**
The SP proposes 150 single-family lots which front onto new public streets and Hobson Pike. Lot sizes throughout the plan range from approximately 3,750 to 7,900 square feet. While the majority of lots will be accessed by new public streets, lots 36-44 and 45-55 will be accessed via private alleys. Along the western property boundary, the plan provides a public road connection to Kensal Drive which currently stubs from the Kensal Green Subdivision. The maximum proposed building height is 2 stories in 36 feet. Along the eastern and western property boundaries, a 20-foot-wide landscape buffer is provided, and across the site, the plan provides approximately 7.12 acres of open space (24.4 percent of the site) consisting of 1.47 acres of active open space, 1.15 acres of stormwater retention, 4.5 acres of undisturbed areas for tree preservation.

**ANALYSIS**
Staff finds that the proposed SP is consistent with the T3 NE policy. T3 NE areas are intended to create and enhance suburban residential neighborhoods with more housing choices, improved pedestrian, bicycle, and vehicular connectivity, and moderate density development patterns. The plan meets the goals of the T3 NE policy by providing a moderately dense development with a density of approximately five units an acre. The smaller lot sizes provided in the plan allow for greater diversity of housing product in the larger area. The plan also meets the form and design goals of the policy by providing contextually appropriate height, moderate setbacks, and orienting units to streets and open spaces. The plan will provide MCSP improvements along both the Hobson Pike and Mt. View frontage and also provides a street connection to the existing Kensal Drive street stub. When the adjacent Kensal Green Subdivision was approved by the Planning Commission, it included three stub streets that were intended to connect when adjacent properties developed in the future. Therefore, the extension of Kensal Drive into the subject property is appropriate and aligns with the goals of the policy to create high levels of pedestrian and vehicular connectivity. The passive and active areas of open space in combination with the landscape buffers will act as an amenity to residents and provides a transition to the adjacent residential developments. Overall, the proposed plan is consistent with the T3 NE policy in this location.

**FIRE MARSHAL RECOMMENDATION**
**Approve**



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 56 of 153 PageID #: 198

**STORMWATER RECOMMENDATION**
**Approve with conditions**

- Approved as a Preliminary review only. Must comply with all regulations in the Stormwater Management Manual at the time of final submittal for approval.

**WATER SERVICES RECOMMENDATION**
**Approve with conditions**

- Approved as a Preliminary SP only. Public and/or private Water and Sanitary Sewer construction plans must be submitted and approved prior to Final Site Plan/SP approval. The approved construction plans must match the Final Site Plan/SP plans. Submittal of an availability study is required before the Final SP can be reviewed. Once this study has been submitted, the applicant will need to address any outstanding issues brought forth by the results of this study. A minimum of 30% Water and Sanitary Sewer Capacity Fees must be paid before issuance of building permits. Unless and until 100% of Capacity Charge has been paid, No Water/Sanitary Sewer Capacity is guaranteed.

**NASHVILLE DOT RECOMMENDATION**
**Approve with conditions**

- Final constructions plans shall comply with the design regulations established by NDOT. Final design and improvements may vary based on actual field conditions. For final plans w/ new public roads, plans shall include proposed public roadway profiles, curvature, grade, tie-in profiles, drainage and utility data. Public roadway construction drawings shall comply with NDOT Subdivision Street Design Standards and specifications. Reference the following details: ST-200,-210,-215,-249,-252,-253, -320,-324. Reference JBS drain inlet details type 3300v TYP (Contact NDOT roads for detail).
- All public street intersections should be provided with stop control(signs/bars) and ADA compliant pedestrian access ramps. Any public access point(ramps, drives) and/or intersection should meet AASHTO stopping sight distance requirements, otherwise additional MUTCD warning signs maybe required by traffic.
- Coordinate w/ metro planning on MCSP requirements along existing ROW frontages. For reference, provide call outs on the final site plan for any MCSP requirements by planning. Any proposed roadway sections, ramps, driveways, sidewalks, curb & gutter, etc. shall be designed and called outed per NDOT ST- standard details.
- If the project is in the Urban Services Tax District(USD-see city GIS interactive maps) a street lighting plan will be required with the final SP. Coordinate w/ Teresa Neal teresa.neal@bargedesign.com for street lighting plan approval.
- Submit landscape plan with the final SP.
- A mandatory referral approval will be required for proposed abandonments of existing ROW and/or encroachments into existing ROW.
- There shall be no earthen retaining walls installed in the public ROW. There shall be no vertical utility obstructions in new public sidewalks(or roadways) and the removal, or relocation, of utilities will be required to accommodate new public sidewalks.
- Note: A private hauler will be required for waste/recycle disposal. Contact Metro Water services for waste disposal requirement solidwastereview@nashville.gov. Submit waste/recycle disposal plan with final SP.



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 57 of 153 PageID #: 199

- Note: No watering irrigation lines will be permitted in the ROW.
- Additional 1-1/2' mill and overlay may be required to cover full extents of utility, and/or road widening, work in the public ROW. On site plans, call out “mill & overlay extents to be coordinated in field with NDOT inspector”.
- Comply w/ NDOT traffic comments/conditions of approval.

**TRAFFIC & PARKING RECOMMENDATION**
**Approve with conditions**

- Per review of the MMTA, the applicant is to provide a three lane section on Hobson Pike along the development's frontage with the required 6' bike lane, 8' furnishing & 6' sidewalk per the MCSP. The striping and signage for the associated tapers shall be in compliance with AASHTO & MUTCD guidance. Further coordination with NDOT will be required at Final SP.
- Along the Mt. View Road frontage comply with the MCSP requirements, 29.5' half-section, 6' bike lane, 6' grass strip, 6' sidewalk.
- The applicant shall provide the appropriate traffic control at each internal intersection. Cross-walks shall be provided along appropriate legs of each internal intersection, with any necessary pedestrian signage per MUTCD.
- Along the approaches of the new public road intersection with Mt. View Rd and Hobson Pike, 'No parking' signage may be required to prevent parking near intersections.
- The applicant's final construction drawings shall comply with the design regulations established by the Nashville Department of Transportation, in effect at the time of the approval of the preliminary development plan or final development plan or building permit, as applicable. Final design may vary based on field conditions.

**ANTICIPATED TRIP CALCULATIONS**
The proposed rezoning from AR2a to SP is estimated to have an increase of 1,188 daily weekday trips, including 86 additional AM peak hour trips and 119 additional PM peak hour trips. For a full traffic table, please contact the Planning Department.

**METRO SCHOOL BOARD REPORT**
**Projected student generation existing AR2a district: 3 Elementary 2 Middle 3 High**
**Projected student generation proposed SP district: 33 Elementary 25 Middle 25 High**

**METRO SCHOOL BOARD REPORT**
The proposed SP district is expected to generate 75 more students than the existing AR2a district. Students would attend Edison Elementary School, John F. Kennedy Middle School, and Antioch High School. Edison Elementary School is identified as overcapacity; John F. Kennedy Middle School is identified as at capacity and Antioch High School is identified as at capacity. This information is based upon the 2025-2026 MNPS School Enrollment and Utilization report provided by Metro Schools.

**STAFF RECOMMENDATION**
Staff recommends approval with conditions and disapproval without all conditions.



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 58 of 153 PageID #: 200

**CONDITIONS**

1. Permitted uses shall be limited to 150 Single-Family Residential lots.
2. On the corrected copy, update the street yard setback to "20' along new streets and 40' along Hobson Pike from ultimate right-of-way".
3. Direct vehicular access for lots fronting Hobson Pike shall be prohibited from Hobson Pike. Lots shown with private alleys at the rear shall use the alley for vehicular access.
4. The minimum lot size shall be limited to 3,750 square feet.
5. With the final site plan, a tree preservation plan shall be provided for the areas identified as undisturbed areas. Areas outside of stormwater management areas that are identified to be preserved/undisturbed on the preliminary SP shall include tree protection measures consistent with the requirements of the Metro Zoning Code.
6. With the final site plan, provide architectural elevations complying with all architectural standards outlined on the preliminary SP for review and approval.
7. Comply with all conditions and requirements of Metro Reviewing Agencies.
8. A corrected copy of the preliminary SP plan incorporating the conditions of approval by Metro Council shall be provided to the Planning Department prior to or with the final site plan application.
9. If a development standard, not including permitted uses, is absent from the SP plan and/or Council approval, the property shall be subject to the standards, regulations, and requirements of the RS5 zoning district as of the date of the applicable request or application. Uses are limited as described in the Council ordinance.
10. The Preliminary SP plan is the site plan and associated documents. If applicable, remove all notes and references that indicate that the site plan is illustrative, conceptual, etc.
11. The final site plan shall label all internal driveways as "Private Driveways." A note shall be added to the final site plan that the driveways shall be maintained by the Property Owners' Association.
12. No master permit/HPR shall be recorded prior to final SP approval.
13. Final plat may be required prior to permitting.
14. Minor modifications to the preliminary SP plan may be approved by the Planning Commission or its designee based upon final architectural, engineering or site design and actual site conditions. All modifications shall be consistent with the principles and further the objectives of the approved plan. Modifications shall not be permitted, except through an ordinance approved by Metro Council, that increase the permitted density or floor area, add uses not otherwise permitted, eliminate specific conditions or requirements contained in the plan as adopted through this enacting ordinance, or add vehicular access points not currently present or approved.
15. The requirements of the Metro Fire Marshal's Office for emergency vehicle access and adequate water supply for fire protection must be met prior to the issuance of any building permits.



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 59 of 153 PageID #: 201




**2026SP-023-001**
COURTYARDS AT BATTLE GROVE
Map 187, Parcel(s) 015, 035
12, Southeast
33 (Antoinette Lee)



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 60 of 153 PageID #: 202

| | |
|---|---|
| **Item #8** | **Specific Plan 2026SP-023-001** |
| **Project Name** | **Courtyard at Battle Grove** |
| **Council District** | 33 – Lee |
| **School District** | 02 – Elrod |
| **Requested by** | Barge Design Solutions, applicant; Janette and Ronald J. Haislip, owners. |
| **Deferrals** | This item was deferred at the May 14, 2026, May 28, 2026, June 11, 2026, and June 25, 2026 Planning Commission meetings. No public hearing was held. |
| **Staff Reviewer** | Garland |
| **Staff Recommendation** | *Defer to the July 23, 2026, Planning Commission meeting.* |

---

**APPLICANT REQUEST**
**Preliminary SP to permit a mixed-use development.**

<u>Preliminary SP</u>
A request to rezone from Agricultural/Residential (AR2a) to Specific Plan (SP) zoning for properties located at 1010 and 1002 Battle Road, approximately 298 feet north of Kidd Road (82.37 acres), to permit 109 single-family residential lots.

**STAFF RECOMMENDATION**
Staff recommends deferral to the July 23, 2026, Planning Commission meeting.



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 61 of 153 PageID #: 203




**2026SP-027-001**
KITTY WELLS STATION
Map 043-14, Parcel(s) 051
04, Madison
09 (Tonya Hancock)



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 62 of 153 PageID #: 204

| | |
|---|---|
| **Item #9** | **Specific Plan 2026SP-027-001** |
| **Project Name** | **Kitty Wells Station** |
| **Council District** | 09 – Hancock |
| **School District** | 03 – Young |
| **Requested by** | Pape Dawson, applicant; Habitat for Humanity of Greater Nashville, owner. |
| **Deferrals** | This item was deferred at the June 11, 2026, Planning Commission meeting. No public hearing was held. |
| **Staff Reviewer** | Commey |
| **Staff Recommendation** | *Defer to the July 23, 2026, Planning Commission meeting.* |

**APPLICANT REQUEST**
**Preliminary SP to permit a mixed-use development.**

Preliminary SP
A request to rezone from Single-Family Residential (RS5) and Commercial Service (CS) to SP zoning for property located at 610 Old Hickory Boulevard, located at the corner of Ronnie Road and Old Hickory Boulevard (13.82 acres), to permit 33 single family lots, 18 two family lots, and commercial uses.

**STAFF RECOMMENDATION**
Staff recommends deferral to the July 23, 2026, Planning Commission meeting.



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 63 of 153 PageID #: 205




**2025S-203-001**
HARPETH OVERLOOK – PHASE 2
Map 126, Parcel(s) 141
06, Bellevue
35 (Jason Spain)



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 64 of 153 PageID #: 206

| | |
|---|---|
| **Item #10** | **Concept Plan 2025S-203-001** |
| **Project Name** | **Harpeth Overlook – Phase 2** |
| **Council District** | 35 – Spain |
| **School District** | 09 – Tylor |
| **Requested by** | Catalyst Design Group, applicant; William & Shawna Travis II, owners. |
| **Deferrals** | This item was deferred at the February 26, 2026, March 12, 2026, May 14, 2026, May 28, 2026, and June 11, 2026, Planning Commission meetings. No public hearing was held. |
| **Staff Reviewer** | Konigstein |
| **Staff Recommendation** | *Approve with conditions, pending a recommendation of approval by NDOT.* |

---

**APPLICANT REQUEST**
**Request for concept plan approval to create seven lots.**

Concept plan
A request for concept plan approval to create seven lots utilizing conservation development standards on property located at 7934 McCrory Lane, approximately 770 feet north of Beautiful Valley Drive, zoned Agricultural/Residential (AR2a) (5 acres).

**SITE DATA AND CONTEXT**
**Location:** The site consists of one property located along McCrory Lane, north of the intersection with Beautiful Valley Drive.

**Street Type:** The site has frontage on McCrory Lane which is classified as a Scenic Arterial Boulevard in the Major and Collector Street Plan (MCSP).

**Approximate Acreage:** 5 acres (217,879 SF).

**Parcel/Site History:** The subject property at McCrory Lane (unnumbered) was created by deed in July 2024 and includes a total of five acres. The site is adjacent to the neighboring Harpeth Overlook – Phase 1 which was approved in September 2024 (2024S-083-001).

**Zoning History:** The property was rezoned to Single Family Residential (RS10) in 2025. Prior to being rezoned, the site was previously zoned Agricultural/Residential (AR2a).



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 65 of 153 PageID #: 207




N

**Proposed Concept Plan**

**Existing Land Use:** The site is currently developed with a single-family structure.

**Surrounding Land Use and Zoning:**
- North: Single Family/Agricultural/Residential (AR2a)
- South: Single Family/Single Family Residential (RS10)
- East: Single Family/Single Family Residential (RS10)
- West: Cemetery/One and Two-Family Residential (R10)

**Zoning:** Single-Family Residential (RS10)
Min. lot size: 10,000 square feet
Max. building coverage: 0.40
Min. rear setback: 20 feet
Min. side setback: 5 feet
Max. height: 3 stories
Min. street setback:
- 20 feet along local streets – Hailey Heights
- 40 feet on arterial boulevards – McCrory Lane

**PROPOSAL DETAILS**
**Number of lots:** Seven lots.

**Lot sizes:** The proposed lot sizes vary from 7,475 square feet to 58,093 square feet. The plan utilizes the Conservation Development standards to permit lot size flexibility in exchange for protection of natural areas present on the site. The Conservation Development Standards (17.12.090) allow subdivisions to reduce lots in size from the minimum required by the base zoning district by equivalent percentage of the site that is to remain natural open space. The site acreage is five acres or 217,879 square feet, while the plan proposes 1.8 acres of primary conservation area, resulting in allowable lot size reduction of 36 percent. This reduction would result in a minimum lot size of 6,400 square feet. All proposed lots exceed the minimum lot size.

**Access:** The plan proposes access for Lots 36 to 41 from the recently approved Hailey Heights street to the south of the subject parcel. Lot 42 is accessed from McCrory Lane. This access point is intended to remain, pending agreement of an access easement to maintain clear sight distance from McCrory Lane.

**Subdivision Variances or Exceptions Requested:** Exception for Lot 42 from Section 3-5.2 for the compatibility criteria.

**Conservation Development Standards (17.12.090)**

A. *Purpose and Intent. Conservation development is a set of standards that shall be utilized in the design of subdivisions as provided in this section. The purpose of these standards is to:*
    1. *Preserve unique or sensitive natural resources such as steep slopes; hillsides; streams, wetlands, floodways, and floodplains; problem soils; archaeological resources; and native forests or unique vegetation through the creation of natural open space.*

2. *Encourage the creation of lots on less environmentally sensitive areas of the site.*
3. *Provide flexibility in design of subdivisions within existing zoning districts to promote environmental resource protection.*

B. *Applicability. Subdivisions proposed in the R/R-A and RS/RS-A zoning districts that meet both of the following standards shall utilize the provisions of this section.*

1. *Minimum Site Area. The minimum site area of no less than ten times the minimum lot area for the base zoning district as established by Table 17.12.020A. For example, in the R10 district the minimum area for the subdivision would be one hundred thousand square feet. (Ten thousand square feet minimum lot size times ten).* Complies. The site is zoned RS10 which would require a minimum area of 100,000 square feet. The proposed site has a total area (217,879 SF) which meets the minimum site area.
2. *Minimum Natural Area. A minimum of ten percent of the site contains any, or a combination of, the following:*
   a. *Areas shown on FEMA maps as part of the 100-year floodplain or identified in local studies as confirmed by Metro Stormwater;*
   b. *All perennial and intermittent streams, floodways, and associated buffers, as determined by Metro Stormwater or the State;*
   c. *Areas of natural slopes of twenty percent or greater of at least ten thousand square foot contiguous area;*
   d. *Areas containing problem soils as established by Section 17.28.050; wetlands, as determined by metro stormwater;*
   e. *Known habitat for federally or state listed or proposed rare, threatened, or endangered species;*
   f. *Areas containing a protected Cedar Glade plant species as established by Section 17.28.060;*
   g. *Archaeological or historic sites, cemeteries, and burial grounds; or*
   h. *Protected, heritage and historic and specimen trees, as defined by Section 17.40.450 of the Metro Zoning Code.*

   More than 10 percent of the site contains features described in parts b and c.

C. *Maximum Lot Yield. The determination of the maximum lot yield shall be based on assigning twenty percent of the gross acreage of the site to open space and infrastructure. The remaining eighty percent of the gross acreage shall be divided by the minimum lot size of the base zoning district to determine the maximum yield. Yield shall not be based on the minimum lot size as described in Section D Lot Size Flexibility.*
The total site area is five acres. Eighty percent of the gross acreage of the site is four acres. The maximum lot yield is 17 lots based on a minimum of 10,000 square feet for an RS10 residential lot. A total of seven lots are proposed, which does not exceed the maximum lot yield.

D. *Conservation and Design Flexibility. In order to accomplish the purposes of this section, flexibility in lot sizes may be proposed in exchange for protection of the natural areas present on the site in natural open space according to the following standards:*



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 68 of 153 PageID #: 210

The proposal sets aside approximately 36 percent (1.8 acres) of the five-acre site for undisturbed natural area. The minimum lot size is reduced from 10,000 square feet to 6,400 square feet (17.12.090.d.4).

E. *Natural Open Space. Open space provided for the purposes of protecting natural areas and in exchange for flexibility of design, as described above, shall be called natural open space and subject to the standards below. These standards are not applicable to common areas or open spaces that may be provided for other purposes.*
Natural areas on the site include areas of natural slopes of twenty percent or greater, floodway and associated buffers. Protected natural open space comprising approximately 1.8 acres (shown as Preserved Natural Open Space on the plans) is identified on the northeastern portion of the site, encompassing river and stream floodway and associated buffers on this portion. These areas are also co-located with areas of slopes and wooded areas. As shown on the preliminary grading plan, grading is limited to the development footprint, the areas associated with the construction of the new bio-retention area, and the single-family lots. A homeowner's association will be responsible for management and maintenance of open spaces.

F. *Application Requirements*
The submitted application contains all the necessary information for a Conservation Development including a site plan, a site analysis map that identifies natural areas, and a preliminary grading plan that demonstrates the limits of disturbance and overall impacts to natural areas.

**APPLICABLE SUBDIVISION REGULATIONS**
Volume III of NashvilleNext, the General Plan for Nashville and Davidson County, contains the Community Character Manual (CCM) which establishes land use policies for all properties across the county. The land use policies established in CCM are based on a planning tool called the Transect, which describes a range of development patterns from most to least developed.

Prior versions of Subdivision Regulations for Nashville and Davidson County contained a uniform set of standards that were applied Metro-wide. This did not take into account the diverse character that exists across the County. In order to achieve harmonious development within the diversity of development patterns that exist in Nashville and Davidson County, the Planning Commission has adopted the current Subdivision Regulations. The Subdivision Regulations incorporate the General Plan policies by including rules or standards for each specific transect. This allows policies of the General Plan to be followed through application of the varying Subdivision Regulations to reflect the unique characteristics found in the different transects. The site is within the Suburban Neighborhood Maintenance (T3 NM) policy. For T3 NM, the conventional regulations found in Chapter 3 are utilized.

**3-1 General Requirements**
This subdivision is required to meet the standards of Chapter 3. Staff finds that all standards are met.



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 69 of 153 PageID #: 211

**3-2 Monument Requirements**
Does not apply to concept plans. Monuments will be set after final plat approval.

**3-3 Suitability of the Land**
The site includes natural areas as defined by the Conservation Development Standards in the zoning code. The standards are intended to address the environmental factors. The site includes sensitive environmental features including slopes and floodway and associated buffers at the northeastern corner. The plan does not propose any building within the floodway or the buffers identified to be preserved, therefore staff finds that the land is suitable for development consistent with this section.

**3-4 Lot Requirements**
All lots comply with the minimum standards of the zoning code and the conservation subdivision requirements. Lots are required to have frontage onto a public street or, where permitted, onto a private street, or onto a common open space. Lots that front onto a common open space shall have a pedestrian connection from the front of each residential unit to the sidewalk and shall have vehicular access from an abutting public or private alley, or a shared driveway easement. All proposed lots front onto the proposed public streets and at the time of the development plan will be reviewed for sidewalk connections.

**3-5 Infill Subdivisions**
In order to ensure compatibility with the General Plan, the Commission has adopted specific regulations applicable to infill subdivisions, defined as residential lots resulting from a proposed subdivision within the R, R-A, RS, and RS-A zoning districts on an existing street. If a proposed infill subdivision meets all of the adopted applicable regulations, then the subdivision is found to be harmonious and compatible with the goals of the General Plan. An exception to the compatibility criteria may be granted by the Planning Commission for a SP, UDO, or cluster lot subdivision by approval of the rezoning or concept plan.

*3-5.2 Criteria for Determining Compatibility for policy areas designated in the General Plan as Neighborhood Maintenance, except where a Special Policy and/or a Designated Historic District exists.*
Lots 36 to 41 proposed along Hailey Heights meet compatibility requirements. Lot 42, located along McCrory Lane does not have lots to compare to as it is bordered by a parcel to the north zoned AR2a and the intersection of Hailey Heights and McCrory Lane to the south.

Per Section 3-5.2, in cases where lots do not meet the requirements for compatibility, the Planning Commission may grant an exception to the compatibility requirement by considering a larger area to evaluate general compatibility. More information is provided in the Variance/Exceptions Analysis section below.

*3-5.3 Criteria for Determining Compatibility for policy areas designated in the General Plan as Neighborhood Evolving and/or Special Policies, except within Designated Historic Districts.*
Not applicable to this case.

*3-5.4 Criteria for Determining Compatibility for Designated Historic Districts.*
Not applicable to this case.

*3-5.5 Infill Subdivision Frontage*
Not applicable to this case.

*3-5.6 Reasonable Conditions*
Not applicable to this case.

**Variances/Exceptions Analysis**
The proposed Lot 42 does not have lots to compare to in order to determine compatibility standards as the parcel to the north is zoned AR2a and to the south is the intersection of Hailey Heights. Lot 42 is proposed to be 58,903 square feet or approximately 1.35 acres.

Along McCrory Lane, the larger area, north and south of the site, generally does not have an established lot pattern as there is a large cemetery to the west across McCrory Lane and large irregularly shaped lots to the south. McCrory Lane is also a scenic arterial. The proposed lot size for Lot 42 is appropriate considering the other larger lots to the south with frontage on McCrory Lane are greater than one acre.

Staff finds that the proposed Lot 42 is comparable to parcels in the surrounding area as it is larger in size and fits in to the irregular pattern of lots in the area. Given this information, staff finds the proposed lots to be consistent with the larger area and that an exception to compatibility requirements may be appropriate.

**3-6 Blocks**
No new blocks are proposed with this development.

**3-7 Improvements**
Construction plans for any required public or private improvements (stormwater facilities, water and sewer, public roads, etc.) will be reviewed with the final site plan.

**3-8 Requirements for Sidewalks and Related Pedestrian and Bicycle Facilities**
The proposed plan includes the right-of-way dedication for future MCSP improvements to be constructed in the future.

**3-9 Requirements for Streets**
The proposed subdivision includes no new public streets.

**3-10 Requirements for Dedication, Reservations, or Improvements**
Right-of-way and easements for this project are shown on the concept plan and will be dedicated with final plat. Seventeen and half feet are proposed to be dedicated on McCrory Lane to meet the total 42.5 feet called for by the MCSP. Within this area is a six-foot bike lane, eight-foot planting strip, and six-foot sidewalk all proposed to be built in the future per Section 3-8 of this report.

**3-11 Inspections During Construction**
This section is applicable at the time of construction, which will occur during the installation of infrastructure once construction plans have been approved.

**3-12 Street Name, Regulatory and Warning Signs for Public Streets**
NDOT will require the review and approval of streets with the submittal of the final site plan. Street names for new streets will be reviewed at that time.

**3-13 Street Names, Regulatory and Warning Signs for Private Streets**
Not applicable. No private streets are proposed.

**3-14 Drainage and Storm Sewers**
Drainage and storm sewer requirements are reviewed by Metro Stormwater. Stormwater recommends approval with conditions.

**3-15 Public Water Facilities**
Harpeth Valley Utility District has reviewed this proposed concept plan for water and has recommended approval.

**3-16 Sewerage Facilities**
Harpeth Valley Utility District has reviewed this proposed concept plan for sewer and has recommended approval.

**3-17 Underground Utilities**
Utilities are required to be located underground whenever a new street is proposed. The utility plan will be reviewed in more detail with the submittal of construction plans.

**PLANNING STAFF COMMENTS – SUBDIVISION REGULATIONS**
Staff finds the proposed subdivision consistent with the intent of Chapter 3 of the Subdivision Regulations and the standards of the Metro Zoning Code. Additionally, the Subdivision meets all the standards of a Conservation Development and achieves the purpose of creating lots on less environmentally sensitive areas of the site through flexibility in the lot sizes and design of subdivisions.

**POLICY CONSIDERATIONS**
A recent appeals court decision (Hudson et al v. Metro) upheld a lower court decision which outlined that the Planning Commission has the authority to determine whether a concept plan complies with the adopted General Plan (NashvilleNext). Per the Court, the Planning Commission

may not evaluate each concept plan to determine whether it is harmonious generally but may consider policy. Policy information is provided below for consideration.

NashvilleNext includes a Community Character Manual (CCM) which established character areas for each property within Metro Nashville. The community character policy applied to the entirety of this property is T3 NM (Suburban Neighborhood Maintenance). The goal of the T3 NM Policy is to maintain suburban neighborhoods as characterized by their development pattern, building form, land use and associated public realm. The policy states that these areas are envisioned to remain primarily residential with low- to moderate-density residential development. Appropriate land uses in the T3 NM policy include residential, community gardens and open spaces, and institutional uses.

According to the T3 Suburban Neighborhood Maintenance policy density is secondary to the form of development; however, these areas are meant to be low- to moderate-density, with appropriate density determined by existing character of each individual neighborhood in terms of its mix of housing types, setbacks, spacing between buildings, and block structure.

**COMMENTS FROM OTHER REVIEWING AGENCIES**

**FIRE MARSHAL RECOMMENDATION**
**Approve**

**GREENWAYS RECOMMENDATION**
**Approve with conditions**

- A Conservation Greenway Easement must be dedicated and memorialized in a Metro Parks' Conservation Greenway Easement Agreement (CGEA), including two exhibits: a legal description and a boundary survey of the easement, all of which must be executed by the property owner, notarized, submitted to, and approved by Greenways prior to final plat approval.
- The Conservation Greenway Easement, including the floodway plus 75' floodway buffer Zones 1 and 2, must be clearly labeled and delineated by metes and bounds, including any necessary line and/or curve table, on the final plat.
- The final plat must include the acreage within the Conservation Greenway Easement and its length in feet measured at center.
- The Conservation Greenway Easement Agreement must be recorded with the Davidson County Register of Deed's Office prior to any use and occupancy or issuance of the first Use and Occupancy letter.
- Coordinate with Greenways staff to process the Conservation Greenway Easement Agreement for Park Board and Metro Council approval.
- Maintenance within Greenway Conservation Easement to be performed by Applicant until such time as the greenway is built or as otherwise approved in writing by Parks.
- Dumpsters, loading zones, HVAC units, or like shall not front the greenway and must be screened from view from the greenway.
- Greenway trail to be open to the public 365 days/year per Metro Parks approved operating hours, except for times of routine maintenance where temporary closure is required for public safety.

- Any access to the Conservation Greenway Easement and/or onto the greenway must be approved by Metro Parks.
- No obstructions such as site furniture, signage, and lighting are allowed in a Conservation Greenway Easement unless approved by Greenways staff.

**STORMWATER RECOMMENDATION**
**Approve with conditions**

- Approved as a Preliminary review only. Must comply with all regulations in the Stormwater Management Manual at the time of final submittal for approval.

**NASHVILLE DOT RECOMMENDATION**
**Pending**

**TRAFFIC AND PARKING RECOMMENDATION**
**Pending**

**METRO WATER SERVICES RECOMMENDATION**

- Not applicable – served by Harpeth Valley Utility District

**HARPETH VALLEY UTILITIES DISTRICT**
**Approve**

**STAFF RECOMMENDATION**
Staff recommends approval with conditions, pending approval by NDOT.

**CONDITIONS**

1. The clearing, grading, and disturbance of natural open space shall be prohibited, unless otherwise identified in the concept plan. Minor changes may be allowed during review of the final based on engineering and construction plans. However, if the amount of open space is reduced, the lots may need to increase in size per the requirements of the Conservation Development standards.
2. Pursuant to 2-2.5.f of the Metro Subdivision Regulations, the approval a of concept plan shall be effective for four years from the date of Planning Commission approval to the recording of the final plat or a phase of the plat as described in Section 2-2.5.g.
3. Comply with all conditions and requirements of Metro reviewing agencies.
4. The requirements of the Metro Fire Marshal's Office for emergency vehicle access and adequate water supply for fire protection must be met prior to the issuance of any building permits.

**RECOMMENDED ACTION**
Motion to approve proposed subdivision Case No. 2025S-203-001 with conditions and an exception to the Metro Subdivision Regulations Section 3-5.2, based upon finding that the subdivision complies with the applicable standards of the Metro Subdivision Regulations, Metro Zoning Code, and other applicable laws, ordinances and resolutions as noted in the staff report, subject to all of the staff recommended conditions.

# SEE NEXT PAGE



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 75 of 153 PageID #: 217




**2026S-087-001**
0 CLARKSVILLE PIKE
Map 059, Parcel(s) 152
03, Bordeaux-Whites Creek-Haynes Trinity
01 (Joy Kimbrough)

| | |
|---|---|
| **Item #11** | **Final Plat 2026S-087-001** |
| **Project Name** | **0 Clarksville Pike** |
| **Council District** | 01 – Kimbrough |
| **School District** | 01 – Taylor |
| **Requested by** | ASM Land Surveyors, applicant; Joe Angel Villalobos, Amanda Teresa Villalobos Soriano and Yelu Villalobos, owners. |
| **Staff Reviewer** | Chen |
| **Staff Recommendation** | *Withdraw.* |

**APPLICANT REQUEST**
**Request for final plat approval to create one lot.**

Final Plat
A request for final plat approval to create one lot on property located at Clarksville Pike (unnumbered), approximately 1,637 feet south of Echo Lane (0.55 acres), zoned One and Two-Family Residential (R15) (0.55 acres).

**STAFF RECOMMENDATION**
Staff recommends withdrawal.




**2026CP-007-001**
WEST NASHVILLE COMMUNITY PLAN AMENDMENT
Map 091, Parcel 066 (portion of)
07, West Nashville
21 (Brandon Taylor)



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 78 of 153 PageID #: 220

| | |
|---|---|
| **Item #12** | **Minor Plan Amendment 2026CP-007-001** |
| **Project Name** | **West Nashville Community Plan Amendment** |
| **Council District** | 21 – Taylor |
| **School District** | 05 – Fayne |
| **Requested by** | Barge Civil & Associates, applicant; R Manuel – Centennial, GP, owner. |
| **Staff Reviewer** | Pokhrel |
| **Staff Recommendation** | *Approve.* |

---

**APPLICANT REQUEST**
**Amend the West Nashville Community Plan to change the policy.**

Minor Plan Amendment
A request to amend the West Nashville Community Plan by changing the community character policy from District Industrial (D IN) policy to Urban Mixed Use Neighborhood (T4 MU) policy, with Conservation (CO) policy to remain in place, for a portion of property located at 1401 51st Avenue North (6.15 acres).

**WEST NASHVILLE COMMUNITY PLAN**
**Current Policy**
District Industrial (D IN) policy is intended to maintain, enhance, and create districts that are dominated by one or more industrial activities, so that they are strategically located and thoughtfully designed to serve the overall community or region, but not at the expense of the immediate neighbors. Types of uses in D IN areas include non-hazardous manufacturing, distribution centers, and mixed business parks containing compatible industrial and nonindustrial uses. D IN areas typically have a highly connected internal street network adequate for the movement of freight traffic, which is also connected to external interstate systems and arterial-boulevards. In general, permanent residential activities are not found in D IN areas. An exception may be the edge of a D IN area along the interface with an area containing or planned to contain residential activities. Adjacent Conservation (CO) policy associated with the Cumberland River will remain in place.

Conservation (CO) policy is intended to preserve, remediate, and enhance environmentally sensitive land. CO policy identifies land with sensitive environmental features including, but not limited to, stream corridors, steep slopes, floodway/floodplains, rare or special plant or animal habitats, wetlands, and unstable or problem soils. CO policy applies to a small area of floodplain adjacent to the Cumberland River, near the northwestern corner of the site. CO policy will remain in place.

**Requested Policy**
Urban Mixed Use Neighborhood (T4 MU) policy is intended to maintain, enhance, and create urban mixed use neighborhoods with a diverse mix of moderate to high density residential, commercial, office, and light industrial land uses. These areas have high levels of connectivity and complete street networks with sidewalks, bikeways, and existing or planned transit. Insufficient or missing transportation infrastructure may require enhancements to improve pedestrian, bicycle, and vehicular connectivity.

**BACKGROUND**
At the request of the applicant, Planning staff initiated a study for a 6.15-acre portion of the 8.24-acre property located at 1401 51st Avenue North to determine whether Urban Mixed Use Neighborhood (T4 MU) policy may be appropriate for the property. The remaining portion of the property is already guided by T4 MU policy; therefore, the requested amendment would extend the existing mixed use policy designation across the remainder of the site.

The study area is located along the north side of Centennial Boulevard between 51st Avenue North and 54th Avenue North, adjacent to the Cumberland River and CSX railroad corridor. The property contains a former grain silo at the southeast corner. Surrounding development patterns in the area consist of a mix of industrial, residential, and mixed use policies. T4 MU policy is established on the southern and western sides of the study area, including portions of the subject property (part of a policy amendment in April 2016), while D IN policy remains north of the site along the Cumberland River corridor and to the east. The surrounding policy pattern reflects an evolving urban context with growth of mixed use development in the area.

**COMMUNITY PARTICIPATION**
As part of the community plan amendment review process, Planning staff determined that the proposed amendment qualified as a minor amendment to the West Nashville Community Plan. While a formal community meeting for this specific request was not held, Councilmember Taylor engaged with constituents in his district prior to submitting the request to gauge community sentiment and to determine the community's support for the proposed policy change. Public hearing notices were sent to neighboring property owners in accordance with Metro's adopted rules and regulations; at the time of staff report publication, the Planning Department had not received any comments from the public.

**ANALYSIS**
Planning staff analyzed the 6.15-acre study area to determine the appropriateness of the existing District Industrial (D IN) policy as well as the proposed Urban Mixed Use Neighborhood (T4 MU) policy. The analysis included a review of parcel-level data such as lot size, configuration, and development patterns, as well as an evaluation of recent policy and zoning trends near the study area. Staff were primarily focused on determining whether an extension of T4 MU policy could align with the existing character and context of the neighborhood while also supporting its long-term stability. Staff concluded that T4 MU policy would be compatible with existing patterns and trends in the area.

**NashvilleNext Growth & Preservation Concept Map**
The NashvilleNext Growth and Preservation Concept Map is a countywide visioning tool designed to guide where and how new development and redevelopment should occur in a manner that aligns with community values and enhances overall quality of life. The Concept Map helps shape long-term planning decisions by identifying broad land use categories and emphasizing the balance between growth and conservation.



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 80 of 153 PageID #: 222

As shown in the following image, the study area is situated within a Special Uses area. Special Uses areas include large-scale land uses such as industrial zones, airports, and landfills. Areas to the east and west are also designated Special Uses, consistent with the concentration of industrial and employment-focused activities in the broader area. Areas south of the Centennial Boulevard corridor are designated Neighborhood. Neighborhood areas are intended to support a mix of housing types and neighborhood character, along with smaller-scale civic and employment uses and neighborhood centers. In the larger area, several policy changes to T4 MU have occurred. Should the proposed community plan amendment be approved by the MPC, the Growth and Preservation Concept Map will be updated to reflect the existing and proposed T4 MU policy framework by changing all T4 MU areas within the amendment area from Special Uses to Neighborhood, including the subject property and adjacent properties already guided by T4 MU policy.




**Growth and Preservation Concept Map** ▲North

**Community Character Policy Application**
There are 14 Community Plans that provide the development and preservation vision and policy guidance for neighborhoods and communities across Davidson County. These plans utilize the Community Character Manual, which defines a framework of policy types that help guide appropriate land use, development patterns, and community form to apply the Concept Map's guidance on a property-by-property basis. The West Nashville Community Plan applies these Community Character Policy elements to ensure that growth and change occur in a manner consistent with the area's vision and values. Through this approach, the plan reinforces the preservation of existing neighborhood character while allowing for context-sensitive development and growth that aligns with community expectations.



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 81 of 153 PageID #: 223

The current policy of D IN was applied to the study area to support industrial activities within a strategically located employment area. D IN policy is intended for areas that contain concentrations of industrial uses such as manufacturing, warehousing, distribution, and other employment-generating activities that rely on access to freight transportation networks and separation from sensitive land uses.

The study area is situated along Centennial Boulevard, a corridor that has experienced a gradual transition from predominantly industrial development to a more urban and mixed use environment. Properties immediately west and south of the study area are guided by Urban Mixed Use Neighborhood (T4 MU) policy, while D IN policy remains in place along portions of the Cumberland River corridor to the east. Additional mixed use, neighborhood, and commercial policies are located throughout the surrounding area, reflecting the area's changing development pattern and increasing urban character.

The following map shows how the West Nashville Community Plan will change if T4 MU policy is extended to the study area.




**Community Character Policy Map with Proposed Policy Change** ▲North

**Current Land Uses and Zoning**

The study area is largely undeveloped and contains the former grain silo near 51st Avenue North. The surrounding area contains a diverse mix of land uses, including single-family residential, multi-family residential, commercial, office, community/institutional, and industrial uses. Industrial land uses are concentrated north of Centennial Boulevard and adjacent to the Cumberland River and CSX railroad corridor. South of the study area, development patterns become increasingly mixed, with residential neighborhoods, commercial establishments, office uses, and community facilities located throughout the surrounding area. In recent years, over 100 multi-family units have been

built on the adjacent property to the west (part of this larger development). Commercial and mixed use activity is particularly evident along Centennial Boulevard and nearby corridors, reflecting ongoing reinvestment and redevelopment within West Nashville. This mix of land uses demonstrates that the study area is located within a transitional area between traditional industrial activities and an increasingly urban mixed use environment.

The study area is currently zoned Specific Plan (SP). A mix of zoning districts is present in the study area's vicinity. Industrial zoning districts, including Industrial General (IG) and Industrial Restrictive (IR), are located north and east of the study area near the Cumberland River and CSX railroad corridor. Mixed use zoning districts, including MUL-A and MUL-A-NS, are prevalent along Centennial Boulevard and throughout the surrounding neighborhood. Residential zoning districts, including RM40-A-NS, R6-A, and RS5, are also present in the vicinity, reflecting the area's increasingly diverse development pattern. The following map shows the mix of current base zoning districts for the study area and vicinity.




**Base Zoning Districts** ▲North

T4 MU policy may support a variety of residential, commercial, office, mixed use, and light industrial zoning districts, depending on context and other factors. While the appropriateness of any specific zoning district would be evaluated through a future rezoning process, the range of development forms envisioned under T4 MU appears generally consistent with the mixed use zoning pattern that exists throughout the surrounding area.

**Mobility and Connectivity**

The study area is located along Centennial Boulevard between 51st Avenue North and 54th Avenue North. The Cumberland River is located to the north. Centennial Boulevard is classified as an arterial-boulevard in the Major and Collector Street Plan (MCSP) and serves as an important east-



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 83 of 153 PageID #: 225

west transportation corridor that connects West Nashville neighborhoods with employment centers, commercial areas, and other destinations throughout the city.

The study area has access to 54th Avenue North to the west and limited access to 51st Avenue North to the east. Currently, public access is provided from the 54th Avenue right-of-way to the west. Access to the site from 51st Avenue North is currently provided from an emergency access easement where the street intersects with the CSX railroad crossing at the southeast corner, to 54th Avenue North. Both 51st Avenue North and 54th Avenue North cross the CSX railroad corridor at grade. (Note that 51st Avenue North, north of Centennial, is unpaved in parts.) While these connections provide access to the surrounding street network and nearby corridors, the study area does not have direct access to Centennial Boulevard, and connectivity to the primary arterial corridor is therefore indirect and dependent on crossing the CSX railroad track. Because access to the site is limited, any future development of the site should focus heavily on access improvements with particular emphasis placed on safety.

The study area benefits from proximity to a network of local streets and collector roadways that provide connections to surrounding neighborhoods. 51st Avenue North serves as an important north-south connection within the area, while nearby 63rd Avenue North is classified as a collector-avenue, supporting local circulation and connectivity between residential and commercial areas. In some places, streets are in poor condition and need improvements.

The surrounding area exhibits a relatively connected street network; however, pedestrian infrastructure is inconsistent. Sidewalks are present along portions of the surrounding roadway network but are fragmented. Bicycle facilities are also limited, with portions of bikeways located along Dr. Walter S. Davis Boulevard. A comprehensive bicycle network has not yet been established within the immediate vicinity of the study area. Transit service in the vicinity is provided by the WeGo Public Transit Route 19, which operates along 51st Avenue North, south of the study area, and includes multiple existing bus stops. While transit service is available nearby, no fixed-route bus service currently operates directly through the study area, and any mode of transportation results in crossing the at-grade railroad track.



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 84 of 153 PageID #: 226

The following image shows MCSP classifications for the area.




**Major and Collector Street Plan** ▲North

**Analysis Summary**

The study area is located north of the Centennial Boulevard corridor within The Nations. The area has transitioned from a predominantly industrial environment to a more diverse urban setting characterized by residential, commercial, office, industrial, and mixed use development. While the property is currently guided by District Industrial (D IN) policy, which is intended to preserve and support concentrations of industrial and employment-generating uses, the immediate context surrounding the site no longer reflects a solely industrial character. Properties adjacent to the study area, including portions of the subject property, are already guided by Urban Mixed Use Neighborhood (T4 MU) policy, and a range of mixed use, residential, and commercial zoning districts are established throughout the surrounding area.

The most notable change in conditions is the significant increase in residential development in the surrounding area, including multi-family housing, which has contributed to demand for neighborhood-serving commercial uses and supporting services. This shift has been accompanied by reinvestment and infrastructure improvements that further support higher-intensity, mixed use development along the Centennial Boulevard corridor. As a result, the existing D IN policy is inconsistent with current development patterns and the evolving character of the area.

The study area is also distinguished by the presence of a former grain silo that is identified as Worthy of Conservation, recognizing the site's industrial heritage and contributing to its unique character within The Nations. The applicant has indicated that the Nations Silo will be preserved as part of future redevelopment of the property.



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 85 of 153 PageID #: 227

Within this context, the study area functions as part of a transitioning corridor rather than a consolidated industrial district. The requested T4 MU policy is more responsive to these conditions, as it supports a compatible mix of residential, commercial, office, and light industrial uses within a connected urban framework. As noted previously in this report, improved transportation infrastructure will be necessary to enhance the pedestrian, bicyclist, and vehicular experience in the area. Special attention to access will be required with any future development. Applying T4 MU policy would align the property with adjacent mixed use designations, reflect existing development trends in The Nations, and support a more coordinated development pattern consistent with long-term urban planning objectives for the area.

**STAFF RECOMMENDATION**

Staff recommends approval of the requested policy change from District Industrial (D IN) policy to Urban Mixed Use Neighborhood (T4 MU) policy, with Conservation (CO) policy to remain in place.

# SEE NEXT PAGE



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 87 of 153 PageID #: 229




## 2026SP-021-001

RIVER VIEW TOWNHOMES
Map 070-09, Parcel(s) 018
03, Bordeaux - Whites Creek - Haynes Trinity
02 (Kyonzté Toombs)



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 88 of 153 PageID #: 230

**Item #13** **Specific Plan 2026SP-021-001**
**Project Name** **River View Townhomes**
**Council District** 02 – Toombs
**School District** 01 - Taylor
**Requested by** Williams & Associates Engineering, Inc., applicant; Fed Development, LLC, owner.

**Staff Reviewer** Konigstein
**Staff Recommendation** *Approve with conditions and disapprove without all conditions.*

---

**APPLICANT REQUEST**
**Preliminary SP to permit a multi-family development.**

Zone Change
A request to rezone from One and Two-Family Residential (R10) to Specific Plan (SP) zoning for property located at 2401 Buena Vista Pike, located approximately 400 feet northeast of Mattie Street (1.03 acres), to permit 12 multi-family residential units.

**Existing Zoning**
One and Two-Family Residential (R10) requires a minimum 10,000 square foot lot and is intended for single -family dwellings and duplexes at an overall density of 4.36 dwelling units per acre. *Based on acreage alone, R10 would permit a maximum of four duplex lots. This does not account for compliance with the Metro Subdivision Regulations and compliance with these regulations may result in fewer lots.*

**Proposed Zoning**
Specific Plan-Residential (SP-R) is a zoning district category that provides for additional flexibility of design, including the relationship of streets to buildings, to provide the ability to implement the specific details of the General Plan. *This Specific Plan includes only one residential building type.*

**BORDEAUX – WHITES CREEK – HAYNES TRINITY COMMUNITY PLAN**
T4 Urban Neighborhood Evolving (T4 NE) is intended to create and enhance urban residential neighborhoods that provide more housing choices, improved pedestrian, bicycle, and vehicular connectivity, and moderate to high density development patterns with shallow setbacks and minimal spacing between buildings. T4 NE areas are served by high levels of connectivity with complete street networks, sidewalks, bikeways and existing or planned mass transit. T4 NE policy may be applied either to undeveloped or substantially under-developed "greenfield" areas or to developed areas where redevelopment and infill produce a different character that includes increased housing diversity and connectivity. Successful infill and redevelopment in existing neighborhoods needs to take into account considerations such as timing and some elements of the existing developed character, such as the street network and block structure and proximity to centers and corridors.

Haynes Trinity Supplemental Policy
The site is within the Haynes Trinity Supplemental Policy which was approved and adopted by the Planning Commission on January 11, 2018. The mobility plan component of the Haynes Trinity Planning Study calls for a more connected street system to provide a strong and cohesive block structure. The Mobility Plan within the Study identifies the benefits of increased street connectivity which include lower traffic volumes on major streets, alternative route choices, and redundant emergency vehicle access.

**SITE CONTEXT AND PLAN DETAILS**
The 1.03-acre site is located east of the intersection of Buena Vista Pike and Mattie Street on the northwest side of Buena Vista Pike. The site is developed with a single-family residential use. The site has frontage on Buena Vista Pike and the rear property line abuts East Lane, which is unimproved right-of-way.. The surrounding area is primarily comprised one and two-family residential, multi-family, and vacant land. Surrounding zoning districts around the site include Commercial Neighborhood (CN), Commercial Limited (CL), and One and Two-family Residential (R8).

The proposed SP would permit a maximum of 12 multi-family townhome residential units. All units are rear loaded, and six surface parking spaces are provided internal to the site. The proposed units include individual connections to the sidewalk proposed on Buena Vista Pike. Areas of ROW dedication are proposed to be dedicated along the Buena Vista Pike frontage consistent with the Major and Collector Street Plan (MCSP). The sidewalk, consistent with the MCSP requirement, has connections to the WeGo bus stop also located on the site’s frontage. Units are limited to three stories in 35 feet and have architectural standards that include glazing and building material standards.



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 90 of 153 PageID #: 232




**Proposed Preliminary SP**

**ANALYSIS**
The plan is consistent with the T4 Neighborhood Evolving (T4 NE) policy at this location and meets the intent of the policy to create and enhance urban residential neighborhoods that provide more housing choices, improved pedestrian, bicycle and vehicular connectivity. The proposed plan has residential uses, which is consistent with the intent of the T4 NE policy and contributes to the housing diversity in the area with townhouse units at a moderate level of density of approximately 11.6 units per acre. The plan also proposes the height of all units to be three stories aligning with the guidance of the policy for structures to be between one to three stories.

The site is located along Buena Vista Pike, an arterial boulevard, as identified by the MCSP and shares frontage with a WeGo bus stop serviced by southbound WeGo route 71. The plan proposes to improve the street frontage to MSCP standards including a six foot wide sidewalk. The plan also includes a newly installed passenger waiting area meeting WeGo standards to serve the southbound route. The site is also within a quarter mile of the northbound bus stop for WeGo route 71 across Buena Vista Pike. There are also sidewalk connections from each of the units to the sidewalk proposed along Buena Vista Pike and to the proposed bus stop. Per policy guidance, areas with higher levels of connectivity and access to multi-modal transportation may be appropriate for increases in density.

Given the proposed uses and site layout, staff finds that the proposed plan is consistent with the T4 NE policy.

**FIRE MARSHAL RECOMMENDATION**
**Approve with conditions**

- Fire apparatus access roads shall be provided and maintained in accordance with the 2024 International Fire Code and local amendments.
- Fire apparatus access roads shall extend to within 150 feet of all portions of the facility and all portions of the exterior walls of the first story of the building as measured by an approved route around the exterior of the building or facility.
- Fire apparatus access roads shall have a minimum unobstructed width of 20 feet.
- Aerial fire apparatus access roads shall have a minimum unobstructed width of 24 feet and comply with IFC Appendix D105
- Dead-end fire apparatus access roads exceeding 150 feet, or where required by the fire code official, shall be provided with an approved fire apparatus turnaround.
- Fire apparatus access roads shall be constructed of an all-weather driving surface capable of supporting fire apparatus weighing 87,000 pounds.
- An approved water supply capable of supplying the required fire flow for fire protection shall be provided to premises on which facilities, buildings or portions of buildings are constructed.
- Fire hydrants shall be provided and spaced in accordance with 2024 International Fire Code Appendix C. No portion of the building shall exceed 500 feet from a fire hydrant.
- All construction and developments shall meet the fire-flow requirements listed in 2024 International Fire Code Appendix B.
- Fire Department Connections (FDC) for sprinkler systems and standpipes shall be located within 100 feet of a fire hydrant. FDC locations shall be approved by the fire code official.

- Where two separate and approved fire department access roads are required, they shall be placed a distance apart equal to not less than one-half the maximum overall diagonal dimension of the property or area to be served.
- The maximum grade for fire apparatus access roads shall not exceed 12%.
- Approach and departure angles for fire apparatus access roads shall not exceed 1 foot of drop in 20 feet.
- Gates across fire apparatus access roadways shall comply with NFD policy. Electrically operated gates shall be equipped with "Click-2-Enter" operating system. Manual gates shall have a Knox key box or Knox padlock.
- All approvals are conditional pending full review of building construction documents. Changes to site or building construction may be required to comply with fire and/or building code requirements.

**WEGO RECOMMENDATION**
**Approve with conditions**

- Developer shall provide the in-lane local service bus stop passenger waiting area to upgrade the Buena Vista Pike & Mattie St Southbound bus stop in accordance with latest WeGo Transit Design Guidelines and as shown on plans.
- Appurtenances are not required at this time.
- All WeGo conditions shall be shown on all subsequent SP case plans.
- Developer shall coordinate and reach agreement with WeGo Robert.Johnson@Nashville.govabout all WeGo conditions prior to all subsequent SP case approvals.

**STORMWATER RECOMMENDATION**
**Approve with conditions**

- Approved as a Preliminary review only. Must comply with all regulations in the Stormwater Management Manual at the time of final submittal for approval.

**WATER SERVICES RECOMMENDATION**
**Approve with conditions**

- Approved as a Preliminary SP only. Public and/or private Water and Sanitary Sewer construction plans must be submitted and approved prior to Final Site Plan/SP approval. The approved construction plans must match the Final Site Plan/SP plans. Submittal of an availability study is required before the Final SP can be reviewed. Once this study has been submitted, the applicant will need to address any outstanding issues brought forth by the results of this study.
- A minimum of 30% Water and Sanitary Sewer Capacity Fees must be paid before issuance of building permits. Unless and until 100% of Capacity Charge has been paid, No Water/Sanitary Sewer Capacity is guaranteed.

**NASHVILLE DOT ROADS RECOMMENDATION**
**Approve with conditions**

- Final constructions plans shall comply with the design regulations established by NDOT.

- Final design and improvements may vary based on actual field conditions.
- Any proposed roadway sections, ramps, sidewalks, curb & gutter, etc. shall be designed and called outed per NDOT detail standards.
- Note: A private hauler will be required for waste/recycle disposal. Contact Metro Water services for waste disposal requirement solidwastereview@nashville.gov.
- There are to be no vertical obstructions in new public sidewalks.
- Coordinate w/ utility companies, to have encroaching obstructions relocated to grass/furnishing zones.
- Submit any ROW dedications to NDOT, in tandem with building permit plans.
- Additional 1-1/2' mill and overlay may be required to cover full extents of utility work in public ROW. (cont.) Extents to be coordinated in field with NDOT inspector.

**NASHVILLE DOT TRAFFIC AND PARKING RECOMMENDATION**
**Approve with conditions**

- Final constructions plans shall comply with the design regulations established by NDOT.
- Final design and improvements may vary based on actual field conditions.
- Any proposed public roadway sections, ramps, sidewalks, curb & gutter, etc. shall be designed and called outed per NDOT detail standards.
- Note: A private hauler will be required for waste/recycle disposal. Contact Metro Water services for waste disposal requirement solidwastereview@nashville.gov.
- There are to be no vertical obstructions in new public sidewalks.
- Coordinate w/ utility companies, to have encroaching obstructions relocated to grass/furnishing zones.
- Submit any ROW dedications to NDOT, in tandem with building permit plans.
- Additional 1-1/2' mill and overlay may be required to cover full extents of utility work in public ROW. (cont.)
- Extents to be coordinated in field with NDOT inspector.
- Comply w/ NDOT Roads Comments.

**ANTICIPATED TRIP CALCULATIONS**

With a proposal of 12 multi-family residential units, the proposed development is estimated to have a decrease of 38 daily weekday trips with a reduction of seven AM peak hour trips and a reduction of three PM peak hour trips. For a full traffic table, please contact the Planning Department.

**METRO SCHOOL BOARD REPORT**
**Projected student generation existing R10 districts: 1 Elementary 0 Middle 0 High**
**Projected student generation proposed SP-R district: 3 Elementary 1 Middle 1 High**

The proposed SP-R zone district is anticipated to generate five more students than the existing R10 zoning. Students would attend Cumberland Elementary School, Haynes Middle School, and Whites Creek High School. Cumberland Elementary School and Haynes Middle School have both been identified as being exceedingly under capacity. Whites Creek High School has been identified as being under capacity. This information is based upon the 2025-2026 MNPS School Enrollment and Utilization report provided by Metro Schools.



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 94 of 153 PageID #: 236

**STAFF RECOMMENDATION**
Staff recommends approval with conditions and disapproval without all conditions.

**CONDITIONS**
1. Permitted uses shall be limited to 12 multi-family residential units. Short term rental properties, owner occupied and short term rental properties, not-owner occupied shall be prohibited.
2. The Preliminary SP plan is the site plan and associated documents. If applicable, remove all notes and references that indicate that the site plan is illustrative, conceptual, etc.
3. The final site plan shall label all internal driveways as "Private Driveways." A note shall be added to the final site plan that the driveways shall be maintained by the Homeowner's Association.
4. The requirements of the Metro Fire Marshal's Office for emergency vehicle access and adequate water supply for fire protection must be met prior to the issuance of any building permits.
5. Comply with all conditions and requirements of Metro reviewing agencies.
6. If a development standard, not including permitted uses, is absent from the SP plan and/or Council approval, the property shall be subject to the standards, regulations and requirements of the RM15-A zoning district as of the date of the applicable request or application. Uses are limited as described in the Council ordinance.
7. A corrected copy of the preliminary SP plan incorporating the conditions of approval by Metro Council shall be provided to the Planning Department prior to or with final site plan application.
8. Minor modifications to the preliminary SP plan may be approved by the Planning Commission or its designee based upon final architectural, engineering or site design and actual site conditions. All modifications shall be consistent with the principles and further the objectives of the approved plan. Modifications shall not be permitted, except through an ordinance approved by Metro Council that increase the permitted density or floor area, add uses not otherwise permitted, eliminate specific conditions or requirements contained in the plan as adopted through this enacting ordinance, or add vehicular access points not currently present or approved.
9. No master permit/HPR shall be recorded prior to final SP approval.
10. Final plat may be required prior to permitting.




**2026SP-029-001**
MCNEILLY CENTER SP
Map 082-11, Parcel(s) 041
05, East Nashville
05 (Sean Parker)

| | |
|---|---|
| **Item #14** | **Specific Plan 2026SP-029-001** |
| **Project Name** | **McNeilly Center SP** |
| **Council District** | 05 – Parker |
| **School District** | 01 – Taylor |
| **Requested by** | Barge Civil Associates, applicant; McNeilly Day Home, Inc., owner. |
| **Staff Reviewer** | Garland |
| **Staff Recommendation** | *Approve with conditions and disapprove without all conditions.* |

**APPLICANT REQUEST**
**Preliminary SP to permit a mixed-use development.**

Preliminary SP
A request to rezone from Multi-Family Residential (RM20) to Specific Plan (SP) zoning for property located at 100 Meridian Street and Lischey Place, to permit a mixed-use development (4.16 acres).

**Existing Zoning**
Multi-Family Residential (RM20) is intended for single-family, duplex, and multi-family dwellings at a density of 20 dwelling units per acre. *Based on acreage alone, RM20 would permit a maximum of 83 multi-family residential units.*

**Proposed Zoning**
Specific Plan-Mixed Use (SP-MU) is a zoning district category that provides for additional flexibility of design, including the relationship of streets to buildings, to provide the ability to implement the specific details of the General Plan. *This Specific Plan includes residential uses in addition to daycare and commercial uses.*

**EAST NASHVILLE COMMUNITY PLAN**
T4 Urban Mixed Use Corridor (T4 CM) is intended to enhance urban mixed use corridors by encouraging a greater mix of higher density residential and mixed use development along the corridor, placing commercial uses at intersections with residential uses between intersections; creating buildings that are compatible with the general character of urban neighborhoods; and a street design that moves vehicular traffic efficiently while accommodating sidewalks, bikeways, and mass transit.

Dickerson South Supplemental Policy
The Dickerson South Supplemental Policy is intended to provide guidance beyond the base policies on the properties. The supplemental policy area identifies subdistricts which provide specific direction on appropriate building heights based on context. Another component of the supplemental policy is a mobility plan. The mobility plan identifies future cross sections to enhance existing transportation conditions and provides for future infrastructure in the area of the supplemental policy.

**Specific Plan (SP) Development Summary/Site Data Table:**

| | |
|---|---|
| SP Name | McNeilly Center SP |
| Owner of Record | McNeilly Day Home, Inc. |
| Owner Address | 400 Meridian Street Nashville, TN 37207 |
| Owner Contact | Eugene H. Neubert, Board Chair |
| SP Number | 2026SP-029-001 |
| Council District | 05, Sean Parker |
| Address | 100 Meridian Street Nashville, TN 37207 |
| Map & Parcel | 08211004100 |
| Site Acreage | 4.16 Acres |
| Existing Zoning | RM20 (OV-UZO) |
| Proposed Zoning | SP |
| Allowable Land Uses | Multifamily – Maximum 300 Units<br>Day Care Center Up to & Over 75 Students – Maximum 20,000 S.F.<br>Retail/restaurant - Maximum 2,000 S.F. |
| Fallback Zoning | MUL-A |
| Max Building Height | 5 stories at 75 feet |
| Build-to-zone | 0'-15' on three road frontages |
| Landscape Buffer | Type A buffer on eastern property line |
| ISR Ratio | 0.9 |
| FEMA FIRM | Zone "X" per 47037C0242H dated 04/05/2017 |
| Design Professional | Alex Brockob, P.E. Barge Civil Associates, 615-356-9911 |

**Specific Plan (SP) Regulations:**

1. Landscaping and tree density requirements per Metro Zoning Code. A complete landscape plan will be required with the Final SP submittal.

2. At Final SP, a fully scoped traffic study shall be provided to NDOT for approval prior to approval of Final SP Site Plan.

3. A private hauler will be required for waste/recycle disposal.

4. Final construction plans shall comply with the design regulations & standards established by NDOT.

5. Parking for the development shall be per UZO code requirements.

6. Project to improve three street frontages bordering site to Major & Collector Street Plan regulations for grass strip and sidewalk widths or as approved by Metro Planning.

**REGULATIONS**

MPC #2026SP-029-001

7. Height shall be measured from the average elevation (4 most exterior corners) at the finished grade to the midpoint of the primary roof pitch or to the top of the parapet for a flat room.

8. Prohibited uses - No STRP owner occupied and non-owner occupied.



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 98 of 153 PageID #: 240

**SITE CONTEXT AND PLAN DETAILS**
The subject site consists of a 4.16-acre parcel located at the intersection of Dickerson Pike and Meridian Street. The property is currently developed with a day care center. The existing day care center is proposed to be demolished and reconstructed as part of a mixed-use development that includes the daycare, 300 multi-family residential units and a maximum of 2,000 square feet of retail and restaurant space.

The site has frontage along Meridian Street, which is classified as a collector avenue in the Major and Collector Street Plan (MCSP). Dickerson Pike, classified as an arterial boulevard on the MCSP, forms the western boundary of the site, while Lischey Place, a local street, borders the eastern side of the property. The parcel has been zoned Multi-Family Residential (RM20) since 1998. Surrounding zoning districts include Specific Plan (SP), Multi-Family Residential (RM20 and RM40), Single-Family Alternative (R6-A), Mixed-Use Limited (MUL), and Commercial Neighborhood (CN). Surrounding land uses include single-family and two-family residential development, and institutional uses such as Ida B. Wells Elementary School, and McFerrin Park. This site is within the Urban Zoning Overlay (UZO).

The proposed SP is regulatory and would permit multi-family residential, day care, and retail/restaurant uses. The development would consist of a mixed-use building with a maximum height of five stories in 75 feet. A maximum façade length of 150 feet is proposed to break up the overall structure given the expansive street frontages. Additional architectural treatments include highlighting volumes with differences in materials, color, texture, or window patterns. The applicant proposes architectural treatments intended to enhance the pedestrian experience and ensure the development contributes positively to neighborhood character. A Type A landscape buffer is proposed along the eastern property boundary.

**ANALYSIS**
The subject site is located within the Urban Mixed-Use Corridor (T4 CM) policy area, which is intended to encourage a greater mix of higher-density residential and mixed-use development. The property is also located within the Dickerson South Corridor Supplemental Policy Area (SPA), which was adopted in 2020. The Dickerson South SPA provides guidance regarding building height and supports a maximum height of six stories at this location. The proposed development has a maximum height of five stories and falls within the height guidance established by the supplemental policy. While the plan is regulatory, the architectural standards will ensure a building form compatible with an urban environment including minimum glazing, materials standards, and entrances.

A Multimodal Transportation Analysis (MMTA) has been scoped for the development and will be submitted to the Nashville Department of Transportation (NDOT) for review prior to the final SP submittal. Consistent with the policy guidance for the corridor, no vehicular access points will be permitted from Dickerson Pike. All vehicular access will be provided from Meridian Street or Lischey Place. This approach is consistent with T4 CM policy, which discourages the introduction of new vehicular entrances along major corridors.

The proposed mixed-use development is consistent with policy guidance that encourages higher-intensity residential and mixed-use development along major corridors and at key intersections. Existing sidewalks are provided along Meridian Street and Lischey Place, and two WeGo transit stops are located adjacent to the site. The plan proposed upgrades to the three street frontages to meet the Major and Collector Street Plan (MSCP) requirements. The surrounding area includes a developed sidewalk network for pedestrian connectivity which allows residents and visitors to access nearby destinations.

Based on the proposed land use mix, architectural considerations, transportation access, and consistency with the T4 CM policy and Dickerson South SPA, staff recommends approval with conditions.

**FIRE MARSHAL RECOMMENDATION**
**Approve**

**STORMWATER RECOMMENDATION**
**Approved**

**WATER SERVICES RECOMMENDATION**
**Approve with conditions**

- Approved as a Regulatory SP only. Public and/or private Water and Sanitary Sewer construction plans must be submitted and approved prior to Final Site Plan/SP approval. The approved construction plans must match the Final Site Plan/SP plans. Submittal of an availability study is required before the Final SP can be reviewed. Once this study has been submitted, the applicant will need to address any outstanding issues brought forth by the results of this study. A minimum of 30% Water and Sanitary Sewer Capacity Fees must be paid before issuance of building permits. Unless and until 100% of Capacity Charge has been paid, No Water/Sanitary Sewer Capacity is guaranteed.

**WEGO RECOMMENDATION**
**Approve with conditions**

- Developer shall provide a pair of in-lane bus stops and appurtenances on Meridian St, and provide an integrated crosswalk over Meridian St to safely and conveniently link the bus stops to the development. Bus stops shall comply with latest WeGo Design Guidelines, latest Meridian St Bikeway Plans, and as follows:
- Off-site improvements may be constrained by existing RoW and utilities.
- Developer shall acknowledge that bus stops and crosswalk locations shall take priority over the existing eastern Meridian St site driveway and frontage curb uses. Closure of the eastern Meridian St site driveway may be conditioned at next SP.
- Developer shall mention these WeGo conditions in the text of this SP case.
- Developer shall show bus stops and crosswalks on plans prior to next SP case approval.
- Bus stops and crosswalk shall be provided at earliest phase of development.
- Developer shall coordinate and reach agreement with WeGo Robert.Johnson@Nashville.gov and NDOT Ped/Bike Team William.Ezzell@Nashville.gov about all WeGo conditions prior to next SP case approval.



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 100 of 153 PageID #: 242

**NASHVILLE DOT RECOMMENDATION**
**Approve with conditions**

- Final constructions plans shall comply with the design regulations established by NDOT. Final design and improvements may vary based on actual field conditions. The following are general approval comments and conditions; All public commercial ramps, residential driveways and street intersections shall meet code spacing requirements.
- Any public access point (ramps, drives) and/or intersection should meet AASHTO stopping sight distance requirements.
- Coordinate w/ metro planning on MCSP requirements along existing ROW frontages. For reference, provide call outs on the final site plan for MCSP requirements. Call out and dimension any ROW dedications that are to accommodate ROW frontage requirements. In general, with a final: Any proposed roadway sections, ramps, driveways, sidewalks, curb & gutter, etc. shall be designed and called outed per NDOT standard details. A mandatory referral approval will be required for any proposed abandonments of existing ROW and/or encroachments into existing ROW.
- There shall be no earthen retaining walls installed in the public ROW. Earthen retaining walls, 4 ft. or greater in height, off the public ROW will require a stamped wall design by a licensed CIVIL engineer.
- There should be no vertical obstructions in new public sidewalks and the removal, or relocation, of utilities will be required to accommodate new public sidewalks. Note: A private hauler will be required for waste/recycle disposal. Contact Metro Water services for waste disposal requirement solidwastereview@nashville.gov.
- Additional 1-1/2' mill and overlay may be required to cover full extents of utility, and/or road widening, work in the public ROW. Comply w/ NDOT traffic comments/conditions of approval. Additional road comments/conditions forthcoming, following NDOT traffic review of MMTA at final.

**TRAFFIC AND PARKING RECOMMENDATION**
**Approve with conditions**

- An MMTA has been scoped for this development and will be submitted NDOT for review prior the Final SP submittal.
- Any Developer Mitigations derived from the analysis within the MMTA shall be reflected on the Final SP Site Plan. These mitigations may include and are not limited to:
    - Vehicular Traffic Improvements (Turn Lane additions, Signal Retimings)
    - Pedestrian improvements (sidewalks, ADA ramp, crosswalks and signage along Dickerson Pike and/or Meridian Street)
    - Potential Traffic calming measures within the vicinity of the site.
    - Proportional contributions towards traffic signals
- The Applicant shall continue to coordinate with NDOT and submit a daycare vehicular circulation plan prior to Final SP approval. The circulation plan should accommodate vehicular queueing on site.
- No driveway/vehicular access point(s) shall be permitted on Dickerson Pike. All Vehicular access points shall be located along Meridian Street and/or Lischey Place and shall comply with NDOT's Access Management Manual.

- Parking for this development shall be per metro code.
- MCSP requirements shall all be met along all site frontages. Future coordination with NDOT shall be required to ensure the Meridian Street Frontage complies with future Meridian Street Bikeway plans.
- The applicant's final construction drawings shall comply with the design regulations established by the Nashville Department of Transportation, in effect at the time of the approval of the preliminary development plan or final development plan or building permit, as applicable. Final design may vary based on field conditions.

**ANTICIPATED TRIP CALCULATIONS**
With a proposal of 20,000 square feet of daycare uses, 1,000 square feet of restaurant, 1,000 square feet of retail, and 300 multi-family residential units, the proposed development is estimated to have an increase of 1,555 daily weekday trips with 127 AM peak hour trips and 130 PM peak hour trips. For a full traffic table, please contact the Planning Department.

**STAFF RECOMMENDATION**
Staff recommends approval with conditions and disapproval without all conditions.

**CONDITIONS**
1. Permitted land uses shall be limited to 300 multi-family residential units, 20,000 square foot Day Care Center (up to 75 and over 75), and 2,000 square feet of retail/restaurant use. Short term rental property, owner occupied and not owner occupied, is prohibited.
2. On the corrected copy, for note f under building design standards, mezzanines shall meet the definition of mezzanine in the Metro Code.
3. Comply with all conditions and requirements of Metro reviewing agencies.
4. A corrected copy of the preliminary SP plan incorporating the conditions of approval by Metro Council shall be provided to the Planning Department prior to or with final site plan application.
5. If a development standard, not including permitted uses, is absent from the SP plan and/or Council approval, the property shall be subject to the standards, regulations and requirements of the MUL-A zoning district as of the date of the applicable request or application. Uses are limited as described in the Council ordinance.
6. The Preliminary SP plan is the site plan and associated documents. If applicable, remove all notes and references that indicate that the site plan is illustrative, conceptual, etc.
7. Minor modifications to the preliminary SP plan may be approved by the Planning Commission or its designee based upon final architectural, engineering or site design and actual site conditions. All modifications shall be consistent with the principles and further the objectives of the approved plan. Modifications shall not be permitted, except through an ordinance approved by Metro Council, that increase the permitted density or floor area, add uses not otherwise permitted, eliminate specific conditions or requirements contained in the plan as adopted through this enacting ordinance, or add vehicular access points not currently present or approved.
8. The requirements of the Metro Fire Marshal's Office for emergency vehicle access and adequate water supply for fire protection must be met prior to the issuance of any of any building permits.
9. No master permit/HPR shall be recorded prior to final SP approval.
10. Final plat may be required prior to permitting.



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 102 of 153 PageID #: 244




**2026COD-001-001**

TWIN HILLS-SHEPHERD HILLS CONTEXTUAL OVERLAY DISTRICT

Various Properties

04, Madison

10 (Jennifer Webb)



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 103 of 153 PageID #: 245

| | |
|---|---|
| **Item #15** | **2026COD-001-001 Contextual Overlay District** |
| **Project Name** | **Twin Hills Shepherd Hills Contextual Overlay District** |
| **Council Bill No.** | BL2026-1416 |
| **Council District** | 10– Webb |
| **School District** | 03 –Young |
| **Requested by** | Councilmember Jennifer Webb, applicant; various property owners. |
| **Staff Reviewer** | Commey |
| **Staff Recommendation** | *Approve a substitute ordinance.* |

---

**APPLICANT REQUEST**
**Apply a Contextual Overlay District.**

Contextual Overlay District
A request to apply a Contextual Overlay District to various properties along Shepherd Hills Drive and Twin Hills Drive, southeast of Gallatin Pike, zoned One and Two Family Residential (R20) (137.6 acres)

**Existing Zoning**
One and Two-Family Residential (R20) requires a minimum 20,000 square foot lot and is intended for single-family dwellings and duplexes at an overall density of 2.18 dwelling units per acre.

**Proposed Zoning Overlay**
Contextual Overlay District (COD) provides appropriate design standards in a residential area. It can maintain and protect neighborhood form or character. A Contextual Overlay must apply throughout the residential portion of a complete block face and cannot be applied in an adopted historic overlay district.

*Note that the existing zoning listed above will remain on the subject properties and the proposed overlay would be applied.*

**MADISON COMMUNITY PLAN**
T3 Neighborhood Maintenance (T3 NM) is intended to maintain the general character of developed suburban residential neighborhoods. T3 NM areas will experience some change over time, primarily when buildings are expanded or replaced. When this occurs, efforts should be made to retain the existing character of the neighborhood. T3 NM areas have an established development pattern consisting of low- to moderate-density residential development and institutional land uses. Enhancements may be made to improve pedestrian, bicycle, and vehicular connectivity.

T4 Urban Neighborhood Evolving (T4 NE) is intended to create and enhance urban residential neighborhoods that provide more housing choices, improved pedestrian, bicycle, and vehicular connectivity, and moderate to high density development patterns with shallow setbacks and minimal spacing between buildings. T4 NE areas are served by high levels of connectivity with complete



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 104 of 153 PageID #: 246

street networks, sidewalks, bikeways, and existing or planned mass transit. T4 NE policy may be applied either to undeveloped or substantially under-developed "greenfield" areas or to developed areas where redevelopment and infill produce a different character that includes increased housing diversity and connectivity. Successful infill and redevelopment in existing neighborhoods needs to take into account considerations such as timing and some elements of the existing developed character, such as the street network and block structure and proximity to centers and corridors.

T5 Regional Center (T5 RG) is intended to enhance and create regional centers, encouraging their redevelopment as intense mixed-use areas that serve multiple communities as well as the County and the surrounding region with supporting land uses that create opportunities to live, work, and play. T5 RG areas are pedestrian friendly areas, generally located at the intersection of two arterial streets, and contain commercial, mixed use, residential, and institutional land uses.

Conservation (CO) is intended to preserve environmentally sensitive land features through protection and remediation. CO policy applies in all Transect Categories except T1 Natural, T5 Center, and T6 Downtown. CO policy identifies land with sensitive environmental features including, but not limited to, steep slopes, floodway/floodplains, rare or special plant or animal habitats, wetlands, and unstable or problem soils. The guidance for preserving or enhancing these features varies with what Transect they are in and whether or not they have already been disturbed. *CO policy at this site recognizes potential streams and stream buffers, and pockets of potentially steep slopes.*

**CONTEXTUAL OVERLAY STANDARDS**

Application of the Contextual Overlay District would not change the existing entitlements afforded under base zoning. The standards of the Contextual Overlay District are listed below. These standards are established in the Zoning Code and cannot be modified. The design standards are necessary to maintain and reinforce the established form or character of residential development in an area.

Setback

- Minimum required setback shall be average of the setback of the 2 developed lots abutting each side of the lot
- Example – abutting lots have setbacks of 50 feet, 55 feet, 40 feet, and 42 feet; average 47 feet, required minimum

Height

- Maximum height, including foundation, shall not be greater than 35 feet or 125% of the structures on the two lots abutting each side, whichever is less
- If 125% of the average is less than 27 feet, a maximum height of 1.5 stories in 27 feet is allowed
- Example – average is 24 feet; max allowed height is 30 feet

Coverage

- Maximum coverage shall be 150% of the average of the coverage of the two abutting lots on each side

- Does not include detached garages or accessory buildings
- Example – average coverage of abutting lots is 2,100 square feet; max coverage of 3,150 allowed

Access, Garages, Parking

- If there is an alley, access shall be from the alley
- On corner lots, access shall be within 30 feet of rear property line
- Driveways are limited to 1 per public street frontage
- Parking, driveways, and all other impervious surfaces in the required setback shall not exceed 12 feet in width
- The front of any detached garage shall be located behind the rear of the primary structure
- The garage door of any attached garage shall face the side or rear property line.

**ANALYSIS**

The Contextual Overlay District (COD) as proposed would apply to approximately 137.6 acres for properties located along Shepherd Hills Drive and Twin Hills Drive, southeast of Gallatin Pike. This area consists of numerous properties zoned R20. These properties have primarily been developed with single family and one and two family residential uses.

The COD was created by Metro Council in 2014 (BL2014-771) and amended in 2024 (BL2024-184) to include a definition for one-half story. The contextual overlay district provides appropriate design standards for residential areas necessary to maintain and reinforce an established form or character of residential development in a particular area.

Staff is recommending approval of a substitute which would remove one vacant parcel in the Regional Center (T5 RG) policy and the properties along Cude Lane which are located in the Urban Neighborhood Evolving (T4 NE) policy area. Three parcels on the northern portion of Shepherd Hills Drive would remain in the overlay that are within the T4 NE policy. These properties are developed with residential uses consistent with the broader pattern of Suburban Neighborhood Maintenance (T3 NM) along this block of Shepherd Hills Drive.

The T3 NM policy is intended to maintain the general character of established residential neighborhoods and support compatible infill that reinforces existing development patterns. Application of the Contextual Design Overlay would help preserve the existing character of the neighborhood through the application of specific development standards for bulk, massing, access, garages, and parking. The standards required will maintain and protect existing neighborhood form and character. Generally, the proposed Contextual Design Overlay is consistent with the policies on the properties, subject to the substitute recommended by Planning.



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 106 of 153 PageID #: 248




Exhibit: Proposed Substitute

**STAFF RECOMMENDATION**

Staff recommends approval of a substitute ordinance.




**2026COD-002-001**
NORTH HILLS ESTATES CONTEXTUAL OVERLAY DISTRICT
Various Properties
04, Madison
10 (Jennifer Webb)



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 108 of 153 PageID #: 250

| | |
|---|---|
| **Item #16** | **2026COD-002-001 Contextual Overlay District** |
| **Project Name** | **North Hills Estates Contextual Overlay District** |
| **Bill No** | BL2026-1420 |
| **Council District** | 10– Webb |
| **School District** | 03 –Young |
| **Requested by** | Councilmember Jennifer Webb, applicant; various property owners. |
| **Staff Reviewer** | Konigstein |
| **Staff Recommendation** | *Approve.* |

**APPLICANT REQUEST**
**Apply a Contextual Overlay District.**

Contextual Overlay District
A request to apply a Contextual Overlay District to various properties along Cumberland Hills Drive and Northside Drive, south of Gallatin Pike, zoned One and Two-Family Residential (R20) and Single Family Residential (RS40) (68.2 acres).

**Existing Zoning**
One and Two-Family Residential (R20) requires a minimum 20,000 square foot lot and is intended for single-family dwellings and duplexes at an overall density of 2.18 dwelling units per acre.

Single Family Residential (RS40) requires a minimum 40,000 square foot lot and is intended for single-family dwellings at a density of 1.09 dwelling units per acre.

**Proposed Zoning Overlay**
Contextual Overlay District (COD) provides appropriate design standards in a residential area. It can maintain and protect neighborhood form or character. A Contextual Overlay must apply throughout the residential portion of a complete block face and cannot be applied in an adopted historic overlay district.

*Note that the existing zoning listed above will remain on the subject properties and the proposed overlay would be applied.*

**MADISON COMMUNITY PLAN**
T3 Neighborhood Maintenance (T3 NM) is intended to maintain the general character of developed suburban residential neighborhoods. T3 NM areas will experience some change over time, primarily when buildings are expanded or replaced. When this occurs, efforts should be made to retain the existing character of the neighborhood. T3 NM areas have an established development pattern consisting of low- to moderate-density residential development and institutional land uses. Enhancements may be made to improve pedestrian, bicycle, and vehicular connectivity.



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 109 of 153 PageID #: 251

**CONTEXTUAL OVERLAY STANDARDS**

Application of the Contextual Overlay District would not change the existing entitlements afforded under base zoning. The standards of the Contextual Overlay District are listed below. These standards are established in the Zoning Code and cannot be modified. The design standards are necessary to maintain and reinforce the established form or character of residential development in an area.

Setback

- Minimum required setback shall be average of the setback of the 2 developed lots abutting each side of the lot
- Example – abutting lots have setbacks of 50 feet, 55 feet, 40 feet, and 42 feet; average 47 feet, required minimum

Height

- Maximum height, including foundation, shall not be greater than 35 feet or 125% of the structures on the two lots abutting each side, whichever is less
- If 125% of the average is less than 27 feet, a maximum height of 1.5 stories in 27 feet is allowed
- Example – average is 24 feet; max allowed height is 30 feet

Coverage

- Maximum coverage shall be 150% of the average of the coverage of the two abutting lots on each side
- Does not include detached garages or accessory buildings
- Example – average coverage of abutting lots is 2,100 square feet; max coverage of 3,150 allowed

Access, Garages, Parking

- If there is an alley, access shall be from the alley.
- On corner lots, access shall be within 30 feet of rear property line.
- Driveways are limited to one per public street frontage.
- Parking, driveways, and all other impervious surfaces in the required setback shall not exceed 12 feet in width.
- The front of any detached garage shall be located behind the rear of the primary structure.
- The garage door of any attached garage shall face the side or rear property line.

**ANALYSIS**

The Contextual Overlay District (COD) as proposed would apply to approximately 68.2 acres for properties located along Northside Drive, south of Gallatin Pike. This area consists of one R20 zoned parcel on the northern part of the site and the remainder of properties are zoned RS40. These properties have primarily been developed with one or two-story residential uses.

The COD was originally created by Metro Council in 2014 (BL2014-771) and amended in 2024 (BL2024-184) to include a definition for one-half story. The contextual overlay district provides

appropriate design standards for residential areas necessary to maintain and reinforce an established form or character of residential development in a particular area.

The proposed Contextual Design Overlay district is located within a T3 Suburban Neighborhood Maintenance (T3 NM) policy area. The T3 NM policy is intended to maintain the general character of developed, suburban neighborhoods. Application of the Contextual Design Overlay would help preserve the existing character of the neighborhood through the application of specific development standards for bulk, massing, access, garages, and parking. The standards required will maintain and protect existing neighborhood form and character. As proposed, the Contextual Design Overlay is consistent with the T3 NM policy.

**STAFF RECOMMENDATION**
Staff recommends approval.




## 2026S-083-001

1658 STEWARTS FERRY PIKE
Map 110, Parcel(s) 028, 184, 187
14, Donelson – Hermitage – Old Hickory
12 (Erin Evans)



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 112 of 153 PageID #: 254

**Item #17** **Concept Plan 2026S-083-001**
**Project Name** **1658 Stewarts Ferry Pike**
**Council District** 12 – Evans
**School District** 04– Nabaa-McKinney
**Requested by** Crunk Engineering, LLC, applicant; Kathleen M. King and Don R. King, owners.

**Staff Reviewer** Konigstein
**Staff Recommendation** *Defer to the July 23,2026, Planning Commission meeting.*

---

**APPLICANT REQUEST**
**Request for concept plan approval to create 37 lots.**

Concept plan
A request for concept plan approval to create 37 lots utilizing the conservation development standards on properties located at 1658 Stewarts Ferry Pike and Stewarts Ferry Pike (unnumbered), at the southern intersection of Stewarts Ferry Pike and Smotherman Lane, zoned Single Family Residential (RS15) (31.4 acres).

**STAFF RECOMMENDATION**
Staff recommends deferral to the July 23, 2026, Planning Commission meeting.



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 113 of 153 PageID #: 255




**2026S-095-001**
Larkins Spring Road
Map 052-03, Parcel(s) 187
Map 052-07, Parcel(s) 091-096
04, Madison
09 (Tonya Hancock)



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 114 of 153 PageID #: 256

| | |
|---|---|
| **Item #18** | **Final Plat 2026S-095-001** |
| **Project Name** | **Larkin Springs Road** |
| **Council District** | 09 – Hancock |
| **School District** | 03 – Young |
| **Requested by** | Blue Ridge Surveying Services, applicant; KY-TN Conference Association of Seventh-day Adventists, Inc., owners. |
| **Staff Reviewer** | Ordonez |
| **Staff Recommendation** | *Approve with conditions.* |

**APPLICANT REQUEST**
**Request for final plat approval to create seven lots.**

Final Plat
A request for final plat approval to create seven lots on properties located at 615, 617, 619, 621, 623 and 625 Larkin Spring Road, and Hospital Drive (unnumbered), at the north intersection of Neelys Bend Road, Hospital Drive, and Larkin Spring Road, zoned Office General (OG) (12.82 acres).

**SITE DATA AND CONTEXT**

**Location:** The site consists of seven parcels located along the north intersection of Neelys Bend Road, Hospital Drive, and Larkin Springs Road.

**Street Type:** The site has frontage along Neelys Bend Road, an arterial boulevard in the Major and Collector Street Plan (MCSP). The site also has frontages on Hospital Drive and Larkin Springs Road, both collector roads in the MCSP.

**Approximate Acreage:** 12.82 acres or approximately 558,589 square feet.

**Parcel/Site History:** The site consists of seven parcels located along Hospital Drive and Larkin Springs Road.

Parcel 187 was created by a Special Warranty Deed recorded in 2009, as Instrument No. 20090422-0036519 in the Davidson County Register of Deeds.

Parcels 091–096 are part of a larger tract conveyed by deed recorded in 1905 (Book 74, Pages 74–75).The parcels in their current configuration were established as part of Lot 1 of the Seventh Day Adventist/Tennessee Christian Medical Center campus and were conveyed to the Kentucky Tennessee Conference Association of Seventh Day Adventists by Quitclaim Deed recorded September 8, 2006, as Instrument No. 20060908-0111506.



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 115 of 153 PageID #: 257




**Proposed Final Plat**



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 116 of 153 PageID #: 258

**Zoning History:** Parcels 091–096 have been zoned OG since 1998. Parcel 187 is split zoned between OG and RS10, and this zoning has been in place since 1998.

**Existing land use and configuration:** Parcel 187 located at the intersection of Hospital Drive and Neelys Bend Road is vacant. Parcels 091–096, long along Larkin Springs Road have been developed with residential land uses.

**Surrounding Zoning and Land Use:**
- North: OG/ Residential, Religious Institution
- South: RS20/ Residential
- East: OG/ Residential, Religious Institution
- West: RS10/ Residential

**Number of lots:** 7

**Lot sizes:**
Proposed Lot 1 has an area of approximately 472,324 square feet, or 10.84 acres. Proposed Lot 2 has an area of approximately 13,708 square feet, or 0.31 acres. Proposed Lot 3 contains approximately 13,455 square feet, or 0.31 acres, and proposed Lot 4 contains approximately 13,463 square feet, or 0.31 acres. Proposed Lot 5 consists of approximately 13,494 square feet, or 0.31 acres, and proposed Lot 6 consists of approximately 13,512 square feet, or 0.31 acres. Proposed Lot 7 has an area of approximately 13,489 square feet, or 0.31 acres.

The right-of-way dedication totals approximately 5,143 square feet, or 0.12 acres, resulting in an overall total area of approximately 558,589 square feet, or 12.82 acres.

**Access:** Proposed Lots 2-7 currently have individual drives. Shared access easements are shown on the plat if redevelopment of the lots occur. Access to the proposed Lot 1 lots will be determined by NDOT at the time of building permit.

**Subdivision Variances or Exceptions Requested:** None.

**APPLICABLE SUBDIVISION REGULATIONS**
Volume III of NashvilleNext, the General Plan for Nashville and Davidson County, contains the Community Character Manual (CCM) which establishes land use policies for all properties across the county. The land use policies established in CCM are based on a planning tool called the Transect, which describes a range of development patterns from most to least developed.

Prior versions of Subdivision Regulations for Nashville and Davidson County contained a uniform set of standards that were applied Metro-wide. This did not take into account the diverse character that exists across the County. In order to achieve harmonious development within the diversity of development patterns that exist in Nashville and Davidson County, the Planning Commission has adopted the current Subdivision Regulations. The Subdivision Regulations incorporate the General Plan policies by including rules or standards for each specific transect. This allows policies of the General Plan to be followed through application of the varying Subdivision Regulations to reflect

the unique characteristics found in the different transects. The site is located within the Suburban T3 Residential Corridor (T3 RC), Conservation (CO), and District Major Institutional (D-MI) policies. In order to achieve harmonious development, the Planning Commission has adopted Subdivision Regulations that include standards for specific transects. For sites within these policies, the regulations found in Chapter 3 are utilized.

**3-1 General Requirements**
The proposal meets the requirements of 3-1.

**3-2 Monument Requirements**
Permanent monuments, in accordance with this section of the regulations, shall be placed in all subdivisions when new streets are to be constructed. The proposal does not propose any new streets.

**3-3 Suitability of the Land**
The site contains a stream at the southeast area of the site. The stream is within proposed buffer areas. Staff finds that the remaining land is suitable for development consistent with this section.

**3-4 Lot Requirements**
The proposed lots comply with the minimum standards of the Zoning Code. Any development proposed on the resulting lots will be required to meet the bulk standards and all other applicable regulations of the OG and RS10 zoning districts. The OG zoning district does not have a minimum lot size. Lot 1 which is partially zoned RS10 exceeds the minimum required 10,000 square foot lot size. All lots have frontage along existing public streets.

**3-5 Infill Subdivisions**
Not applicable.

**3-6 Blocks**
Not applicable. No new blocks are being created.

**3-7 Improvements**
No public infrastructure or improvements are required with this subdivision. Construction plans for any required private improvements (private stormwater, water and sewer lines and connections) will be reviewed at the time of building permit.

**3-8 Requirements for Sidewalks and Related Pedestrian and Bicycle Facilities**
For subdivisions, sidewalks are not required along existing streets. Per a recent court case, the section of the Zoning Code that requires sidewalks along existing streets has been voided.

**3-9 Requirements for Streets**
Not applicable. No new streets are proposed.



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 118 of 153 PageID #: 260

**3-10 Requirements for Dedication, Reservations, or Improvements**
Hospital Road is classified as a Collector–Avenue with a planned right-of-way of 51 feet. The plat shows an approximate existing 65-foot right-of-way for Hospital Road, which meets the right-of-way requirement. Neelys Bend Road has a planned right-of-way of 74 feet with a half right-of-way of 35 feet. An area of right-of-way dedication is shown on the plat. Larkin Springs Road is also classified as a Collector–Avenue with a planned right-of-way of 70 feet. The plat shows an area of dedication to meet the half right-of-way standard of 35 feet.

**3-11 Inspections During Construction**
This section is applicable at the time of construction, which for this proposed subdivision, will occur only after issuance of a building permit approved by Metro Codes and all other reviewing agencies.

**3-12 Street Name, Regulatory and Warning Signs for Public Streets**
Not applicable. No new streets are proposed.

**3-13 Street Names, Regulatory and Warning Signs for Private Streets**
Not applicable. No private streets are proposed.

**3-14 Drainage and Storm Sewers**
Drainage and storm sewer requirements are reviewed by Metro Stormwater. Metro Stormwater has reviewed the proposed final plat and found it to comply with all applicable standards of this section. Stormwater recommends approval.

**3-15 Public Water Facilities**
Madison Suburban Utility District has reviewed this proposed final plat for water and has recommended approval.

**3-16 Sewerage Facilities**
Metro Water Services has reviewed this proposed final plat for sewer and has recommended approval with conditions.

**3-17 Underground Utilities**
There are no new utilities proposed.

**PLANNING STAFF COMMENTS**
With the exception for the minimum lot size requirement of the compatibility requirements, the proposed lots meet the standards of the Metro Subdivision Regulations and Metro Zoning Code. Future development will be required to meet the standards of the Metro Zoning Code regarding setbacks, building heights, etc. Staff recommends approval with conditions based on a finding that the proposal can provide for harmonious development.



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 119 of 153 PageID #: 261

**POLICY CONSIDERATIONS**
A recent appeals court decision (Hudson et al v. Metro) upheld a lower court decision which outlined that the Planning Commission has the authority to determine whether a subdivision complies with the adopted General Plan (NashvilleNext). Per the Court, the Planning Commission may not evaluate each subdivision to determine whether it is harmonious generally but may consider policy. Policy information is provided below for consideration.

NashvilleNext includes a Community Character Manual (CCM) which established character areas for each property within Metro Nashville.

The community character policies applied to this property include T3 Residential Corridor (T3 RC), Conservation (CO), and District Major Institutional (D-MI). The intent of the CO policy is preserve natural features. The CO policy reflects a stream buffer that crosses the southern portion of the property. This area is protected by a platted stream buffer. The T3 RC policy is intended to maintain, enhance, and create suburban residential corridors that support predominately residential land uses and are compatible with the general character of suburban neighborhoods in terms of their development pattern, building form, land use, and associated public realm. The proposed Lots 2-7 reflect the existing residential lot pattern to the north. The D-MI policy maintains, enhances, and creates Districts where major institutional uses are predominant and where the development and redevelopment of such Districts occurs in a manner that is complementary of the varying character of surrounding communities as characterized by development patterns, building form, land use, and associated public realm. The proposed Lot 1 is currently vacant, however the proposed plat would not conflict with the intent of the policy.

If the Commission can find that the proposed final plat is meeting the intent of the land use policies on the site, the Commission could place greater weight to this portion of the adopted General Plan (Nashville Next), and the Commission may approve the subdivision.

**COMMENTS FROM OTHER REVIEWING AGENCIES**

**FIRE MARSHAL RECOMMENDATION**
**Approve**

**STORMWATER RECOMMENDATION**
**Approve**

**NASHVILLE DOT RECOMMENDATION**
**Approve**

**TRAFFIC AND PARKING RECOMMENDATION**
**Approve with conditions**

- Traffic conditions to be set at the time of final site plan or building permit approval for individual lots. (Traffic studies, driveway distances, access sight triangles, etc.)

**WATER SERVICES RECOMMENDATION**
**Approve with conditions**

- The Sewer Capacity fees must be paid prior to service connections. Water provided by MSUD.

**MADISON SUBURBAN UTILITY DISTRICT RECOMMENDATION**
**Approve**

**STAFF RECOMMENDATION**
Approve with conditions.

**CONDITIONS**

1. On the mylar copy, remove addresses from the face of the plat.
2. On the mylar copy, add note, "Access to all lots shall be limited to the shared access drive."
3. Comply with all conditions and requirements of Metro reviewing agencies.
4. Pursuant to 2-4.7 of the Metro Subdivision Regulations, the approval shall expire if the plat is not recorded with the Register of Deeds within one year of the Planning Commission's approval.

**RECOMMENDED ACTION**
Motion to approve proposed subdivision Case No. 2026S-095-001 with conditions, based upon finding that the subdivision complies with the applicable standards of the Metro Subdivision Regulations, Metro Zoning Code, and other applicable laws, ordinances and resolutions as noted in the staff report, subject to all of the staff recommended conditions.




**2026S-096-001**
FINAL PLAT OF THE TAMMY FULLER PROPERTY
Map 114, Portions of Parcel(s) 266, 291
06, Bellevue
35 (Jason Spain)



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 122 of 153 PageID #: 264

| | |
|---|---|
| **Item #19** | **Final Plat 2026S-096-001** |
| **Project Name** | **Final Plat of the Tammy Fuller Property** |
| **Council District** | 35 – Spain |
| **School District** | 09 – Tylor |
| **Requested by** | Jesse Walker Engineering, Tammy R. Fuller, Sugar Magnolia Zydel, and Will Coble, owners |
| **Staff Reviewer** | Konigstein |
| **Staff Recommendation** | *Approve with conditions, including variances to Section 4-2.5 of the Metro Subdivision Regulations.* |

---

**APPLICANT REQUEST**
**Request for final plat approval to create one lot.**

Final Plat
A request for final plat approval to create one lot on property located at 7568 and 7586 Old Charlotte Pike, approximately 1,653 feet west of Gower Road, zoned One and Two-Family Residential (R80) (1.9 acres).

**SITE DATA AND CONTEXT**
**Location:** The site consists of portions of two parcels located on the north side of Old Charlotte Pike, approximately 1,653 feet west of Gower Road.

**Street Type:** The site has frontage on Old Charlotte Pike, a collector avenue as identified in the Major and Collector Street Plan (MCSP), with an existing right-of-way width of approximately 50 feet.

**Approximate Acreage:** 1.9 acres, or approximately 82,944 square feet.

**Parcel/Site History:** The site consists of portions of two parcels that were originally part of the same 59.65-acre tract of land established by deed (Book 4812, Page 937). The property at 7586 Old Charlotte Pike was created by deed in 2020 (20200722-0080667) and consists of approximately 10 acres. The property at 7568 Old Charlotte Pike was created by deed in 2025 (20251203-0095864) and consists of approximately 49.65 acres.

**Zoning History:** Both parcels are split zoned Agricultural/Residential (AR2a) in the rear and One and Two-Family Residential (R80) in the front. The property at 7586 Old Charlotte Pike has been zoned AR2a and R80 since 1974. The property at 7568 Old Charlotte Pike has been zoned AR2a to the rear since 1974. The front portion has been zoned R80 since 1998.

**Existing land use and configuration:** Both properties are currently developed with a single-family residential use. The existing structure addressed as 7568 Old Charlotte Pike is located on a portion of the parcel that is not included in this plat.



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 123 of 153 PageID #: 265




**Proposed Final Plat**



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 124 of 153 PageID #: 266

**Surrounding land use and zoning:**

- North: One and Two-Family Residential (R80)
- South: One and Two-Family Residential (R80)
- East: One and Two-Family Residential (R80)
- West: One and Two-Family Residential (R80)

**Zoning:** One and Two-Family Residential (R80)
Min. lot size: 80,000 square feet
Max. building coverage: 0.20
Min. rear setback: 20 feet
Min. side setback: 20 feet
Max. height: 3 stories
Min. street setback: 300 feet per the Subdivision Regulations

**PROPOSAL DETAILS**
**Number of Lots: 1**

**Lot sizes:** Lot 1 is 1.9 acres (82,944 square feet).

**Access:** Access to the lot is provided by Old Charlotte Pike.

**Subdivision Variances or Exceptions Requested:** Variances to Sections 4-2.5.a.1.a., 4-2.5.a.1.b., and Section 4-2.5.a.1.c. are required for building setback, lot depth, and lot size.

**APPLICABLE SUBDIVISION REGULATIONS**
Volume III of NashvilleNext, the General Plan for Nashville and Davidson County, contains the Community Character Manual (CCM) which establishes land use policies for all properties across the County. The land use policies established in the CCM are based on a planning tool called a Transect, which describes a range of development patterns from most to least developed.

Prior versions of the Subdivision Regulations for Nashville and Davidson County contained a uniform set of standards that were applied Metro-wide. This did not take into account the diverse character that exists across the County. In order to achieve harmonious development within the diversity of development patterns that exist in Nashville and Davidson County, the Planning Commission has adopted the current Subdivision Regulations. The Subdivision Regulations incorporate the General Plan policies by including rules or standards for each specific transect. This allows policies of the General Plan to be followed through application of the varying Subdivision Regulations to reflect the unique characteristics found in the different transects. This site is located within the Rural Maintenance (T2 RM) policy. For sites within the T2 Rural transect, the regulations found in Chapter 4 are utilized.

There are several subdivision options within the Rural Subdivision Regulations. This proposal utilizes the Countryside Character Design Open Alternative option as described in Section 4-2.5.a.1 of the subdivision regulations.

## 4-2. Development Standards

**4-2.1 Identification of Primary Conservation Land**

*Prior to design of any subdivision plan with new streets or joint access easement, Primary Conservation Land shall be identified and, subject to the provisions of Sections 4-2.2 and 4-2.3, preserved from any disturbance.*
Not applicable as no new streets or joint access easements are proposed.

**4-2.2 Preservation of Conservation Land**

*Unless an exception is granted under Section 4-2.3, all Primary Conservation Areas shall be preserved and set aside through an appropriate means such as conservation easements and/or open space.*
Not applicable as no new streets or joint access easements are proposed.

**4-2.3 Development Footprint**

*The remaining land outside of the boundary of the Primary Conservation Land shall be designed as the Development Footprint.*
Not applicable as no new streets or joint access easements are proposed.

**4-2.4 Building Placement**

*In subdivisions without new streets or joint access easements, any subdivision application shall note proposed building envelopes. Building envelopes shall not be within areas listed in Section 4-2.1(a) through Section 4-2.1(j).*
The site contains areas of conservation features in the form of steep slopes and floodplain, which are primarily located near the northern and southern portion of the proposed lot, respectively. A building envelope has been identified on Lot 1 outside of these conservation features with the exception of a small area of 100 year floodplain.

**4-2.5 Rural Character Design**

*a. Countryside Character Option*. This option may be used for any rural character subdivision. It is intended to maintain a natural, open rural character by minimizing the visual intrusion of development along primary roadways through the use of setbacks, building placement, existing vegetation and natural topographic features that obscure the view of development from the street.

1. Open Alternative – Street frontage without existing vegetative or topographical screening. For purposes of this section, “surrounding parcels” is defined as the five R, RS, AR2a, or AG parcels oriented to the same block face on either side of the parcel proposed for subdivision, or to the end of the same blockface, whichever is less. If there are no surrounding parcels, the screened alternative shall be used.
Lot 1 is located along an existing street and were reviewed against (a) through (d) below.



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 126 of 153 PageID #: 268

a. *Building Setback along existing public streets*.
Does not comply. The building setbacks are required to be varied, and a minimum setback line is required to be platted when the average setback of abutting parcels is more than the minimum required street setback established by the zoning. Where the minimum required street setback is less than the average of the street setback of the two parcels abutting either side of the lot proposed to be subdivided, a minimum building setback line shall be included on the proposed lots at the average setback of the abutting parcels. The average front setback of the abutting parcels is approximately 300 feet, which is greater than the required 40 feet per the R80 zoning district. A front setback of 140 feet is shown on the plat which is the approximate setback of the existing structure. *Since the front setback shown is less than the required minimum building setback, a variance is required and will be discussed below.*

b. *Lot Depth along existing public streets*.
Does not comply. The minimum depth for lots along existing public streets shall be the building setback required by Sec 4-2.5(a) plus 300 feet. This provision requires an approximately 600-foot lot depth. As proposed, the lot depth is approximately 414 feet, which is less than the required minimum depth. *A variance is required and will be discussed below.*

c. *Lot size along existing public streets*.
Does not comply. A compatibility analysis was conducted per this requirement based on the surrounding parcels. The minimum lot size is to be either equal to or greater than 70 percent of the lot size of the average size of surrounding parcels or equal to or larger than the smallest of the surrounding parcels, whichever is greater. The result of the analysis is that the minimum lot size required is approximately 2.87 acres or 125,233 square feet. The area of the proposed lot is 1.9 acres, or 82,944 square feet which does not meet the 2.87-acre minimum lot size. *A variance is required and will be discussed below.*

*d.* *Lot frontage abutting existing public streets.*
Does comply. A compatibility analysis was conducted per this requirement based on the surrounding parcels. The result of the analysis is that the minimum lot frontage required along Old Charlotte Pike is approximately 150 feet. The frontage of the proposed lot is 203 feet, which is above the required minimum.

*e.* *Street lights.*
Not applicable for this case.

*f.* *Conservation Development.*
Not applicable for this case.

g. Compact Development.
Not applicable for this case.

**Subdivision Variances or Exceptions Requested**: Yes. This request requires a variance from *4-2.5.a.1.a.* for minimum building setback, *4-2.5.a.1.b.* for minimum lot depth, and *4-2.5.a.1.c.* for minimum lot size.

Section 1-11, Variances, permits the Planning Commission to grant variances to the Subdivision Regulations when it finds that extraordinary hardships or practical difficulties may result from strict compliance with the regulations. While the regulations grant the Commission the authority to grant variances, the regulations state that "such variance shall not have the effect of nullifying the intent and purpose of the Subdivision Regulations." In order to grant a variance, the Commission must find that:

1. The granting of the variance shall not be detrimental to the public safety, health, or welfare or injurious to other property or improvements in the neighborhood in which the property is located.
2. The conditions upon which the request for a variance is based are unique to the property for which the variance is sought and are not applicable generally to other property.
3. Because of the particular physical surroundings, shape, or topographical conditions of the specific property involved, a particular hardship to the owner would result, as distinguished from a mere inconvenience, if the strict letter of these regulations were carried out.
4. The variance shall not in any manner vary from the provisions of the adopted General Plan, including its constituent elements, the Major Street Plan, or the Zoning Code for Metropolitan Nashville and Davidson County (Zoning Code).

**Variance Analysis**

<u>Variance Request-Minimum Building Setback</u>

Section 4-2.5.a.1.a. requires the minimum front setback to be the average setback of the abutting parcels. The average front setback of the abutting two parcels on either side of the subject site is approximately 300 feet, which is greater than the 40-foot minimum front setback based on the R80 zoning district. The parcels that were used to compare had front setbacks of 190, 15, 472, and 528 feet. A building envelope, with a front setback of 140 feet is proposed on the plat close to the front of the existing residential structure.

In considering the surrounding parcels on both sides of Old Charlotte Pike, there is a wide variety of building setbacks ranging from zero feet to approximately 528 feet. The majority of parcels on Old Charlotte Pike have shallower setbacks than the minimum required 300-foot setback per the regulations. When considering this range of setbacks, Staff finds that a variance for minimum building setback would not conflict with the intent of the Rural Subdivision Regulations to have varying building setbacks and meets all the requirements for the Commission to grant a variance.

<u>Variance Request-Minimum Lot Depth</u>

Section 4-2.5.a.1.b. requires the minimum lot depth to be the building setback required by Sec 4-2.5(a) plus 300 feet. The approximate proposed lot depth is 414 feet, which is less than the 600-foot lot depth required. When considering the lot depth pattern in the broader area along the same block

as Old Charlotte Pike, the parcels used in the compatibility analysis have a range of lot depths from 100 feet to over 3,000 feet, with several parcels along the same block that have lot depths between 260 and 800 feet. While the proposed lot depth is less than what is required for the average, when considering the wide range of nearby parcels, staff finds that a variance for minimum lot depth would not conflict with the intent of the Rural Subdivision Regulations and meets all the requirements for the Commission to grant a variance.

Variance Request-Minimum Lot Size
Section 4-2.5.a.1.c. requires the minimum lot size along existing public streets to be equal to or greater than 70 percent of the average size of surrounding parcels or equal to or greater than the smallest parcel, whichever is greater. In this case, the minimum required lot size for the proposed lot is approximately 2.87 acres or 125,233 square feet. As proposed, the size of the proposed lot is approximately 1.9 acres, or 82,944 square feet. When considering the lot size pattern of the broader area along Old Charlotte Pike, several existing parcels have lot sizes less than the size of the proposed 1.9-acre or 82,944 square foot lot, including lot sizes of 8,273 to 72,594 square feet. Additionally, the compatibility analysis includes a nearby parcel with a size of approximately 283,454 square feet, which is substantially larger than other nearby lots. Due to the range of lot sizes in the surrounding area, and existing lot sizes less than the size of this proposed lot, Staff finds that a variance for minimum lot size would not conflict with the intent of the Rural Subdivision Regulations and meets all the requirements for the Commission to grant a variance.

**PLANNING STAFF COMMENTS**
Except for the minimum building setback, lot depth, and lot size requirements, the proposed lot meets the standards of the Metro Subdivision Regulations and Metro Zoning Code.

**POLICY CONSIDERATIONS**
A recent appeals court decision (Hudson et al v. Metro) upheld a lower court decision which outlined that the Planning Commission has the authority to determine whether a subdivision complies with the adopted General Plan (NashvilleNext). Per the Court, the Planning Commission may not evaluate each subdivision to determine whether it is harmonious generally but may consider policy. Policy information is provided below for consideration.

NashvilleNext includes a Community Character Manual (CCM) which established character areas for each property within Metro Nashville. The community character policy applied to the entirety of this property is T2 RM (Rural Maintenance). The goal of the T2 RM Policy is to maintain the general character of rural neighborhoods as characterized by their development pattern, varying setbacks, building form, and land uses. Appropriate land uses in the T2 RM policy include maintenance of the land in its natural state, small scale agricultural and related accessory and support uses, residential, institutional, and rural subdivisions. Staff finds that the proposed subdivision meets the intent of the T2 RM policy to provide rural residential lots maintaining the general character of rural neighborhoods.

**COMMENTS FROM OTHER REVIEWING AGENCIES**



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 129 of 153 PageID #: 271

**FIRE MARSHAL RECOMMENDATION**
**Approve**

**STORMWATER RECOMMENDATION**
**Approve**

**NASHVILLE DOT RECOMMENDATION**
**Approve**

**TRAFFIC AND PARKING RECOMMENDATION**
**Approve**

- Traffic conditions to be set at the time of final site plan or building permit approval for individual lots. (Traffic studies, driveway distances, access sight triangles, etc.)

**WATER SERVICES RECOMMENDATION**
**Not Applicable**

- Harpeth Valley Water and Sewer Utility District

**HARPETH VALLEY WATER AND SEWER DISTRICT RECOMMENDATION**
**Approve**

**METRO HEALTH RECOMMENDATION**
**Approve**

**STAFF RECOMMENDATION**
Staff recommends approval with conditions, including a variance from Sections 4-2.5.a.1.a., 4-2.5.a.1.b., and 4-2.5.a.1.c, of the Metro Subdivision Regulations

**RECOMMENDED ACTION**
Motion to approve proposed subdivision Case No. 2026S-096-001 with conditions, including variances to Section 4-2.5 based upon finding that the subdivision complies with the applicable standards of the Metro Subdivision Regulations, Metro Zoning Code, and other applicable laws, ordinances and resolutions as noted in the staff report, subject to all of the staff recommended conditions.

**CONDITIONS**

1. The remainder of parcels 11400029100 and 114000266 shall be consolidated prior to the recording of this plat. If the parcels are not to be combined, prior to recording, proof of an access easement to a public street for parcel 291 will be required.
2. Comply with all conditions and requirements of Metro reviewing agencies.
3. Pursuant to 2-4.7 of the Metro Subdivision Regulations, the approval shall expire if the plat is not recorded with the Register of Deeds within one year of the Planning Commission's approval.
4. The mylar shall be approved and signed by the Metro Health Department prior to recording.

# SEE NEXT PAGE



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 131 of 153 PageID #: 273




**2026S-101-001**
313 EMERY DRIVE
Map 095-16, Parcel(s) 013
14, Donelson-Hermitage-Old Hickory
15 (Jeff Gregg)

| | |
|---|---|
| **Item #20** | **Final Plat 2026S-101-001** |
| **Project Name** | **313 Emery Drive** |
| **Council District** | 15 – Gregg |
| **School District** | 04 – Nabaa-McKinney |
| **Requested by** | Christopher Blake Sexton, RLS, applicant; Olger Mullalli, owner. |
| **Staff Reviewer** | Dhital |
| **Staff Recommendation** | *Approve with conditions.* |

---

**APPLICANT REQUEST**

**Request for final plat approval to create three lots and remove the reserve status.**

Final Plat

A request for final plat approval to create three lots and remove the reserve status for property located at 313 Emery Drive approximately 460 feet south of Lakeland Drive, zoned One and Two-Family Residential (R10) (0.97 acres).

**SITE DATA AND CONTEXT**

**Location:** The parcel is located approximately 480 feet north of Elm Hill Pike.

**Street type:** The parcel has frontage on Emery Drive, a local street.

**Approximate Acreage:** 0.97 acres or approximately 42,379 square feet.

**Parcel/Site History:** The parcel was platted as a reserve parcel for future development in 1952, Plan of Lakeland (Plat Book 2133, Page 15). The 1952 plat does not indicate why the reserve tract was put in place and the Planning Commission must approve the removal of the reserve status to make the parcel a buildable lot.

**Zoning History:** The property has been zoned One and Two- Family Residential (R10) since 1974.

**Existing land use and configuration:** The parcel contains an existing structure, which is identified on the plat as to be removed.

**Surrounding land use and zoning:**

- North: Single-Family Residential (R10)
- South: Single-Family Residential (R10)
- East: Office (OL)
- West: Single-Family Residential (R10)



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 133 of 153 PageID #: 275




**Proposed Final Plat**

**Zoning:** One and Two- Family Residential (R10)
Min. lot size: 10,000 square feet
Max. building coverage: 0.40
Min. rear setback: 20 feet
Min. side setback: 5 feet
Max. height: 3 stories
Min. street setback: 20 feet or Contextual per Zoning Code

**PROPOSAL DETAILS**
**Number of lots:** 3

**Lot sizes:** The proposed Lot 1 is approximately 13,667 square feet. The proposed Lot 2 is approximately 14,054 square feet. The proposed Lot 3 is approximately 14,657 square feet.

**Access:** The proposed Lot 1, Lot 2 and Lot 3 have frontage along Emery Drive. Any future access conditions based on redevelopment will be determined at the time of any future building permit.

**Subdivision Variances or Exceptions Requested:** None.

**APPLICABLE SUBDIVISION REGULATIONS**
Reserve Parcel
Chapter 2-8, Miscellaneous Platting Situations, applies to this request. Section 2-8.1 pertains to converting parcels to building sites. The Planning Commission is required to review parcels being converted to building sites. An exception to this is when a parcel is in reserve due to pending action by a public utility to provide service to the parcel and the reason is stated on the plat that created the reserve parcel. In the event where the reason is stated in the plat, the review can be done at an administrative level with all reviewing agency approvals. However, because no reason was provided on this plat, action by the Planning Commission is required.

When determining if the reserve status should be removed from parcels where the plat does not cite why the parcel is in reserve, the regulations require the Planning Commission to consider the following:

1. That the parcel fits into the character of the area and is consistent with the general plan.
2. That all minimum standards of the zoning code are met.
3. That the parcel has street frontage or meets the requirements of Section 3-4.2.b or meets the requirements of Sections 3-4.2.b, 3-4.2.c, 4-6.3 or 5-3.1.
4. That the current standards of all reviewing agencies are met.

The proposed Lot 1 is approximately 13,667 square feet. The proposed Lot 2 is approximately 14,054 square feet. The proposed Lot 3 is approximately 14,657 square feet. All three proposed lots meet the minimum lot size of the zoning district. All three proposed lots have frontage along Emery Drive, consistent with the orientation of surrounding residential lots. All agencies have recommended approval. Staff find that the subject reserve parcel meets the four requirements to become a buildable lot.



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 135 of 153 PageID #: 277

Chapter 3
Volume III of NashvilleNext, the General Plan for Nashville and Davidson County, contains the Community Character Manual (CCM) which establishes land use policies for all properties across the county. The land use policies established in CCM are based on a planning tool called the Transect, which describes a range of development patterns from most to least developed.

Prior versions of Subdivision Regulations for Nashville and Davidson County contained a uniform set of standards that were applied Metro-wide. This did not take into account the diverse character that exists across the County. In order to achieve harmonious development within the diversity of development patterns that exist in Nashville and Davidson County, the Planning Commission has adopted the current Subdivision Regulations. The Subdivision Regulations incorporate the General Plan policies by including rules or standards for each specific transect. This allows policies of the General Plan to be followed through application of the varying Subdivision Regulations to reflect the unique characteristics found in the different transects. The site is within the District Employment Center (D EC) policy. For D EC, the conventional regulations found in Chapter 3 are utilized.

**3-1 General Requirements**
The proposal meets the requirements of 3-1.

**3-2 Monument Requirements**
Permanent monuments, in accordance with this section of the regulations, shall be placed in all subdivisions when new streets are to be constructed. The proposal does not propose any new streets.

**3-3 Suitability of the Land**
Staff finds that the land is suitable for development consistent with this section.

**3-4 Lot Requirements**
The proposed lots 1, 2 and 3 comply with the minimum standards of the zoning code. Any development proposed on the resulting lot will be required to meet the bulk standards and all other applicable regulations of R10 zoning at the time of building permit. The proposed lots are greater than 10,000 square feet and have frontage along Emery Drive.

**3-5 Infill Subdivisions**
In order to ensure compatibility with the General Plan, the Commission has adopted specific regulations applicable to infill subdivisions, defined as residential lots resulting from a proposed subdivision within the R, R-A, RS, and RS-A zoning districts on an existing street. If a proposed infill subdivision meets all of the adopted applicable regulations, then the subdivision is found to be harmonious and compatible with the goals of the General Plan. An exception to the compatibility criteria may be granted by the Planning Commission for a SP, UDO or cluster lot subdivision by approval of the rezoning or concept plan.

*3-5.2 Criteria for Determining Compatibility for policy areas designated in the General Plan as Neighborhood Maintenance, except where a Special Policy and/or a Designated Historic District exists.*
Not applicable to this case.

*3-5.3 Criteria for Determining Compatibility for policy areas designated in the General Plan as neighborhood Evolving and/or Special Policies, expect within Designated Historic Districts.*
Not applicable to this case.

*3-5.4 Criteria for Determining Compatibility for Designated Historic Districts.*
Not applicable to this case.

*3-5.5 Infill Subdivision Frontage*
Not applicable to this case.

*3-5.6 Reasonable Conditions*
Not applicable to this case.

**3-6 Blocks**
Not applicable. No new blocks are being created.

**3-7 Improvements**
No public infrastructure or improvements are required with this subdivision. Construction plans for any required private improvements (private stormwater, water and sewer lines and connections) will be reviewed at the time of building permit.

**3-8 Requirements for Sidewalks and Related Pedestrian and Bicycle Facilities**
For subdivisions, sidewalks are not required along existing streets. Per a recent court case, the section of the Zoning Code that requires sidewalks along existing streets has been voided.

**3-9 Requirements for Streets**
Not applicable. No new streets are proposed.

**3-10 Requirements for Dedication, Reservations, or Improvements**
Emery Drive is a local street. The plat shows an approximate 50 feet right-of-way for Emery Drive, which meets the right-of-way requirement for local streets.

**3-11 Inspections During Construction**
This section is applicable at the time of construction, which for this proposed subdivision, will occur only after issuance of a building permit approved by Metro Codes and all other reviewing agencies.

**3-12 Street Name, Regulatory and Warning Signs for Public Streets**
Not applicable. No new streets are proposed.

**3-13 Street Names, Regulatory and Warning Signs for Private Streets**
Not applicable. No private streets are proposed.

**3-14 Drainage and Storm Sewers**
Drainage and storm sewer requirements are reviewed by Metro Stormwater. Metro Stormwater has reviewed the proposed final plat and found it to comply with all applicable standards of this section. Stormwater recommends approval.

**3-15 Public Water Facilities**
Metro Water Services has reviewed this proposed final plat for water and has recommended approval with conditions.

**3-16 Sewerage Facilities**
Metro Water Services has reviewed this proposed final plat for sewer and has recommended approval with conditions.

**3-17 Underground Utilities**
There are no new utilities proposed.

**PLANNING STAFF COMMENTS – SUBDIVSION REGULATIONS**
Staff finds the proposed subdivision consistent with the intent of Chapter 3 of the Subdivision Regulations and the standards of the Metro Zoning Code.

**POLICY CONSIDERATIONS**
A recent appeals court decision (Hudson et al v. Metro) upheld a lower court decision which outlined that the Planning Commission has the authority to determine whether a concept plan complies with the adopted General Plan (NashvilleNext). Per the Court, the Planning Commission may not evaluate each concept plan to determine whether it is harmonious generally but may consider policy. Policy information is provided below for consideration.

NashvilleNext includes a Community Character Manual (CCM) which established character areas for each property within Metro Nashville. The community character policy applied to the entirety of this property is D EC (District Employment Center). The goal of the D EC policy is to maintain, create, and enhance Districts where a mixture of office, commercial, and sometimes select light industrial uses are predominant. Secondary and supportive uses are also present and may include residential and institutional uses.

The property currently contains a residential unit; the proposed plat would not conflict with the intent of the policy.

**COMMENTS FROM OTHER REVIEWING AGENCIES**

**FIRE MARSHAL RECOMMENDATION**
**Approve**

**STORMWATER RECOMMENDATION**
**Approve**

**NASHVILLE DOT RECOMMENDATION**
**Approve with conditions**

- Confirm with Planning on reserve status. NDOT takes no exceptions on subdivision.

**TRAFFIC AND PARKING RECOMMENDATION**
**Approve with conditions**

- Traffic conditions to be set at the time of final site plan or building permit approval for individual lots. (Traffic studies, driveway distances, access sight triangles, etc.)

**WATER SERVICES RECOMMENDATION**
**Approve with conditions**

- Attached is a copy of the above-referenced subdivision (uploaded by planning on June 1, 2026) on which we recommend approval. The W&S Capacity fees must be paid prior to service connections.

**STAFF RECOMMENDATION**
Staff recommends approval with conditions.

**CONDITIONS**

1. Proof of demolition for structures identified to be demolished shall be provided prior to plat recordation.
2. Comply with all conditions and requirements of Metro reviewing agencies.
3. Pursuant to 2-4.7 of the Metro Subdivision Regulations, the approval shall expire if the plat is not recorded with the Register of Deeds within one year of the Planning Commission's approval.

**RECOMMENDED ACTION**
Motion to approve proposed subdivision Case No. 2026S-101-001 with conditions based upon finding that the subdivision complies with the applicable standards of the Metro Subdivision Regulations, Metro Zoning Code, and other applicable laws, ordinances and resolutions as noted in the staff report, subject to all of the staff recommended conditions.



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 139 of 153 PageID #: 281




**2003UD-003-012**
RIDGEVIEW UDO, SECTIONS VI & VII (AMENDMENT)
Map 163, Parcel(s) 122
13, Antioch-Priest Lake
32 (Joy Styles)

**Item #21** **2003UD-003-012 Amendment**
**Project Name** **Ridgeview UDO, Sections VI & VII**
**Council Bill No.** BL2026-1386
**Council District** 32 –Styles
**School District** 06 – Mayes
**Requested by** Councilmember Joy Styles, applicant; Missio Ridgeview Land, LLC owners.

**Staff Reviewer** Commey
**Staff Recommendation** *Defer to the July 23, 2026, Planning Commission meeting.*

---

**APPLICANT REQUEST**
**Amend a portion of an Urban Design Overlay.**

UDO Amendment
A request to amend a portion of the preliminary plan for property located at Eagle View Boulevard (unnumbered), at the northeast corner of Eagle View Boulevard and Baby Ruth Lane, zoned Mixed Use Limited (MUL) and Multi-Family Residential (RM9) (14.57 acres) and within the Ridgeview Urban Design Overlay to permit 200 assisted living units and open space.

**STAFF RECOMMENDATION**
Staff recommends deferral to the July 23, 2026, Planning Commission meeting.




**2024Z-052PR-001**
Map 069-16, Parcel(s) 086
03, Bordeaux – Whites Creek – Haynes Trinity
01 (Joy Kimbrough)

| | |
|---|---|
| **Item #22** | **Zone Change 2024Z-052PR-001** |
| **Council Bill No.** | BL2026-1387 |
| **Council District** | 01 - Kimbrough |
| **School District** | 01 – Taylor |
| **Requested by** | Requested by Councilmember Joy Kimbrough, applicant; TNVest Capital, LLC, owner. |
| **Staff Reviewer** | Commey |
| **Staff Recommendation** | *Approve.* |

**APPLICANT REQUEST**
**Zone change from RS10 to R10.**

Zone Change
A request to rezone from Single Family Residential (RS10) to One and Two Family Residential (R10) zoning for property located at 1616 Ashton Ave, approximately 540 feet west of Hydes Fery Road (0.37 acres).

**Existing Zoning**
Single-Family Residential (RS10) requires a minimum of 10,000 square foot lot and is intended for single-family dwellings at a density of 4.36 dwelling units per acre. *Based on acreage alone, RS10 would permit a maximum of one single-family lot.*

**Proposed Zoning**
One and Two-Family Residential (R10) requires a minimum 10,000 square foot lot and is intended for single -family dwellings and duplexes at an overall density of 4.63 dwelling units per acre. *Based on acreage alone, R10 would permit a maximum of one duplex lot.*

**BORDEAUX – WHITES CREEK - HAYNES TRINITY COMMUNITY PLAN**
T3 Suburban Neighborhood Evolving (T3 NE) is intended to create and enhance suburban residential neighborhoods with more housing choices, improved pedestrian, bicycle, and vehicular connectivity, and moderate density development patterns with moderate setbacks and spacing between buildings. T3 NE policy may be applied either to undeveloped or substantially under-developed "greenfield" areas or to developed areas where redevelopment and infill produce a different character that includes increased housing diversity and connectivity. Successful infill and redevelopment in existing neighborhoods needs to take into account considerations such as timing and some elements of the existing developed character, such as the street network, block structure, and proximity to centers and corridors. T3 NE areas are developed with creative thinking in environmentally sensitive building and site development techniques to balance the increased growth and density with its impact on area streams and rivers.

**SITE AND CONTEXT**
The subject property consists of one parcel totaling 0.37 acres located on the south side of Ashton Avenue, west of Hydes Ferry Road. The property is currently zoned Single Family Residential (RS10) and is vacant. The land uses of the surrounding properties are predominately residential



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 143 of 153 PageID #: 285

including single-family, two family, and multi-family. There are some non-residential land uses such as warehouse, office, and religious institution to the south of the subject property. Ashton Avenue and Hydes Ferry Road are local streets. Surrounding properties are zoned RS10, R10, Industrial Warehousing Distribution (IWD), and Specific Plan Zoning District (SP).

**ANALYSIS**
The Suburban Neighborhood Evolving policy (T3 NE) is applied to properties along Ashton Avenue, Hydes Ferry Road, and the surrounding neighborhoods to the west, east, and north. A key intent of the T3 NE policy is to create and enhance suburban residential neighborhoods with more housing choices. While the T3 NE policy supports residential zoning districts, including the requested R10 zoning district, staff still evaluates the surrounding zoning districts, land uses, and adjacent policies when considering rezonings.

The Planning Commission previously recommended approval of this request in 2024, however, the two-year period during which that recommendation remained valid for Council consideration has expired. As a result, the case is returning to the Commission for consideration.

Within the last several years there have been other zone changes from RS10 to R10 in the surrounding area, including for properties to the north along Elizabeth Road. The proposed R10 zoning could allow up to one duplex lot for a total of two units, which is a moderate increase in intensity from the existing RS10 district which would permit one single-family lot. Properties in T3 NE policy areas including those in the R10 zoning district will typically have good access to arterial streets with preference given to locations with mass transit service. This site meets that criterion, as it is located within a five-minute walk of several WeGo bus stops along County Hospital Road and John Mallette Dr., and it is also located within a quarter mile of County Hospital Road which is classified as an arterial boulevard, on the Major and Collector Street Plan (MCSP).

The R10 zoning district would permit a moderate increase in density by creating the potential for two family housing in the area, which expands the diversity in housing choice, consistent with the intent of T3 NE policy. Given policy guidance, proximity to high connectivity, and other recent rezonings in the area, staff recommends approval.

**FIRE RECOMMENDATION**
Approve

**ANTICIPATED TRIP CALCULATIONS**
The proposed rezoning from RS10 to R10 is estimated to have an increase of 13 daily weekday trips, including two additional AM peak hour trips and one additional PM peak hour trip. For a full traffic table, please contact the Planning Department.

**METRO SCHOOL BOARD REPORT**
**Projected student generation existing RS10 district: 0 Elementary 0 Middle 0 High**
**Projected student generation proposed R10 district: 0 Elementary 0 Middle 0 High**



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 144 of 153 PageID #: 286

The proposed R10 zoning is not expected to generate any additional students compared to the existing RS10 zoning. Students would attend Cumberland Elementary School, Haynes Middle School, and Whites Creek High School. Cumberland Elementary School, and Haynes Middle School are identified as exceedingly under capacity while Whites Creek High School is identified as under capacity. This information is based upon the 2025-2026 MNPS School Enrollment and Utilization report provided by Metro Schools.

**STAFF RECOMMENDATION**
Staff recommends approval.



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 145 of 153 PageID #: 287




**2026Z-027PR-001**
Map 072-06, Parcel(s) 307-308
05, East Nashville
07 (Emily Benedict)

**Item #23** — **Zone Change 2026Z-027PR-001**

**Council District** 07 – Benedict
**School District** 03 – Young
**Requested by** Dale and Associates, applicant; Upside, LLC, owner.

**Staff Reviewer** Dhital
**Staff Recommendation** *Approve.*

---

**APPLICANT REQUEST**
**Zone change from RS7.5 to RM20-A-NS.**

Zone Change
A request to rezone from Single-Family Residential (RS7.5) to Multi-Family Residential-Alternative No Short-Term Rental (RM20-A-NS) for properties located at Loftin Avenue (unnumbered), approximately 351 feet west of Gallatin Pike (1.03 acres).

**Existing Zoning**
Single-Family Residential (RS7.5) requires a minimum 7,500 square foot lot and is intended for single-family dwellings at a density of 5.81 dwelling units per acre. *Based on acreage alone, RS7.5 would permit a maximum of five lots. This does not account for compliance with the Metro Subdivision Regulations and compliance with these regulations may result in fewer lots.*

**Proposed Zoning**
Multi-Family Residential-Alternative No Short-Term Rental (RM20-A-NS) is intended for single-family, duplex, and multi-family dwellings at a density of 20 dwelling units per acre and is designed to create walkable neighborhoods through appropriate building placement and bulk standards. *Based on acreage alone, RM20-A-NS would permit a maximum of 21 units.*

**EAST NASHVILLE COMMUNITY PLAN**
T4 Urban Neighborhood Maintenance (T4 NM) is intended to maintain the general character of existing urban residential neighborhoods. T4 NM areas will experience some change over time, primarily when buildings are expanded or replaced. When this occurs, efforts should be made to retain the existing character of the neighborhood. T4 NM areas are served by high levels of connectivity with complete street networks, sidewalks, bikeways, and existing or planned mass transit. Enhancements may be made to improve pedestrian, bicycle, and vehicular connectivity.

Conservation (CO) is intended to preserve environmentally sensitive land features through protection and remediation. CO policy applies in all Transect Categories except T1 Natural, T5 Center, and T6 Downtown. CO policy identifies land with sensitive environmental features including, but not limited to, steep slopes, floodway/floodplains, rare or special plant or animal habitats, wetlands, and unstable or problem soils. The guidance for preserving or enhancing these features varies with what Transect they are in and whether or not they have already been disturbed

**ANALYSIS**

The application consists of two properties on approximately 1.03 acres located south of Kirkland Avenue and east of Gallatin Pike. The properties have been zoned Single-Family Residential (RS7.5) since 1998. Parcel 07206030800 (east) is currently vacant and parcel 07206030700 (west) contains a utility tower at the northern corner with overhead Tennessee Valley Authority (TVA) lines that cross through the site and adjacent properties A small property to the west that contains an NES utility station separates the site from a CSX rail line, which crosses over Gallatin Pike to the west. The surrounding properties are primarily zoned RS7.5 to the north, south and east. Adjacent properties to the east include a subdivision named "Kenmore Court" zoned RS7.5. Along Kirkland Avenue to the northeast, properties are located in a Neighborhood Conservation Overlay. Properties to the west are zoned Mixed-Use Alterative (MUL-A), including properties along Gallatin Pike that are developed with a mix of residential and nonresidential uses. The adjacent property to the north of subject property is zoned Office/Residential (OR20) that has frontage along Kirkland Avenue. Land uses of the surrounding parcels include single-family, one and two-family residential, and commercial. There are also several vacant properties in the vicinity.

The site does not have street frontage; however, a shared access easement has been recorded with the Davidson County Register of Deeds (Instrument # 20260521-0046453) granting access from the site through parcel 07206029600 (1102 Kirkland Avenue), an adjacent property to the north that has frontage on Kirkland Avenue and that is under common ownership to the subject properties.

The proposed RM20-A-NS zoning is consistent with the T4 NM policy at this location. The T4 NM policy focuses on maintaining the general character of existing urban residential neighborhoods while also acknowledging that these areas will experience some change over time. The proximity of T4 NM sites to complete street networks, transit, and higher intensity policy areas may support opportunities for change. The subject properties are located less than a quarter mile from Gallatin Pike to the west which is identified as Arterial Boulevard on Major and Collector Street Plan (MCSP) where several WeGo bus stops are located. The subject properties are also located proximate to higher intensity policy areas such as Urban Mixed-Use Corridor (T4 CM) to the northwest, adjacent to parcel (307), and Urban Community Center (T4 CC) to the west, on the other side of the CSX rail line. Locating additional residential density in proximity to major transit corridors and commercial uses creates an active, mixed-use pedestrian-oriented streetscape anticipated in urban residential neighborhoods.

The requested RM20-A-NS zoning provides an opportunity for infill housing between the higher intensity mixed-use policy areas to the west and the lower intensity T4 NM areas to the east, which are primarily developed with one-and two-family residential uses. A multi-family infill development at this unique location, situated in a pocket between Gallatin Pike and a rail line, and the interior of the neighborhood to the east, provides for a transition in development intensity away from the corridor. The proposed Alternative (-A) standards would ensure that future development on the site has an urban form, consistent with policy guidance. The -A standards would limit maximum building height, and landscape buffers would be required per Code between the site and the single-family zoned areas to the east. The proposed -NS designation prohibits short term rental properties from the zoning district, which is consistent with one of the goals of residential policy areas.



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 148 of 153 PageID #: 290

The Conservation (CO) policy is intended to preserve environmentally sensitive land features through protection and remediation. CO policy at this location applies to a potential stream extending through the northeast side of the site. Future development would be subject to all requirements of Metro review agencies, including the adopted stormwater management manual.

Staff finds that the proposed RM20-A-NS zoning is consistent with the T4 NM policy given the site's unique context at this location. Therefore, staff recommends approval.

**FIRE RECOMMENDATION**
**Approve**

**ANTICIPATED TRIP CALCULATIONS**
The proposed rezoning from RS7.5 to RM20-A-NS is estimated to have an increase of 47 daily weekday trips, including one less AM peak hour trip and four additional PM peak hour trips. For a full traffic table, please contact the Planning Department.

**METRO SCHOOL BOARD REPORT**
**Projected student generation existing RS7.5 districts: 0 Elementary 0 Middle 0 High**
**Projected student generation proposed RM20-A-NS district: 3 Elementary 2 Middle 1High**

The proposed zoning is expected to generate six additional students than the existing RS7.5 zoning district. Students would attend Inglewood Elementary School, Issac Litton Middle School, and Stradford STEM High School. Inglewood Elementary School, Issac Litton Middle School and Stradford STEM High School are identified as under capacity. This information is based upon the 2025-2026 MNPS School Enrollment and Utilization report provided by Metro Schools.

**STAFF RECOMMENDATION**
Staff recommends approval.




**2026Z-044PR-001**
Map 149, Parcel(s) 156.02, 157
13, Antioch-Priest Lake
32 (Joy Styles)



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 150 of 153 PageID #: 292

| | |
|---|---|
| **Item #24** | **Zone Change 2026Z-044PR-001** |
| **Council Bill No.** | BL2026-1389 |
| **Council District** | 32 – Styles |
| **School District** | 06 – Mayes |
| **Requested by** | Councilmember Joy Styles, applicant; EHE Properties LLC, owner. |
| **Staff Reviewer** | Dhital |
| **Staff Recommendation** | *Defer to the July 23, 2026, Planning Commission meeting.* |

**APPLICANT REQUEST**
**Zone change from SP to AR2a.**

Zone Change
A request to rezone from Specific Plan (SP) to Agricultural/Residential (AR2a) zoning for properties located at 532 and 538 Bell Road, approximately 570 feet south of Murfreesboro Pike and located in the Murfreesboro Pike Urban Design Overlay and Corridor Design Overlay District (5.25 acres).

**STAFF RECOMMENDATION**
Staff recommends deferral to the July 23, 2026, Planning Commission meeting.



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 151 of 153 PageID #: 293




**2026Z-045PR-001**
Map 163, Parcel(s) 054-055
13, Antioch – Priest Lake
32 (Joy Styles)

| | |
|---|---|
| **Item #25** | **Zone Change 2026Z-045PR-001** |
| **Council Bill No.** | BL2026-1388 |
| **Council District** | 32 – Styles |
| **School District** | 06 – Mayes |
| **Requested by** | Councilmember Joy Styles, applicant; Intuition Development, LLC, owner. |
| **Staff Reviewer** | Marton |
| **Staff Recommendation** | *Defer to the July 23, 2026, Planning Commission meeting.* |

---

**APPLICANT REQUEST**
**Zone change from RM20-NS to AR2a.**

Zone Change
A request to rezone from Multi-Family Residential-No Short Term Rental (RM20-NS) to Agricultural/Residential (AR2a) zoning for properties located at 5118 Mt. View Road and Mt. View Road (unnumbered), approximately 360 feet west of Highlander Drive (9.4 acres).

**STAFF RECOMMENDATION**
Staff recommends deferral to the July 23, 2026, Planning Commission meeting.



Case 3:26-cv-01143 Document 12-14 Filed 08/15/26 Page 153 of 153 PageID #: 295