IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| **DCB NASHVILLE, LLC,**<br>a Delaware limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>**THE METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY**,<br><br>Defendant. | Case No. 3:26-cv-01143<br>Judge Richardson<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES UNDER 42 U.S.C. § 1983**<br><br>**JURY DEMAND** |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

## I. INTRODUCTION

Plaintiff DCB Nashville, LLC d/b/a DC BLOX ("DC BLOX") respectfully submits this Memorandum of Law in support of its Motion for Preliminary Injunction. DC BLOX seeks to enjoin The Metropolitan Government of Nashville and Davidson County ("Metro") from enforcing Ordinance No. BL2026-1448 (the "Data Center Moratorium"), as amended. DC BLOX also seeks an order requiring Metro to accept, process, review, and act upon its building, grading, zoning, and related development applications under the law governing those applications.

DC BLOX seeks to continue the operation of a data center at 648 Grassmere Park Drive ("the Property"). The Property is a 23.49-acre IWD-zoned site where Asurion lawfully operated office and data-center functions for years, under Metro-issued permits that specifically referenced data-center operations. DC BLOX selected and acquired the Property for continuation and expansion of that use, entered a $23,000,000 Purchase and Sale Agreement on November 7, 2025, closed on July 16, 2026, and made substantial predevelopment expenditures in reliance on the

Property's zoning and use history. Metro's Zoning Administrator confirmed the proposed use as permitted General Office, and later as Warehouse with incidental General Offices, and confirmed in writing that DC BLOX's permit applications vested under Tennessee law.

Metro nevertheless enacted the Data Center Moratorium for the purpose of blocking DC BLOX's project. Metro Legal advised that the moratorium would apply "even if the project is vested," while acknowledging that a vested project retains the right to build under the law in effect when it vested. In spite of this, Metro has placed DC BLOX's permits on hold, deferred BZA proceedings, and recently refused grading and demolition permits despite approval by all reviewing agencies.

Metro's conduct demonstrates that the Data Center Moratorium is not a neutral or generally applicable planning measure, but part of a concerted effort to stop DC BLOX's project. Metro's elected officials publicly pledged to oppose, block, and delay the project, and Metro's Director of Law told DC BLOX's counsel that Metro would do whatever it could to prevent the project from proceeding. Metro then acted on those statements. It enacted a moratorium that, as Metro's own counsel acknowledges, cannot divest DC BLOX of its vested rights, yet Metro has nevertheless invoked that moratorium to delay processing DC BLOX's permit applications in the name of "doing something." At the same time, Metro has continued processing permits for the similarly situated RadiusDC data-center project on comparable IWD-zoned property. Metro subsequently enacted legislation authorizing condemnation of DC BLOX's property, which DC BLOX purchased for approximately $23 million.

Viewed together, these actions reveal a targeted governmental campaign directed at a particular project and property owner, not a legitimate, evenhanded exercise of Metro's land-use authority. The Data Center Moratorium conflicts with Tennessee's Vested Property Rights Act,


Case 3:26-cv-01143 Document 13 Filed 08/15/26 Page 2 of 24 PageID #: 322

disregards the statutory procedures governing local zoning decisions and administrative review, and subjects DC BLOX to disparate and arbitrary treatment in violation of the Due Process and Equal Protection Clauses. This Court should therefore enjoin Metro from enforcement of the moratorium and order Metro to process DC BLOX's applications under the laws, regulations, and development standards in effect when those applications were submitted.

DC BLOX is likely to succeed on all nine counts pleaded in the Complaint: substantive due process, class-of-one equal protection, procedural due process, regulatory taking,[1] and the related declaratory judgment claims. The four preliminary-injunction factors are interrelated: in a constitutional case, irreparable injury is presumed, and the public interest favors preventing unconstitutional conduct. *Vitolo v. Guzman*, 999 F.3d 353, 360 (6th Cir. 2021); *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012).[2]

## II. STATEMENT OF FACTS

A. The Property and the Preexisting Data-Center Use

The Property consists of approximately 23.49 acres at 648 and 650 Grassmere Park Drive in Nashville, Tennessee (Parcel No. 13300013500) (Ex. 1, Parcel map for 648 Grassmere Park, Parcelviewer). The Property was and is zoned IWD (Industrial Warehousing/Distribution). (Ex. 2, Property zoning for 648 Grassmere Park, Parcelviewer; Ex. 3, March Hargis Letter).

The applicable land-use policy is DEC—District Employment Center. (Ex. 4, Land Use Policy for 648 Grassmere Park, Parcelviewer). That policy supports IWD zoning and industrial warehouse uses, as well as light and medium manufacturing, distributive businesses, wholesale

[1] At this stage, DC BLOX is not relying on the regulatory takings claim as a basis for an injunction. DC BLOX anticipates this claim resulting in damages based on the period of time that DC BLOX is prevented from developing the Property.

[2] DC BLOX acknowledges this Court and others have questioned whether these four considerations are requirements or factors. *See Isham v. City of Belle Meade,* No. 3:26-cv-00473, 2026 LX 213010 (M.D. Tenn. May 20, 2026). As discussed further below, all four items support granting a preliminary injunction in this case.

uses, and related employment-generating activity. (Ex. 5, Excerpts from NashvilleNext Community Character Manual). The Property is also part of the Radnor-Seaboard-Sidco-Harding Place industrial corridor, which includes more than 1,400 acres zoned IWD or IR and contains industrial, office, warehouse, transportation, institutional, rail, manufacturing, food-processing, and heavy-freight uses. (Ex. 6, Parcelviewer, View of Adjacent Industrial).

For years before the challenged zoning changes, Asurion operated office and data-center functions on the Property. (Ex. 7, Gatch Decl., ¶ 3). Metro approved that use through permits expressly referencing data-center operations. (Ex. 8, Selection of Asurion Permit Documents). The preexisting facility used the Property for the same essential category of activity DC BLOX intends to continue and expand—housing and operating computer and data-processing systems and associated electrical, cooling, network, backup-power, and office functions. (Ex. 7, Gatch Decl., ¶ 4). The preexisting Asurion facility included approximately 3.6 electrical megawatts (MWs) of generator capacity on the exterior of the building. (Ex. 7, Gatch Decl. ¶ 5).

Federal energy authorities expressly recognize that data centers frequently exist as embedded uses within larger office buildings.[3] The objective electrical-demand evidence confirms that this was no ordinary office use: the Asurion facility maintained 3.6 megawatts of generator capacity, many multiples of the electrical demand expected from a conventional office building of comparable size and consistent with the extraordinary energy intensity characteristic of data-center operations.

Asurion maintained its use and has a license agreement permitting storage of equipment currently in place. (Ex. 7, Gatch Decl., ¶ 5). The use was never intentionally or voluntarily abandoned: the Property was contracted for, acquired, designed, and permitted for continued data-

[3] *See* https://www.eia.gov/todayinenergy/detail.php?id=28232 last visited August 14, 2026.

center use before Metro changed the zoning regulations. Under Tenn. Code Ann. § 13-7-208(g), as applied to metropolitan municipalities through § 13-7-208(l)(3), a temporary interruption does not terminate the protection, and the government bears the burden of proving an overt act of intentional and voluntary abandonment. *See* Tenn. Code Ann. § 13-7-208(g)(4). The Property also contains reasonable space for continuation, reconstruction, and expansion of the protected activity without creating a nuisance to adjoining landowners. (Ex. 7, Gatch Decl., ¶ 6).

B. DC BLOX's Acquisition and Reliance

DC BLOX began searching for a suitable Nashville data center location in approximately January 2022. (Ex. 7, Gatch Decl., ¶ 7). The Property was first presented as a potential site in April 2024, and DC BLOX focused on the Grassmere location by May 2025 after evaluating other potential sites. (Ex. 7, Gatch Decl., ¶ 8). The site was selected as particularly suitable because it was IWD-zoned, had existing data-center operations, fiber connectivity, and access to the electrical capacity required for the proposed development. (Ex. 7, Gatch Decl., ¶ 9).

During acquisition discussions, the seller advised DC BLOX that the Nashville Zoo had expressed interest in purchasing the Property or a portion of it. (Ex. 7, Gatch Decl., ¶ 10). Between approximately June and September 2025, DC BLOX proposed potential subdivisions that would have allowed DC BLOX to develop the portion needed for its facility while the Zoo acquired the balance. (Ex. 7, Gatch Decl., ¶ 11). Those proposals did not result in a final transaction. (Ex. 7, Gatch Decl., ¶ 12).

On or about November 7, 2025, DC BLOX PARENT, LLC entered into a Purchase and Sale Agreement with MarketStreet Grassmere LLC for approximately $23,000,000. (Ex. 7, Gatch Decl., ¶ 13). The agreement was conditioned upon or otherwise premised on DC BLOX's intended use of the Property for data-center development. (Ex. 7, Gatch Decl., ¶ 14).

Before closing, DC BLOX invested substantial sums in due diligence, engineering, architectural design, utility coordination, environmental and geotechnical work, legal work, and other predevelopment expenditures in reliance on the Property's lawful data-center use and IWD zoning. (Ex. 7, Gatch Decl., ¶ 15). DCB Nashville, LLC closed on the purchase on July 16, 2026, paying approximately $23,000,000, and continued incurring predevelopment costs thereafter. (Ex. 7, Gatch Decl., ¶ 16; Ex. 9, Deed for 648 Grassmere).

C. Metro Determines the Use Is Permitted and DC BLOX Submits Its Permit Applications

Before BL2026-1391 became effective, the Metropolitan Zoning Code did not define "data center" as a distinct land-use classification. (Ex. 10, July Hargis Letters). In all other data-center applications, Metro has administratively classified data centers into two existing categories: General Office and Warehouse, both of which were permitted as of right in the IWD district. (Ex. 10, July Hargis Letters).

On March 18, 2026, Metro Zoning Administrator Joey Hargis issued a formal use determination classifying DC BLOX's proposed data center as "General Office," a use permitted as of right in the IWD district. (Ex. 3, March Hargis Letter). That determination was consistent with Metro's longstanding treatment of data centers and Asurion's prior operation on the same Property. (Ex.3, March Hargis Letter; Ex. 10, July Hargis Letters; Ex. 11, Agenda Analysis regarding BL2026-1391, pg. 4 ("Currently, data center is not a separately classified use within the Zoning Code. The Zoning Administrator classifies data centers as a general office use. The general office use is permitted by right (P) in the . . . IWD, and IR zoning districts.")).

On May 11, 2026, DC BLOX submitted grading-permit applications. (Ex. 7, Gatch Decl., ¶ 17). On May 29, 2026, it submitted building-permit applications for the proposed data-center facility. (Ex. 7, Gatch Decl., ¶ 18; Ex. 12, Building Permit Package). Those applications

substantially complied with Metro's development requirements within the meaning of Tenn. Code Ann. § 13-4-310(b)(2), and no preliminary development plan was required as a prerequisite to the building permits. (Ex. 10, July Hargis Letters).

After the July 16 closing, Burr Computer Environments, Inc., on behalf of DCB Nashville, LLC, the new owner, submitted additional building permit materials on July 17, 2026. (Ex. 7, Gatch Decl., ¶ 19; Ex. 12, Building Permit Package). After reviewing the application and floor plans, Mr. Hargis amended the use classification on July 21, 2026, to "Warehouse with incidental General Offices," another use permitted as of right in the IWD district. (Ex. 10, July Hargis Letters).

On July 21, 2026, Mr. Hargis issued a written determination to the Board of Zoning Appeals confirming that DC BLOX's permit applications had vested under Tenn. Code Ann. § 13-4-310(b)(1)(C) and must be reviewed under the rules, regulations, and zoning applicable to the applications. (Ex. 10, July Hargis Letters). At all relevant times, the use classified as General Office or Warehouse with incidental General Offices was permitted as of right on the IWD-zoned Property. *See* Metropolitan Code of Laws, § 17.08.030. (Ex. 10, July Hargis Letters).

D. Metro Introduces New Data-Center Zoning After DC BLOX Applies

On May 26, 2026, after DC BLOX submitted its grading applications and shortly before the May 29 building applications, BL2026-1391 and BL2026-1392 were filed. BL2026-1391 proposed, for the first time, to create separate data-center use classifications and impose new zoning restrictions and conditions. (Ex. 13, BL2026-1391[4]; Ex. 11, Agenda Analysis).

BL2026-1391 ultimately created five data-center categories based on size and electrical capacity, assigned those uses to specified zoning districts, and imposed new conditions and

[4] DC BLOX has requested a certified copy of this ordinance but has not yet received it. This exhibit is substantially what was adopted but does not include amendments that do not impact this matter.

application requirements. It passed on July 21, 2026, was approved by the Mayor on July 24, 2026, and became effective July 31, 2026. As the timeline clearly shows, those requirements did not exist when Asurion operated a data center on the Property or when DC BLOX submitted its relevant applications.

The later-enacted standards cannot lawfully extinguish the protected preexisting data-center use or the vested rights created by Tenn. Code Ann. §§ 13-4-310 and 29-43-101. Metro's later policy choices therefore cannot displace the legal framework governing DC BLOX's earlier applications.

E. The Data Center Moratorium, Illegal Extension and Expansion, and Metro's Express Decision to Apply It to Vested Projects

On June 8, 2026, after DC BLOX had submitted its May 29, 2026, building-permit applications, Metro filed Ordinance No. BL2026-1448 to impose a temporary moratorium on the acceptance, processing, approval, and issuance of specified permits for data-center developments. (Ex. 15, Certified Copy of BL2026-1448). The Planning Commission considered a substitute version on June 25, 2026. At that time, the proposed substitute version would have expired on November 1, 2026, or the effective date of BL2026-1391 and BL2026-1392, whichever occurred first.

Metro Legal advised the Planning Commission that permits for data-center uses should not be accepted, processed, reviewed, approved, or issued while the moratorium was in effect, even if the project was vested. (Ex. 14, Planning Commission Packet). At the same time, Metro Legal acknowledged that a project with established vested rights retained the right to build under the law in effect at the time of vesting and would not be subject to subsequent changes in law. *Id.*

**Therefore, by Metro's own admission, the moratorium's only effect on DC BLOX is to delay the processing and exercise of rights that Metro acknowledges survive later zoning changes.**

On July 21, 2026, during third reading, the Council adopted Amendment No. 1. (Ex. 15, Certified Copy BL2026-1448). The amendment materially changed the scope and duration of the Data Center Moratorium by adding "administrative appeals" to the matters covered by the moratorium and changing the termination to an outside date of December 1, 2026. *Id.* The amended ordinance was not referred to the Metropolitan Planning Commission. *Id; see* official recording of 7/21/2026 Council Meeting at 3:20:00 at https://www.youtube.com/live/GdGMRuA159E?si=MY_Yw7gI4207i6Lt**.**

BL2026-1448 passed on third reading as amended on July 21, 2026, and was approved by the Mayor on July 24, 2026. (Ex. 15, Certified Copy BL2026-1448). Metro has applied it to DC BLOX by placing the relevant permits on "hold" and refusing to process, review, approve, or issue the development approvals necessary for the project. (Ex. 16, epermits, DC BLOX permits on "hold" status). The resulting delay affects DC BLOX's customer obligations, development schedule, financing and carrying costs, construction sequencing, utility coordination, and competitive position. (Ex. 7, Gatch Decl. ¶¶ 20-23).

F. Metro's Application of the Moratorium to Administrative Appeals

Tennessee law establishes and defines the authority of municipal boards of zoning appeals, including appellate jurisdiction over administrative zoning decisions. *See* Tenn. Code Ann. §§ 13-7-206 and 13-7-207. That statutory right of review is particularly important here because Metro Codes has refused to issue DC BLOX's previously approved grading and demolition permits. Ordinarily, DC BLOX could seek review of that administrative action before the Metropolitan

Board of Zoning Appeals. Metro, however, has used the Data Center Moratorium to block both the permits and the administrative process for challenging their denial.

Before final passage of BL2026-1448, appeals concerning the Zoning Administrator's determinations for the Property were filed with the Metropolitan Board of Zoning Appeals, including an appeal by Councilmember Courtney Johnston and an appeal by the Nashville Zoo at Grassmere. (Ex. 17, BZA Hearing Information). Amendment No. 1 then expanded the moratorium to encompass "administrative appeals," and Metro has interpreted that provision by deferring the pending BZA proceedings concerning the Property until after the moratorium. (Ex. 17, BZA Hearing Information).

The practical effect is extraordinary. Metro has refused to issue DC BLOX's permits and, under the same moratorium, has foreclosed timely access to the administrative tribunal established by Tennessee law to review that refusal. Metro has therefore placed DC BLOX in a procedural limbo of Metro's own creation: Metro may withhold the permits, while DC BLOX is prevented from obtaining administrative review of Metro's decision to withhold them. Nothing about that arrangement preserves the status quo. It affirmatively alters DC BLOX's legal position by depriving it, for the duration of the moratorium, or the ordinary statutory process available to challenge adverse zoning decisions.

The resulting delay imposes immediate and continuing harm. The unresolved administrative proceedings cloud the Property and DC BLOX's vested development rights, impede its ability to obtain finality regarding the permits, and interfere with financial, contractual, and development obligations dependent upon those rights. (Ex. 7, Gatch Decl. ¶ 23). The moratorium thus does more than delay development activity; as Metro has applied it, the moratorium

simultaneously suspends the governmental approvals DC BLOX seeks and the statutory mechanism through which DC BLOX may challenge Metro's refusal to provide them.

G. Targeted Government Action Directed at DC BLOX

The Moratorium was enacted against a backdrop of public and governmental efforts directed specifically at stopping DC BLOX's Grassmere project. Councilmember Courtney Johnston, the principal sponsor of BL2026-1448 and an appellant challenging the Zoning Administrator's decision, publicly stated that she was "doing everything I can, legislatively and otherwise, to prevent this project from coming to fruition" next to the Nashville Zoo. (Ex. 18, Councilmember Johnston Facebook Post). Mayor Freddie O'Connell publicly opposed the Grassmere project and issued Executive Order No. 59 relating to data-center development and an expedited temporary moratorium. (Ex. 19, EO No. 59).

Councilmember Rollin Horton posted a request for public support of his legislation (BL2026-1391) by including an image of the Nashville Zoo's request to "keep momentum going in *our* fight . . . We cannot allow DC Blox to move forward or be grandfathered into the legislation while this work is under way." (Ex. 20, CM Horton Instagram Post) (emphasis added). Mayor O'Connell stated that he has "carefully followed the concerns from the community and the Zoo" and he also "remain[s] deeply concerned about the proposed use." (Ex. 21, Mayor O'Connell Instagram Post).

Additionally, during the June 6, 2026, specially called Metropolitan Council meeting, several councilmembers similarly expressed their desire to stop the DC BLOX project through the passage of the Data Center Moratorium following comments from the public at that meeting. These comments included Councilmember Benedict stating, "the public is disgusted by this, I am as well," "we must do something," "something must be done . . . relative to any permits that have

been or could be issued" and "we are with the public on this."[5] Councilmember Porterfield agreed that "we must do something."[6] Councilmember Gadd reiterated that the Council is "sympathetic to the Nashville Zoo" and doesn't want to see resources taken from that.[7]

These examples are small sampling of the public evidence directly linking the consideration and amendment of the Data Center Moratorium to DC BLOX and its vested project.

On June 12, 2026, during a telephone call with attorney Dan Weede, then-Director of Law Wally Dietz stated that Metro would do whatever it could to ensure that the DC BLOX Project was not developed. (Ex. 24, Weede Decl, ¶¶ 5-6). This statement is consistent with the Moratorium's project-specific application, the permit hold, and the delayed BZA proceedings.

On August 4, 2026, the Metropolitan Council passed BL2026-1489, as amended, authorizing Metro to acquire by negotiation or condemnation the fee interest in the approximately 23.49-acre parcel at 648 Grassmere Park for "office, warehouse, training and other uses" by Metro departments. (Ex. 22, BL2026-1489). The condemnation authorization followed the Moratorium and forms part of the coordinated course of government action directed at preventing DC BLOX from exercising its protected and vested development rights.

<u>H. Disparate Treatment</u>

Other data-center facilities have operated within Metro Nashville under warehouse, office, or similar classifications without the combination of permit holds, project-specific condemnation authorization, and extraordinary measures imposed on DC BLOX. (Ex. 14, Planning Commission Packet, noting at least nine operating data centers currently in Metro Nashville). By way of a more specific example, RadiusDC operates or is developing a data-center facility at 2902 Brick Church

---

[5] Official recording available at https://www.youtube.com/live/H5nTYPj8c6w?si=UqL0aVTQkKX3OtmT; comments beginning at 17:00.
[6] Comments beginning at 21:20.
[7] Comments beginning at 31:50.

Pike, a property also zoned IWD. This development is known as Project Smash. Like DC BLOX, RadiusDC submitted its building application before the July 24, 2026 change to the Metro Zoning Code that addressed data centers.

However, in a stark contrast to DC BLOX, after the Mayor approved BL2026-1448, Metro continued processing permits and issued trade permits for RadiusDC while DC BLOX's permits remained on a Hold status. (Ex. 23, collection of RadiusDC permit documents, including *issuance* of trade permits including the electrical permit issued and approved in August 2026; Ex. 16, Status of DC BLOX permit application). And beyond data centers, Metro has not imposed comparable moratoria on other industrial or commercial facilities based solely on electrical demand, backup generation, fuel storage, mechanical equipment, noise, vibration, or twenty-four-hour operation. There is no rational basis for treating DC BLOX's vested, preexisting-use project differently from RadiusDC's project or other industrial uses with similar purported concerns.

## III. LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy never awarded as of right." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008). In evaluating a motion for preliminary injunction, this Court considers the following: (1) whether the movant has demonstrated a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable harm absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by granting the injunction. *Id.* at 20.

These factors are "not prerequisites to be met," but are interrelated considerations that must be balanced together. *Doe v. University of Cincinnati*, 872 F.3d 393, 399 (6th Cir. 2017) (internal quotation omitted). However, "where 'a party seeks a preliminary injunction on the basis of a potential constitutional violation, the likelihood of success on the merits will often be the

determinative factor.'" *Fowler v. Benson*, 924 F.3d 247, 256 (6th Cir. 2019) (*quoting Bailey v. Callaghan*, 715 F.3d 956, 958 (6th Cir. 2013)).[8]

Moreover, in constitutional cases, the remaining three factors effectively merge with the first: "'[w]hen constitutional rights are threatened or impaired, irreparable injury is presumed,'" and "'it is always in the public interest to prevent violation of a party's constitutional rights.'" *Vitolo v. Guzman*, 999 F.3d 353, 360 (6th Cir. 2021) (quoting *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) and *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, 274 F.3d 377, 400 (6th Cir. 2001)).

## IV. ARGUMENT

A. DC BLOX is likely to succeed on the merits.

Metro has adopted this Data Center Moratorium for the purpose of delaying DC BLOX's lawful, vested use of its property and to prevent other property owners from vesting through application, in direct conflict with the Tennessee Vested Property Rights Act and Metro's own assertions that the project is vested. DC BLOX is likely to succeed on all nine Counts pleaded in the Complaint, and specifically relies on every claim except for the regulatory takings claim for injunctive relief. Each of those claims independently support preliminary relief: (1) substantive due process under 42 U.S.C. § 1983; (2) class-of-one equal protection under the Fourteenth Amendment; (3) procedural due process under 42 U.S.C. § 1983; (4) protected preexisting use under Tenn. Code Ann. § 13-7-208; (5) permit-based vested rights under Tenn. Code Ann. § 13-4-310 and the policy stated in § 29-43-101; (6) ultra vires interference with the Board of Zoning

[8] As noted above, DC BLOX acknowledges recent decisions that list these items as requirements rather than factors. Under either analysis, DC BLOX respectfully submits that all four items have been satisfied and strongly weigh in favor of injunctive relief.

Appeals' statutory jurisdiction; (7) invalid enactment of the materially amended Moratorium; and (8) preemption by the Tennessee Vested Property Rights Act.

*1. Metro has no rational basis for the Data Center Moratorium, which is designed to only delay DC BLOX's lawful, vested project.*

The Fourteenth Amendment prohibits arbitrary and unreasonable governmental action. *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). In the land-use context, a substantive due process violation exists when governmental action is not rationally related to a legitimate governmental interest or is arbitrary and capricious. *See Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1221 (6th Cir. 1992). Similarly, the Equal Protection Clause prohibits intentional differential treatment of similarly situated persons or entities without a rational basis. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

DC BLOX possesses protected property interests in its ownership and lawful use of the Property, its preexisting-use rights under Tenn. Code Ann. § 13-7-208, and its vested permit rights under Tenn. Code Ann. § 13-4-310. Metro determined that the proposed use was permitted under the governing IWD zoning, determined that the July 17, 2026 application vested, and confirmed in writing that the applications must be reviewed under the rules applicable when they were submitted.

Metro's application of BL2026-1448 to delay DC BLOX's project is arbitrary and irrational as applied to those interests. Metro Legal advised that the Moratorium applies "even if the project is vested," while simultaneously acknowledging that a vested project retains the right to build under the law in effect when it vested and is not subject to subsequent changes in law. The stated planning purpose of allowing time to develop future standards cannot rationally justify withholding processing of a project to which Metro admits those future standards cannot apply.

Indeed, the Moratorium's only effect on DC BLOX is to delay the processing and exercise of rights that Metro acknowledges survive the later zoning changes. The as-applied deprivation is reinforced by the post-application Moratorium, the express policy of applying it to vested projects, the project-specific statements by Metro officials, the administrative hold, the delayed BZA proceedings, and the condemnation authorization.[9] The Metropolitan Council enacted the policy and Metro departments implemented it by refusing to process DC BLOX's permits. That conduct is arbitrary, capricious, and without a rational relationship to a legitimate governmental objective.

Turning to Equal Protection, Metro's conduct becomes even further egregious in light of Metro's materially different treatment of the RadiusDC project: the RadiusDC property at 2902 Brick Church Pike (known as Project Smash) is zoned IWD, its building application was submitted before the July 24, 2026 change to the Metro Zoning Code, and Metro continued permit processing and/or issued trade permits after the Mayor approved BL2026-1448. DC BLOX, by contrast, had an express vesting determination and a protected prior use, yet Metro placed its permits on hold and refused comparable processing.

No rational distinction justifies allowing one similarly situated IWD data-center project to continue through Metro's permitting system while refusing to process DC BLOX's project. The Moratorium's stated concerns—electrical demand, backup generation, fuel storage, mechanical equipment, noise, vibration, and twenty-four-hour operation—do not explain the selective treatment. Instead, the Mayor's opposition, the sponsor's statement that she was doing everything possible to prevent the project, the Legal Director's statement, and the condemnation authorization further support an inference that the differential treatment was intentional and carried out pursuant to official Metro policy.

---

[9] DC BLOX notes that the Data Center Moratorium, as improperly extended, does appear to give Metro time to proceed through the condemnation process while unlawfully prohibiting development on the Property.

Additionally, even if Metro decides to apply the Data Center Moratorium to other data centers, the legislation still lacks a rational basis to delay processing of permits that are vested because new zoning regulations would not apply to such projects.

*2. The improper amendment and the delay of administrative appeals result in a Procedural Due Process Violation.*

This claim challenges (i) Metro's administrative implementation of official policy against an already submitted project that the Zoning Administrator determined was vested, together with DC BLOX's protected preexisting-use rights and (ii) an improper amendment to the zoning ordinance adopted without opportunity for DC BLOX to be heard.

DC BLOX possessed protected interests before Metro placed the applications on hold. After the Zoning Administrator determined that the applications were vested, Metro implemented BL2026-1448 by refusing to process, review, approve, or issue the permits and by delaying the administrative-appeal mechanism through which the underlying zoning determinations were to be adjudicated. Because the deprivation results from the terms and implementation of official Metro policy itself, DC BLOX had no meaningful pre-deprivation administrative mechanism through which it could obtain processing of its vested applications while the Data Center Moratorium was enforced against them.

Further, the improper amendment occurred on third and final reading. As discussed further below, this amendment required re-referral to the Planning Commission. There can be no doubt that this amendment was incredibly substantial: the result of the amendment was to change the expiration date from immediate (due to passage of the companion zoning regulation) to more than four months later on December 1, 2026, as well as significantly delay the existing BZA appeals related to the project.

The deprivation remains active. Metro continues to refuse to process and issue permits related to DC BLOX's project, and recent requests for grading and demolition permits were refused despite approval by all reviewing agencies within Metro. This targeted attack is further highlighted by Metro's ongoing issuance and approval of permits related to the RadiusDC project, including by way of recent example, an electrical permit issued and approved on August 4th and 5th, respectively. The continuing refusal of Metro to process DC BLOX's permits, based on an improper amendment, is not merely a past procedural defect; it is an ongoing administrative deprivation of DC BLOX's protected property interests without constitutionally adequate process.

*3. The Data Center Moratorium should be enjoined due to numerous violations of state law.*

Tennessee's Vested Property Rights Act establishes vesting in the development standards applicable when a qualifying application is *submitted*. Tenn. Code Ann. § 13-4-310(b), (c). The Act defines "submission" for a building permit as the date on which an applicant submits a complete application to the local government. Tenn. Code Ann. § 13-4-301(5)(B). Tenn. Code Ann. § 29-43-101 likewise states that property owners should expect the merits of a permit application to be judged under the law in effect at the time of application.

BL2026-1448 purports to suspend the acceptance of applications. That is directly contrary to the statutory vesting mechanism: Metro cannot avoid the law governing an application by refusing to accept, process, or act upon it after the owner has submitted a complete application and acquired the right to vest in the applicable development standards. The Data Center Moratorium is therefore preempted and invalid due to the direct conflict with the Vested Property Rights Act.

Additionally, the Data Center Moratorium illegally restricts the jurisdiction of the Board of Zoning Appeals. Tennessee law establishes the authority and jurisdiction of municipal boards of zoning appeals, including appellate jurisdiction over administrative zoning decisions. Tenn.

Code Ann. §§ 13-7-206 and 13-7-207. Appeals concerning the Zoning Administrator's determinations for the Property were filed before final passage of BL2026-1448, including appeals by Councilmember Johnston and the Nashville Zoo.

Amendment No. 1 added "administrative appeals" to the matters purportedly subject to the Data Center Moratorium, and Metro has applied or interpreted that language to defer the pending BZA proceedings. However, a municipal ordinance cannot suspend, eliminate, or materially curtail jurisdiction conferred by state law. The BZA statutes authorize a board of zoning appeals to hear and decide appeals from the decisions of a municipal administrative official, and that power is not conditioned on a grant of authority by a municipal zoning ordinance. Because BL2026-1448 purports to do so, it conflicts with Tennessee law and is ultra vires. *See* Tenn. Op. Att'y Gen. 98-082 (determining that "a zoning ordinance that purports to limit these types of appeals…would be inconsistent with the statutory scheme governing municipal zoning.").

The BZA interference independently supports injunctive relief against the invalid and void Data Center Moratorium. DC BLOX is likely to succeed because the challenged delay is a direct administrative implementation of an ordinance that exceeds Metro's authority.

Metro again violated state law by amending the Data Center Moratorium on third reading without a referral back to Planning Commission. This was a substantial modification that changed the expiration date of the moratorium from immediate to more than 120 days later. Tennessee's municipal zoning statutes require Planning Commission review and recommendation as part of the prescribed process for zoning ordinances and amendments. Tenn. Code Ann. §§ 13-7-203(b), 13-7-204; *Cherokee Country Club, Inc. v. City of Knoxville*, 152 S.W.3d 466 (Tenn. 2004); *Westland West Community Ass'n v. Knox County*, 948 S.W.2d 281 (Tenn. 1997); *Edwards v. Allen*, 216

S.W.3d 278 (Tenn. 2007). Failure to follow these proscribed conditions renders the offending legislative act null and void. *Westland West Community Ass'n,* 948 S.W.2d at 283.

The version of BL2026-1448 reviewed by the Planning Commission imposed the Moratorium on specified permits until November 1, 2026, or the effective date of BL2026-1391 and BL2026-1392, whichever occurred first. The Planning Commission was also told by the sponsor of the Data Center Moratorium that it would be extremely temporary and may not even go into effect. The Data Center Moratorium did not include administrative appeals.

However, on third and final reading, the Council materially altered the ordinance by adding administrative appeals and replacing the original termination structure (vetted through the Planning Commission and opportunity for public hearing) with an outside date of December 1, 2026. Those changes altered both the matters subject to the Moratorium and the period during which it could continue after the companion zoning legislation became effective.

The materially amended ordinance was not returned to the Planning Commission for review and recommendation before final passage. Because the final ordinance materially departed from the version reviewed by the Commission without the review required by Tenn. Code Ann. § 13-7-204, BL2026-1448 is invalid and unenforceable in whole or at least as to the materially added provisions. DC BLOX is therefore again likely to succeed that the Data Center Moratorium is invalid and void.

B. DC BLOX will suffer irreparable harm absent an injunction

The Sixth Circuit has held that "'[w]hen constitutional rights are threatened or impaired, irreparable injury is presumed.'" *Vitolo v. Guzman*, 999 F.3d 353, 360 (6th Cir. 2021) (quoting *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012)). Because DC BLOX has shown a substantial likelihood of success on its due-process and equal-protection claims, that presumption

applies here. The deprivation is ongoing, not theoretical: Metro continues to enforce the Moratorium against a project its own officials determined was vested and permitted.

Even apart from the presumption, DC BLOX faces concrete and continuing harms that cannot be remedied by a later damages award. As evidenced by the accompanying declaration, DC BLOX has contractual obligations that require development of this project well before the expiration of the Data Center Moratorium. Lost customer relationships and contractual opportunities cannot be fully valued or restored through damages after the development window has passed.

Further, data center development is time-sensitive and depends on coordinated construction sequencing, utility coordination, financing, and customer delivery schedules. Every month that Metro prevents DC BLOX from proceeding narrows the window in which DC BLOX can serve the Nashville market and coordinate the project's construction and infrastructure commitments.

C. The balance of equities and public interest favors DC BLOX.

The balance of equities overwhelmingly favors DC BLOX. DC BLOX faces the continuing deprivation of constitutionally protected property rights, the impairment of a $23,000,000 investment, carrying and financing costs, jeopardized customer obligations, competitive injury, and the loss of a time-sensitive development window. Metro, by contrast, has no legitimate interest in enforcing the Moratorium against a project it admits is vested and entitled to be built under the law in effect when it vested.

Metro cannot claim hardship from being required to perform the governmental function its own Zoning Administrator has already directed: accept, process, review, and act upon DC BLOX's applications under the governing law. An injunction would not require Metro to approve an

application automatically or exempt DC BLOX from lawful review. It would prevent Metro from refusing to process the project based on later standards that cannot lawfully govern it.

An injunction would preserve, not expand, DC BLOX's existing rights. It would restore the lawful permitting process and prevent Metro from using the Data Center Moratorium to delay or foreclose vested and protected development rights while the Court resolves the parties' legal dispute.

Additionally, the Sixth Circuit has repeatedly held that "'it is always in the public interest to prevent violation of a party's constitutional rights.'" *Vitolo v. Guzman*, 999 F.3d at 360 (quoting *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, 274 F.3d 377, 400 (6th Cir. 2001)). That principle applies with particular force where Metro is actively enforcing a permit hold and delaying state-law administrative appeals against a project that its own officials determined was vested.

The public also has a strong interest in the rule of law and in governmental adherence to state statutes. Tennessee's General Assembly declared in Tenn. Code Ann. § 29-43-101 that property owners should expect permit applications to be judged under the law in effect when submitted. Enforcing that policy promotes certainty and predictability for property owners throughout Tennessee and prevents local governments from defeating vesting by withholding application processing.

The public interest likewise favors preserving the statutory jurisdiction of the Board of Zoning Appeals and requiring Planning Commission review of material zoning amendments. Local governments benefit, as does the public, when zoning decisions follow the procedures and jurisdiction established by Tennessee law rather than project-specific legislative interference. Finally, the public has an interest in neutral administration of the permitting system, economic

development, and continued investment in Nashville. DC BLOX's project represents a substantial capital commitment and planned digital infrastructure, while Metro's selective attacks against DC BLOX undermine public confidence in equal and predictable enforcement.

## V. CONCLUSION AND RELIEF REQUESTED

For the foregoing reasons, and consistent with the Prayer for Relief in the Complaint, Plaintiff DCB Nashville, LLC d/b/a DC BLOX respectfully requests that this Court grant its Motion for Preliminary Injunction and enter an order granting a preliminary injunction (i) enjoining Metro from enforcing BL2026-1448 against DC BLOX and the Property, (ii) requiring Metro to accept, process, review, and act upon DC BLOX's building, grading, zoning, and related development applications under the law governing those applications, and (iii) prohibiting Metro from using BL2026-1448 to delay, stay, or foreclose BZA proceedings concerning the Property. DC BLOX also requests such other and further relief as the Court deems just and proper.

Respectfully submitted,

THOMPSON BURTON PLLC

*/s/ Joshua C. Lee*

Joshua C. Lee, #30227
R. Alex Dickerson, #27184
J. Douglas Sloan III, #21016
Thompson Burton PLLC
1801 West End, Suite 1550
Nashville, TN 37203
Telephone: (615) 988-1629
alex@thompsonburton.com
joshua.lee@thompsonburton.com
dsloan@thompsonburton.com

*Attorneys for Plaintiff DCB Nashville, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 15th day of August, 2026, a true and correct copy of the foregoing was filed electronically using the CM/ECF system, which will send notification of such filing to all counsel of record.

__*/s/ Joshua C. Lee*________________
Joshua Lee