UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| DCB NASHVILLE, LLC,<br><br>Plaintiff,<br><br>v.<br><br>THE METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | NO. 3:26-cv-01143<br><br>JUDGE RICHARDSON |

**MEMORANDUM OPINION**

Pending before the Court is the motion to dismiss (Doc. No. 22, "Motion") filed by Defendant, the Metropolitan Government of Nashville and Davidson County.[1] Via the Motion, Defendant seeks the dismissal, pursuant to Rule 12(b)(1) and Rule 12(b)(6), of the complaint (Doc. No. 1, "Complaint") of Plaintiff, DCB Nashville, LLC. Plaintiff has filed a response (Doc. No. 24, "Response") in opposition to the Motion. Defendant has filed a reply (Doc. No. 25) in further support of the Motion.

For the reasons stated herein, the Motion (Doc. No. 22) will be **GRANTED IN PART AND DENIED IN PART**.

[1] Defendant's memorandum of law in support of the Motion is incorporated within the Motion.

## BACKGROUND[2]

Below, the Court begins by reviewing the parties to this action and the facts alleged in the Complaint. The Court then examines the claims asserted by Plaintiff in the Complaint and then explains the bases on which Defendant has brought the instant Motion.

### 1. The Parties and the Property

Plaintiff is "a Delaware limited liability company and the current owner of the real property located at 648 and 650 Grassmere Park Drive, Nashville, Tennessee 37211 (the "Property")." (Doc. No. 1 at ¶ 7). Plaintiff "is engaged in the business of developing and operating data-center and digital-infrastructure facilities." (*Id.*). Plaintiff is a subsidiary of DC BLOX PARENT LLC. (*Id.* at ¶ 8).

Defendant (hereinafter, sometimes "Metro"), is the Metropolitan Government of Nashville and Davidson County, Tennessee. (*Id.* at ¶ 12).

The Property "consists of approximately 23.49 acres at 648 and 650 Grassmere Park Drive in Nashville (Parcel Number 13300013500)." (*Id.* at ¶ 13). The Property "is and was zoned IWD (Industrial Warehousing/Distribution) at all times material before the 2026 data-center zoning changes."[3] (*Id.* at ¶ 14). "The current land use policy for the property is DEC - District Employment Center. Metro's District Employment Center supports IWD zoning and industrial warehouse uses as well as light and medium manufacturing, industrial warehouse, and distributive businesses and

---

[2] The facts herein are taken from the Complaint. For purposes of the instant Motion, the facts in the Complaint are accepted as true, except to the extent that they are qualified herein (as, for example, by "Plaintiff alleges") to denote that they are not being taken as true but instead are set forth merely to make clear what a party claims to be true. Throughout this opinion, the Court forgoes any such qualifiers for any fact that it is accepting as true, stating those facts without qualification even though it is aware that any such (alleged) fact ultimately might not prove to be true.

[3] The Court discusses in more depth below the "2026 data-center zoning changes" referred to in this allegation.

wholesale use." (*Id.* at ¶ 15).[4] The Property is adjacent to the Nashville Zoo. (*Id.* at ¶ 16). In the years leading up to the events that gave rise to this action, "Asurion [(a name that Plaintiff does not identify but which the Court recognizes as that of another business entity)] operated office and data-center functions on the Property[, and Defendant] approved that use through Metro-issued permits that expressly referenced data-center operations." (*Id.* at ¶ 17). Prior to Plaintiff purchasing the Property, an entity called MarketStreet Grassmere, LLC owned the Property. (*Id.* at ¶¶ 10, 21).

**2. Factual Background**

*a. Plaintiff's Acquisition of the Property*

Plaintiff began "searching for a suitable Nashville data-center location in approximately January 2022." (Doc. No. 1 at ¶ 23). The Property "was first presented as a potential site in April 2024." (*Id.*). "The Property was particularly suitable [in Plaintiff's view] because it was zoned IWD, had existing data center operations, had significant fiber-optic network connectivity, and had access to the electrical capacity required for [Plaintiff's] proposed [data-center] development." (*Id.* at ¶ 24). On or about November 7, 2025, DC BLOX PARENT, LLC (Plaintiff's parent company) entered into a purchase and sale agreement with MarketStreet Grassmere, LLC to purchase the Property. (*Id.* at ¶ 27). The agreement was "premised on [Plaintiff's] intended use of the Property for data-center development." (*Id.*). On or about February 2, 2026, Plaintiff "initiated communications with the Mayor's Office [an instrumentality of Defendant] and other Metro officials regarding the planned data-center development, including the Property address and the contemplated first and second phases of the project." (*Id.* at ¶ 29). On or about March 31, 2026, Plaintiff "met with Metro's Department of Economic and Community Development regarding the

[4] Plaintiff does not explain the precise contours of IWD zoning or the DEC land use policy. The notion from the Complaint seems to be that IWD zoning, coupled with a DEC land use policy or the other types of land use policies/classifications that the Court discusses below, somehow permits (or permitted) Plaintiff to embark on its planned data-center project.

project." (*Id.* at ¶ 30). Finally, on July 16, 2026, Plaintiff (as opposed to Plaintiff's parent company, DC BLOX PARENT, LLC, which had entered into the purchase and sale agreement with MarketStreet Grassmere, LLC), "closed on the purchase of the Property [] for approximately $23,000,000." (*Id.* at ¶ 31).

*b. Plaintiff Seeks Permits for its Proposed Data-Center Project*

On March 18, 2026, "Metro Zoning Administrator Joey Hargis [(hereinafter "Zoning Administrator Hargis" or the "Zoning Administrator")] issued a use determination classifying [Plaintiff's] proposed data center as a 'General Office' use, which was [(allegedly)] permitted as of right in the IWD zoning district." (Doc. No. 1 at ¶ 34). Then, on May 11, 2026, Plaintiff "submitted grading-permit applications for the proposed [data-center] development." (*Id.* at ¶ 33). Subsequently, on May 29, 2026, Plaintiff "submitted building-permit applications for the proposed data-center facility." (*Id.* at ¶ 35). On July 17, 2026, "Burr Computer Environments, Inc., on behalf of [Plaintiff], submitted a complete building permit application [for Plaintiff's proposed data center] to [Defendant]." (*Id.* at ¶ 11).

On July 21, 2026, after reviewing Plaintiff's "building permit application and floor plans,"[5] "Zoning Administrator Hargis amended the use classification [for Plaintiff's proposed data center] to 'Warehouse with incidental General Offices,' another use [(allegedly)] permitted as of right in the IWD zoning district under the law governing the May 29 applications." (*Id.* at ¶ 39). On July 28, 2026, "Zoning Administrator Hargis issued a written determination to the Board of Zoning Appeals [stating] that [Plaintiff's] building-permit applications had vested under Tenn. Code Ann.

[5] Having reviewed the pertinent allegations, the Court is unsure as to precisely which applications Zoning Administrator Hargis reviewed. That is to say, the Court is unsure whether Zoning Administrator Hargis reviewed the applications submitted on May 11, 2026, the applications submitted on May 29, 2026, or the application submitted on July 17, 2026, or a combination of some or all of those applications. The Court discerns that it is most likely that Zoning Administrator Hargis reviewed the applications submitted on May 29, 2026.

§ 13-4-310(b)(1)(C) and were to be reviewed under the rules, regulations, and zoning applicable to the applications." (Doc. No. 1 at ¶ 40).[6]

Appeals of Zoning Administrator Hargis's "determinations for the Property were filed with" Defendant's Board of Zoning Appeals (hereinafter, "BZA"), by the Nashville Zoo—which, as noted above, abuts the Property—and a member of Defendant's city council, Courtney Johnston. (*Id.* at ¶ 60).[7]

*c. Defendant Adopts New Zoning Ordinances Related to Data Centers*

Concurrently with Plaintiff's efforts to acquire the Property and to obtain permits in connection with its proposed data-center project, Defendant's city council began considering two ordinances that would create new data-center use classifications and zoning restrictions and conditions for data-center facilities. (Doc. No. 1 at ¶¶ 43-46). The first of these, BL2026-1391, was passed by Defendant's city council on July 21, 2026, was approved by Defendant's mayor three days later, and became effective on July 31, 2026. (*Id.* at ¶ 44). The second, BL2026-1392, was also passed by Defendant's city council on July 21, 2026, was approved by Defendant's Mayor three days later, and became effective on July 31, 2026.[8] *See BL2026-1392*, Metropolitan

[6] The meaning (and consequences) of this purported vesting is detailed in more depth below, where the Court discusses the particular claims Plaintiff asserts in the Complaint.

[7] Of note, under T.C.A. §§ 13-7-206 and 13-7-207, the BZA has appellate jurisdiction over administrative zoning decisions issued by Zoning Administrator Hargis, such as the above-described ones issued by Zoning Administrator Hargis related to the Property.

[8] The full text and legislative history of BL2026-1391 may be found at https://nashville.legistar.com/LegislationDetail.aspx?ID=8040869&GUID=007B8704-62ED-46D1-9E9A-8B3F778229A8&FullText=1. The full text and legislative history of BL2026-1392 may be found at https://nashville.legistar.com/LegislationDetail.aspx?ID=8040870&GUID=ABD166B5-005A-400B-B447-1F81227D7B2C.

The Court discerns that it properly may consider all of this information in evaluating the Motion. This is because even though a copy of those ordinances and documents evincing their legislative history were not attached to the Complaint, each of those ordinances (the text and legislative history of which are maintained on a municipal website) is a public record, *Patriot Angels Consulting Corp. v. Veterans of Foreign Wars of the United States*, No. 3:24-CV-00087, 2026 WL 625680 at *9 n. 14 (M.D. Tenn. Mar. 5, 2026) (observing

Government of Nashville & Davidson County Legislative Information Center, https://nashville.legistar.com/LegislationDetail.aspx?ID=8040870&GUID=ABD166B5-005A-400B-B447-1F81227D7B2C (last visited Oct. 5, 2026).

*d. The Data-Center Moratorium*

As relevant here, Defendant's city council also began considering BL2026-1448, which was (and is) an ordinance designed to impose a temporary moratorium on the acceptance, processing, approval, and issuance of certain types of permits for data-center developments. (Doc. No. 1 at ¶ 47). On July 21, 2026, Defendant's city council adopted BL2026-1448 as amended by an amendment ("Amendment No. 1") thereto.[9] (Doc. No. 1 at ¶ 56). BL2026-1448 provides, in relevant part:

> Section 1. That a moratorium is hereby declared upon the acceptance, processing, approval, and issuance of zoning, building, or grading permits by the Metropolitan Department of Codes Administration and the Metropolitan Water Services Department for any data center development for property within Nashville & Davidson County until November 1, 2026 or the effective date of BL2026 1391 and BL2026-1392, whichever occurs first.
>
> Section 2. That for the purposes of this ordinance, a "data center development" shall include any development including a physical room, building, or facility primarily used for housing and operating computer systems and associated equipment, including servers, data storage and processing systems, and accessory infrastructure such as cooling systems, power generators, electrical substations, and network hardware. The square footage of a data center shall include the total square footage of each floor in the data center development. the square footage of any supporting uses, and the square footage of any additional exterior equipment. such as

---

that a public record is a record "that is both created by and maintained by a public (i.e., government) agency."), which—as the Court describes below—a court may consider in adjudicating a motion like the instant Motion. *See City of Murfreesboro, Tenn., v. BFI Waste Systems of Tenn., LLC*, No. 3:22-CV-00605, 2026 WL 2807005, at *6, *6 n.26 (M.D. Tenn. Sept. 18, 2026).

As relevant here, BL2026-1391 created, just as Plaintiff alleges, "five separate data-center categories based on size and electrical capacity, assigned those uses to specified zoning districts, and imposed new conditions and application requirements [for data-center development]." (Doc. No. 1 at ¶ 44). BL2026-1392 implements certain restrictions and requirements regarding building materials for the data-center categories established in BL2026-1391.

[9] Hereinafter, BL2026-1448, as amended by Amendment No. 1, is referred to as the "Moratorium".

> substations, electrical yards, mechanical yards, and all other exposed equipment. located within the property boundaries. A "server room" shall not be considered a data center. A collection of computer workstations configured solely for use by a principal use shall not be considered a data center. "Server room" means a dedicated closet or room containing servers and/or other computer equipment that is less than 500 square feet in size and that is located within and supports functions of a principal use and relies on the principal use's existing HVAC and electrical supply.
>
> Section 3. The Metropolitan Clerk is directed to publish a notice announcing such change in a newspaper of general circulation within five days following final passage.
>
> Section 4. This Ordinance shall take effect upon publication of the above said notice, the welfare of The Metropolitan Government of Nashville and Davidson County requiring it.

(Doc. No. 1-1 at 3).[10] Amendment No. 1 modified Section 1 of BL2026-1448 to read, in full:

> Section 1. That a moratorium is hereby declared upon the acceptance, processing, approval, and issuance of zoning, building, or grading permits or administrative appeals by the Metropolitan Department of Codes Administration and the Metropolitan Water Services Department for any data center development for property within Nashville & Davidson County until December 1, 2026.

(Doc. No. 1-1 at 1). Thus, the Moratorium is and will remain in effect until December 1, 2026, and is applicable to "the acceptance, processing, approval, and issuance of zoning, building, or grading permits or administrative appeals for any data center development." (*Id.*). Of note, the Moratorium was not "re-referred to the Metropolitan Planning Commission for review and recommendation after the addition of administrative appeals and the change to the duration/termination structure[,]" (i.e., after the addition of the provisions introduced via Amendment No. 1) (Doc. No. 1 at ¶ 55), as allegedly required by T.C.A. §§ 13-7-203(b), 13-7-204. (Doc. No. 1 at ¶¶ 55, 128). The Moratorium was signed by Defendant's mayor and became effective on July 24, 2026. (*Id.* at ¶ 56).

[10] A copy of the adopted version of BL2026-1448 (and the amendment thereto—i.e., Amendment No. 1) is filed as an exhibit at Docket No. 1-1 to the Complaint. For reasons explained below, the Court may consider the exhibit at Docket No. 1-1 in its adjudication of the Motion.

*e. The Moratorium in Action*

Following the implementation of the Moratorium, Defendant "interpreted or implemented [the Moratorium] to delay or stay the BZA proceedings concerning [Plaintiff and the Property] until after the [] Moratorium [expires, and] Zoning Administrator [] Hargis has deferred the pending appeals by Councilmember Johnston and the [Nashville] Zoo until after the expiration of the [] Moratorium[.]" (Doc. No. 1 at ¶ 63). Likewise, since the implementation of the Moratorium, Defendant has placed Plaintiff's "permit[ applications] on 'HOLD' and refus[ed] to process, review, approve, or issue the development approvals necessary for [Plaintiff's data-center] project." (*Id.* at ¶ 57).[11]

Additionally, although Plaintiff's permit applications are on hold, another business entity that is involved in data-center development or operation (RadiusDC), has "received permit processing activity and/or trade permit approvals" for the operation or development of a data-center at the property at 2902 Brick Church Pike in Nashville, Tennessee. (*Id.* at ¶ 72-73).

**3. Plaintiff's Claims**

Based on the forgoing, Plaintiff brings claims in nine counts, the final five of which seek solely declaratory relief.[12]

---

[11] Plaintiff specifically alleges that its "permits" are on hold. (Doc. No. 1 at ¶ 57). Here, the Court discerns that it is more precise to say that Plaintiff's *applications* for permits are on hold. And as for the applications to which Plaintiff refers here, the Court discerns that these are the above-referenced applications (submitted on May 11, 2026, May 29, 2026, and July 17, 2026, respectively).

[12] In each of its counts (including Count III, which at first glance seems possibly to assert two claims, as the Court discusses in a footnote below), Plaintiff (to its credit and contrary to the imprudent approach sometimes taken by plaintiffs) asserts only a single claim. For example, Plaintiff brings a single claim via Count I, a single claim via Count II, etc. And further to Plaintiff's credit, none of the claims are duplicative; in no case is the claim in one count redundant of the claim in another count. Given these circumstances, herein the Court will sometimes refer to Plaintiff's claims and Plaintiff's counts interchangeably and will discuss a particular count (e.g., Count II) when discussing the particular claim asserted within that count.

*a. Count I*

Count I is a claim brought pursuant to 42 U.S.C. § 1983 (hereinafter, sometimes "Section 1983") for alleged violations of substantive due process. Plaintiff specifically alleges that it "possesses protected property interests in its ownership and lawful use of the Property, its preexisting use rights under Tenn. Code Ann. § 13-7-208, and its vested permit rights under Tenn. Code Ann. § 13-4-310 and applicable Tennessee law." (Doc. No. 1 at ¶ 77).[13] Plaintiff further alleges that the application of the Moratorium to Plaintiff "is arbitrary and irrational as applied to those protected interests" because (according to Plaintiff) "[Defendant] has determined that [Plaintiff's] use was permitted under the governing IWD zoning, determined that the July 17, 2026 [building permit] application vested, and acknowledged that subsequent data-center zoning changes cannot govern a project that vested before the [] Moratorium." (*Id.* at ¶ 78).

*b. Count II*

Count II is a claim brought pursuant to Section 1983 for alleged violations of the Equal Protection Clause. The claim is, in particular, a so-called "class of one" equal protection claim.[14] Via Count II, Plaintiff alleges that "[Defendant] intentionally subjected [Plaintiff] to materially different permitting treatment [under the Moratorium] than one or more similarly situated industrial developers, data-center developers and operators, including RadiusDC, while lacking a rational basis for the difference." (Doc. No. 1 at ¶ 86).

[13] The Court discusses in more depth below the (purported) property interest(s) at issue in this case. Suffice it to say for now that it is unclear to the Court what the property interest(s) is (are) that Plaintiff is asserting is (are) at issue in this case. As the Court explains below, this is fatal to Counts I, III, and IV.

[14] The Court will discuss in more detail below the precise contours of a "class of one" equal protection claim.

*c. Count III*

Count III is a claim brought pursuant to Section 1983 for alleged violations of procedural due process. Via Count III, Plaintiff specifically challenges (what it alleges is) "[Defendant's] administrative implementation of [the Moratorium] against an already submitted project that [Defendant's] Zoning Administrator determined to be vested, together with [Plaintiff's] asserted preexisting protected use." (Doc. No. 1 at ¶ 93).[15] Via Count III, Plaintiff also alleges that "[Plaintiff] possessed protected property interests before [Defendant] placed the applications [for Plaintiff's data-center project] on hold, including its statutory preexisting-use rights and vested permit rights described above." (*Id.* at ¶ 94).

*d. Count IV*

Count IV is a claim brought pursuant to Section 1983 alleging a violation of the Takings Clause of Fifth Amendment. Plaintiff specifically alleges that the Moratorium constitutes a

[15] Of note, in Count III Plaintiff also seems to bring a challenge to the procedure used for the adoption of Amendment No. 1 to BL2026-1448. (*See* Doc. No. 1 at ¶ 93 ("[This count] challenges the improper amendment on final reading, targeting [Plaintiff's data-center] project")). The Court is uncertain precisely what Plaintiff is alleging was procedurally improper about the amendment to BL2026-1448. One possibility is that Plaintiff is asserting that BL2026-1448, as amended by Amendment No. 1, was not "re-referred to the Metropolitan Planning Commission for review and recommendation after the addition of administrative appeals and the change to the duration/termination structure[,]" (Doc. No. 1 at ¶ 55), as allegedly required by T.C.A. §§ 13-7-203(b), 13-7-204. (Doc. No. 1 at ¶¶ 55, 128). Another option, seemingly contemplated by Plaintiff's memorandum (Doc. No. 13) filed in support of its (pending) motion for a preliminary injunction (Doc. No. 12), is that Plaintiff is challenging the amendment because it was "adopted without opportunity for [Plaintiff] to be heard." (Doc. No. 13 at 17). However, this latter theory seems to contradict what Plaintiff actually alleges in the Complaint, wherein Plaintiff states that Count III "does not depend on an asserted federal constitutional right to notice or a hearing before the Metropolitan Council enacted generally applicable legislation." (Doc. No. 1 at ¶ 93).

In any event, in its Response to the Motion, Plaintiff seems to have abandoned any particular challenge to the procedure underlying the adoption of Amendment No. 1 to BL2026-1448 and instead argues that Count III is a challenge to Defendant's "administrative implementation" of the Moratorium, without any mention of a challenge to the procedure under which Amendment No. 1 to BL2026-1448 was adopted. (Doc. No. 24 at 20). So, the Court treats Count III as solely a challenge to the "administrative implementation" of the Moratorium.

"taking" without just compensation. (Doc. No. 1 at ¶ 101-03). As to what in particular was "tak[en]," Plaintiff is unclear, as discussed below.

*e. Count V, Count VI, Count VII, Count VIII, and Count IX*

Plaintiff's remaining counts—that is Counts V, VI, VII, VIII, and IX (hereinafter, collectively "Declaratory Judgment Counts"), are claims brought pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

Via Count V, Plaintiff seeks a declaration that its (allegedly) "protected data-center use [pursuant to T.C.A. § 13-7-208] was not terminated by the cessation [of data-center use on the Property] before the zoning change [implemented via BL2026-1391 and the Moratorium] and that, upon satisfaction of the remaining statutory conditions, [Defendant] may not apply later zoning restrictions[, like those in BL2026-1391 and the Moratorium] to prohibit the lawful continuation, reconstruction, and expansion of that protected use." (Doc. No. 1 at ¶ 111). The Court discerns that Plaintiff's requested declaration in Count V seems predicated on a (not yet issued) declaration ("predicate declaration") that the Property in fact had a preexisting data-center use that remains protected under T.C.A. § 13-7-208, but Plaintiff does not explicitly request the predicate declaration via Count V. However, the Complaint actually does request the predicate declaration, albeit not under the aegis of Count V or any of the other Declaratory Judgment Counts but rather in the "Prayer for Relief" section of the Complaint. (Doc. No. 1 at 26).

Via Count VI, Plaintiff seeks a declaration that "its July 17, 2026 [building permit] applications established vested rights under Tenn. Code Ann. § 13-4-310; that the merits of that application and previously filed applications must be judged under the law governing them at [the time of] application; and that later enacted data-center restrictions may not be applied to defeat those rights." (Doc. No. 1 at ¶ 120).

Via Count VII, Plaintiff seeks a declaration that the Moratorium "does not lawfully suspend the BZA's statutory jurisdiction over [] pending appeals" and also seeks "equitable relief preventing [Defendant] from using the [] Moratorium to delay or foreclose those [BZA] proceedings." (*Id.* at ¶ 126).[16]

Via Count VIII, Plaintiff seeks a declaration that because (according to Plaintiff) the Moratorium, as enacted (i.e., with Amendment No. 1 incorporated therein), "materially departed from the version reviewed by the Planning Commission without the review required by Tenn. Code Ann. § 13-7-204, [the Moratorium] is invalid and unenforceable, in whole or at least as to the materially added provisions [(i.e., Amendment No. 1)], as determined by the Court." (Doc. No. 1 at ¶ 133).

Finally, via Count IX, Plaintiff seeks a declaration that the Moratorium is "void as preempted by the Tennessee Vested Property Rights Act, [T.C.A. § 13-4-310] and, therefore, cannot be applied to [Plaintiff] to further hinder and obstruct its vested project." (Doc. No. 1 at ¶ 138).

[16] The Court discerns that via Count VII Plaintiff is, rather than seeking an injunction independent of the entering of any declaratory judgment in Count VII, requesting, after receiving its sought-after declaratory judgment in Count VII, an injunction to enforce that declaratory judgment. Such a course of action is permissible. *See e.g., D.L. v. Unified Sch. Dist. No. 497*, 392 F.3d 1223, 1228 (10th Cir. 2004) ("even though a party seeks only declaratory relief, once a declaratory judgment is obtained, the party may obtain an injunction to enforce the declaratory judgment."). Of note, the Court's interpretation of Count VII here is actually in Plaintiff's favor, given the Court's strong intuition that it is inappropriate to seek free standing injunctive relief via the Declaratory Judgment Act. *Steffel v. Thompson*, 415 U.S. 452, 466 (1974) ("Congress plainly intended declaratory relief to act as an alternative to the strong medicine of the injunction"); 28 U.S.C § 2201 (discussing the authority of a court to "declare the rights and other legal relations of any interested party seeking such declaration").

Given this interpretation, the Court will discuss Count VII and indeed all the Declaratory Judgment Counts (wherein, outside of Count VII, Plaintiff does not explicitly request injunctive relief) as seeking declaratory judgments only, even if the Court realizes that Plaintiff seemingly could, if any of its sought-after declaratory judgments were granted, *then* seek an injunction to enforce those declaratory judgments.

### 4. The Motion and Briefing Thereto

The Court now turns to the Motion, whereby Defendant contends that the Complaint should be dismissed in its entirety. Defendant first asserts that the Complaint should be dismissed in its entirety pursuant to Rule 12(b)(1) on the (alternative) bases of prudential ripeness (Doc. No. 22 at 5-8), *Pullman* abstention (*id.* at 8-9), and *Younger* abstention. (*Id.* at 9-10). That is to say, Defendant asserts that the Court should decline to exercise (i.e., abstain from exercising) subject-matter jurisdiction over this case. Defendant alternatively argues, pursuant to Rule 12(b)(6), that Plaintiff has failed to state a claim as to Counts I through IV, (Doc. No. 22 at 10-25), and given that (according to Defendant) Counts I through IV thus should be dismissed, then the Court should decline to exercise supplemental jurisdiction over the Declaratory Judgment Counts. (*Id.* at 25). Plaintiff, in its Response (Doc. No. 24), resists these arguments.

## LEGAL STANDARD

Because Defendant has raised bases for dismissal under Rule 12(b)(1) and Rule 12(b)(6), the Court reviews the standards for dismissal under both rules below.

### 1. Rule 12(b)(1)

Rule 12(b)(1) "provides for the dismissal of an action for lack of subject matter jurisdiction." *Cartwright v. Garner*, 751 F.3d 752, 759 (6th Cir. 2014). "Subject matter jurisdiction is always a threshold determination." *Am. Telecom Co. v. Republic of Lebanon*, 501 F.3d 534, 537 (6th Cir. 2007).[17]

---

[17] The Court notes that there is some disagreement among courts as to whether an argument for dismissal based on the application of *Younger* abstention is brought more appropriately under Rule 12(b)(1) or under Rule 12(b)(6). *Cooper v. Rapp*, No. 2:16-CV-00163, 2016 WL 7337521, at *5 n.6 (S.D. Ohio Dec. 19, 2016), *aff'd*, 702 F. App'x 328 (6th Cir. 2017). As far as the undersigned has been able to determine, neither the Supreme Court nor the Sixth Circuit has spoken definitively on this issue. The Court need not belabor the point, but it will note that there are arguments to be made in support of either approach. Ultimately, the Court concludes that a motion to dismiss grounded on *Younger* abstention is based more appropriately on Rule 12(b)(1) than on Rule 12(b)(6). That is because *Younger* abstention implicates the Court's subject-

Motions to dismiss under Rule 12(b)(1) are categorized as either facial or factual attacks. *Gentek Bldg. Products, Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007) (citing *Ohio Nat. Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990)). A facial attack challenges the sufficiency of the complaint's allegations, requiring the district court to take the allegations as true. *Id.* If the complaint establishes federally cognizable claims, jurisdiction exists. *Id.* A factual attack, by contrast, raises a factual controversy regarding whether subject-matter jurisdiction exists, and no presumptive truthfulness applies to the complaint's allegations when a court resolves a factual attack. *Id.* In such cases, the court may weigh conflicting evidence,

---

matter jurisdiction, *cf. Doe v. Lee*, No. 3:21-cv-00809, 2022 WL 1164228, at *9 (M.D. Tenn. Apr. 19, 2022) (declining "to exercise [subject-matter] jurisdiction in this case, based on the abstention doctrine derived from *Younger*"), and because a dismissal on the basis of *Younger* abstention plainly is one that is not on the merits (and such dismissal is *without* prejudice), and a dismissal under Rule 12(b)(6) generally is a dismissal on the merits while a dismissal under Rule 12(b)(1) is not.

As for prudential ripeness and *Pullman* abstention, motions to dismiss based on those grounds are properly categorized as being brought under Rule 12(b)(1), which makes sense given that those grounds implicate the Court's subject-matter jurisdiction. *See e.g., Aerojet Rocketdyne, Inc. v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.*, No. CV 17-5122 PSG (SKX), 2017 WL 9500948, at *3 (C.D. Cal. Nov. 27, 2017) ("Ripeness, which includes both constitutional and prudential considerations, is addressed under Rule 12(b)(1)."); *Red Roof Inns, Inc. v. Liberty Mut. Fire Ins. Co.*, No. 2:25-CV-00352, 2026 WL 775589, at *7 (S.D. Ohio Mar. 19, 2026) (discussing constitutional and prudential ripeness in terms of a federal court's subject-matter jurisdiction); *Jones v. Coleman*, No. 3:16-00677, 2016 WL 2962693, at *1-2 (M.D. Tenn. May 23, 2016) (considering *Pullman* abstention under Rule 12(b)(1)); *Detroit Mem'l Park Ass'n, Inc. v. City of Detroit Bd. of Zoning Appeals*, 105 F. Supp. 3d 769, 772, 776-78 (E.D. Mich. 2015) (considering *Pullman* abstention under Rule 12(b)(1)); *Barichello v. McDonald*, 98 F.3d 948, 955 (7th Cir. 1996) (noting that "[t]he abstention doctrines [including *Pullman* abstention] all concern the propriety of exercising subject matter jurisdiction."); *United States v. Truss*, No. 3:05-CR-146, 2006 WL 1409107, at *6 n.3 (E.D. Tenn. May 19, 2006) ("*Pullman* abstention involves federal courts declining jurisdiction when they cannot answer a substantial federal constitutional question until difficult, unresolved questions of state law are answered."). *But see Show Media California, LLC v. City of Los Angeles*, No. 09-3270 ABC PLAX, 2009 WL 8652843 at *3 n.4 (C.D. Cal. Nov. 16, 2009) ("[Defendant] has chosen the wrong vehicle in Rule 12(b)(1) to raise *Pullman* abstention because the doctrine does not implicate the Court's subject-matter jurisdiction."), *aff'd*, 479 F. App'x 48 (9th Cir. 2012).

In any event, the question of whether Defendant's arguments as to prudential ripeness, *Pullman* abstention, and *Younger* abstention should have been brought under Rule 12(b)(1) or Rule 12(b)(6) is ultimately without much import in the instant case. That is because Defendant has explicitly noted that its arguments under Rule 12(b)(1)—i.e., its arguments with respect to prudential ripeness, *Pullman* abstention, and *Younger* abstention—are Rule 12(b)(1) *facial attacks* (which the Court discusses below). And the court's approach on "a facial attack on the pleading under Rule 12(b)(1) mirrors the [court's approach] on a motion brought under Rule 12(b)(6)." *Ball by Burba v. Kasich*, 244 F. Supp. 3d 662, 672 (S.D. Ohio 2017).

including affidavits, and documents, or even conduct a limited evidentiary hearing, to determine the factual predicate for jurisdiction. *Id.*; *Nichols v. Muskingum Coll.*, 318 F.3d 674, 677 (6th Cir. 2003). Here, Defendant explicitly notes—and the Court likewise independently perceives—that the arguments it raises in the Motion pursuant to Rule 12(b)(1) are facial attacks. (Doc. No. 22 at 4 ("In a facial Rule 12(b)(1) challenge, such as this one, the Court accepts Plaintiff's factual allegations as true and determines whether they establish a proper basis for the exercise of jurisdiction.")).

That raises the question of what documents or filings (if any) the Court may consider outside of the Complaint in resolving these facial attacks. As the undersigned just recently observed, in considering a motion to dismiss that brought a facial attack under Rule 12(b)(1), the Court "may consider the [complaint] and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to the [motion to dismiss] so long as they are referred to in the [complaint] and are central to the claims contained therein." *BFI*, 2026 WL 2807005, at *6.

**2. Rule 12(b)(6)**

For purposes of a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must take all factual allegations in the complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Id*. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id*. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give

rise to an entitlement to relief. *Id*. at 679. A legal conclusion, including one couched as a factual allegation, need not be accepted as true on a motion to dismiss, nor are mere recitations of the elements of a cause of action sufficient. *Id*. at 678; *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010), *cited in Abriq v. Hall*, 295 F. Supp. 3d 874, 877 (M.D. Tenn. 2018). Moreover, factual allegations that are merely *consistent* with the defendants' liability do not satisfy the claimant's burden, as mere consistency does not establish *plausibility* of entitlement to relief even if it supports the *possibility* of relief. *Iqbal*, 556 U.S. at 678.

In determining whether a complaint is sufficient under the standards of *Iqbal* and its predecessor and complementary case, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), it may be appropriate to "begin [the] analysis by identifying the allegations in the complaint that are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 680. This can be crucial, as no such allegations count toward the plaintiff's goal of reaching plausibility of relief. To reiterate, such allegations include "bare assertions," formulaic recitation of the elements, and "conclusory" or "bald" allegations. *Id*. at 681. The question is whether the remaining allegations—factual allegations, *i.e.*, allegations of factual matter—plausibly suggest an entitlement to relief. *Id*. If not, the pleading fails to meet the standard of Federal Rule of Civil Procedure 8 and thus must be dismissed pursuant to Rule 12(b)(6). *Id*. at 683.

Of note, Fed. Rule of Civ. P. 12(d) states that "[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." However, there is an exception to this Rule: "[w]hen a court is presented with a Rule 12(b)(6) motion, it may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of

the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). *See also Doe v. Ohio State Univ.*, 219 F. Supp. 3d 645, 652-53 (S.D. Ohio 2016) ("when a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment." (quoting *Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 335–36 (6th Cir. 2007))); *Blanch v. Trans Union, LLC*, 333 F. Supp. 3d 789, 791-92 (M.D. Tenn. 2018) ("Documents attached to the motion to dismiss briefing may be considered part of the pleadings if they were incorporated into the complaint by reference and are central to the plaintiff's claim.").

## DISCUSSION[18]

Generally, "federal courts [] must decide jurisdictional issues before considering merits issues." *Jones v. Sexton*, No. 3:23-CV-01033, 2025 WL 3000203, at *9 (M.D. Tenn. Oct. 24, 2025). Thus, below, the Court first addresses Defendant's arguments for dismissal pursuant to Rule 12(b)(1) because these arguments implicate the Court's subject-matter jurisdiction, and the Court then addresses, to the extent necessary (i.e., with respect to any count(s) that survive the (purported) bases for dismissal advanced by Defendant under Rule 12(b)(1)), Defendant's arguments for dismissal pursuant to Rule 12(b)(6). However, before addressing Defendant's particular arguments, the Court addresses two important preliminary points that serve to guide the Court's approach to resolving the Motion—including its decision to resolve almost all of Plaintiff's

[18] Consistent with the Court's discussion of the legal standards applicable to the Motion, the Court discerns that it may consider the exhibit at Docket No. 1-1 to the Complaint in adjudicating the Motion and resolving the arguments therein for dismissal under Rule 12(b)(1) and Rule 12(b)(6). Likewise, and consistent with the Court's discussion of the legal standards applicable to the Motion as well as the Court's discussion in two earlier footnotes, the Court may consider BL2026-1391 and BL2026-1391's legislative history, and BL2026-1392 and BL2026-1392's legislative history in adjudicating the Motion.

claims without regard to arguments and grounds for dismissal set forth by Defendant in support of the Motion.

**1. Preliminary Matters**

*a. Property Interest At Issue*

As an initial matter, the Court addresses the particular property interest at issue in this action. The Court does so because Counts I, III, and IV of the Complaint each depend on Plaintiff having a protected property interest.[19]

As noted above, Count I and III are claims brought pursuant to Section 1983 for alleged violations of substantive due process and procedural due process, respectively. Importantly, "to [state] a cognizable claim of a violation of procedural or substantive due process, [a plaintiff] must [allege] that [it] possessed a protected liberty or property interest." *Rondigo, LLC v. Twp. of Richmond, Mich.*, No. 08-10432, 2009 WL 2579419, at *9 (E.D. Mich. Mar. 31, 2009). *See also Choate v. Kentucky Horse Racing Auth.*, No. CV 06-158-C, 2006 WL 8457987, at *2 (W.D. Ky. July 20, 2006) ("[T]o successfully allege a claim for either substantive or procedural due process, a plaintiff must first show that he was denied a protected liberty or property interest.").

As for Count IV, it too is a claim brought pursuant to Section 1983. But unlike Counts I and III, it is premised not on alleged violations of due process, but rather on alleged violations of the Takings Clause of the Fifth Amendment (as made applicable to the States via the Fourteenth

---

[19] Two notes are warranted here regarding terminology herein. Below, the Court sometimes discusses Counts I, III, and IV in terms of property (or liberty) interests without using the "protected" qualifier in connection with those interests. When doing so, the Court uses the term property interest (or liberty interest) to mean a *protected* property (or liberty) interest. Also, the Court may—depending on the context—use the term "protected property interest" or "property interest" to refer to a property interest protected by the Due Process Clause of the Fourteenth Amendment, the Takings Clause of the Fifth Amendment, or both.

Amendment's Due Process Clause); this kind of claim is called a "takings" claim.[20] But not dissimilarly to a plaintiff (like Plaintiff here) bringing due process claims premised on a property interest, "[t]o survive a motion seeking the dismissal of a Fifth Amendment takings claim, the plaintiff must sufficiently allege that (1) the plaintiff possessed a [protected] 'property interest' and (2) a 'taking' of such property interest occurred." *Waste Servs. of the Bluegrass, LLC v. City of Georgetown, Kentucky*, No. CV 5:20-410-KKC, 2023 WL 2759030, at *8 (E.D. Ky. Mar. 31, 2023) (quoting *Coalition for Gov't Procurement v. Fed. Prison Indus., Inc.*, 365 F.3d 435, 481 (6th Cir. 2004)), *amended in part*, No. CV 5:20-410-KKC, 2024 WL 843959 (E.D. Ky. Feb. 28, 2024). In other words, and as relevant here (given that Counts I, III, and IV seem to be predicated on the existence solely of a *property* interest),[21] Plaintiff's "due process and takings claims require that [P]laintiff[] first [allege] that [it actually has] a legally [protected] property interest." *McCarthy v. Middle Tenn. Elec. Membership Corp.*, 466 F.3d 399, 412 (6th Cir. 2006).

---

[20] The Takings Clause of the Fifth Amendment prohibits the taking of "private property [] for public use, without just compensation." U.S. Const. amend. V. Of note, although "[t]he Takings Clause of the Fifth Amendment is made applicable to the states (and their political subdivisions[, such as municipalities]) by the Due Process Clause of the Fourteenth Amendment," *Vince Refuse Serv., Inc. v. Clark Cnty. Solid Waste Mgmt. Dist.*, No. C-3-93-319, 1995 WL 253121, at *12 n.18 (S.D. Ohio Mar. 7, 1995) (citing *Dolan v. City of Tigard*, 114 S. Ct. 2309, 2316 (1994) (citing *Chicago, B. & Q. R. Co. v. Chicago*, 166 U.S. 226 (1897))), a claim alleging a violation of the Takings Clause of the Fifth Amendment is called a takings claim and not a (procedural or substantive) due process claim.

[21] Of course, as the Court noted above, substantive and procedural due process claims can also be predicated on a *liberty* interest. Here, however, what is at stake is an alleged *property* interest.

Importantly, the Court does not mean to imply that the property-interest analysis for a due process claim is the same as a property-interest analysis for a takings claim. *See e.g., Waste Servs. of the Bluegrass, LLC*, 2023 WL 2759030, at *7 ("The property interest analysis is not the same for due process and takings claims." (citing *Andrews, Tr. of Gloria M. Andres Tr. Dated April 23, 1998 v. City of Mentor, Ohio*, 11 F. 4th 462, 469 (6th Cir. 2021))). For instance, a particular property interest may be able to sustain a takings claim even if it cannot sustain a due process claim. *Id.* That is, it may be cognizable for purposes of the former claim but not the latter claim.

In any event, the problem here is not that Plaintiff has alleged a property interest that is incapable of sustaining either kind of claim or, alternatively, is incapable of sustaining a due process claim even if it is capable of sustaining a takings claim. Instead, as the Court explains below, the problem here is that the Court cannot tell the particular nature of the property interest at stake in this action.

Here, however, there is a crucial flaw with respect to Counts I, III, and IV: the Court cannot ascertain the particular property interest underpinning this action in general (as a whole) or the particular property interest(s) underpinning any of these respective counts in particular. A review of the Complaint's allegations demonstrates the problem. Beginning with the general allegations in the Complaint (i.e., those allegations not specifically set forth under a particular count, even if those general allegations are all incorporated by reference into each count), Plaintiff at points seems to be asserting some sort of property interest in Plaintiff's *particular* data-center *project*. (Doc. No. 1 at ¶ 52 (alleging that the Moratorium does not govern Plaintiff's "vested project.")).

However, the Complaint's other allegations irredeemably muddle the identity of the relevant property interest. For example, in Count I (the substantive due process claim), Plaintiff alleges that it "possesses protected property interests in its ownership and lawful use of the Property, its preexisting use rights under Tenn. Code Ann. § 13-7-208, and its vested permit rights under Tenn. Code Ann. § 13-4-310 and applicable Tennessee law." (Doc. No. 1 at ¶ 77). Thus, via Count I Plaintiff seems to *expand* the scope of the at-issue property interest in this action beyond an interest in Plaintiff's particular data-center project to include an interest in the *ownership* of the Property and an interest in a broader generalized lawful use of the Property. But then, and also in connection with Count I, Plaintiff pivots its focus back to a property interest in Plaintiff's particular data-center project. (Doc. No. 1 at ¶ 82 (["Defendant's] challenged conduct is arbitrary, capricious, and without a rational relationship to a legitimate governmental objective as applied to [Plaintiff's] already *protected and vested project*[.]" (emphasis added))).

Then in Count III (wherein Plaintiff asserts its procedural due process claim and again refers to an interest in Plaintiff's particular data-center project (Doc. No. 1 at ¶ 93)), Plaintiff seemingly introduces a new property interest—namely, some sort of interest in the *applications*

(presumably for permits) underlying Plaintiff's data-center project. (Doc. No. 1 at ¶ 95 ("After the Zoning Administrator determined that [Plaintiff's] *applications were vested*, [Defendant] implemented BL2026-1448" (emphasis added)) ¶ 96 ("[Plaintiff] had no meaningful pre-deprivation administrative mechanism through which it could obtain processing of its *vested applications* while the [] Moratorium was being enforced against them." (emphasis added))).[22] Similar confusion reigns in Plaintiff's allegations made with respect to Count IV; therein, Plaintiff *seems* to assert that its property interest in its particular data-center project was subject to a taking, and yet Plaintiff is not definitive regarding this assertion. (*Id.* at ¶ 103).

Then, in its Response to the Motion, Plaintiff further muddles the question of what property interest is at stake. In particular, Plaintiff argues that "[Plaintiff] maintains multiple protected property interests. It owns fee simple title to the Property. Metro's own Zoning Administrator determined that [Plaintiff's] applications vested. And it has grandfathered property rights as a legal nonconforming data center use." (Doc. No. 24 at 19).[23] Plaintiff thereby seems to be asserting

---

[22] Whether Plaintiff in Count III is asserting an interest in having its applications (presumably for permits) *processed* (even if ultimately denied) or instead *approved*, the Court declines to hazard a guess.

[23] Plaintiff's memorandum (Doc. No. 13) filed in support of its motion for a preliminary injunction (Doc. No. 12) likewise provides no clarity on the particular property interest that Plaintiff contends is implicated by the instant action. For example, Plaintiff therein contends variously:

> [Plaintiff] possesses protected property interests in its ownership and lawful use of the Property, its preexisting-use rights under Tenn. Code Ann. § 13-7-208, and its vested permit rights under Tenn. Code Ann. § 13-4-310.
>
> ***
>
> [Plaintiff] possessed protected interests before [Defendant] placed the applications on hold.
>
> ***
>
> The continuing refusal of [Defendant] to process [Plaintiff's] permits, based on an improper amendment, is not merely a past procedural defect; it is an ongoing administrative deprivation of [Plaintiff's] protected property interests without constitutionally adequate process.

(Doc. No. 13 at 15, 17, 18). What's more, in its reply (Doc. No. 20) in further support of its motion for a preliminary injunction, Plaintiff then frames the property interest at stake as "a protected property interest

some combination of interests in ownership of the Property, use of the Property (whether an interest in a general use in a particular manner—i.e., general data-center development—or an interest in a use for the development of Plaintiff's particular data-center project, the Court declines to hazard a guess), and an interest in Plaintiff's applications for the permits necessary to complete its data-center project.

In summary, the Court is entirely unclear as to what particular property interest(s) Plaintiff bases this action on generally or Counts I, III, and IV on specifically. This is no mere technical defect. The inability of the Court to ascertain the nature of the property interest(s) at stake in this action renders the Court unable to adequately evaluate Counts I, III, and IV generally. More to the point, it renders the Court unable to assess how these counts stand up to the various applicable challenges made to them via the Motion—i.e., the grounds for dismissal raised, via the Motion, pursuant to either Rule 12(b)(1) or Rule 12(b)(6). Given these circumstances, and to avoid inappropriate speculation as to the basis of Plaintiff's claims, the Court will dismiss Counts I, III and IV. Such dismissal is without prejudice to Plaintiff filing an amended complaint within twenty-one days of the entry of this memorandum opinion (and the accompanying order) reasserting these counts in a manner that addresses the deficiencies that the Court has identified herein.[24] To the

---

in [Plaintiff's] vested right to construct a data center, as determined by Metro's own Zoning Administrator." (Doc. No. 20 at 9).

So, even if the other papers Plaintiff has filed in this action conceivably could serve to fix the Complaint's lack of clarity, they actually do not provide clarity as to the particular identity of the property interest at stake in this action.

[24] The Court is well within its authority to dismiss these counts *sua sponte* without prejudice to Plaintiff reasserting these counts in an amended complaint. *See e.g., Madden v. Thorburn*, 889 F.2d 1087 (6th Cir. 1989) (noting that "sua sponte dismissals are disfavored *unless* the district court . . . first provides the plaintiff an opportunity to amend a deficient complaint" (emphasis added)); *Puckett v. Ain Jeem, Inc.*, No. 24-5282, 2025 WL 948092, at *2 (6th Cir. Feb. 11, 2025) ("Generally, a fee-paid complaint may not be sua sponte dismissed *without* affording the plaintiff an opportunity to amend it" (emphasis added)), *cert. denied*, 146 S. Ct. 986, 223 L. Ed. 2d 426 (2025), *reh'g denied*, No. 25-432, 2026 WL 2374076 (U.S. Aug. 17, 2026). *See also Choi v. 37 Parsons Realty LLC*, 642 F. Supp. 3d 329, 336 (E.D.N.Y. 2022) ("a court dismissing a complaint *sua sponte* as inadequately pled must, unless the complaint is frivolous or meritless

extent that Plaintiff decides not to timely reassert any or all of these counts in an amended complaint (therein addressing the deficiencies that the Court has identified herein), those counts that are not timely reasserted will be dismissed conclusively.

*b. The Declaratory Judgment Counts*

That takes the Court to the second (and final) of the preliminary issues that it will address herein: the Declaratory Judgment Counts. As noted above, the Declaratory Judgment Counts are claims pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

---

as a matter of law, give the plaintiff leave to amend." (citing *Perez v. Ortiz*, 849 F.2d 793, 798 (2d Cir. 1988))).

The Court notes that by permitting Plaintiff to reassert these counts (if it can) in an amended complaint (rather than by dismissing the entire action without prejudice and thereby relegating Plaintiff to filing an entirely new lawsuit), the Court is granting Plaintiff leniency that it is not *required* (though it is *authorized*) to grant. As one district court in this circuit explained:

> "[I]n the end, '[i]t is not the Court's place to speculate or imagine what the plaintiff's claims may be." ' *Boswell v. Honorable Governor of Texas,* 138 F.Supp.2d 782, 785 (N.D. Texas, Sept.19, 2000) (citing *Martin v. United States Post Office,* 752 F. Supp. 213, 218 (N.D. Texas 1990)). When a court cannot fully determine the nature of a plaintiff's claims without resorting to improper speculation, and the confusing nature of the claims would force the defendants to speculate as to the nature of the claims, thus handicapping the defendants and effectively making them unable to fairly defend the lawsuit, *the complaint should be dismissed without prejudice and the plaintiff may be permitted to re-file the lawsuit*, if appropriate. *Boswell,* 138 F. Supp. at 785 (citing *Good v. Allain,* 823 F.2d 64, 67 (5th Cir.1987); *Moawad v. Childs,* 673 F.2d 850, 851 (5th Cir.1982)); *Moore v. United States,* 193 F.R.D. 647 (N.D. Cal. June 29, 2000). A district court need only draft a few sentences explaining the deficiencies in a complaint and should not have to act as an advocate for the [ ] litigant in deciphering the complaint so as to make it possible for the defendants to respond appropriately. *Id.* at *650 (citing *Noll v. Carlson,* 809 F.2d 1446, 1448–49 (9th Cir.1987)). Judges are not required to construct a party's legal arguments for him. *Hedgewood v. Blanton,* 1995 WL 646217 (N.D. Ill. Nov. 2, 1995). An action *may* be dismissed without prejudice pursuant to Rules 8(a)(2) and 8(e)(1) because the court is "not required to strain to find favorable inferences that are not apparent on the face of the complaint." *Clemens v. Smith, et al.,* 1997 WL 461991 (N.D. Ill., Aug. 5, 1997).

*Gunn v. State of Kentucky*, No. CIV.A. 05-CV-28-JBC, 2005 WL 1079293, at *2 (E.D. Ky. Apr. 18, 2005) (emphasis added).

i. Declaratory Judgment Act General Principles

Under the Declaratory Judgment Act, "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The "may" in this statute is telling; it suggests that issuing declarations (in response to an "appropriate pleading" filed by an "interested party") is discretionary rather than mandatory. And so it is. "[T]he exercise of the court's power to consider a claim for declaratory judgment is discretionary." *Wirtgen Am., Inc. v. Hayden-Murphy Equip. Co.*, No. 3:22-CV-00308, 2024 WL 1661125, at *10 (M.D. Tenn. Apr. 17, 2024), *appeal dismissed*, No. 24-5480, 2024 WL 3839808 (6th Cir. June 20, 2024). *See also Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995) ("Since its inception, the Declaratory Judgment Act has been understood to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants.").

So, "when faced with a declaratory judgment claim, [the district court] must determine whether to exercise its discretion to hear such a claim by analyzing the five factors outlined in *Grand Trunk*."[25] *CBL & Assocs. Mgmt., Inc. v. Lumbermens Mut. Cas. Co.*, No. 1:05-CV-210, 2006 WL 2087625, at *4 (E.D. Tenn. July 25, 2006) (citing 28 U.S.C. §§ 2201-2202; *Grand Trunk W. R.R. Co. v. Consol. Rail Corp.* [*Grand Trunk*], 746 F.2d 323, 326 (6th Cir. 1984)). The five factors outlined in *Grand Trunk* (each a "Grand Trunk factor" and, collectively, "*Grand Trunk* factors") are:

(1) Whether the [declaratory] judgment would settle the controversy;

[25] Just as the quoted language asserts, the Court *must* utilize the *Grand Trunk* factors in evaluating whether to exercise jurisdiction over a claim brought pursuant to the Declaratory Judgment Act. *See Byler v. Air Methods Corp.*, 823 F. App'x 356, 365 (6th Cir. 2020) (finding that district court abused its discretion in declining jurisdiction where "[a]lthough the district court acknowledged these [*Grand Trunk*] factors, the court did not appear to apply them and otherwise included only three lines of analysis explaining its decision to decline jurisdiction" and noting that "[w]e have [] suggested that a failure to apply the *Grand Trunk* factors constitutes reversible error." (collecting cases)).

> (2) Whether the declaratory judgment action [or claim] would serve a useful purpose in clarifying the legal relations in issue;
> (3) Whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for res judicata";
> (4) Whether the use of a declaratory action [or claim] would increase the friction between our federal and state courts and improperly encroach on state jurisdiction; and
> (5) Whether there is an alternative remedy that is better or more effective.

*Selective Ins. Co. of S.C. v. Devoted Senior Care LLC*, No. 4:21-CV-00051-JHM, 2021 WL 3926247, at *2 (W.D. Ky. Sept. 1, 2021) (citing *Grand Trunk*, 746 F.2d at 326).

"The Sixth Circuit has 'never indicated how these *Grand Trunk* factors should be balanced.'" *Devoted Senior Care LLC*, 2021 WL 3926247, at *2 (quoting *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 563 (6th Cir. 2008)). However, a court's consideration of these factors should be guided by considerations of "efficiency, fairness, and federalism." *Western World Ins. Co. v. Hoey*, 773 F.3d 755, 759 (6th Cir. 2014). And as relevant here—given that the parties' respective briefing on the Motion regrettably addresses neither the *Grand Trunk* factors specifically nor the Court's discretion as to whether to exercise jurisdiction over claims brought under the Declaratory Judgment Act in general—a court may *sua sponte* consider the *Grand Trunk* factors and consider whether it should exercise jurisdiction over a claim (or action) brought under the Declaratory Judgment Act. *See e.g., Chemical Solvents, Inc. v. Greenwich Ins. Co.*, No. 1:19 CV 525, 2021 WL 8053560, at *5 (N.D. Ohio Mar. 30, 2021) ("Although the parties have made no argument with respect to the *Grand Trunk* factors, the court will briefly explain why the factors support the court's decision to exercise its jurisdiction over the declaratory judgment claims in this case."); *Berkley Assurance Co. v. Carter Douglas Co., LLC*, No. 1:18-CV-00099-GNS, 2020 WL 201051, at *1 (W.D. Ky. Jan. 13, 2020) ("courts are encouraged to, *sua sponte*, examine the issue of whether to exercise their discretion in asserting jurisdiction over actions brought pursuant to the Declaratory Judgment Act" (citing *Travelers Indem. Co. v. Bowling Green Prof'l Assocs., PLC*,

495 F.3d 266, 271 (6th Cir. 2007))). So, the Court *sua sponte* will consider whether it should exercise jurisdiction over the Declaratory Judgment Counts and, in so doing, *sua sponte* will consider the *Grand Trunk* factors.[26]

ii. *Grand Trunk* Factors

As to the first *Grand Trunk* factor—whether the declaratory judgment would settle the controversy—here the Court discerns that none of the Declaratory Judgment Counts would settle the controversy between the parties. Even if the Court were to grant Plaintiff each of the declarations sought via the Declaratory Judgment Counts, each of Plaintiff's other, non-Declaratory Judgment Act counts—i.e., Counts I, III and IV if they are ultimately re-pled in an amended complaint, and also Count II—would not thereby be resolved but rather would remain pending. Indeed, Count II—an equal protection claim challenging (allegedly) disparate application of the Moratorium to Plaintiff—in particular seems entirely unrelated to the relief sought via the Declaratory Judgment Counts. That is to say, "the [Declaratory Judgment Counts] will not settle the controversies; resolution of [Plaintiff's other] claims [in this action] will," and in these circumstances district courts have found that the first factor weighs against exercising jurisdiction. *Smoot Construction of Washington, D.C. v. Smoot Corp.*, No. 2:22-CV-1707, 2025 WL 3736470, at *11 (S.D. Ohio Jan. 28, 2025). *See also Ingram, v. Baughman.*, No. 3:25-CV-00787, 2026 WL 2618230, at *9 (M.D. Tenn. July 6, 2026) ("As to the first [*Grand Trunk*] factor, acceptance of the declaratory action would not settle the underlying controversy[,] because Plaintiff's tort and contract claims against [the defendant] would remain unresolved."), *report and recommendation adopted in part, rejected in part and on other grounds sub nom. Ingram v. Baughman*, No. 3:25-

[26] Although aware that each of the Declaratory Judgment Counts seek a declaration different from the ones sought respectively in all of the other counts, the Court believes that it appropriately can consider the Declaratory Judgment Counts collectively in evaluating the *Grand Trunk* factors. And the Court does so herein.

CV-00787, 2026 WL 2608789 (M.D. Tenn. Sept. 3, 2026). Accordingly, the Court finds that the first *Grand Trunk* factor weighs against the Court exercising jurisdiction over the Declaratory Judgment Counts.

As to the second *Grand Trunk* factor—whether the declaratory judgment action or claim would serve a useful purpose in clarifying the legal relations in issue—the Court answers that question in the affirmative. The declarations sought via the Declaratory Judgment Counts would help clarify, for example, the extent of Plaintiff's asserted property interests (whatever those might turn out to be) and the lawfulness and applicability of the Moratorium to Plaintiff. Accordingly, the Court finds that this factor weighs in favor of exercising jurisdiction over the Declaratory Judgment Counts. *See e.g., Stevenson v. S. USA Life Ins. Co., Inc.*, No. 1:25-CV-1658, 2025 WL 3041850, at *4 (N.D. Ohio Oct. 31, 2025) (finding second factor weighed in favor of jurisdiction where declaratory judgment would "clarify the rights and obligations of each party").

As to the third *Grand Trunk* factor—whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for res judicata"—the Court finds that this factor is neutral. Where there is no evidence of "procedural fencing" or of a "race for res judicata" the Sixth Circuit has found this factor to be neutral. *United Specialty Ins. Co. v. Cole's Place, Inc.*, 936 F.3d 386, 399 (6th Cir. 2019) ("If there is no evidence of procedural fencing [or of a "race for res judicata"], we often find that the factor is 'neutral[.]'").[27] Here, there is no evidence that Plaintiff has brought its Declaratory Judgment Counts for the purpose of "procedural fencing" or "to provide an arena for a race for res judicata," and so the Court finds

[27] Of course, this raises the question of when, if ever, this factor would weigh in *favor* of exercising jurisdiction over a Declaratory Judgment Act claim or action. To that question, the Court declines to hazard a guess, while noting that it certainly seems initially as if the best a claimant under the Declaratory Judgment Act could ever hope for on this factor is neutrality.

that this factor is neutral (as opposed to the other possibility, which would be that it cuts in favor of declining to exercise jurisdiction).

That takes Court to the fourth *Grand Trunk* factor—i.e., whether the declaratory action or claim would increase the friction between our federal and state courts and improperly encroach on state jurisdiction. The Sixth Circuit has identified three subfactors for district courts to consider in evaluating the fourth *Grand Trunk* factor, namely:

> (1) whether the state court's [potential future] resolution of the underlying factual issues is important to an informed resolution of the federal case;
> (2) whether the [state] trial court is in a better position to evaluate those factual issues than is the federal court; and
> (3) whether there is a close nexus between the underlying factual and legal issues and state law and/or public policy, or whether federal common law or statutory law dictates a resolution of the declaratory judgment action.

*Cincinnati Ins. Co. v. Orten*, No. 3:17-CV-00036, 2017 WL 4918594, at *5-6 (M.D. Tenn. Oct. 30, 2017) (citing *Travelers Indem. Co.*, 495 F.3d at 271). As suggested by the language of these three subfactors, two of the three subfactors (namely the first two) are entirely inapplicable to the instant action. Why? Because each of them contemplates an ongoing state court action related to the declaratory judgment claim or action. Here, there is no indication in the Complaint (or elsewhere in the record for that matter) of the existence of an ongoing state court proceeding that is related to the Declaratory Judgment Counts (or indeed related to any of the other counts brought in the Complaint). So, the Court will not consider the first two subfactors in evaluating the fourth *Grand Trunk* factor, finding them to be inapplicable to the instant case. By contrast, the Court discerns that in the circumstances of this action, the Court appropriately *can* evaluate the third subfactor and the third subfactor weighs against exercising jurisdiction. Indeed, the Court discerns both that there is "a close nexus between the underlying [] legal issues [raised by the Declaratory Judgment Counts ]and state law and/or public policy" and that "federal common law or statutory

law [does not] dictate[] a resolution of the declaratory judgment [claims]." *Orten*, 2017 WL 4918594, at *6. The Court so discerns because via the Declaratory Judgment Counts Plaintiff requests various declarations regarding the effect of Tennessee state law (and solely of Tennessee state law) on Plaintiff's property interests (whatever those interests are) and on the Moratorium itself.

That is all to say that via the Declaratory Judgment Counts, Plaintiff is asking the Court to opine on matters of state law (and only state law), and in particular state law's impact on local zoning ordinances, land use decisions, and property interests. These are legal fields that state courts are especially qualified to address. *See Lilly Invs. v. City of Rochester*, 674 F. App'x 523, 530 (6th Cir. 2017) ("state courts undoubtedly have more experience than federal courts do in resolving the complex factual, technical, and legal questions related to zoning and land-use regulations." (quoting *San Remo Hotel, L.P. v. City & Cty. of San Francisco, Cal.*, 545 U.S. 323, 347 (2005))). Intruding into these fields through exercising jurisdiction over the Declaratory Judgment Counts would increase the friction between our federal and state courts and improperly encroach on state jurisdiction. *Cf. Liberty Mut. Fire Ins. Co. v. Arcline Elevation Servs. Holdings, LLC*, No. 6:25-CV-167-CHB, 2026 WL 1165311, at *14 (E.D. Ky. Apr. 29, 2026) (finding that the fourth *Grand Trunk* factor weighed against exercising jurisdiction where exercising jurisdiction "would deprive a state court of the opportunity to interpret and apply its own law."). And so, the fourth *Grand Trunk* factor weighs against exercising jurisdiction.

As to the last *Grand Trunk* factor—whether there is an alternative remedy that is better or more effective—the Court answers that question in the affirmative. Tennessee state law provides a procedure for Plaintiff to seek the relief that it seeks via the Declaratory Judgment Counts. *See* T.C.A. § 29-14-101, *et seq.*; *Massachusetts Bay Ins. Co. v. Christian Funeral Directors, Inc.*, 759

F. App'x 431, 441 (6th Cir. 2018) ("Tennessee provides a clear and concise avenue for a plaintiff's declaratory judgment action to proceed through Tenn. Code Ann. § 29-14-101 [et seq.] and Tenn. R. Civ. P. 57."). And in circumstances where state law provides a vehicle for seeking the relief sought via the declaratory judgment claims or action, the Sixth Circuit has found that a district court does not abuse its discretion "in finding that this factor weighed against exercising jurisdiction." *Christian Funeral*, 759 F. App'x at 441. And so, the Court finds that this factor weighs against the exercise of jurisdiction.

Here, three of the *Grand Trunk* factors weigh against the Court exercising jurisdiction, one weighs in favor, and one is neutral. Recognizing these circumstances and being guided by the principles of "efficiency, fairness, and federalism," *Western World Ins. Co*, 773 F.3d at 759—in particular the Court's concern that exercising jurisdiction over the Declaratory Judgment Counts would inappropriately encroach on state jurisdiction—the Court will decline to exercise jurisdiction over the Declaratory Judgment Counts and, accordingly, will dismiss the Declaratory Judgment Counts without prejudice.[28] *Cf. Nationwide Mut. Fire Ins. Co. v. Hatton*, 357 F. Supp. 3d 598, 618-20 (E.D. Ky. 2019) (declining to exercising jurisdiction over Declaratory Judgment Act action where three of the five *Grand Trunk* factors weighed against exercising jurisdiction).[29]

[28] The dismissal of a declaratory judgment action or claim on the basis of declining to exercise jurisdiction over that action or claim is a dismissal without prejudice. *See e.g., Royal Surplus Lines Ins. Co. v. U.S. Four, Inc.*, 614 F. Supp. 2d 875, 879 (S.D. Ohio 2007) ("Because the Court declines to exercise jurisdiction over Plaintiffs' declaratory judgment action, the Court DISMISSES this case WITHOUT PREJUDICE"); *Adrian Energy Assocs., LLC v. Michigan Pub. Serv. Comm'n*, No. 5:05-CV-60, 2005 WL 2571881, at *5 (W.D. Mich. Oct. 12, 2005) ("A Judgment shall issue dismissing this suit without prejudice because the Court declines the exercise of declaratory jurisdiction."), *aff'd on other grounds sub nom. Adrian Energy Assocs. v. Michigan Pub. Serv. Comm'n*, 481 F.3d 414 (6th Cir. 2007). This appears merely to be a straightforward application of the principle that "[d]ismissals of actions that do not reach the merits of a claim, such as dismissals for lack of jurisdiction, ordinarily are without prejudice." *Mitan v. Int'l Fid. Ins. Co.*, 23 F. App'x 292, 298 (6th Cir. 2001).

[29] Given the Court's decision herein to dismiss the Declaratory Judgment Counts, the Court declines to analyze the grounds for the dismissal of the Declaratory Judgment Counts asserted by Defendant via its briefing in (and on) the Motion.

### 2. Count II

Above, the Court has stated—as a preliminary matter, and without addressing the particular arguments made by Defendant in support of the Motion—that it will dismiss eight of the nine counts asserted in the Complaint. And so, only a single count remains before the Court with respect to the instant Motion: Count II. As noted above, Count II is a claim brought pursuant to Section 1983 based on alleged violations of the Equal Protection Clause. Specifically, Plaintiff brings a so-called "class of one" equal protection claim. Via Count II, Plaintiff alleges that "[Defendant] intentionally subjected [Plaintiff] to materially different permitting treatment [under the Moratorium] than one or more similarly situated industrial developers, data-center developers and operators, including RadiusDC, while lacking a rational basis for the difference." (Doc. No. 1 at ¶ 86).

Before analyzing the parties' arguments as to Count II, the Court discusses first the Equal Protection Clause generally and then the particular kind of equal protection claim that Plaintiff brings here (as noted, a "class of one" claim).

#### *a. The Equal Protection Clause and "Class of One" Equal Protection Claims*

"The Equal Protection Clause prohibits discrimination by government which either burdens a fundamental right, targets a suspect class, or intentionally treats one differently than others similarly situated without any rational basis for the difference." *TriHealth, Inc. v. Bd. of Comm'rs, Hamilton Cnty., Ohio*, 430 F.3d 783, 788 (6th Cir. 2005) (citing *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 312 (6th Cir. 2005)). A "class of one" equal protection claim "differs from a traditional equal protection claim based on race, gender, or national origin." *Ziss Bros. Constr. Co. v. City of Indep., Ohio*, No. 1:07 CV 3767, 2010 WL 11538705, at *8 (N.D. Ohio Mar.

30, 2010), *aff'd sub nom. Ziss Bros. Const. Co. v. City of Indep., Ohio*, 439 F. App'x 467 (6th Cir. 2011). Specifically, and as the undersigned explained recently:

> A class-of-one theory describes the situation where a plaintiff brings an equal protection claim alleging some sort of discrimination against him or her as an individual; this is to be contrasted with the standard theory for an equal protection claim, where a plaintiff alleges discrimination against him or her based on his or her status as a member of a particular protected class (historically, a particular racial group or sex).

*Nichols v. Skrmetti*, No. 3:25-CV-442, 2025 WL 3299727, at *10 (M.D. Tenn. Nov. 26, 2025) (citing William D. Araiza, Flunking the Class-of-One / Failing Equal Protection, 55 Wm. & Mary L. Rev. 435, 438 (2013)).

The two elements of a "class of one" equal protection claim are: (1) a plaintiff was treated differently from others similarly situated;[30] and (2) there was no rational basis for that difference in treatment. *See Rubicon Real Est. Holdings, LLC v. City of Pontiac, Michigan*, 179 F.4th 431, 450 (6th Cir. 2026) (quoting *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).[31] With

[30] These similarly situated "others" from whom a plaintiff must have been treated differently in order to establish a "class of one" equal protection claim are sometimes referred to as "comparators."

[31] These elements are sometimes stated in terms of three, rather than two, elements, namely: "(1) the plaintiff is similarly situated to others; (2) the government intentionally treated the plaintiff differently than the others; and (3) the government did not have a rational basis for the difference in treatment." *Ziss Bros*, 2010 WL 11538705, at *8 (citing *Willowbrook*, 528 U.S. at 564). Herein, the Court will discuss the elements of a "class of one" equal protection claim not in terms of these three elements, but rather in terms of the two elements discussed above.

Of note, some out of circuit authority states that plaintiffs bringing a "class of one" equal protection claim are not required to identify similarly situated comparators in their complaint. *See e.g., Capra v. Cook Cnty. Bd. of Review*, 733 F.3d 705, 717 (7th Cir. 2013) ("[p]laintiffs alleging class-of-one equal protection claims do not need to identify specific examples of similarly situated persons in their complaints."). However, the Sixth Circuit has been clear that to survive a motion to dismiss, a plaintiff asserting a "class of one" equal protection claim must have identified in its complaint at least one similarly situated comparator whom defendant(s) treated differently from the plaintiff. *See Fouts v. Warren City Council*, 97 F.4th 459, 470-71 (6th Cir. 2024) (affirming a district court's 12(b)(6) dismissal of a "class of one" equal protection claim, on the ground—among others—that a plaintiff had failed to allege a comparator who was "similarly situated"); *Clark v. Johnston*, 413 F. App'x 804, 817-18 (6th Cir. Jan. 25, 2011) (finding that the plaintiff failed to state a "class of one" equal protection claim because his complaint did not "state any facts that could be used to infer an allegation that similarly situated prisoners were treated more favorably than [the plaintiff]").

respect to the second element, a plaintiff can establish a lack of rational basis by either "(1) 'negat[ing] every conceivable basis which might support the government action or [(2)] demonstrat[ing] that the challenged government action was motivated by animus or ill-will.'" *EJS Props., LLC v. City of Toledo*, 698 F.3d 845, 865 (6th Cir. 2012) (quoting *Warren v. City of Athens*, 411 F.3d 697, 711 (6th Cir. 2005)).

*b. The Court's Subject-Matter Jurisdiction*[32]

Before examining whether Plaintiff has stated a claim in Count II, the Court must first address the challenges to the Court exercising subject-matter jurisdiction over Count II[33] that Defendant has raised via the Motion. Those challenges raise the issues of so-called prudential ripeness (Doc. No. 22 at 5-8), so-called *Pullman* abstention (*id.* at 8- 9), and so-called *Younger* abstention. (*Id.* at 9-10). Defendant claims, alternatively, that prudential ripeness is lacking, that *Pullman* abstention is appropriate, and that *Younger* abstention is appropriate.

i. <u>Prudential Ripeness</u>

The Court begins with the first of Defendant's jurisdictional arguments: the absence (according to Defendant) of prudential ripeness. As the Sixth Circuit recently explained regarding ripeness, in both its constitutional and prudential incarnations:

> "[T]he ripeness doctrine traditionally incorporates both constitutional and prudential elements." *Kiser*, 765 F.3d at 606. The constitutional elements of ripeness encompass traditional parts of the standing inquiry: namely, whether a

[32] Below, the Court rejects the bases that Defendant has asserted for dismissal under Rule 12(b)(1). The Court sometimes does so on grounds that Plaintiff did not raise in its Response to the Motion. The Court feels justified so doing because as the Court discussed in an earlier footnote, prudential ripeness, *Pullman* abstention, and *Younger* abstention each implicate the Court's subject-matter jurisdiction, and the Court has a "'duty to consider' jurisdictional issues and may raise them '*sua sponte*.'" *Buck v. Goyim Def. League*, 815 F. Supp. 3d 702, 726 n.19 (M.D. Tenn. 2025) (quoting *Clark v. United States*, 764 F.3d 653, 657 (6th Cir. 2014)).

[33] Defendant raises challenges to this Court's exercise of subject-matter jurisdiction over this action in its entirety (i.e., as to each and every count). Here, however, the Court is (naturally) addressing at this juncture whether it should exercise subject-matter jurisdiction only with respect to Count II.

> plaintiff "is threatened with 'imminent' injury in fact." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128 n.8, 127 S. Ct. 764, 166 L.Ed.2d 604 (2007) (quoting *Lujan*, 504 U.S. at 560, 112 S. Ct. 2130); *accord Susan B. Anthony List*, 573 U.S. at 158–59, 134 S. Ct. 2334. If a case is "dependent on 'contingent future events that may not occur as anticipated, or indeed may not occur at all,' " it is not constitutionally ripe. *Trump v. New York*, 592 U.S. 125, 131, 141 S. Ct. 530, 208 L.Ed.2d 365 (2020) (per curiam) (quoting *Texas v. United States*, 523 U.S. 296, 300, 118 S. Ct. 1257, 140 L.Ed.2d 406 (1998)).
>
> On the other hand, prudential ripeness, although closely related, has been called into question in recent years. *See, e.g.*, *Susan B. Anthony List*, 573 U.S. at 167, 134 S. Ct. 2334 (commenting on the questions surrounding "the continuing vitality of the prudential ripeness doctrine"); *Lexmark*, 572 U.S. at 126, 134 S. Ct. 1377 (recognizing that prudential standing doctrines are "in some tension with our recent reaffirmation of the principle that a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging" (internal quotation marks and citations omitted)). Nonetheless, this court as well as other circuits have continued applying the doctrine particularly when important future intervening events, such as impending regulatory action, will clarify the dispute or obviate the need for weighing in on contingencies. *See Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 291–92 (6th Cir. 1997) ("We believe a federal court should not intervene and determine whether a statute enacted by Congress is unconstitutionally vague on its face before the agency with rulemaking authority has had an opportunity to interpret the statute."); *see also, e.g.*, *Bellion Spirits, LLC v. United States*, 7 F.4th 1201, 1209 (D.C. Cir. 2021) (considering whether claim was prudentially ripe post-*Lexmark*, and concluding claim was "fit for judicial decision because ... 'judicial intervention' would not 'inappropriately interfere with further administrative action' " (quoting *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733, 118 S. Ct. 1665, 140 L.Ed.2d 921 (1998))). Prudential ripeness is concerned with (1) whether a claim is fit for judicial review; and (2) the hardship to the parties. *Kiser*, 765 F.3d at 607 & n.2.

*Carman v. Yellen*, 112 F.4th 386, 400-01 (6th Cir. 2024). Here, as mentioned above, what is at issue is whether prudential ripeness is lacking such that the Court should decline to exercise subject-matter jurisdiction over Count II.

Of note, prudential ripeness (and for that matter constitutional ripeness) is assessed on a "claim-by-claim, rather than case-by-case, basis." *Revitalizing Auto Communities Env't Response Tr. v. Nat'l Grid USA*, No. 5:18-CV-1267, 2020 WL 2404770, at *7 (N.D.N.Y. May 12, 2020), *vacated and remanded on other grounds,* 10 F.4th 87 (2d Cir. 2021). And importantly, prudential

ripeness is not a doctrine that *divests* the Court of jurisdiction. Instead, prudential ripeness is a doctrine that permits the "dismissal [on the basis of *declining to exercise jurisdiction*] of jurisdictionally sound cases for practical reasons." *SW Nashville EB Owner, LLC v. Metro. Gov't of Nashville & Davidson Cnty.*, 187 F.4th 807, 812 (6th Cir. 2026).

As relevant to the instant case, which is an action involving land use, some types of claims brought in "'land-use cases' come with their own distinct rule for addressing [prudential] ripeness." *SW Nashville EB Owner, LLC v. Metro. Gov't of Nashville & Davidson Cnty.*, 187 F.4th 807, 813 (6th Cir. 2026) (citing *Cath. Healthcare Int'l, Inc. v. Genoa Charter Twp.*, 82 F.4th 442, 448 (6th Cir. 2023)). Specifically:

> In the land-use context, "the necessary event [for prudential ripeness to exist] is simply that the government has adopted a definitive position as to how the regulations at issue apply to the particular land in question." *Id.* (citation omitted). Courts refer to the need for a definitive land-use decision as the "finality requirement." *Pakdel v. City & County of San Francisco*, 594 U.S. 474, 478, 141 S. Ct. 2226, 210 L.Ed.2d 617 (2021).
>
> That finality requirement sets a "relatively modest" hurdle: "[A] federal court should not consider the claim before the government has reached a final decision" about the relevant property. *Id.* at 475, 478, 141 S. Ct. 2226 (citation omitted). Only "*de facto* finality is necessary," meaning a claim may proceed "[o]nce the government is committed to a position." *Id.* at 479, 141 S. Ct. 2226. So "[a]ll a plaintiff must show is that there is no question about how the regulations at issue apply to the particular land in question." *Id.* at 478, 141 S. Ct. 2226 (cleaned up). Enforcing that rule ensures that "a court knows the extent of permitted development on the land in question" before determining whether a compensable taking has occurred. *Palazzolo v. Rhode Island*, 533 U.S. 606, 618, 121 S. Ct. 2448, 150 L.Ed.2d 592 (2001) (citation omitted). After all, to determine if a government's regulation of property "has gone too far, the court must first know how far the regulation goes." *Pakdel*, 594 U.S. at 479, 141 S. Ct. 2226 (cleaned up).

*SW Nashville EB Owner, LLC*, 187 F.4th at 813-14.[34] Here, Defendant contends that the Court should decline to exercise jurisdiction over Plaintiff's claims based on a (purported) lack of

[34] Importantly, although the quoted language from *SW Nashville EB Owner, LLC* discussed the "finality" requirement in the specific context of a takings claim involving "land use," this "finality" requirement is also applicable in the context of equal protection claims involving "land use," like the claim brought by

prudential ripeness because as yet no final decision has been made as to Plaintiff's rights in the Property (whatever in particular those rights are). Specifically, Defendant argues:

> Here, [Defendant] has reached no final position. Under Tennessee law, the BZA is the tribunal empowered to review, modify, or reverse the Zoning Administrator's determinations. Tenn. Code Ann. §§ 13-7-206–207. The Zoning Administrator's determinations triggered timely appeals to the BZA, and those appeals remain pending. (Compl. ¶ 60.) Until the BZA decides those appeals, [Defendant] has not issued a definitive ruling on whether the proposed data center use was allowed under pre-moratorium law or whether Plaintiff currently has a vested, or grandfathered, right in the proposed data center use. This alone defeats ripeness: the Supreme Court holds that a claim is unripe where "avenues still remain" for local government to revise or clarify the decision. *Pakdel*, 594 U.S. at 480.
>
> The same principle governs Plaintiff's state-law theories: Under Tennessee law, whether a use is permitted, vested, grandfathered, or a reasonable extension of a pre-existing nonconforming use is a question committed to the BZA in the first instance. In *Trezevant Enterprises, Inc. v. City of Germantown*, the Court of Appeals held that a grandfathered-use claim was not ripe "because the city was never permitted to rule on the proposed non-conforming use." No. W2024-00420-COA-R3-CV, 2025 WL 1013956, at *1 (Tenn. Ct. App. 2025). And in *Lafferty v. City of Winchester*, the court emphasized that determining whether a proposed change "was a reasonable extension of a pre-existing nonconforming use" is a decision for the zoning board, with courts limited to reviewing whether the board acted illegally or arbitrarily. 46 S.W.3d 752, 757–58 (Tenn. Ct. App. 2000). Because the BZA has not yet issued a final ruling here, none of Plaintiff's federal or state-law claims are ripe for judicial review.

(Doc. No. 22 at 7). Ultimately, dismissal on the basis of a lack of prudential ripeness, although potentially warranted as to one or more of Plaintiff's other counts in the Complaint, is plainly unwarranted as to Count II. Count II does not depend on any BZA decision as to Plaintiff's property rights. That is to say, neither Plaintiff's theory of the wrongfulness of Defendant's

---

Plaintiff in Count II. *Golf Vill. N., LLC v. City of Powell, Ohio*, 338 F. Supp. 3d 700, 706 (S.D. Ohio 2018) (collecting cases).

Of note, some (but not all) Sixth Circuit authority suggests that the "finality" requirement is not applicable to due process claims, like Count I and Count III. *Id.* at 707 (discussing Sixth Circuit authority on this topic); *Wedgewood Ltd. P'ship I. v. Twp. of Liberty, Ohio*, 456 F. Supp. 2d 904, 921 n.19 (S.D. Ohio 2006) ("The Court notes that the Sixth Circuit has issued many inconsistent opinions on the issue of whether a plaintiff's procedural and/or substantive due process claims are subject to [] finality [] requirements." (collecting cases)). Ultimately, the Court need not resolve herein whether the "finality" requirement is applicable to the claims in Count I and III due to the Court's dismissal of those counts.

treatment of Plaintiff (i.e., allegedly unconstitutional unequal treatment vis-à-vis RadiusDC) underpinning Count II, nor Plaintiff's alleged injuries-in-fact underpinning Count II,[35] depend on any BZA decision on Plaintiff's property rights.

Rather, Count II is challenging the application of the Moratorium to Plaintiff in a way that (Plaintiff alleges) is "materially different [from] one or more similarly situated industrial developers, data-center developers and operators, including RadiusDC, while lacking a rational basis for the difference." (Doc. No. 1 at ¶ 86). Indeed, the only way that prudential ripeness's finality requirement would somehow be fatal to the Court exercising jurisdiction over Count II is if the application of the Moratorium to Plaintiff was somehow not final, and just as Plaintiff argues in its Response "[Defendant] committed to its position by applying the [Moratorium] to the [Plaintiff] and providing no effective means of administrative appeal [of the Moratorium]." (Doc. No. 24 at 5). What's more, there is no indication that the Moratorium will be displaced before it expires on December 1, 2026. (Doc. No. 1-1 at 1).

Defendant suggests that the fact that the Moratorium is a "short-term [] pause" (i.e., that the Moratorium is in effect only until December 1, 2026) means that the finality requirement has not been satisfied with respect to—among other counts—Count II. However, Defendant cites no persuasive authority in support of the suggestion that a "short-term" policy, like the Moratorium, categorically cannot effectuate the "finality" of decision that would supply prudential ripeness (i.e., enable the plaintiff to avoid dismissal on the grounds of lack of prudential ripeness). (Doc. No. 25 at 2). So, the Court is not persuaded by this particular argument, especially because here

[35] The Court discerns that Plaintiff's alleged injuries-in-fact are twofold, namely: (i) the injury that intrinsically (inherently) is suffered by unconstitutional unequal treatment; and (ii) various (alleged) monetary costs resulting from the particular (alleged) unconstitutional unequal treatment experienced by Plaintiff in this case. (Doc. No. 1 at ¶ 91).

there is no indication that Plaintiff somehow retains an avenue (aside from a court action) with which to challenge the Moratorium before it expires.

Put another way, the Court finds that at least for the purposes of Count II, the application of the Moratorium to Plaintiff satisfies the "relatively modest" finality hurdle to avoiding dismissal for lack of prudential ripeness, *SW Nashville EB Owner, LLC*, 187 F.4th at 814, and so, the Court finds no lack of prudential ripeness as would present a hurdle to the Court exercising subject-matter jurisdiction over Count II.

ii. *Pullman* Abstention

The Court now turns to Plaintiff's second 12(b)(1) argument: the applicability (according to defendant) of *Pullman* abstention. Named after the case—*Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, (1941)—from which the doctrine is derived, *Pullman* abstention is one of a handful of federal abstention doctrines whereby a federal court abstains from exercising jurisdiction over a case that is otherwise jurisdictionally sound. *See Clarkco Landfill Co. v. Clark Cnty. Solid Waste Mgmt. Dist.*, 110 F. Supp. 2d 627, 631 (S.D. Ohio 1999) (discussing abstention doctrines generally and noting that "[a]bstention doctrines are equitable principles whereby federal courts may, under certain circumstances, decline to exercise the subject matter jurisdiction which they otherwise possess." (citing *City of Chicago v. International College of Surgeons*, 522 U.S. 156 (1997))). With respect to *Pullman* abstention in particular, it "is appropriate only where state law is unclear and a clarification of that law would preclude the need to adjudicate the federal question." *Hunter v. Hamilton Cnty. Bd. of Elections*, 635 F.3d 219, 233 (6th Cir. 2011).

Here, Defendant contends that *Pullman* abstention is appropriate in this case because (according to Defendant):

> Numerous unsettled questions of Tennessee zoning law remain at issue here, including the meaning of "submission" versus "approval" and the scope of

> substantial-compliance vesting under the grandfathering statute. (*See* infra Section III.) No court has interpreted the relevant sections of Tenn. Code Ann. § 13-4-310 since its amendment in 2025. And resolution of those state-law issues will necessarily determine whether Plaintiff possesses any vested rights or lawful nonconforming-use ("grandfathered") protections, thereby eliminating the need for federal adjudication. As the Sixth Circuit explained in *Slyman v. City of Willoughby*, abstention is warranted when "resolution of the state law question . . . would obviate the need to decide Plaintiffs' federal claims." 134 F.3d 372, 379 (6th Cir. 1998) (applying *Pullman* abstention to allow state resolution of challenge to zoning ordinance). The same is true here: If Tennessee courts or the BZA conclude that Plaintiff lacks a vested right or protected use under state law, Plaintiff's takings and due process claims collapse entirely without further constitutional analysis. Accordingly, *Pullman* abstention is appropriate.

(Doc. No. 22 at 8-9). Ultimately, although *Pullman* abstention might be (or might have been) warranted as to one or more of Plaintiff's other counts,[36] it is not warranted with respect to Count II. Count II does not implicate any of the (purportedly) unclear portions of Tennessee law cited by Defendant in the Motion. Rather, Count II implicates the Moratorium and *only* the Moratorium. Defendant does not assert, and Court does not discern, that the Moratorium is unclear so as to implicate *Pullman* abstention. What's more, the Moratorium is *not* a state law, as required for *Pullman* abstention to be (potentially) applicable, but rather a municipal ordinance. The upshot is that *Pullman* abstention is not implicated by Count II, and so the Court will not decline to exercise jurisdiction over Count II on the basis of *Pullman* abstention.[37]

iii. *Younger* Abstention

That takes the Court to the final of Defendant's 12(b)(1) arguments: that the Court should abstain from exercising subject-matter jurisdiction on the basis of *Younger* abstention. Like

---

[36] The Court discerns that *Pullman* abstention is appropriately considered on a claim-by-claim basis. *See Slyman v. City of Willoughby, Ohio*, 134 F.3d 372 (6th Cir. 1998) (declining to exercise jurisdiction over some, but not all, claims on the basis of *Pullman* abstention).

[37] Plaintiff seems to have anticipated the particular basis on which the Court is rejecting Defendant's *Pullman* abstention argument. (Doc. No. 24 at 2 (arguing that issues of state law "will not resolve other bases for constitutional relief[, like those raised in Count II], including targeted government animus, discriminatory enforcement, and arbitrary conduct."), 7 (similar)).

*Pullman* abstention, *Younger* abstention is a doctrine whereby a federal court abstains from exercising jurisdiction over a case that is otherwise jurisdictionally sound. *See Johnson v. Collins,* No. CIV. 15-31-ART, 2015 WL 4546794, at *4 (E.D. Ky. July 28, 2015) ("Even if the Court had jurisdiction over the case, . . . the Court would still be required to abstain under the doctrine established in *Younger v. Harris*. 401 U.S. 37 (1971)"), *aff'd* (Feb. 2, 2016).

In *Younger*, the Supreme Court "held that absent extraordinary circumstances[,] federal courts should not enjoin pending state criminal prosecutions." *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 364 (1989) (citing *Younger*, 401 U.S. at 43–44). The underlying concern of *Younger* is the "threat to our federal system posed by displacement of state courts by those of the National Government." *Moore v. Sims*, 442 U.S. 415, 423 (1979). Expressing this concern slightly differently, the Sixth Circuit has stated that "*Younger* abstention derives from a desire to prevent federal courts from interfering with the functions of state criminal prosecutions and to preserve equity and comity." *Doe v. Univ. of Kentucky*, 860 F.3d 365, 368 (6th Cir. 2017). Accordingly, when it does apply, "*Younger* abstention requires the federal court to defer to the state proceeding." *Coles v. Granville*, 448 F.3d 853, 865 (6th Cir. 2006). Importantly, *Younger* abstention is applied on a claim-by-claim basis. *Stark v. City of Memphis*, No. 19-2396-JTF-TMP, 2020 WL 8770177, at *4 (W.D. Tenn. Feb. 18, 2020), *report and recommendation adopted*, No. 219CV02396JTFTMP, 2021 WL 597880 (W.D. Tenn. Feb. 16, 2021). Although *Younger* originally was contemplated to apply to state-court *criminal* proceedings, the Supreme Court over the years has extended the doctrine to quasi-criminal contexts and even some strictly civil contexts.

To determine whether *Younger* abstention applies, a court in the Sixth Circuit should take a two-step approach. It first asks whether the state proceedings at issue fall within the "exceptional"

categories outlined by the Supreme Court as implicating *Younger* abstention. *Woodcock v. Univ. of Kentucky*, No. 26-5057, 2026 WL 2474872, at *2 (6th Cir. Aug. 24, 2026) (citing *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 73 (2013)), *reh'g denied*, No. 26-5057, 2026 WL 2821944 (6th Cir. Sept. 10, 2026). These categories include "(1) 'state criminal prosecutions,' (2) 'civil enforcement proceedings,' and (3) 'civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions.'" *Woodcock*, 2026 WL 2474872, at *2 (quoting *Sprint Commc'ns Inc.*, 571 U.S. at 73). If the court is satisfied that the state proceedings at issue fall into one of these categories, then the court turns to the second (and final) step, which entails examining whether three requirements are satisfied so as for *Younger* abstention to be applicable. These three requirements are: "(1) [the existence of related] on-going state judicial proceedings; (2) [that] those proceedings . . . implicate important state interests; and (3) [the existence of] an adequate opportunity in the state proceedings to raise constitutional challenges." *O'Neill v. Coughlan*, 511 F.3d 638, 643 (6th Cir. 2008) (quoting *Sun Refining & Mktg. Co. v. Brennan*, 921 F.2d 635, 639 (6th Cir. 1990)).

Crucially, in addition to considering the two steps laid out above, "[i]n deciding whether the *Younger* abstention applies, a court must determine, at the threshold, whether litigating claims that are present could interfere with an ongoing state proceeding." *Formosa v. Lee*, No. 3:22-CV-00213, 2023 WL 2390674, at *3 (M.D. Tenn. Mar. 7, 2023), *aff'd,* No. 23-5296, 2024 WL 113788 (6th Cir. Jan. 10, 2024) (quoting *Koranda v. City of Chicago*, No. 05-C-1856, 2005 WL 6242047, at *3 (N.D. Ill. Aug. 2, 2005)). *See also Woodcock v. Univ. of Kentucky*, 820 F. Supp. 3d 555, 568 (E.D. Ky. 2026) ("Thus, the threshold issue in any *Younger* analysis is the 'question of whether "interference" exists."' (quoting *Merck Sharp & Dohme Corp. v. Conway*, 909 F. Supp. 2d 781, 784 (E.D. Ky. 2012)), *rev'd and remanded on other grounds,* No. 26-5057, 2026 WL 2474872

(6th Cir. Aug. 24, 2026); *Berrada Properties Management Inc. v. Romanski*, 608 F. Supp. 3d 746, 752 (E.D. Wisc. 2022) ("As a threshold matter, *Younger* is inapposite unless the federal plaintiff's requested relief would actually interfere with an ongoing state court proceeding.").

Here, Defendant argues that *Younger* abstention precludes the Court from exercising jurisdiction over Plaintiff's claims (including Count II) owing to the ongoing BZA appeals (discussed above). Specifically, Defendant asserts, discussing the second part of the two-part approach detailed above:

> *Younger* abstention [] independently bars federal intervention. The Sixth Circuit applies a three-[requirement] test: Abstention is mandatory where state proceedings are "(1) currently pending; (2) involve an important state interest; and (3) will provide the federal plaintiff with an adequate opportunity to raise his or her constitutional claims." *Nimer v. Litchfield Twp. Bd. of Trs.*, 707 F.3d 699, 701 (6th Cir. 2013) (citing Habich v. Dearborn, 331 F.3d 524, 530 (6th Cir. 2003)). The first prong is analyzed under the "day-of-filing" rule. *Fed. Express Corp. v. Tenn. Pub. Serv. Comm'n*, 925 F.2d 962, 969–70 (6th Cir. 1991). The Sixth Circuit has recognized that administrative actions related to land-use regulation may trigger *Younger* abstention, *see Miles Christi*, 629 F.3d at 542, and has described a constitutional challenge to zoning enforcement, brought while zoning board appeals were pending, as a "textbook candidate for [*Younger*] abstention." *Ken-N.K., Inc. v. Vernon Twp.*, 18 F. App'x 319, 324 (6th Cir. 2001).
>
> All three elements are met. First, BZA appeals challenging the Zoning Administrator's use classification are pending. (Compl. ¶ 60.) Tennessee statutes authorize such appeals and require the BZA to notify parties of their right to judicial review. Tenn. Code Ann. §§ 13-7-206(b), -207(a)–(b). Second, zoning enforcement is a core local interest: a city "does have a substantial interest in enforcing its zoning laws without federal interference in the state's judicial processes." *Nimer*, 707 F.3d at 701 (cleaned up); *see also Ken-N.K.*, 18 F. App'x at 324 (holding that "the application of zoning ordinances and land-use regulations" constitute an "an important state and local interest"). Third, Tennessee provides adequate avenues to litigate federal constitutional claims through certiorari review; Plaintiff bears the burden of showing inadequacy and has not met it. *Fed. Express*, 925 F.2d at 970; *Moore v. Sims*, 442 U.S. 415, 430 (1979).

(Doc. No. 22 at 9-10). At base, Defendant's argument for *Younger* abstention fails at the threshold, at least as to Count II. This is because, in the Court's view, there is no way in which the Court's adjudication of Count II would interfere with the at-issue state proceeding in this matter, namely

the ongoing BZA appeals. As Plaintiff alleges (and Defendant does not dispute in its Motion) the BZA appeals concern "the Zoning Administrator's determinations for the Property." (Doc. No. 1 at ¶ 60). But Count II *does not* concern any of the Zoning Administrator's determinations for the Property. Rather, and as the Court has mentioned elsewhere herein, Count II is challenging the application of the Moratorium to Plaintiff in a way that (Plaintiff alleges) is "materially different [from] one or more similarly situated industrial developers, data-center developers and operators, including RadiusDC, while lacking a rational basis for the difference." (Doc. No. 1 at ¶ 86).

So, because litigating Count II will not interfere with the ongoing BZA appeals, the Court will not decline to exercise jurisdiction over Count II on the basis of *Younger* abstention.[38]

*c. Whether Plaintiff has Stated a Claim in Count II*

Having reviewed—and dispensed with—Defendant's Rule 12(b)(1) arguments, the Court now turns to Defendant's arguments, raised under Rule 12(b)(6), that Count II should be dismissed for failure to state a claim.

As noted above, the two elements of a "class of one" equal protection claim are: (1) the plaintiff was treated differently from others similarly situated; and (2) there was no rational basis for this difference in treatment. *Rubicon Real Est. Holdings*, 179 F.4th at 450. Here, the parties dispute both whether Plaintiff has identified anyone *similarly situated* to Plaintiff (i.e., a similarly situated comparator) from whom Plaintiff was treated differently and whether there was a rational basis for Defendant's (alleged) difference in treatment. (Doc. No. 22 at 20-22; Doc. No. 24 at 21-22; Doc. No. 25 at 6-7). The Court begins and ends with the question of whether Plaintiff has identified a comparator similarly situated to Plaintiff.

[38] Plaintiff did not assert the particular bases on which the Court is rejecting Defendant's *Younger* abstention argument. Nevertheless, and consistent with the Court's discussion in a footnote above, the Court feels justified in rejecting Defendant's *Younger* abstention argument on these particular bases *sua sponte*.

As to such a question, the Sixth Circuit requires that a so-called comparator "must be 'similarly situated [to a plaintiff] in all relevant respects.'" *Fouts*, 97 F.4th at 470 (quoting *EJS Props.*, 698 F.3d at 865). On the other hand, this requirement does not "demand exact correlation [between a comparator and a plaintiff]." *EJS Props.*, 698 F.3d at 865 (quoting *Perry v. McGinnis*, 209 F.3d 597, 601 (6th Cir. 2000)).

Here, as the Court noted above, the comparator put forward by Plaintiff is RadiusDC.[39] Plaintiff specifically alleges regarding RadiusDC:

> 72. Upon information and belief, RadiusDC operates or is developing a data-center facility at 2902 Brick Church Pike in Nashville and received permit processing activity and/or trade permit approvals after the Mayor approved BL2026-1448, while [Plaintiff's] permits were placed on hold.
>
> 73. Like [the Property], RadiusDC's property at 2902 Brick Church Pike is zoned IWD. It too has a pending building application that was submitted prior to the change to the Metro Zoning Code on July 24, 2026, that prevents data-center on its property.
>
> 86. Metro intentionally subjected [Plaintiff] to materially different permitting treatment than one or more similarly situated industrial developers, data-center developers and operators, including RadiusDC, while lacking a rational basis for the difference.
>
> 88. [Defendant] continued to process and/or approve material permit activity for RadiusDC after BL2026-1448 while holding [Plaintiff's] permit applications and refusing comparable processing.

---

[39] In the Complaint, Plaintiff obliquely refers to other "similarly situated industrial developers, data-center developers and operators" beyond RadiusDC from whom Plaintiff (allegedly) has been treated differently. (Doc. No. 1 at ¶ 86). These allegations are conclusory (and devoid of factual enhancement) and do not help Plaintiff to meet its burden at the 12(b)(6) stage to identify a similarly situated comparator. Further, Plaintiff does not discuss these other "similarly situated industrial developers, data-center developers and operators" (Doc. No. 1 at ¶ 86) even once in its Response to the Motion. Thus, the Court's analysis of whether Plaintiff has sufficiently alleged a similarly situated comparator is focused (and hinges) on the allegations set forth in the Complaint regarding RadiusDC.

(Doc. No. 1 at ¶¶ 72, 73, 86, 88). As an initial matter, the Court notes that the Complaint identifies only one permit for which RadiusDC was approved, and it was a "trade permit." (*Id.* at ¶ 72).[40] This immediately presents an issue for Plaintiff, as Defendant points out in the Motion. (Doc. No. 22 at 21). Why? Because the Moratorium, by its terms, applies to only "the acceptance, processing, approval, and issuance of *zoning, building, or grading* permits or administrative appeals." (Doc. No. 1-1 at 1 (emphasis added)). That is to say, the Moratorium does *not* apply to trade permits. What's more, and just as Defendant argues, "Plaintiff does not allege that it had trade-permit applications that were denied, while RadiusDC's were approved." (Doc. No. 22 at 21). Indeed, regarding Plaintiff's permit applications, the only of these permit applications that Plaintiff alleges are implicated (i.e., were put on hold) by the Moratorium seem to be the applications submitted on May 11, 2026 (for grading permits), the applications submitted on May 29, 2026 (for building permits), and the application submitted on July 17, 2026 (for a building permit). (Doc. No. 1 at ¶¶ 11, 33, 35, 57). Crucially, these applications are for permits—*contra* a trade permit—to which the Moratorium, by its plain terms, applies. Given these circumstances, the Court cannot find that RadiusDC is similarly situated to Plaintiff.

Plaintiff argues, in contrast to the Court's conclusion:

> [Defendant's] argument that RadiusDC is not a valid comparator because it received only "trade permits" elevates form over substance. Both [Plaintiff] and RadiusDC's applications were for data-center projects on property zoned IWD (Complaint ¶ 73). Both submitted building permit applications before the moratorium. *Id.* By the plain reading of the legislation, both were subject to the

[40] Importantly, although the Complaint alludes to RadiusDC potentially receiving other permit approvals beyond an approved trade permit, (Doc. No. 1 at ¶ 72 (discussing "permit processing activity"); ¶ 88 (discussing "material permit activity")), in its Motion, Defendant asserts that "RadiusDC (Plaintiff's sole proposed comparator) allegedly received *only* trade-permit approvals" (Doc. No. 22 at 21 (emphasis added)). And, Plaintiff does not seem to dispute Defendant's characterization, although Plaintiff seems to identify RadiusDC's trade-permit approval as constituting (or being related to) "electrical permit(s)." (Doc. No. 24 at 21-22). Given these circumstances, the Court understands that the only permit Plaintiff identifies in its Complaint that RadiusDC was approved for was a "trade permit," and the Court will conduct its analysis accordingly.

> moratorium. Yet [Defendant] continued processing RadiusDC's permits, including issuing an electrical permit on August 4–5, 2026, while freezing [Plaintiff's] applications and placing them on indefinite hold. (Complaint ¶ 72). The Sixth Circuit requires "relevant similarities," not identical circumstances. *EJS Properties*, 698 F.3d at 865. This kind of factual assessment [into whether the named comparator actually is similarly situated] is not proper at the pleading stage.

(Doc. No. 24 at 21-22). Plaintiff's argument is unavailing. Whether the permit RadiusDC was issued was actually subject to the Mortarium is not just relevant, but indeed *critical* to the similarly situated inquiry. The fact that RadiusDC received a *trade permit*, which is not implicated by the Moratorium, coupled with the fact that Plaintiff has not alleged that Plaintiff was denied trade permit approvals on the basis of the Moratorium, is fatal to Plaintiff's attempt to establish, even at the 12(b)(6) stage, that RadiusDC is "similarly situated in all relevant respects" to Plaintiff as required to state a "class of one" equal protection claim. *Fouts*, 97 F.4th at 470.

Additionally, although Plaintiff suggests that it is inappropriate for the Court to consider whether RadiusDC is similarly situated to Plaintiff at this stage of the case (Doc. No. 24 at 22 ("This kind of factual assessment [into whether the named comparator actually is similarly situated] is [premature] at the pleading stage")), the Court rejects this suggestion given the Court's observation in an earlier footnote that the Sixth Circuit has been clear that even at the motion to dismiss stage, a plaintiff asserting a "class of one" equal protection claim must identify *in their complaint* a similarly situated comparator who defendant(s) treated differently from plaintiff. *See Fouts*, 97 F.4th at 470-71 (affirming a district court's 12(b)(6) dismissal of a "class of one" equal protection claim, on the ground—among others—that a plaintiff had failed to allege a comparator who was "similarly situated"); *Clark*, 413 F. App'x at 817-18 (finding that plaintiff did not state a "class of one" equal protection claim as his complaint did not "state any facts that could be used to infer an allegation that similarly situated prisoners were treated more favorably than [plaintiff]"). True, Plaintiff need not set forth factual matter that *conclusively* establishes that the

comparator actually was similarly situated, but under *Iqbal* and *Twombly* it *does* need to set forth factual matter that at least *plausibly suggests* that this was the case, and Plaintiff failed to do so.

In short, for this claim, Plaintiff needs both to identify a comparator that was treated differently (i.e., better) than Plaintiff was *under the Moratorium* and to set forth factual matter plausibly suggesting that that comparator was *actually* similarly situated in all respects. But Plaintiff has not done so, and so the Court will dismiss Count II for failure to state a claim.[41]

---

[41] Plaintiff makes one final attempt to head off the dismissal of Count II. Plaintiff argues that, even if Plaintiff has not adequately alleged the existence of a similarly situated comparator, Plaintiff has alleged that Defendant had, in applying the Moratorium to Plaintiff, a constitutionally impermissible animus towards Plaintiff. (Doc. No. 24 at 22). Plaintiff argues that this "provides an independent basis for [an] equal protection claim" even where a plaintiff has not adequately alleged the existence of a similarly situated comparator. (*Id.* (citing *Paterek v. Village of Armada*, 801 F.3d 630, 650 (6th Cir. 2015))). This argument is unavailing.

The theory that Plaintiff advances—i.e., that a plaintiff need not advance allegations identifying a similarly situated comparator if a plaintiff is alleging government animus—is unmeritorious. In asserting this theory, Plaintiff relies on *Paterek v. Village of Armada*, 801 F.3d 630 (6th Cir. 2015). In *Paterek*, the Sixth Circuit held that "[t]o succeed on [a "class of one" equal protection] claim, a plaintiff must allege either disparate treatment from similarly situated individuals and that the government actors had no rational basis for the difference, *Assoc. of Cleveland Fire Fighters v. City of Cleveland, Ohio*, 502 F.3d 545, 549 (6th Cir. 2007), or that the 'challenged government action was motivated by animus or ill-will,' *EJS Properties, LLC v. City of Toledo*, 698 F.3d 845, 864 (6th Cir. 2012)." *Paterek*, 801 F.3d at 650. Admittedly, the language in *Paterek* suggests that a "class of one" equal protection claim can be sustained solely on the basis that the challenged government conduct was motivated by animus or ill-will, even where a plaintiff does not make out disparate treatment from someone similarly situated. However, the Court discerns that what *Paterek* is *really* saying (even if inartfully) is that to state (or otherwise succeed on) a "class of one" equal protection claim, a plaintiff must allege (or establish) (1) that it was treated differently from others similarly situated; and (2) that there was no rational basis for this difference in treatment, and that the *latter element* can be shown by either "(1) 'negat[ing] every conceivable basis which might support the government action or [(2)] demonstrat[ing] that the challenged government action was motivated by animus or ill-will.'" *EJS Props.*, 698 F.3d at 865 (quoting *Warren*, 411 F.3d at 711). In this interpretation, showing government animus is simply not a valid alternative to showing treatment different from that afforded to one or more comparators; it is, instead, an alternative to negating every conceivable basis that might support the government action. The Court's interpretation of *Paterek* (and "class of one" equal protection claims generally) is buttressed by a recent—albeit unreported—Sixth Circuit opinion where the Sixth Circuit explained, just as the Court does in this footnote, that in the context of a "class of one" equal protection claim, "[a] class of one plaintiff may demonstrate that a government action lacks a rational basis in one of two ways: either by negativing every conceivable basis which might support the government action *or* by demonstrating that the challenged government action was motivated by animus or ill-will." *Shavers v. Almont Twp., Michigan*, 832 F. App'x 933, 938 (6th Cir. 2020) (quoting *Warren*, 411 F.3d at 711) (emphasis added).

Additionally, the Court's conclusion as to what *Paterek* is conveying is further buttressed by case law from the Sixth Circuit and from district courts in the Sixth Circuit. Specifically, district courts in this circuit have previously recognized (including in a case post-dating *Paterek*) that a "class of one" equal protection

CONCLUSION

For the reasons stated above, Defendant's Motion (Doc. No. 22) will be **GRANTED IN PART AND DENIED IN PART**, as reflected in the following two sentences. The Motion will be granted to the extent that it requests the dismissal of Count II pursuant to Rule 12(b)(6), and Count II of the Complaint will be dismissed pursuant to Rule 12(b)(6). The Motion will be denied in that the Court will not dismiss any of the other counts in the Complaint on any of the particular (purported) bases for dismissal asserted by Defendant in its Motion.

Additionally, for the reasons stated above, Count I, Count III, and Count IV will be dismissed. Such dismissal is without prejudice to Plaintiff filing, within twenty-one days of the entry of this memorandum opinion (and the accompanying order) an amended complaint reasserting these counts in a manner that addresses the above-identified deficiencies with respect to these counts. To the extent that Plaintiff does file an amended complaint reasserting one or more of Count I, Count III, and/or Count IV, Defendant shall then have twenty-one days from such filing to respond, by filing either an answer or a motion to dismiss, to the amended complaint. To the extent that Plaintiff ultimately forgoes timely reasserting any or all of these counts in an amended

---

claim requires a plaintiff to identify a similarly situated comparator and that this requirement cannot be avoided merely because the plaintiff alleges (or shows) government animus or ill-will. *See e.g., Fiore v. City of Detroit*, No. 18-11565, 2018 WL 5014196, at *5 (E.D. Mich. Oct. 16, 2018) (recognizing these principles when considering a motion for a preliminary injunction); *Foster v. Judnic*, 963 F. Supp. 2d 735, 760-62 (E.D. Mich. 2013) (recognizing these principles when considering a motion for summary judgment), *aff'd sub nom. Foster v. Michigan*, 573 F. App'x 377 (6th Cir. 2014). Furthermore, the Sixth Circuit reaffirmed in a case post-dating *Paterek*—albeit in adjudicating an appeal of a decision on a motion for summary judgment—that "to state a class-of-one equal protection claim, a party *must* show that 'the government treated similarly situated persons differently.'" *Superior Commc'n v. City of Riverview, Mich.*, 881 F.3d 432, 446 (6th Cir. 2018) (quoting *Braun v. Ann Arbor Charter Twp.*, 519 F.3d 564, 574 (6th Cir. 2008)) (emphasis added).

That is all to say that the Court does not discern any scenario where allegations of government animus or ill-will *without* accompanying allegations plausibly alleging a similarly situated comparator is enough to sustain a "class of one" equal protection claim. And so, Plaintiff's argument on this point is unavailing.

complaint (therein addressing the deficiencies that the Court has identified herein), those counts that Plaintiff forgoes timely reasserting in an amended complaint will be dismissed conclusively.

Further, for the reasons discussed above, the Court will decline to exercise jurisdiction over Count V, Count VI, Count VII, Count VIII, and Count IX of the Complaint, and the Court will accordingly dismiss these counts without prejudice.

Moreover, given that all of the counts that Plaintiff has asserted in its Complaint have been dismissed (in one form or another), Plaintiff's pending motion for a preliminary injunction (Doc. No. 12) will be **DENIED** as moot. Such denial is without prejudice to Plaintiff filing a renewed motion for a preliminary injunction in the event that Plaintiff ultimately does reassert any of Count I, Count III, or Count IV in a timely amended complaint.[42]

Finally, the Court notes that the decisions herein have nothing to do with the desirability (or lack thereof) of building (and maintaining) data centers in general or the particular proposed data center implicated in this case. Instead, those decisions are based on the Court's resolution of a multitude of legal issues that were apparent from the Complaint and accordingly were raised either by the Motion or the Court *sua sponte*. With that said, the Court wishes to make one more observation. Plaintiff may believe, and is entitled to believe and contend, that it received a raw deal from (or was sandbagged by), the imposition of the Moratorium after it purchased the

[42] The Court observes that in Plaintiff's motion for a preliminary injunction, the primary (though not necessarily exclusive) request seemed to be for an injunction restraining Defendant from applying the Moratorium to Plaintiff and the Property. (Doc. No. 12 at 1, 2-3).

With that said, and given the denial of Plaintiff's motion for a preliminary injunction, the Court wishes to make another observation. Specifically, the Court notes that again seeking preliminary injunctive relief targeted at the Moratorium itself may not, upon the filing of any amended complaint, behoove Plaintiff. The Court so notes because the Moratorium, as discussed elsewhere, expires on December 1, 2026. (Doc. No. 1-1 at 1). Indeed, by the time of completion of briefing on any renewed motion for a preliminary injunction, the Moratorium would in all likelihood have less than a month left to be in effect. Given the Court's scarce judicial resources (and many other pressing matters), the Court is uncertain that any order on a renewed motion for a preliminary injunction would be entered prior to the expiration of the Moratorium.

Property. However, a raw deal or sandbagging—real or imagined, without more—does not a federal lawsuit make. Instead, the metaphorical raw deal and sandbagging must involve facts that plausibly suggest actual entitlement to relief, based on one or more comprehensible legal theories, from a court that can and should exercise jurisdiction over the claims arising out of that raw deal and sandbagging. Where, as here, the court concludes that that is simply not the case, the plaintiff will be unsuccessful.

An appropriate accompanying order will be entered.

Eli Richardson

ELI RICHARDSON
UNITED STATES DISTRICT JUDGE